IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JAMES G. HOWE,                )
TIMOTHY CHARLES,              )
JACOB KALLAL and              )
GEORGE NEEDS,                 )
                              )  Case No. 14-CV-844-SMY-RJD
            Plaintiffs,       )
                              )
vs.                           )
                              )
DR. C. THOMAS HOLT,           )
JOHN BALDWIN and              )
JASON C. GARNETT              )
                              )
            Defendants.       )

# MEMORANDUM AND ORDER

**YANDLE, District Judge:**

This action was filed by several individuals in the Big Muddy River Correctional Center Sexually Dangerous Persons Program ("SDPP"). Plaintiffs are civil detainees classified as "sexually dangerous persons" under the Sexually Dangerous Persons Act, 725 ILCS 205/0.1, *et seq*. They claim that the SDPP provides constitutionally deficient treatment and that the program is punitive in nature. Plaintiffs also allege that their rights pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq*., and the Rehabilitation Act ("RA"), 29 U.S.C. § 794, *et seq.* are being violated. They seek a declaratory judgment and injunctive relief.

Plaintiffs James G. Howe, Timothy Charles, Jacob Kallal, Tony Harden, Charles Bone and George Needs filed their Complaint on July 25, 2014. The Complaint was screened pursuant to 28 U.S.C. § 1915A, and Plaintiffs were found to have articulated the following colorable claims:

**Count 1:** Defendants violated Plaintiffs' right to receive treatment as sexually dangerous persons;

**Count 2:** Defendants violated Plaintiffs' right to receive treatment for their mental illnesses and disorders under the Eighth and Fourteenth Amendments;

**Count 3:** Defendants violated Plaintiffs' rights under the Eighth and Fourteenth Amendments by failing to adequately train or supervise their employees regarding the proper care and treatment of sexually dangerous persons with mental illnesses or disorders;

**Count 4:** Defendants violated Plaintiffs' liberty interests under the Fourteenth Amendment by subjecting them to a punitive environment; and

**Count 5:** Defendant Baldwin violated Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act by denying adequate program funding, reasonable housing, and access to programs.

(Doc. 26). Plaintiffs Tony Harden and Charles Bone later withdrew from the case (Docs. 73 and 89).

The defendants, Dr. C. Thomas Holt (Big Muddy Sexually Dangerous Persons Program Administrator), John Baldwin (IDOC Director), and Jason C. Garnett (Big Muddy Warden), all sued in their official capacities, now seek summary judgment (Doc. 117). Defendants have also filed a motion to strike some of the materials that were submitted with the Plaintiffs' response (Doc. 129), and Plaintiff James Howe has filed a Motion for Preliminary Injunctive Relief (Doc. 134).

For the following reasons, the Defendants' Motion to Strike (Doc. 129) is **DENIED**; Plaintiff Howe's Motion for Preliminary Injunctive Relief (Doc. 134) is **DENIED**; and Defendants' Motion for Summary Judgment (Doc. 117) is **GRANTED in part and DENIED in part**.

## Background

Plaintiffs are participants in the Big Muddy SDPP. Pursuant to the Sexually Dangerous Persons Act, individuals found, to be "sexually dangerous persons" may be subject to civil commitment:

> "When any person is charged with a criminal offense and it shall appear to the [prosecutor] that such person is a sexually dangerous person, within the meaning of this Act, then the [prosecutor] may file with the clerk of the court in the same proceeding wherein such person stands charged with criminal offense, a petition in writing setting forth facts tending to show that the person named is a sexually dangerous person."

725 ILCS 205/3.01. The Act defines "sexually dangerous person" as someone suffering from a mental disorder for at least one year, "coupled with criminal propensities to the commission of sex offenses, and who have demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children [.]" 725 ILCS 205/1.01.

After a local state's attorney's office (or the Illinois Attorney General's office) files a petition to commit an individual to confinement as a sexually dangerous person, the individual has a right to an attorney and a jury trial. 725 ILCS 205/5. Although these are civil proceedings, the evidentiary burden on the state is proof beyond a reasonable doubt. 725 ILCS 205/3.01.

If the individual is found to be a sexually dangerous person, they are placed in the custody of the Illinois Department of Corrections for an indefinite duration. 725 ILCS 205/8. If a committed individual believes that they have recovered and are no longer dangerous, they may petition the committing court for a new hearing. 725 ILCS 205/9(a). A committed individual may only file such a petition if two years have lapsed since the prior court determination that he or she was a sexually dangerous person, or sooner if approved by the treatment provider. 725 ILCS 205/9(d).

If the committing court finds that the individual is no longer dangerous, the court shall order that they be discharged. 725 ILCS 205/9(e). The court may also discharge the individual under supervised release if "the person appears no longer to be dangerous but that it is impossible to determine with certainty … that the person has fully recovered [.]" *Id*.

At all times relevant to this case, Big Muddy maintained the only SDPP in Illinois. (Affidavit of Dr. Holt, Doc. 118-5). As of June, 2016, there were approximately 174 participants in the program. *Id*. at p. 2. Program participants are generally housed in separate wings of the facility, apart from the general population prisoners. *Id*. at p. 5. They do not eat or have yard time with the inmates in general population. *Id*. at p. 4. Because the program is located inside a prison, program participants are subject to the Big Muddy security guidelines. *Id*. at p. 3. For instance, if the facility is on lockdown, the SDPP will also be placed on lockdown and treatment sessions may be cancelled. *Id*. at p. 3. Program participants are also subject to the facility's property restrictions and disciplinary rules. *Id*. at p. 4. This includes periodic shakedowns and possible disciplinary segregation for rule infractions. *Id*. at p. 4.

Defendant Dr. C. Thomas Holt manages the SDPP at Big Muddy. (Doc. 118-5, p. 1). According to his affidavit, Dr. Holt has a PH.D in psychology and 25 years of experience in sex offender treatment. *Id*. pp. 1-2. Under his management, the SDPP utilizes five full-time, licensed sex-offender treatment providers. *Id*. at p. 2.

When an individual first arrives in the SDPP, they undergo an initial evaluation. *Id.* at p. 2. If they decide to participate in treatment, they will be assigned a primary therapist and placed with a core group. *Id*. at p. 2. The SDPP implements 20 "core therapy groups" and 26 "elective, skill or program groups." *Id*. at p. 2. Dr. Holt utilizes four-phase treatment progression system, encompassing 28 different treatment subjects. *Id*. at p. 3. "In general, SDPs will move from

lower to higher phases as they engage in the treatment process." *Id*. at p. 3. The committing court ultimately decides whether someone is eligible for release. *Id*. at p. 3.

Timothy Charles[1] arrived at Big Muddy in 1997. (Charles Deposition, Doc. 118-2, p. 3). Charles testified at his deposition that the quality of treatment in the SDPP declined around 2012 – 2013 when Dr. Carich, the previous program administrator, retired and Dr. Holt was hired to fill the position. *Id*. at p. 4. Charles received approximately three hours of treatment a week under Dr. Carich, but now only receives one hour of treatment per week. *Id*. at p. 4. Charles could apply for additional therapy programs, but states, "[I] have been through all of that stuff, and I'm just not going to go back through all that stuff." *Id*. at p. 7.

Charles receives progress evaluations every six months. (Doc. 118-2, p. 7). At the time his deposition was taken in 2016, Charles was working with therapist Jessica Stover. *Id*. at p. 9. Charles does not receive any direct treatment from Dr. Holt. *Id*. Therapy sessions take place in a group setting with approximately 16 to 17 individuals. *Id*.

SDPP detainees are assigned to 4 house at Big Muddy. *Id*. at p. 10. General population inmates are housed in wings A and D in 4 house. *Id*. The SDPP participants are assigned to Wings B and C. *Id*. Inmates in general population are not currently housed in B and C wings, but according to Charles, until late 2015 or early 2016, some general population inmates were housed in B wing. *Id*. Charles has never been placed in a cell with a general population inmate. *Id*. at p. 11.

Charles is dissatisfied with many of the general conditions of confinement at Big Muddy. He is almost 70 years old, suffers from COPD, asthma, high blood pressure, hypertension, and

---

[1] According to Dr. Holt's affidavit, Charles was placed in the Sexually Dangerous Persons Program in 1997 after being charged with aggravated criminal sexual abuse. (Doc. 118-5, p. 5). "On September 9, 2014, his most recent independent evaluation, Mr. Charles was diagnosed by the independent evaluator as having pedophilic disorder, non-exclusive type, sexually attracted to both." *Id*.

uses a wheelchair for mobility. *Id*. at pgs. 11 and 13. He is subject to a co-pay for medical appointments, and is required to pay $5.00 for replacement ID cards and $10.00 for replacement keys. *Id*. at p. 4. Occasionally, the food service workers serve smaller portions to the individuals in 4 house, knowing that 4 house includes those in the SDPP. *Id*. at p. 6. Charles would like to receive better therapy services and treatment so that he could make progress toward his release. (Doc. 118-2, p. 13). He believes that the facility should offer additional treatment courses and he would like to see overall improvements in living arrangements because the conditions in the SDPP are not much different than those in general population. *Id*. at p. 13.

Plaintiff Jacob Kallal[2] has been civilly committed at the Big Muddy SDPP since 2001. During his deposition, Kallal reiterated much of Charles' testimony. He described the general layout of 4 house as an "X" shape with wings A through D extending outwards from the center of the "X." (Doc. 118-3, p. 4). In the center of the "X" is a "bubble" where corrections staff maintain an office. *Id*. Kallal was never housed in B wing when it contained general population inmates, nor has he ever had a general population cellmate. *Id*. at p. 7.

Kallal's therapy sessions have been reduced from two hours per week to one hour per week. (Doc. 118-3, p. 8). During the therapy sessions, some of the therapists treat the detainees in a degrading manner. He has also observed staff members "cracking jokes" at what was discussed during therapy sessions. *Id*. at p. 11.

Kallal is also critical of the overall treatment of SDPP participants. Some of the correctional officers are particularly disruptive during cell shakedowns (including the "Orange

---

[2] According to Dr. Holt's affidavit, Kallal was civilly committed in 2001 with a diagnosis of "sexual abuse of an adult; sexual abuse of a child, female, 8 years old; paraphilia not otherwise specified with features of child molestation and exhibitionism." (Doc. 118-5, p. 5). Kallal was last evaluated in 2016. *Id*. Following the evaluation, Kallal was "diagnosed by the independent evaluator as having exhibitionistic disorder, sexually aroused by exposing genitals to prepubertal children and to physically mature individuals, in a controlled environment. *Id*.

Crush" IDOC shakedown) and will take personal property or scatter it in the cells. *Id*. at p. 5. Additionally, Big Muddy does not have air conditioning and the cell doors are solid metal with a narrow mesh screen in the middle. *Id*. at p. 8. As a result, the temperature in the wing can reach over 100 degrees in the summer. *Id*.

Kallal asserts that Big Muddy should provide additional treatment services and that the staff should be focused on rehabilitation so that individuals can be released. *Id*. at p. 12. He believes that the SDPP would be better served if it was located in a more clinical setting, as opposed to the current prison location. *Id*. at p. 12.

Plaintiff George Needs[3] entered IDOC custody in 1980 and was initially housed at Menard Correctional Center. (Doc. 118-4, p. 3). He was transferred from Menard to Big Muddy in 1995. *Id*. at p. 3. He currently receives one hour of therapy per week with Jessica Stover. *Id*. at p. 4. The treatment takes place in a group therapy setting with 13 or 14 individuals, and primarily consists of Stover instructing the group. *Id*. at pp. 4 and 8. When Needs first arrived at Big Muddy, he took part in seven therapy groups, but now he is down to one per week. *Id*. at p. 4. He requested to join additional groups, but was denied placement. *Id*. at p. 9. Needs receives an evaluation from his primary therapist once every six months. *Id*. at p. 6.

Needs testified at his deposition that he would like for the SDPP to be separated entirely from the prisoners in general population and corrections staff. *Id*. at p. 13. According to Needs, correctional officers come into the wing and disrupt the group therapy sessions. *Id*. at p. 10. The correctional officers also perform shakedowns in an aggressive manner, "trashing" their cells. *Id*. Needs testified that the individuals in the SDPP should have more time to spend outside of their cells, and that he has spent up to 22 hours per day locked in his cell. *Id*. at p. 12. Needs

---
[3] According to Dr. Holt's affidavit, Needs was committed to the Sexually Dangerous Persons Program in 1981 after being charged with attempted rape and indecent liberties with a child. (Doc. 118-5, p. 5). Needs was diagnosed as having pedophilic disorder at his 2016 independent evaluation. *Id*.

believes that Big Muddy should provide more treatment sessions, including individualized therapy.  *Id*. at p. 14.  He also believes that therapy should be more focused on rehabilitation and that there should be more support for individuals discharged from the SDPP.  *Id*. at pp. 10-11.

Plaintiff James G. Howe is also a participant in the SDPP.  In early 2016, Howe was discharged from Big Muddy and placed on conditional release.  (Docs. 105 and 118-1).  Pursuant to the Order for Plan for Conditional Release, he was required to register as a sex offender, subjected to electronic (GPS) monitoring, and was required to report to a parole officer.  *Id.* at pp. 1-2.  How was arrested for violating the conditions of his release on June 15, 2017.  (Doc. 144).  He was placed back in the SDPP in July 2017.  (Doc. 152).

Plaintiffs attached numerous affidavits from various SDPP participants to their response to Defendants' summary judgment motion.  (Doc. 124-2, p. 6 through 124-3 p. 260).  The affidavits indicate that individuals the SDPP detainees are treated the same as the inmates in general population and that the two groups frequently come into contact with one another in the facility.  *Id*.  The affidavits state "[t]hat all visiting, clothing, property and all general functions of the Prison Facility apply to Sexually Dangerous Person's essentainally [sic] identically as any general population inmate [sic]." *Id*.  The affidavits also state that detainees are harassed by inmates in general population, that none of the SDPP paricipants receive one-on-one treatment, and that they are often retaliated against if they choose to use the prison grievance procedure.  *Id*.

Also attached to the Plaintiffs' response is a report from Dr. Dean R. Cauley.  (Doc. 124-1, pp. 13-29).  Dr. Cauley has a Ph.D. in clinical mental health counseling and counselor supervision.  *Id*. at p. 26.  He states in his report that he has reviewed materials provided by the plaintiffs in this case and that the materials raise "concerns" as to the adequacy of the Big Muddy SDPP's treatment methods.  *Id*. at p. 24.  Specifically, Dr. Cauley states that "it is evident that

the treatment as offered [at Big Muddy] is not in keeping with generally accepted practices." *Id*. at p. 21. He goes on to state, "[the treatment] [g]roups are too large, ratings are subjective, a correctional environment overshadows the therapeutic intent, important modules are not offered, and – as a result – there is a feeling that treatment may be endless." *Id*. at p. 21. He asserts that, "[t]hese issues taken together suggest that intervention is needed to correct the program[.]" *Id*. at p. 23.[4] The report is signed and dated July 26, 2016. *Id*. at p. 24.

Additionally, Plaintiffs attached two documents – a December 2002 affidavit and a December 2000 letter drafted by psychologist, Dr. Ralph Underwager. In both documents, Dr. Underwager asserts that the Big Muddy SDPP provides deficient treatment. The affidavit, signed and dated December 16, 2002, appears to have been produced in support of a SDPP detainee's habeas corpus petition. (Doc. 124-1, p. 45). In general terms, Dr. Underwager critiques the treatment methods implemented at the Big Muddy SDPP. He then concludes, "[a]ssuming the claims [petitioner] makes about the treatment program and the prison environment at the Big Muddy facility are accurate and can be documented, the sex offender treatment program at Big Muddy cannot be regarded as an effective treatment program." *Id* at p. 54. Underwager's December 1, 2000 letter appears to have been directed to an attorney in regards to other litigation involving the Big Muddy SDPP. (Doc. 124-1, pp. 57-66). He provides an analysis of the treatment provided at Big Muddy and concludes that "[s]exual

---

[4] Cauley concludes his report by stating:
> Based upon what the documents sent by the [Plaintiffs] do show, it would seem that a next step is warranted. That next step would be for an independent expert to be allowed access to the clinical files and records for all of the men involved. These files should include group notes, 90 day reviews, and annual reviews. Also, related to treatment, a list of materials provided to the men at each stage, a list of expectations in treatment for each stage and a copy of criteria for advancement in each stage would be needed. Looking into the area of supervision and training a review of the program outline, training manuals and policy manuals from the facility would also be needed. At that point we would be in a better position to determine if the concerns found in this current limited review still hold true on a larger and more systematic review.

(Doc. 124-1, p. 24).

offenders are unlikely to benefit from the sex offender treatment program at Big Muddy." *Id*. at 58.

## Discussion

### Motion to Strike

As an initial matter, the Court needs to address Defendants' motion to strike Dr. Cauley's report and Dr. Underwager's affidavit and letter (Doc. 129). Defendants argue that the Court should not consider the documents in ruling on Defendants' motion because Plaintiffs failed to timely disclose the expert reports and the documents don't comply with the requirements of Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure. Plaintiffs oppose the motion, stating that they disclosed Dr. Cauley as an expert in an earlier filing (Doc. 80) and that Defendants' motion raises only harmless errors (Doc 130).

Under *F.R.C.P.* 26(a)(2)(B), expert witnesses must be disclosed and must provide a report containing all the opinions (and basis and reasons for them) the expert will express, the facts or data considered by the expert in forming the opinions, any exhibits that will be used, the expert's qualifications, a list of other cases the expert has testified in, and compensation information for the expert's testimony. Although Dr. Cauley is mentioned in a previous filing (Doc. 80), Plaintiffs did not provide Defendants with his report prior to Plaintiffs' response to Defendants' summary judgment motion. Plaintiffs were exempt from the Rule 26(a)(1) requirement for initial disclosures, but they are not exempt from the Rule 26(a)(2) expert disclosure requirements, including Rule 26(a)(2)(D) which states, "A party must make [expert] disclosures at the times and in the sequence that the court orders. ***Absent a stipulation or a court order, the disclosures must be made: (i) at least 90 days before the date set for trial or for the case to be ready for trial…***" (emphasis added).

Here, the Scheduling Order entered by former Magistrate Judge Philip Frazier (Doc.46) did not set a deadline for expert witness disclosures and the parties did not have a stipulation regarding the same. Thus, as the pro se plaintiffs correctly concluded, their expert witness disclosure was due 90 days before the trial date – not by the discovery deadline as argued by Defendants. That deadline had not passed when Plaintiffs responded to Defendants summary judgment motion with Dr. Cauley's report and CV attached.

The Court recognizes that Dr. Cauley's report does not fully comply with the requirements set forth at Rule 26(a)(2) as he has not provided a list of cases in which he has served as an expert witness nor has he disclose the compensation he will receive for his work on the case. That said, these deficiencies can be rectified by a supplemental report and do not warrant the report being stricken for purposes of the Court's consideration of Defendants' summary judgment motion.

Defendants also request that the documents drafted by Dr. Underwager be stricken for failing to comply with Rule 26(a)(2). In their response, Plaintiffs clarify that they "…submitted the Underwager opinion merely as an example of the longstanding and systemic problems that plague the Illinois SDP Program, not as testimony to the current event…" (Doc. 130). Therefore, Plaintiffs were not obligated to comply with Rule 26(a)(2) as is relates to Dr. Underwager and the Court will not strike his documents on that basis. However, Dr. Underwager drafted the documents over a decade ago for purposes of an unrelated litigation. His opinions about the SDPP at that time are immaterial and irrelevant to Plaintiff's claims in this case and the issues raised in Defendants' motion. As such, the Court will not consider the Underwager documents in ruling on Defendants' summary judgment motion. For these reasons, the Defendants' Motion to Strike (Doc. 129) is **DENIED in its entirety.**

**Motion for Summary Judgment**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When presented with a motion for summary judgment, the court must construe all facts and draw all reasonable inferences in favor of the nonmoving party. *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 805 (7th Cir. 2014). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

### *Counts 1 and 2*

Inmates serving sentences for criminal convictions are protected by the Eighth Amendment, but the constitutional protections for civil detainees arise out of the Due Process Clause of the Fourteenth Amendment. *Sain v. Wood*, 512 F.3d 886, 893 (7th Cir. 2008). Those protections are "at least as extensive as that afforded to prisoners by the Eighth Amendment[.]" *Id.*

Inmates have an Eighth Amendment right to "adequate food, clothing, shelter, and medical care" along with "reasonable measures to guarantee [their] safety[.]" *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976, 128 L. Ed. 2d 811 (1994). But as the Supreme Court held in *Youngberg v. Romeo*, "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." 457 U.S. 307, 321–22, 102 S. Ct. 2452, 2461, 73 L. Ed. 2d 28 (1982).

At this point, the Supreme Court has not clearly defined the elements of a constitutionally adequate civil detainee treatment program. However, "[a]t the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson v. Indiana,* 406 U.S. 715, 738, 92 S. Ct. 1845, 1858, 32 L. Ed. 2d 435 (1972). The Seventh Circuit has also noted, "The Supreme Court understands the Fourteenth Amendment to require that civil detainees receive treatment for the disorders that led to their confinement and be released when they've improved enough no longer to be dangerous." *Hughes v. Dimas*, 837 F.3d 807, 808 (7th Cir. 2016). At a minimum, "civil detainees… are entitled to non-punitive programs designed using the exercise of professional judgment." *Allison v. Snyder*, 332 F.3d 1076, 1080 (7th Cir. 2003) (internal quotes omitted).

In the present case, Plaintiffs testified that they now receive approximately one hour of group therapy treatment per week. Because the treatment takes place in group sessions, the therapists provide little, if any, individualized treatment. Plaintiffs do receive evaluations from their therapists once every six months, but they state that they are unsure as to why they are placed in a particular "phase" of treatment and that they are not provided with clear treatment objectives. Given these facts and with all reasonable inferences drawn in favor of the plaintiffs, a genuine issue of material fact exists as to whether the plaintiffs are receiving a constitutionally adequate level of treatment. With such little treatment being allegedly provided to the SDPP participants, the Court is unable to conclude as a matter of law that professional judgment has in fact been exercised as to Plaintiffs' needs. *See Youngberg v. Romeo*, 457 U.S. 307, 314, 102 S. Ct. 2452, 2457, 73 L. Ed. 2d 28 (1982); *Thomas S. by Brooks v. Flaherty*, 902 F.2d 250, 252 (4th

Cir. 1990) ("substantial departure from accepted professional judgment" indicative that treatment decisions were not based on professional judgment).[5]

Defendants also argue that Plaintiffs' claims are barred pursuant to *Heck v. Humphrey* and on the basis of qualified immunity. Under *Heck,* a prisoner plaintiff is barred from bringing a § 1983 action if a judgment in his favor "would necessarily imply the invalidity of his conviction or sentence[.]" 512 U.S. 477, 487, 114 S. Ct. 2364, 2372, 129 L. Ed. 2d 383 (1994). Here, because Plaintiffs assert that the SDPP is constitutionally deficient, and are seeking additional program treatment, a judgment in Plaintiffs' favor on Counts 1 and/or 2 would not imply that their civil detainment orders are invalid.

Qualified immunity is also not a valid defense to Plaintiffs' claims. Plaintiffs are proceeding against Defendants in their official capacities, and qualified immunity only applies to individual capacity claims. *Ruffino v. Sheahan*, 218 F.3d 697, 700 (7th Cir. 2000) ("it is well established that the qualified immunity doctrine does not apply to official capacity claims"). Plaintiffs will therefore be allowed to proceed on Counts 1 and 2 of their Complaint in regard to the allegations that their rights under the Fourteenth Amendment have been violated. However, as previously noted, because Plaintiffs are not convicted prisoners, Defendants are entitled to dismissal of Plaintiffs' Eighth Amendment claims asserted in Count 2.

### *Count 3*

In Count 3, Plaintiffs assert a claim that Defendants violated their rights under the Eighth and Fourteenth Amendments by failing to adequately train or supervise their employees regarding the proper care and treatment of sexually dangerous persons with mental illnesses or disorders. It has long been established that the doctrine of *Respondeat Superior* is not applicable

---

[5] In addition to Plaintiffs' deposition testimony, the Court has considered Dr. Cauley's preliminary opinions contained in his July 26, 2016 report, as expert testimony will be required to establish Plaintiffs' claims asserted in Counts 1, 2 and 4.

to § 1983 claims; each individual defendant must have been personally involved in the alleged constitutional violation. *Ashcroft v. Iqbal*, 556 U.S. 662, 676, 129 S. Ct. 1937, 1948, 173 L. Ed. 2d 868 (2009) (citing *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Moreover, "failure to train" constitutional tort theories of liability are generally only asserted within the the confines of a *Monell* municipal liability claim seeking monetary damages. *See, e.g., City of Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985). For these reasons, Defendants' motion is granted as to Count 3.

### *Count 4*

In Count 4, Plaintiffs allege that the conditions in the Big Muddy SDPP are punitive in nature and violate their Fourteenth Amendment rights. Civil detainees "may be subjected to conditions that advance goals such as preventing escape and assuring the safety of others," *Allison v. Snyder*, 332 F.3d 1076, 1079 (7th Cir. 2003), but the various aspects of those conditions must be justified on the basis of institutional security or treatment. *West v. Schwebke*, 333 F.3d 745, 748 (7th Cir. 2003).

Plaintiffs argue that the conditions in the SDPP are essentially the same as those for inmates in the Big Muddy general population. Specifically, there is evidence in the record that indicates until recently, inmates in the SDPP were housed in the same living unit with general population inmates. Aside from the hour per week of treatment and the periodic mental health evaluations, the Court is unable to discern any significant difference in living arrangements and conditions of confinement between the plaintiffs and the inmates in general population. Plaintiffs also note that they spend the bulk of each day confined in their cells. Based on these facts, Plaintiffs have raised a genuine issue of material fact as to whether they are being

subjected to punitive conditions of confinement. Plaintiffs will therefore be allowed to proceed on Count 4 of their Complaint.

## *Count 5*

In Count 5, Plaintiffs assert that Defendant John Baldwin, in his official capacity, has violated their rights under Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act are being violated due to the denial of adequate program funding, reasonable housing, and access to programs. The relief provided under the ADA and the Rehabilitation Act is "coextensive." *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012). To state such a claim, a plaintiff must show that "(1) he is a qualified person (2) with a disability and (3) the Department of Corrections denied him access to a program or activity because of his disability." *Id*. at 672.

Plaintiffs have not clearly identified the programs or activities they are being denied access to. Indeed, the focus of Plaintiffs' allegations appears to be not so much the denial of access to programs or activities, but rather the fact that Big Muddy generally lacks adequate treatment programs and activities for individuals in the SDPP.

Summary judgment is the "'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). But Plaintiffs have not identified the manner in which their rights are being violated under these statutes. Accordingly, summary judgment will be granted in favor of Defendant Baldwin as to Count 5.

**Plaintiff Howe's Motion for Preliminary Injunctive Relief**

During the pendency of this case, James Howe was released from the Big Muddy SDPP and subsequently re-entered the program. While on supervised release, he filed a "Motion for

Temporary Restraining Order and [Preliminary] Injunction a Declaratory Judgment for Plaintiffs [sic]." (Doc. 134). In the motion, Howe asserts that he is being harassed by his parole officer, Agent Mark Schaffer, and seeks an injunction mandating that Agent Schaffer be removed from his position as Howe's parole officer.

The Constitution limits the jurisdiction of federal courts to "actual, ongoing cases or controversies" and an issue becomes moot when "there is no longer an injury that can be redressed by a favorable decision." *Ostby v. Manhattan School District No. 114*, 851 F.3d 677, 682 (7th Cir. 20017). Here, Howe's motion is now moot because he is no longer on supervised release. The motion also pertains to issues that are outside the scope of the Complaint. "A preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally," but a preliminary injunction is improper when dealing with matters outside the issues in the lawsuit. *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220, 65 S. Ct. 1130, 1134, 89 L. Ed. 1566 (1945). For these reasons, Howe's motion will be denied.

## Conclusion

Defendants' Motion to Strike (Doc. 129) and Plaintiff James Howe's Motion for Preliminary Injunctive Relief (Doc. 134) are hereby **DENIED**. Defendants' Motion for Summary Judgment (Doc. 117) is **GRANTED in part and DENIED in part**. The motion is denied as to Counts 1 and 4; the motion is granted as to the Eighth Amendment claim asserted in Count 2, but denied as to the Fourteenth Amendment claim asserted in Count 2; the motion is granted as to all claims asserted in Counts 3 and 5.

**IT IS SO ORDERED.**

**DATED: January 31, 2018**

<pre>
                                        s/ Staci M. Yandle
                                        STACI M. YANDLE
                                        United States District Judge
</pre>