```
1                   UNITED STATES OF AMERICA
                  SOUTHERN DISTRICT OF ILLINOIS
2

3    JAMES G. HOWE, et al.,          )
                                     )
4               Plaintiffs,     )
     v.                              ) No. 3:14-cv-00844-SMY-RJD
5                                    )
     SALVADORE GODINEZ, et al.,      ) BENTON, IL
6                                    )
                Defendants.     )
7

8

9

10             TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
                           VOLUME I
11
           BEFORE THE HONORABLE STACI M. YANDLE
12             UNITED STATES DISTRICT JUDGE

13                     October 24, 2018

14

15

16

17

18

19

20

21   REPORTED BY:        Christine Dohack LaBuwi, RDR, RMR
                         Official Court Reporter
22                       301 West Main Street
                         Benton, Illinois  62812
23                       (618) 439-7725
                         Christine_Dohack@ilsd.uscourts.gov
24
     Proceedings recorded by mechanical stenography, produced
25   by computer-aided transcription.
```

```
 1    APPEARANCES:

 2    FOR PLAINTIFF:      John D. Stobbs, II, Esq.
                          STOBBS LAW OFFICES
 3                        307 Henry Street, Suite 211
                          Alton, IL  62002
 4                        (618) 462-8484
                          jds2@stobbslaw.com
 5
                          John D. Simmons, Esq.
 6                        Gary L. Payne, Esq.
                          Taylor F. Sprehe, Esq.
 7                        SIMMONS HANLY CONROY
                          One Court Street
 8                        Alton, IL  62002
                          (618) 259-2222
 9                        jsimmons@simmonsfirm.com
                          gpayne@simmonsfirm.com
10                        tsprehe@simmonsfirm.com

11    FOR DEFENDANT:      Kyle Rockershousen, Esq.
                          Jeremy C. Tyrrell, Esq.
12                        OFFICE OF THE ATTORNEY GENERAL
                          500 South Second Street
13                        Springfield, IL  62706
                          (217) 782-1090
14                        krockershousen@atg.state.il.us
                          jtyrrell@atg.state.il.us
15

16

17

18

19

20

21

22

23

24

25
```

```
1                            I N D E X

2                             WITNESSES

3    ALL WITNESSES:                                 PAGE:

4      TIMOTHY CHARLES for Plaintiff:
         Direct Examination by Mr. Simmons          6:10
5        Cross-Examination by Mr. Tyrrell           23:18
         Examination by the Court                   38:17
6        Recross-Examination by Mr. Tyrrell         43:22

7      GEORGE NEEDS for Plaintiff:
         Direct Examination by Mr. Stobbs           45:25
8        Cross-Examination by Mr. Rockershousen     64:12
         Redirect Examination by Mr. Stobbs         76:10
9        Recross-Examination by Mr. Rockershousen   79:15
         Examination by the Court                   80:4
10       Further Recross-Examination by Mr.         83:25
     Rockershousen
11       Re-examination by the Court                84:23

12     JACOB KALLAL for Plaintiff:
         Direct Examination by Mr. Stobbs           86:1
13       Cross-Examination by Mr. Tyrrell           111:17
         Redirect Examination by Mr. Stobbs         125:8
14       Examination by the Court                   127:15
         Cross-Examination by Mr. Rockershousen     161:21
15       Re-examination by the Court                168:23

16     DR. DEAN CAULEY for Plaintiff:
         Direct Examination by Mr. Stobbs           173:14
17

18

19

20

21

22

23

24

25
```

```
 1              (Proceedings began in open court at 9:30 a.m.,
 2    parties present.)
 3              THE CLERK:  The Court calls Case No. 14-CV-844,
 4    Howe, et al. versus Godinez, et al.  This matter is called
 5    for day one of bench trial.
 6              Would the parties please state your presence for
 7    the record?
 8              MR. STOBBS:  John Stobbs present for the
 9    plaintiffs, Judge.
10              MR. SPREHE:  Taylor Sprehe present for the
11    plaintiffs, Your Honor.
12              MR. PAYNE:  Gary Payne present for the plaintiffs.
13              MR. SIMMONS:  John Simmons present with the
14    plaintiffs.
15              THE COURT:  And if one of you, Mr. Stobbs, could
16    introduce the actual plaintiffs?
17              MR. STOBBS:  Judge, this is Mr. Tim Charles.  He's
18    in the wheelchair.  This is James Howe and George Needs
19    and Jacob Kallal.  They're the plaintiffs.
20              THE COURT:  Thank you.
21              MR. ROCKERSHOUSEN:  Your Honor, Kyle Rockershousen
22    on behalf of defendants.
23              MR. TYRRELL:  Good morning, Your Honor.  Jeremy
24    Tyrrell, Assistant Attorney General, on behalf of the
25    defendants.  Also present in the courtroom is Dr. Thomas
```

1    Holt, one of the defendants.

2         THE COURT:  Okay.  Thank you.  Good morning again,

3    everybody.

4         So, as I indicated to counsel in the final

5    pretrial hearing, we are going to dispense with opening

6    statements and proceed right into evidence.  And it's my

7    understanding that plaintiffs will be calling Mr. Charles,

8    first, so we can get him back and get him comfortable.

9         Just by way of a little background, in terms of

10   the nature of this case, the plaintiffs have all filed

11   this case and they assert three causes of action:  First,

12   that the defendants violated plaintiffs' rights to receive

13   treatment as sexually dangerous persons in violation of

14   the Fourteenth Amendment;

15        Second.  That the defendants violated plaintiffs'

16   right to receive treatment for their mental illnesses and

17   disorders under the Fourteenth Amendment; and

18        Third.  That the defendants violated plaintiffs'

19   liberty interests under the Fourteenth Amendment by

20   subjecting them to a punitive environment.

21        The relief that the plaintiffs are seeking is

22   affirmative injunctive relief, otherwise a mandatory

23   injunction.

24        And with that, I'm going to move over.  Do we have

25   Mr. Charles miked up?

```
 1              MR. STOBBS:  Yes, ma'am.

 2              THE COURT:  I want to be able to look at him.

 3              You may call your first witness.

 4              MR. SIMMONS:  Your Honor, we call Timothy Charles.

 5              (Witness sworn by clerk.)

 6                           TIMOTHY CHARLES,

 7       having been first duly sworn, was examined and testifies

 8       as follows:

 9                           DIRECT EXAMINATION

10       BY MR. SIMMONS:

11       Q.     Good morning, Timothy.  How are you?  My best

12       friend was named Timothy and he preferred to be called

13       Tim.

14       A.     Right.

15       Q.     What would you prefer that I call you today?

16       A.     Tim.

17       Q.     Tim?  Okay.  Tim, can you introduce yourself again

18       to the judge, please?

19              THE WITNESS:  My name is Timothy Charles.

20              THE COURT:  Okay.

21       Q.     (BY MR. SIMMONS)  Thank you.  This is your day in

22       court.  This is your chance to tell your story to this

23       judge --

24       A.     Right.

25       Q.     -- okay?  We're clear on that.  This is the direct
```

```
 1    examination portion of the trial.  That means I am
 2    directing you to give testimony to the court for evidence.
 3    Direct examination means I may dispense with some cursory
 4    things.  I may talk like I wouldn't ordinarily talk to
 5    others, because I'm going to be very direct with you in my
 6    direct examination.  Do you understand that?
 7    A.      Mm-hmm.  Yes.
 8    Q.      Okay.  Thank you.
 9    A.      I'm not used to --
10    Q.      Okay.  I understand.  I understand.  I just want
11    you to -- I just want us to talk.
12            THE COURT:  Mr. Charles?  Let me just interrupt
13    for one second.  I know you're not used to this.  Just
14    remember to give verbal responses so -- we have a court
15    reporter that's taking down your testimony.
16            THE WITNESS:  Oh, okay.
17            THE COURT:  So, just say yes, no, or answer out
18    loud.  Okay?
19            THE WITNESS:  Yes, ma'am.
20            THE COURT:  Okay.  Thank you.
21    Q.      (BY MR. SIMMONS)  So with that, let's talk about
22    your situation.  You filed a lawsuit.  Do you remember
23    when you filed the lawsuit?
24    A.      Back in 2014.
25    Q.      2014.
```

```
 1   A.       Somewhere around July, the end of July.

 2   Q.       And where do you live?

 3   A.       Big Muddy River prison in Ina.

 4   Q.       What -- what's your diagnosis of your -- since you

 5   have been committed?  What have you been diagnosed with?

 6   A.       I was diagnosed with -- the person I see...

 7   Q.       I, for example, take high blood pressure pills.

 8   Do you take high blood pressure pills?

 9   A.       It's just --

10   Q.       I understand.  I understand.

11   A.       Um --

12   Q.       Do you take anything for --

13   A.       Pedophilia.

14   Q.       The COPD.  Do you take -- COPD, at that the reason

15   for your oxygen?

16   A.       Yeah.

17   Q.       And I see you're in the wheelchair.

18   A.       Right.

19   Q.       Can you walk?

20   A.       I can walk a little bit, yeah.

21   Q.       And --

22   A.       But not very far.

23   Q.       And you don't have shoes on.  You can't walk very

24   far today without --

25   A.       Right.
```

```
1    Q.      -- I mean, I would think?

2    A.      Right.

3    Q.      You are giving testimony today from your

4    wheelchair in front of the counsel table.  What's going on

5    with your feet?

6    A.      They're swelled and they're, they're draining.

7    Q.      Drain -- what's draining?

8    A.      It's got bacteria and stuff in 'em.  They swelled

9    up with a lot of water and stuff.

10   Q.      Okay.  So, let's talk about the, the Big Muddy,

11   your residence right now.  Is that -- that's what the --

12   that's the prison; right?

13   A.      It's prison, yes.

14   Q.      And -- does it feel like prison, I guess, when you

15   are there?

16   A.      Yeah.

17   Q.      Are you getting treatment when you are there?

18   A.      Because we're, we're, we're right inside the

19   prison and we've got to go back and forth to chow, and the

20   general population is in the chow hall while we're eating.

21   And we see them every once in awhile like in Health Care.

22   Matter of fact, Health Care, we've got -- they call 'em

23   porters, and we've got -- they're convicted inmates that

24   take care of, like mopping the floor and taking out the

25   trash, bringing our food to us.  Stuff like that.
```

```
 1   Q.      Speaking of food, how is the food there?
 2   A.      Not good.
 3   Q.      Do you, do you get enough food?
 4   A.      Right now, being, being that I'm a -- been put
 5   back in Health Care because of my condition right now --
 6   Q.      Is it different than normal?
 7   A.      Yeah.  So they, they tend to give them a little
 8   more food.
 9   Q.      Okay.
10   A.      But when I was out in general population, you was
11   lucky if you got any.  You got shortchanged all the time.
12   Q.      Now, I apologize that I don't know this.  I tried
13   to come and see you a few times and couldn't.
14   A.      Yeah.
15   Q.      But the situation is, when you go through and get
16   your food in the normal situation, not the Health Care --
17   A.      Right.
18   Q.      -- but in the normal general population, are other
19   inmates putting the beans on your --
20   A.      Yeah.
21   Q.      -- tray like you see?
22   A.      Yeah, convicted inmates.
23   Q.      And do they know when you're coming through the
24   thing that you are in the SDP program?
25   A.      Somehow or other, they know.  Because they was
```

```
 1    held in 4-House and, as soon as you get to the line, they
 2    say "4-House" and right away --
 3    Q.      So, it identifies everybody that's coming as --
 4    A.      Everybody that's coming through.  And that's,
 5    that's us.
 6    Q.      And are you treated differently as you are going
 7    through the line than the others?
 8    A.      Oh, yeah.  Yeah.
 9            THE COURT:  Hold on one second.  One second.
10    Okay, Mr. Simmons, she can only take one person talking at
11    a time.  I know you're having this conversation with Mr.
12    Charles, but we need you to be able to ask the question
13    before he starts to answer, and we need him to answer
14    before you ask the next question, or Chris is going to
15    throw a shoe, which is what she generally does when she
16    gets frustrated.
17            MR. SIMMONS:  Very good.  Thank you.
18            THE COURT:  Mm-hmm.
19    Q.      (BY MR. SIMMONS)  Sorry about that.
20    A.      Yeah.
21    Q.      So, were you ever in a situation where you felt
22    like, in the food line, that you were not getting the food
23    that you wanted or that you needed to -- for -- because
24    you were in the --
25    A.      Yeah.
```

```
1    Q.      -- SDP program?
2    A.      Yeah, I even asked -- like they got a guard right
3    there when you are picking your trays up.  I even asked
4    the guard or one of the food supervisors if I could get a
5    little more food.  And they say, "you got what you got
6    coming."  And, you know, a lot of times you go back,
7    you're just hungry.
8    Q.      So, that's food.  What about treatment?  What kind
9    of treatment are you getting?
10   A.      Treatment.  I guess, I don't know if you call it
11   treatment, you know, I've been through it two or three
12   times now.  It's like a revolving door.  You go one way
13   and then you come back and then they want to start all
14   over and do something else.  And now, you know, the stuff
15   that I have learned beforehand, I have -- I am starting to
16   do all over again.
17   Q.      Tell me about the program itself.  What's the
18   situation there?  Starting all over, what do you mean, you
19   are starting all over?
20   A.      Well, it's like, you know, they got definitions
21   for different things like high risk, low risk, and stuff
22   like that.
23   Q.      And you do Phase 1?
24   A.      Yeah, now I'm in Phase 1 now.  I was in Phase 2
25   and got dropped back.  And I was receiving three hours of
```

1    treatment a week, and now I'm only receiving one hour of

2    treatment a week.  And I haven't -- since I fell out last

3    February, I come back to the prison March the 16th, I

4    haven't had any treatment at all.  None.  And the

5    treatment staff is like maybe 150, 200 foot down the hall

6    from me.

7    Q.      When you go to these sessions, the one hour a

8    week, how many folks are with you?

9    A.      You mean -- the group, you mean?

10   Q.      Yeah, as a group.  Right.

11   A.      In the group, there's anywhere from like 12 to 17

12   on, on any given day.

13   Q.      And you get one hour of that a week?

14   A.      Yeah, that's as long as you don't mess up then

15   have her send -- have the therapist send you back to your

16   cell or your wing or whatever.

17   Q.      What happens when the therapist has a wedding or a

18   funeral to attend and can't attend your scheduled

19   sessions?  Do you see another counselor?  Do you make that

20   hour up somewhere or --

21   A.      No.  It's just gone.

22   Q.      You just miss that week?

23   A.      Yeah, you miss it.

24   Q.      And you -- has that happened?

25   A.      Yeah, on quite a few occasions.

1    Q.       Okay.  Well, this is your chance to tell your

2    story.  So, don't limit yourself to my inability to ask

3    you a proper question.  Please, feel free to --

4    A.       Oh, okay.

5    Q.       -- tell your story because we need to know what's

6    going on.  So, you go through phases of this program.  How

7    many phases of the program do you understand there to be?

8    A.       There's four phases.

9    Q.       Four phases.

10   A.       Yes.  I don't know if people can grasp a lot of

11   that because a lot of it is college level stuff, at least

12   that's what it seems like to me, it would be like

13   postgraduate work in psychology or stuff like that.

14   Q.       For the program, it's getting more and more

15   difficult?

16   A.       Yeah, it -- and if the therapist don't think that

17   you did a good enough job on the -- like a homework

18   assignment?

19   Q.       Mm-hmm.

20   A.       She has you do it over.  You know, I didn't know

21   that I was going to college.  I thought I was going to get

22   treatment and...

23   Q.       How many -- how long have you lived where you

24   live?

25   A.       Twenty-one years.

1    Q.      During that time, have you ever registered to

2    vote?

3    A.      No.

4    Q.      Have you ever voted?

5    A.      Yeah, I voted, but not from there.

6    Q.      So, pre-21 years ago, you voted?

7    A.      I voted, yes.  Matter of fact, I've been -- I was

8    involved in the political process.  I've been a

9    committeeman.  I have been on committees to re -- help

10   re-elect people and stuff like that.  So, I mean, I'm --

11   Q.      So, you know what it's about, you just can't do it

12   right now, is that --

13   A.      Can't do it right now.  It was good, it was nice

14   when I was doing it because I got to meet people.  You

15   know, it was always interesting.

16   Q.      You felt like your voice mattered when you were

17   doing that?

18   A.      Yeah, like you were doing something to help the

19   community, to make this world a better place.  You know,

20   to live, make it not so violent and stuff like that.  You

21   know, because I'm -- my belief is, violence isn't the

22   answer to anything.  And I've always tried to, you know,

23   reason with people rather than go to aggressive behavior.

24   Q.      Speaking of aggressive behavior, have you seen

25   that in Big Muddy?

1    A.       Yes.  I have seen people get into arguments and

2    fights, and I have seen people get their arms broke and

3    stuff like that, yeah.

4    Q.       Have you been threatened?

5    A.       Yeah.

6    Q.       Tell me about that.

7    A.       Well, I was threatened when -- I don't -- it's

8    been awhile, but I was threatened with my life.  I was

9    sharing my hot pot -- it's a pot that heats water -- with

10   a person, and I always want to unplug it before I go to

11   sleep so it don't short out or anything from being plugged

12   in too long.  And I always asked my cellie at that time if

13   he was going to need any more hot water or I was going to

14   -- because I was going to unplug it.  If he did, I would

15   have left it plugged in.  And he got mad and he said, "You

16   ask me that every day.  Quit asking me that or I'm going

17   to kill you."  And he's a pretty aggressive person.

18   Q.       What about the staff there?

19   A.       Staff?

20   Q.       Like the security guards.

21   A.       Oh, the -- yeah, I've been threatened.  I've been

22   threatened to, if I didn't do this here, that they'd haul

23   me off to seg.  Segregation.  But not too often.

24   Q.       So, back to the program you are being treated for.

25   You say you are in Level 1 and there's four levels;

1    correct?

2    A.       Right.

3    Q.       What's the highest level you have been to?

4    A.       Phase 2.

5    Q.       And it's a progressive program?

6    A.       Supposed to be, yes.

7    Q.       What does that mean, "supposed to be"?

8    A.       Well, it seems like you get so far along in the

9    program and all of a sudden you are starting over again.

10   Like, six months after I was here -- I come in 1997 -- I

11   was promoted to Phase 2.  And I got three hours of

12   treatment a week, until about 2013 or 20 -- right -- yeah,

13   about 2013, 2014, it got dropped all the way back to an

14   hour.  And I'm starting over again in Phase 1.

15         And you, you just don't go nowhere.  I mean, I've

16   tried and tried and tried to -- you know, even when I was

17   in Phase 2, I tried to get to Phase 3.  Couldn't do it.

18   Kept -- got, got the answer, *No, no, no, you're not ready,*

19   *no, no, no.*

20         You know, and you're just not going anywhere.  And

21   after 20-something years, you're realizing, *hey, you're*

22   *not going anywhere.  You're not even going to see the*

23   *outside no more.*  That's the way it feels.  And right now,

24   I'm 70 years old.  I got COPD.  My life expectancy isn't

25   that great.

Q.      What is your goal with this lawsuit?

A.      My goal with this lawsuit is to, I hope to make

the program better, make it to where the -- I don't know

how to say it -- the people who don't -- are not really

intelligent?  Understand it, so they'll have a chance to

get out.  And find a way where this program will be where

you start and you'll go through it.  It isn't because

we're going to put you back because you messed up here or

you made this little flub up here.

Q.      Tell me about messing up.  How -- what is the

level of mess-up?  How do you mess up to get kicked back

to another level?  How severe does it have to be?  How

minor does it -- is, is it?

A.      It all depends on the therapist.  It could be a

minor thing or it could be a serious thing.  But it's, you

know, it's the level of the therapist.

Q.      They decide?

A.      They decide, yes.  Staff decides.

Q.      Just, no reviews or nothing.  Just, you did what

to get bumped down?

A.      More like --

Q.      Give me an example.

A.      I'm going to give you an example of, one time I

was -- they had -- we was doing commissary, okay?  And we

only get to go like once every two weeks.  So, they made

```
 1    last call on the wing and so I stayed back and went to
 2    commissary.  Well, if you get three program tickets, they
 3    -- you get a 30-day suspension.  And I had got suspended
 4    for 30 days, and then they're supposed to start giving you
 5    passes.  Well, I had to wait for, oh, two, three months
 6    before I even got another pass to go back to group.
 7    Q.      And that bumped you down a level?
 8    A.      That -- well, you're not getting no therapy, so
 9    then when you go to get evaluated, that messes up your
10    evaluation.
11    Q.      It messes up your evaluation, so it doesn't help
12    you progress.
13    A.      No.
14    Q.      How come it caused you to go back down, though?
15    A.      Because they, they see you as not really serious
16    about your, your treatment and all that, so then they,
17    they put you back down a notch.
18    Q.      Excuse me for one second.  I just want to grab
19    some water.
20            If you were out of your wheelchair -- strike that.
21    Sorry.
22            Is your wheelchair causing you to miss any of your
23    counseling treatment, or your medical condition at Big
24    Muddy?
25    A.      No.  I -- usually one of the persons in the group
```

```
 1    -- the counseling session I had is over on another wing.

 2    When I'm allowed to -- you know, right now I'm in Health

 3    Care so I can't go.  But one of the guys in the group will

 4    push me over and bring me back.  So, I'm not, you know --

 5    but having 12 to 17 people in group, you only get --

 6    they're only going to get to talk every 17 weeks or

 7    something like that.

 8    Q.      Is that how they do -- they take one person that

 9    talks most of that --

10    A.      Right.

11    Q.      -- week?

12    A.      Now, you get to interject every once in awhile,

13    but that would be about it.

14    Q.      So, it's pretty much your counseling when it's

15    your day --

16    A.      Right.

17    Q.      -- and everybody else is just listening in --

18    A.      Right.

19    Q.      -- is that the deal?  And there's 12 to 17 of you?

20    A.      And they'll still give you a question like, "How

21    many victims do you have?"  And then write something about

22    each victim.  And then you do that and then you gotta wait

23    until everybody -- until it comes around to you.  And if

24    you got 12 people in there, it could take 12 weeks to get

25    to you.
```

1              Could I back up a little bit and tell you about --
2    where you talked about the guards?
3    Q.        Absolutely.
4    A.        Okay.  Now, we did -- we was in that Orange Crush
5    shakedown.  And the guard that took me up front to -- by
6    the phones, because they didn't take us off the wing
7    because of the wheelchair, I walked up there and they had
8    me sit in a plastic chair.  Told me to keep my head down.
9    And if I didn't keep my head down, if he seen me raise my
10   head, he said he'd take that nightstick and knock my head
11   off.
12             And I -- you know, the guy sitting next to me, he
13   is a little slow and he don't really understand what the
14   heck they're talking about all the time, and he -- he got
15   right up there in his face and cursed him and told him he
16   was going to do the same to him if he didn't keep that
17   head down.  He said he was going to be watching him.
18             When they took me back to my cell, I was told to
19   put my head on the, on the desk and, if I raised it, they
20   would -- he would use that nightstick on me.  And --
21   Q.        That was during a lockdown; right?
22   A.        That was during a lockdown, yeah.  An Orange Crush
23   shakedown.  I'm kind of leery, you know, I've been
24   threatened pretty bad with that stuff.
25   Q.        In 21 years, how many folks have you seen leave

1  the SDP program?

2  A.      One, two, three, four -- about, oh, right around

3  ten.

4  Q.      Ten in --

5  A.      Or actually around 20, but only ten had stayed

6  out.  They keep coming back on technical violations.  They

7  didn't commit another offense.  They could have been like

8  late for a therapy session, forgot to call the parole

9  agent, would have been late to turn -- turn his self or

10 talking to the parole agent and stuff.  That's about all I

11 can say there.

12 Q.      Let me know if you need any water or anything.

13 A.      No, I'm --

14 Q.      Okay.  Because I kinda need -- and I'm not even

15 talking, I'm just listening.  Excuse me.

16 A.      I could use a sip.

17         (Off the record.)

18 A.      Thank you.

19 Q.      (BY MR. SIMMONS)  Well, is there anything else

20 that you want to say today?

21 A.      Well, not really except that it's -- I hope that

22 everything turns out good to where the people have a

23 chance of getting out rather than...

24 Q.      Do you feel like you don't have a chance to get

25 out?

1   A.      No.  Just this year alone, there's been about five

2   or six people die and, you know, I see that and I figure,

3   *well, with my condition, I'm not -- I'm never going to get*

4   *out.*

5   Q.      And the only way to progress through the program?

6   A.      It's the only way you're going -- well, unless the

7   court decides you have been there long enough and, yeah,

8   you -- but usually the judge sides with the State so you

9   have to get a jury, you know, that -- that's about the

10  only way you're going to go, if the jury decides you are

11  going to get out.

12  Q.      Excuse me one second.  (Pause.)  Mr. Charles --

13  Tim, I should say.  I'm going to sit down for a while and

14  let the other side talk for a minute.  Is that okay?

15  A.      Okay.  Fine.

16          MR. SIMMONS:  Your Honor.

17                    CROSS-EXAMINATION

18  BY MR. TYRRELL:

19  Q.      Good morning, Mr. Charles.

20  A.      Good morning.

21  Q.      My name is Jeremy --

22  A.      Sounds like you need some water.

23  Q.      That's an excellent suggestion.  Thank you.

24  (Pause.)  Sorry about that.  My name is Jeremy Tyrrell and

25  I'm one of the attorneys representing the defendants in

```
 1    this case.  We actually met a few years ago.  I don't know
 2    if you remember that --
 3    A.      Jeremy --
 4    Q.      Tyrrell.
 5    A.      Tyrrell.  I remember the name.  I don't remember
 6    you.
 7    Q.      That's fine.  And as your attorney said, if you
 8    need a break, need a glass of water, please let me know
 9    and I'll give you an opportunity to get that water.
10    A.      Okay.
11    Q.      Okay.  Mr. Charles, what's your understanding of
12    why you are at Big Muddy River Correctional Center?
13    A.      My understanding?
14    Q.      Yes.
15    A.      Is that they say I fondled a couple of my
16    grandchildren and that they -- I was charged with two
17    counts of aggravated sexual abuse to a minor and it was a
18    Class Two.  And they said that if I went to treatment, I
19    could -- it would only take like six months to a year, to
20    two years, and then after that, I would, you know, be
21    released and all the charges would be dropped and all the
22    information would be erased, or something like that.
23            So, I -- my hopes was, 21 years ago, was to get
24    the treatment and -- in hopes I could get reconciliated
25    with my family.  But now there's no chance of that, not
```

1    after 20 years, so -- and there's going to be a sadness in

2    my heart in a ways, not to be with my family and I hurt my

3    grandkids.

4    Q.      And those charges were brought out of Sangamon

5    County?

6    A.      Yes, sir.

7    Q.      Is it your understanding that the Sangamon County

8    Circuit Court is the reason why you are in the SDP

9    program?  Meaning, that was a judge's decision from

10   Sangamon County to place you in the program?

11   A.      Yes.

12   Q.      And we were just talking about this one to two

13   years of treatment and then being released.  Who made

14   those statements to you?

15   A.      I believe it was the public defender, if I'm not

16   mistaken, at that time.

17   Q.      Do you have an understanding of how you can be

18   removed from the SDP program, meaning leave Big Muddy

19   Correctional Center?

20   A.      Yeah, you gotta finish the program.

21   Q.      Do you understand that you can apply for

22   permission from the Circuit Court of Sangamon County to

23   leave the program?

24   A.      Yes, I know that.  But usually, like I said, the

25   judge sides with the State because they -- he's -- they

1    say that they're in the best position to judge your mental

2    capacity.  And the program in itself is a behavioral

3    modification program, it has nothing to do with mental

4    health.

5    Q.      When you say "the judge sides with the State," who

6    is the State?

7    A.      The State?

8    Q.      Yeah, who are you talking about?  Are you talking

9    about an examiner with --

10   A.      IDOC.

11   Q.      Okay.

12   A.      Okay.  I worked for Department of Transportation

13   for 25 years, so the State could be the transportation, it

14   could be IDOC, but it's IDOC right now.

15   Q.      Okay.  Have you ever applied with the Circuit

16   Court of Sangamon County to get released from the SDP

17   program?

18   A.      In 2002, and it took until 2007 to bring it to, to

19   an end -- a close.

20   Q.      Now, my records also indicate that you applied for

21   recovery in approximately September of 2014?  Does that

22   sound familiar?

23   A.      Yes.  We haven't had -- that is not finalized.

24   Q.      Hasn't been finalized?

25   A.      No.

1    Q.       Do you recall receiving an evaluation regarding
2    that last petition for recovery?
3    A.       Dr. Weldon-Padera, yeah.
4             THE REPORTER:  I'm sorry?
5             MR. TYRRELL:  Dr. Weldon -- W-E-L-D-O-N -- Padera
6    -- P-A-D-E-R-A.
7    Q.       (BY MR. TYRRELL)  Does that name sound familiar?
8    A.       Yes.
9    Q.       Do you know who employs Dr. Weldon-Padera?
10   A.       When we -- no, I don't.  But we -- the sex
11   offender -- I can't think of the name of it.  But when we
12   had all the addresses and everything of sex offender
13   treatment providers, and when her name was in there, and
14   it said somewhere in Chicago and had her employer is
15   Illinois Department of Corrections.
16   Q.       Do you have any information that, on whether Dr.
17   Weldon-Padera is actually employed by Wexford Health
18   Sources?
19   A.       I do now, yeah.
20   Q.       So, apart from me telling you that, you weren't
21   aware of that fact until today?
22   A.       Well, no.  I was aware of that fact when I got the
23   evaluation from my attorney.  The -- it wasn't her that
24   sent it.  It was somebody else from Wexford.  But I
25   believe that they, they have contractual services with

1    IDOC, so that would still make their -- her an employee to
2    that, that identity.
3    Q.      Did you speak to Dr. Weldon-Padera as part of your
4    evaluation for your petition for recovery?
5    A.      Did I what?
6    Q.      Sorry.  Did you speak with Dr. Weldon-Padera?
7    A.      Yes, I did.
8    Q.      And that was part of your petition for recovery in
9    Sangamon County?
10   A.      Yes.
11   Q.      Do you know how long Dr. Weldon-Padera spoke with
12   you for?
13   A.      A couple hours.  Two, three hours.
14   Q.      Do you know if Dr. Weldon-Padera did anything else
15   in terms of reviewing your petition for recovery?
16   A.      She spoke with Jessica Stover about it.  And
17   seemed like when I got my evaluation, it seemed like that
18   even though she, she rated me low, she still found me
19   sexually dangerous.  But it was always about -- well, I
20   think she took Jessie Stover's words over her own, you
21   know, test and stuff.
22   Q.      Now, this last evaluation by Dr. Weldon-Padera in
23   September of 2014, you said that petition is still pending
24   in Sangamon County?
25   A.      Yes.

```
 1    Q.      Have you made any additional petitions for
 2    recovery since that one that led to the September 2014
 3    evaluation?
 4    A.      No.  They actually -- it's been changed so much.
 5    We can't file except for once every two years now.  It
 6    used to be, we could file at any time, but we can't no
 7    more.
 8    Q.      Have you filed any additional ones since you
 9    last --
10    A.      No.  The only thing I filed is a judicial review
11    for care and treatment.
12            THE COURT:  Mr. Charles, just remember, let him --
13    I know you can anticipate his questions, but let him
14    finish his question before you answer.
15            THE WITNESS:  Okay.  Thank you, ma'am.
16    Q.      (BY MR. SIMMONS)  I want to switch gears and talk
17    about some of the things you just testified about a minute
18    ago.  My records show that you were last in group therapy
19    in January of 2018.  Does that sound correct?
20    A.      Yeah.
21    Q.      How many people were in your group at that time?
22    A.      At that time, 12 to 14.  I can't -- I don't
23    remember exactly how much.
24    Q.      Now, at one point during today's testimony you had
25    up to 17 people in a group?
```

```
1    A.      When it was first -- yeah, when it was first,
2    first put together.
3    Q.      When -- so when was that, when you had 17 people
4    in your group?
5    A.      I couldn't tell you.
6    Q.      Was it closer towards when you first entered Big
7    Muddy or more recent?
8    A.      No.  No.  It's about 2015, 2016, somewhere along
9    there.
10   Q.      So, you're thinking 2015 or 2016 you had about 17
11   people in a group?
12   A.      Somewhere along there.
13   Q.      Okay.
14   A.      I really, really can't tell you, you know.
15   Q.      That's fine.  I can only -- we can only ask you to
16   testify to the best of your ability.
17   A.      Yeah.
18   Q.      Apart -- and I believe you said it was one hour of
19   group therapy a week?
20   A.      Yes.
21   Q.      Apart from this one hour of group therapy a week,
22   is there any other opportunities for additional therapy
23   sessions, to your knowledge?
24   A.      Not to my knowledge.
25   Q.      Have you ever participated in additional therapy
```

1   beyond the one hour group?

2   A.      Oh, yeah, I've done like Inner Child.  I've done

3   Anger Management, Cycle work.  Oh, I don't know, I've done

4   so much over the 20 years, I just can't name it all.

5   Q.      Sure.  Have you been offered substance abuse

6   therapy?

7   A.      Yeah, I -- they offered it.  It was 12 weeks.  But

8   when I mentioned it in my last recovery in 2007, Dr.

9   Carich said he didn't consider that a full course in

10  substance abuse.  And he -- I don't know why, but that's

11  what he said.

12  Q.      Now, you just mentioned Dr. Carich.  And for the

13  court reporter, that's C-A-R-R-IC-H?

14  A.      C-A-R-I-CH.

15  Q.      Thank you.  Dr. Carich --

16  A.      Carich.

17  Q.      Carich.  Thank you.  Dr. Carich was the program

18  administrator before Dr. Holt took over; correct?

19  A.      Yeah.

20  Q.      And so when you are talking about Dr. Carich, the

21  statements about the substance abuse program, that was

22  before Dr. Holt was involved in the program; correct?

23  A.      Yeah.

24  Q.      Okay.  Have you been offered additional therapy

25  groups since Dr. Holt took over?

A.      No.

Q.      Have you ever refused additional therapy groups?

A.      No -- well, yeah.  I just don't like -- I've been through them so many times, I don't see no point in going through them over and over and over again.  So, yes.

Q.      So, you have refused some of these additional therapy groups?

A.      I would have to say yes.

Q.      Okay.  And you have refused these additional therapy groups since Dr. Holt took over the program; correct?

A.      Yeah.

Q.      Okay.

A.      I would have to say that, yes.

Q.      Do you recall being in group therapy generally in the month of August of 2017?

A.      Yeah.

Q.      Do you recall specifically being dismissed from group due to your refusal to participate and argumentative behavior in August of 2017?

A.      I wasn't argumentative.  I just tried to get my point across.  The therapist, she talks so much.  And I, I was just, you know, talking to get my point across and she said I could go back to see -- she excused me from group and sent me back to, over on B Wing.

```
 1    Q.      So, you do recall being dismissed from group, but
 2    you just disagree with the therapist's opinion for why you
 3    are being argumentative?
 4    A.      Yes.
 5    Q.      I want to talk about the actual Big Muddy River
 6    correctional facility.  Now, on the wings that you are on
 7    -- strike that.
 8            It's my understanding that there are two wings in
 9    the Big Muddy Correctional Center that house the SDP in
10    the SDP program?
11    A.      Two wings, yes.
12    Q.      That's both B and C Wing?
13    A.      Yes.
14    Q.      Have you been placed on both B and C Wing?
15    A.      Yes.
16    Q.      Are there security staff at Big Muddy Correctional
17    Center on both B and C Wing?
18    A.      Yeah.
19    Q.      Okay.  Earlier, you mentioned an incident
20    involving, I think you said a hot box and your cellmate,
21    when you were threatened by your cellmate.  Do you recall
22    that testimony?
23    A.      Yes.
24    Q.      When did that happen?
25    A.      2009 or '10, I would say around there.
```

1    Q.      2009 or 2010?

2    A.      Yeah, somewhere around there.

3    Q.      That was before Dr. Holt joined the program;

4    correct?

5    A.      Yeah, I don't know when he joined it.  I've

6    forgot.

7    Q.      Did you tell security staff at the time you were

8    threatened by your cellmate about what happened?

9    A.      Yes.

10   Q.      And what happened as a result of telling security

11   staff, if anything?

12   A.      As a result of that, we went to, over to the

13   major's office.  And shortly after that we were -- we were

14   separated.

15   Q.      And so after you told security staff, security

16   staff took measures to separate you two?

17   A.      Right.  He was called to my group, and then was

18   asked by a staff member if he said -- you know, if he

19   threatened me with my life.  And he said, yes.  So, that's

20   when we went to the major's office and we were separated.

21   Q.      It's my understanding at one point there was both

22   SDP's and the regular general population inmates on the B

23   and C Wing at Big Muddy River Correctional Center; is that

24   correct?

25   A.      Yes.

```
 1    Q.      Okay.  It's my understanding that now there's only
 2    SDP's placed on the B and C Wings at Big Muddy River
 3    Correction Center?
 4    A.      Yeah.
 5    Q.      That's correct?
 6    A.      That's correct.
 7    Q.      When the populations were mixed, were you ever
 8    placed with a general population inmate?
 9    A.      No.
10    Q.      So, you have always been in a cell with an SDP
11    inmate or by yourself?
12    A.      As far as I can remember, yes.
13    Q.      And I apologize.  I said SDP inmate.  I meant SDP
14    program participant.
15    A.      It don't matter.  Our ID's say inmate, so it don't
16    matter.
17    Q.      Earlier, you mentioned that you haven't voted
18    since you went to Big Muddy River Correctional Center?
19    A.      I haven't what?
20    Q.      Haven't voted.
21    A.      Voted.  Yes, I haven't voted.
22    Q.      Have you made a request to vote?
23    A.      No.
24    Q.      Earlier today, you talked about an incident with
25    Orange -- during an Orange Crush shakedown.  Do you recall
```

```
1    that testimony?
2    A.      Yes.
3    Q.      When did that happen?
4    A.      About 2013, if I can recall.  Yeah, it was about
5    2013.
6    Q.      You said it was an officer that threatened you?
7    A.      Yes.
8    Q.      Do you know the name of that officer?
9    A.      No.
10   Q.      Did you tell anyone about that incident with the
11   officer?
12   A.      Yeah.
13   Q.      Who did you tell?
14   A.      I can't remember now.  It was -- I think it was a
15   counselor, if I'm not mistaken.  I didn't file no formal
16   -- formal complaint, I just talked about it.
17   Q.      Do you recall what the counselor did or said in
18   response to that allegation, if anything?
19   A.      That they would look into it.  And I'm still
20   waiting.
21   Q.      So, you just haven't heard anything back?
22   A.      No.
23   Q.      During your time in the SDP program, have you been
24   placed on probation for not showing up to groups?
25   A.      On probation?  Yeah, I think once or twice.
```

```
 1    Q.      And you have also been -- sorry.  Strike that.
 2            You have also been suspended from groups because
 3    of not showing up; correct?
 4    A.      Yeah, one time.
 5    Q.      Have you ever requested additional therapy groups?
 6    A.      No.
 7    Q.      Are there workbooks available on the wings at Big
 8    Muddy River Correctional Center?
 9    A.      Used to be.  There is no more.
10    Q.      Are there any books available at Big Muddy River
11    Correctional Center?
12    A.      No.
13    Q.      It's your testimony today that there are no books
14    available at Big Muddy River Correctional Center to you?
15    A.      Yes.
16    Q.      Thank you, Mr. Charles.
17            MR. TYRRELL:  I believe that's all the questions I
18    have.
19            MR. SIMMONS:  Your Honor?
20            THE COURT:  (Nonverbal response.)
21                         REDIRECT EXAMINATION
22    BY MR. SIMMONS:
23    Q.      Tim, how are you doing?
24    A.      I'm doing okay.
25    Q.      Do you need a break or anything?
```

```
 1    A.      No.  I'm fine.
 2    Q.      Well, regarding your right to vote, what would
 3    happen, in your estimation, if you asked to vote in an
 4    election?
 5            MR. TYRRELL:  Objection, Your Honor, calls for
 6    speculation.
 7            THE COURT:  Sustained.  And I'm not really sure
 8    it's relevant.
 9            Next question, Mr. Simmons.
10    A.      Do I get to answer?
11    Q.      (BY MR. SIMMONS)  No.
12            MR. SIMMONS:  I don't think I have anything
13    further, Your Honor.
14            THE COURT:  Okay.  I have a couple of questions
15    for you directly.
16                         EXAMINATION
17    BY THE COURT:
18    Q.      You mentioned an incident or you talked generally
19    about what happens when you mess up, and that results in
20    you being suspended from therapy; right?
21    A.      Right.
22    Q.      Is that something that, let's say over the last
23    five years, has occurred frequently?  Is it -- does it
24    seldom happen?  How often does it --
25    A.      Once.
```

1    Q.      It happened to you once?

2    A.      Once.

3    Q.      How often have you seen it happen to other

4    participants?

5    A.      I don't know because they go in and out, in and

6    out, so much.

7    Q.      Okay.

8    A.      And in the group --

9    Q.      Let me ask you about this incident where you said

10   -- and I just want to clarify.  Did you say you were

11   suspended from therapy for two to three months because you

12   stayed back for commissary?

13   A.      One month, ma'am.

14   Q.      You were suspended for one month.

15   A.      One month.

16   Q.      So, that meant for four therapy sessions you were

17   not allowed to go because you stayed back on one occasion

18   to go to commissary?

19   A.      Right.  I got three program tickets, so I got

20   suspended for a month.

21   Q.      Okay.  What types of things do you get suspended

22   for?

23   A.      You can get -- well, you -- the way that works,

24   you get two program tickets or three program tickets, you

25   get probation.  And then after -- and then if you get a

```
 1    ticket while you're on probation, you get suspended.
 2    Q.      And so what that means is, you get suspended from
 3    therapy?
 4    A.      Yes.
 5    Q.      So, you are not allowed to go to therapy?
 6    A.      Not allowed to go to therapy.
 7    Q.      Okay.  And did I understand you to say that you
 8    have last -- the last time you were in therapy was in
 9    January of this year?
10    A.      Right.
11    Q.      Is that for medical -- due to your medical
12    condition?
13    A.      Yes.  Actually, February -- February the 25th is
14    when they said that I had fell out.
15    Q.      What do you mean, "fell out"?
16    A.      I went down with my COPD.  In other words, I went
17    to the hospital.
18    Q.      Okay.
19    A.      And then I came back to the prison March the 16th.
20    And I have not been offered any, any therapy or any
21    treatment.
22    Q.      Has a doctor restricted you from therapy?
23    A.      No, not that I know of.
24    Q.      Now, you have been talking here to us for about
25    close to an hour --
```

1    A.      Yes.

2    Q.      -- in your chair.  Is there any reason that you

3    couldn't do that in therapy?

4    A.      The only thing is, I'm -- I've got oxygen.  And

5    they won't allow oxygen out in general population.

6    Q.      They won't -- what?

7    A.      Allow oxygen out in general population.

8    Q.      In general population?

9    A.      Yeah.

10   Q.      You're not -- are you in general population?

11   A.      Right now, I'm in Health Care.

12   Q.      Okay.

13   A.      And if I went back, I would have to go to chow and

14   everything else with general population, and they don't

15   have no portable oxygen.

16   Q.      Okay.  Let me ask you this:  Before you had your

17   last medical situation back in February, before then --

18   A.      Yes.

19   Q.      -- when you were still going to therapy --

20   A.      Yes.

21   Q.      -- and you were in what you call -- when you say

22   general population, you're talking about SDP general

23   population; right?

24   A.      Yes.

25   Q.      Or are you talking about general population?

```
1    A.      Well, both, really.
2    Q.      Okay.  Well, let me ask you this:  Before you had
3    your last medical incident and you were still in, in
4    therapy -- okay?  Back then, describe for me what a
5    typical day would be like for you.  Tell me what your
6    general activities would be, and where physically you
7    would be in the prison.
8    A.      Okay.  We'll start on Monday.  My therapy group
9    was 12:30 to 1:30, and we would -- if she -- if we had
10   homework assignments, we would discuss homework
11   assignments in our group.  And if she gave out another
12   homework assignment, I usually came back and put the
13   homework assignment up and played some cards or done
14   something.
15   Q.      Where?
16   A.      On dayroom.
17   Q.      So, there's a dayroom in the wing that --
18   A.      Yes.
19   Q.      -- where the participants are?
20   A.      But we're only, we're only allowed -- our dayroom
21   privileges, that's only if staff is present.  Otherwise,
22   we're locked down just like general population.
23   Q.      How often in a typical week would you have been
24   locked down in your cell versus allowed to go on dayroom?
25   A.      Well, we're -- staff's only there from like 8:00
```

1    to 2:30, is the only time we're out, Monday through

2    Friday, unless it's the holiday.

3    Q.      8:00 a.m. to 2:30 p.m.?

4    A.      Yes, ma'am.

5    Q.      And then the rest of the time you are on

6    lockdown --

7    A.      The rest of the time, we're on lockdown.  We get

8    to come out for an hour at night, one hour, then we're

9    locked all the way down until breakfast time, to when we

10   can go get breakfast.

11   Q.      And how long has it been like that?

12   A.      Since about 2015, somewhere along in there.

13   Q.      Okay.  Thank you, Mr. Charles.

14   A.      You're welcome.

15           THE COURT:  I believe -- unless there's anything

16   else, we can excuse Mr. Charles?  If that's the case, why

17   don't we go ahead --

18           MR. TYRRELL:  I just had one followup question,

19   based on the Court's question, Your Honor?

20           THE COURT:  Sure.

21                        RECROSS-EXAMINATION

22   BY MR. TYRRELL:

23   Q.      Mr. Charles, do you also receive dayroom on the

24   weekends?

25   A.      The same as general population.

```
1    Q.      Is that for a couple hours a day?

2    A.      Yeah.

3    Q.      Do you know how many hours?

4    A.      Yeah, we get to come out like, I think it's like

5    noon to 2:30 or somewhere along there.

6            MR. TYRRELL:  Okay.  Thank you, that's all I had,

7    Your Honor.

8            THE COURT:  Anything else, Mr. Simmons?

9            MR. SIMMONS:  No, Your Honor.

10           THE COURT:  Why don't we go ahead and take a break

11   and allow the folks to deal with Mr. Charles.

12           Let me say this:  Mr. Charles, I know you want to

13   be here for the course of this trial but, because your

14   health is the most important thing, we're going to let

15   them go ahead and take you back.  And your attorneys will

16   be in touch with you and let you know what's going on.

17           THE WITNESS:  Okay.

18           THE COURT:  But we wanted you to have your day in

19   court, but we need you to -- we need you to be taken care

20   of.  We need you to be safe.  Okay?

21           THE WITNESS:  All right, ma'am.

22           THE COURT:  All right.

23           THE CLERK:  All rise.

24           (Court recessed from 10:33 a.m. to 10:43 a.m.)

25           (Proceedings continued in open court, parties
```

```
 1    present.)
 2          THE COURT:  Hello, Mr. Stobbs.  You can call your
 3    next witness.
 4          But before we do that, let me just let you know
 5    what we're going to do.  We're going to go at least until
 6    quarter-to or ten-to-12.  I have to take a plea at noon.
 7          MR. STOBBS:  Okay.
 8          THE COURT:  So, just to let you all know, we're
 9    going to take the break for lunch somewhere between 11:45
10    and 11:50.
11          MR. STOBBS:  Perfect.  Okay.  If we could call
12    George Needs, Judge?
13          THE COURT:  All right.
14          MR. STOBBS:  Come on up here, George.
15          (Witness sworn by clerk.)
16          THE COURT:  Mr. Needs, I know you are soft spoken
17    but you need to speak up.  I know you are nervous, but
18    just relax and listen to the questions from Mr. Stobbs.
19    Okay?
20          THE WITNESS:  Okay, ma'am.  Thank you.
21                      GEORGE NEEDS,
22    having been first duly sworn, was examined and testifies
23    as follows:
24                   DIRECT EXAMINATION
25    BY MR. STOBBS:
```

1    Q.      George, could you tell Judge Yandle where you are

2    from?

3    A.      Big Muddy Correctional Center.

4    Q.      That's where you live now.  Where were you born?

5    A.      Quincy, Illinois.  I was born and raised in

6    Blessings Hospital.

7    Q.      George -- and I know you are a little bit nervous

8    here.  We all get that.  So, what I'm going to ask you to

9    do -- we're not in any hurry here.  Okay?

10   A.      All right.

11   Q.      I'm going to ask you questions.  And think before

12   you answer, and answer it truthfully.  Okay?

13   A.      Yes, sir.

14   Q.      So, you said that you were born in Quincy?

15   A.      Right.

16   Q.      How old are you?

17   A.      I was born September 18, 1959.  I'd be 60 years

18   old, I think, right now.

19   Q.      Okay.  When were you born?

20           THE REPORTER:  Please repeat your date of birth.

21           THE WITNESS:  September 18, 1959.

22   Q.      (BY MR. STOBBS)  Okay.  How far did you go in

23   school?

24   A.      I quit when I was in senior high one -- no.

25   Correction.  I quit when I was in junior high school at

1    the age of 16.

2    Q.      George, do you remember the year that you were

3    civilly committed?

4    A.      I was civilly committed in 1981, I believe it was.

5    Q.      And since that time, have you ever left being

6    civilly committed?

7    A.      No.   I've been in Menard since 1995.   Transferred

8    from Menard to Big Muddy, where I have been ever since, to

9    this day.

10   Q.      So, basically for about 40 years you have been

11   civilly committed; right?

12   A.      Been civilly committed.

13   Q.      Has there -- have you ever tried to go through the

14   judicial process to have them allow you free?

15   A.      I have tried several times, got scared, re -- what

16   do you call that -- stopped the process.   Tried again.

17   The court ruled -- this was in 2000-and-something, I can't

18   remember, I think 2007, maybe.   I don't know.   The court

19   ruled that I was still sexually dangerous.   Then I filed a

20   motion for judicial care and review, which I'm waiting on

21   now for November the 14th.

22   Q.      And you have been at Big Muddy for how long?

23   A.      Since '95.

24   Q.      And since that time there have been various

25   directors; right?

```
1    A.      Yes.

2    Q.      And one of those directors is Dr. Holt?

3    A.      Yes.

4    Q.      And he's the guy that's been in charge for the

5    past couple years; right?

6    A.      Yes.

7    Q.      Since Dr. Holt has been at Big Muddy, do you think

8    -- have you been getting treatment there?

9    A.      No, I would have to actually say, no, I have not.

10   Q.      Is treatment offered there?

11   A.      Treatment is offered there, but that doesn't mean

12   we're getting the treatment.

13   Q.      And is punishment also avail -- in existence at

14   Big Muddy?

15   A.      Yes.  You have program -- you have SDP program

16   punishments, which are tickets, and then you got IDOC

17   tickets --

18   Q.      Okay.  Now what I want you to tell --

19   A.      -- for the program.

20   Q.      What I want you to tell Judge Yandle is, since you

21   have been there, since Dr. Holt's been in charge, do you

22   think the focus is on treatment or on punishment?

23   A.      Do you want me to tell Judge Yandle --

24   Q.      Tell her.

25   A.      I've been locked up for 40 years.  I've been
```

1    through the process of this treatment program, okay.

2    There was one time when I believed -- didn't even care

3    about it.  Okay?  Because that's when I was in my

4    deviancies and stuff like this.  I just didn't care.

5         Then came a point in my life when I had started,

6    actually do care.  When I really thought that was

7    something.  There was a judge, her name was Judge Scott.

8    She was my judge.  She sat there and said, "Mr. Needs, I'm

9    going to send you to a place where you will receive the

10   help that you need and you will not hurt any more little

11   girls."  I believed that.  That was 40 years ago.  I don't

12   believe that no more.  I have no faith in that system no

13   more.

14   Q.    George, listen to my question and answer the

15   question.  Okay?

16   A.    Okay.

17   Q.    My question is:  Do you think, since Dr. Holt has

18   been there, the focus is on punishment or treatment?

19   A.    I do not believe it's on, on treatment.  Because

20   when he first got down there, the first thing out of his

21   -- what he said was, he was not there to help us.  That --

22   for whatever reason.  Because people started yelling and

23   whatnot.  It is more -- I have seen people get program

24   tickets.  I have seen people going to seg because they

25   refused to go to group -- hell, I was one -- excuse me,

1    Lord.  Sorry.  Sorry, Lord.

2         I was one of them.  Okay?  I've been dismissed

3    from the groups for disrupting the groups, for questioning

4    the staff why that they are going down there.  Questioning

5    them about why they're destroying my books and other items

6    and stuff like this.  And they're not giving me no

7    answers.  They're not giving any reason why.

8         How is it therapeutic if they're sitting there,

9    they're trashing your stuff, but they're saying it's out

10   of therapy but they're not telling you why it's out of

11   therapy.  How does that affect me?  How is that -- sitting

12   there saying, like, I get a religious book mag in and it's

13   got a picture in there that they said it's inappropriate

14   for me to have, so they tear it out or they destroy the

15   mag altogether because it's inappropriate.  But they don't

16   tell me what's inappropriate.  They don't tell me nothing.

17   That is not therapy.  That is punishment.  That's, that's

18   plain and simple just downright punishment.

19   Q.    Hey, could you tell Judge Yandle what, what's the

20   worst punishment you have received there?

21   A.    The worst punishment I ever received there is,

22   they took my underwears for two -- excuse me, Lord.  I

23   know.  I know.  They took my underwears for two, two

24   years.

25   Q.    Wait.

1    A.      This was because me and John Lance -- John Nance

2    -- John Nance, I think his name is -- got into an

3    argument.

4            THE COURT:  Took your underwear?

5            THE WITNESS:  They took my underwears.

6    Q.      (BY MR. STOBBS)  For two years?

7    A.      For two years.

8    Q.      Well, I gotta ask you this then:  Have you got

9    underwear on now?

10   A.      Yes.

11   Q.      When did you get it?

12   A.      I got these two weeks before the trial, because a

13   person -- I will not mention his name because he will get

14   a ticket, program ticket for traffic and trading -- for me

15   to have them.

16   Q.      So, you have some illegal underwear on?

17   A.      Yes, I do.

18   Q.      Okay.  Do -- if, if they -- if they take your

19   underwear, did they say it's therapeutic for any reason?

20   A.      No.

21   Q.      They just took your underwear?

22   A.      They took 'em.  Well, the reason why they took 'em

23   was because I received a ticket because I had two pairs of

24   underwears in my cell, that I was so desperate, that, that

25   they were somebody else's.  Someone else threw the

1    underwears out on a stoop, underneath the stairwell.  I
2    was so desperate and so humiliated because I didn't have
3    no underwears, I felt naked.  So I went --
4         THE COURT:  Go ahead.
5    A.    So, I went and I took these off of the stoop, took
6    them back in the house.  Next thing I know, my cell's
7    being searched by Officer Brown and O'Hara, who go down
8    there and they tell me that the administrator ordered a
9    search.  I went down there and I told them, I said,
10   "Listen, if you look in my box, it's right there."  They
11   said, "Well, you just told the guy that you didn't have no
12   underwears."  I said, "I don't got underwears."  And it
13   was the truth.
14   Q.    (BY MR. STOBBS)  I mean, I guess it's a good thing
15   you're not wear -- you weren't wearing a white suit like
16   Mr. Simmons was, in those two years; right?
17   A.    I like that suit.
18   Q.    But what did Dr. Holt say about your lack of
19   underwear?
20   A.    Dr. Holts was the one who sent the dogs on me.
21   Q.    So he approved of it, in your mind?
22   A.    No.
23   Q.    The -- when you -- do you remember your diagnosis
24   when you were committed to the, to this program, civilly
25   committed?

```
1    A.      When I was committed, there was two of them.
2    There was anti-social and then there was pedophilia.
3    Q.      So, while you're -- and I'm just talking about the
4    last four or five years since Holt's been there, all
5    right?
6    A.      Okay.
7    Q.      Now, since you have been there, have you been
8    offered any sort of treatment?
9    A.      I have had -- my facilitator at the time was --
10   when they came, and when Miss Rush was there, it was --
11   Miss Marsha Woods was our facilitator, and it was for one
12   hour that we were there when we had group.
13   Q.      And in your group, since you have been there since
14   Dr. Holt was there, just in this time period, have there
15   been people in your group who had different diagnoses?
16   A.      No.  It was pretty much established that if you
17   smell like a duck, you look like a duck, you quack like a
18   duck, you're a duck.
19   Q.      George, I got all that, and I got that you're mad.
20   But you're going to have listen to my questions and
21   answer.  I didn't ask you anything about a duck.  All
22   right?
23   A.      Okay.  Sorry.
24   Q.      When you were in the group and you have this
25   diagnosis of pedophilia and whatever, are there other
```

1    people with different diagnoses in that group?  Yes or no.

2    A.      Yes.  There are people that has -- who are

3    rapists.  There are people who are druggies.  There are

4    people who are alcoholics.  There are people who --

5    related to sex offending and stuff like that that are in

6    the same group, but we're all, we're all treated as one in

7    the group.

8    Q.      So, in your mind are you receiving individualized

9    treatment?

10   A.      No, never have been.

11   Q.      What is your medical condition?

12   A.      My medical condition right now is, I have blood

13   clogs, memory loss.

14   Q.      Are you taking any medication for that?

15   A.      Yeah, they asked me about that.  Mr. Tyrrell there

16   was the guy who did the deposition on us.  He asked me

17   about the medicine.  I brought the list.  I asked the

18   nurse.  Can you hand him the list?  There's a list right

19   there on the table.

20   Q.      And the medication is for your, your different

21   medical conditions; right?

22   A.      Yes.  I take Coumadin because I have blood clogs.

23   I take Nitros because of my heart.  I take -- I mean --

24   excuse me, not Nitros.  I take Lithium for my mood swings.

25   And various other things in there.

```
 1    Q.      Have you ever had a concern that because of your
 2    medical condition you might not be able -- allowed into
 3    any of the groups?  That if you get put into the medical
 4    wing, that you somehow won't be able to participate in
 5    groups?
 6    A.      I have a dread going to Health Care because it is
 7    called the death care, because it means death.  We have
 8    one of ours here, his name was -- I can't think of his
 9    name right now --
10            THE COURT:  Mr. Needs?
11            THE WITNESS:  Yes, ma'am.  I'm sorry.
12            THE COURT:  I just need you to answer his
13    question.  If you don't understand it, he'll restate it.
14    But I need you to focus --
15            THE WITNESS:  All right.  Sorry, ma'am.
16            THE COURT:  -- and answer his question.  It's
17    okay.
18            Do you want to ask it again, Mr. Stobbs?
19    Q.      (BY MR. STOBBS)  Have you ever had a concern, have
20    you been afraid that if you get put in the medical wing
21    that somehow you won't be able to participate in group?
22    Like Mr. Charles.
23    A.      Yes.
24    Q.      Okay.  Now, I want to talk to you now, I'm going
25    to focus now about the groups --
```

```
 1    A.      Okay.

 2    Q.      -- okay?  We have talked about kinda the other

 3    stuff, but I want to talk specifically about groups.

 4    Okay?  All right?

 5    A.      All right, sir.

 6    Q.      So, are you in -- are you in a group therapy

 7    session right now?

 8    A.      No.

 9    Q.      Why?

10    A.      I quit.

11    Q.      When?

12    A.      About six to eight months ago.

13    Q.      Why?

14    A.      Because it is not a program.  It is about punitive

15    punishment.

16    Q.      You have been there for 40 years --

17    A.      Yes.

18    Q.      -- right?  And since Dr. Holt's been there, how

19    high up the list have you gone in terms of the phases?

20    A.      I was once on Phase 2, but I am not on any phases

21    now.

22    Q.      When, when you were in groups before the six

23    months that you quit -- before, all right?  Okay?

24    A.      Mm-hmm.

25    Q.      -- what was the largest group, the number of
```

```
 1   people in the group, do you remember?
 2   A.      Well, that would have been when we first came down
 3   here, and that was like 25 people in the group.  But
 4   that's when Mark was here.
 5   Q.      I'm not asking about Mark.  I'm asking about Dr.
 6   Holt.
 7   A.      When Dr. Holts and them got here, the groups were
 8   anywhere from 12 to 14, maybe a little bit higher.
 9   Q.      Okay.  How long did the groups last?
10   A.      Can you clarify?
11   Q.      If a group session was 60 minutes, one hour --
12   okay?
13   A.      Okay.
14   Q.      -- how long did the session last in that 60-minute
15   time frame?  Was it a full 60 minutes or was it less?
16   A.      No, because it was a lot of variables that went
17   on.  You gotta take into account about --
18   Q.      Tell Judge Yandle about that.
19   A.      Hmm?
20   Q.      Tell Judge Yandle about that.
21   A.      It varies.  If I go to group one -- one second or
22   one minute late, I would be told to leave the group
23   because I'm not allowed to be in the group because I'm
24   disrupting the group.  Jessica Stover has did this on me
25   numerous of times.
```

1      If you -- if they got an emergency or if they got

2   to go to a seminar or if they got to go to some other deal

3   with the emergency situation, groups are cancelled.  And

4   that could last up to a week or whatever.

5      I have been, like I said, removed from a group for

6   being disrespectful towards Jessica, as well as some of

7   the other staff that are there.  I have been disrupted

8   through the groups, you know, because out of just

9   frustration and anger because when you sit there and, and

10  you try to do your group work but all you hear is, is her

11  telling you what it is you want -- what you need to think

12  in your head and stuff like this, not what you are

13  thinking in the head but what they want you to think in

14  the head, that is, to me, not therapy.

15      I mean, when I go to therapy, I want to be able to

16  sit there and lay out what's going on with me.  They --

17  you have -- you -- you have people who are doing their

18  cycles, who are there for six months, and you have to

19  wait.  And then when another one pops up, you have to wait

20  another six months, and then so forth, down the line.

21          THE COURT:  What do you mean by that?

22          THE WITNESS:  I did a cycle one time --

23          THE COURT:  What's a cycle?

24          THE WITNESS:  A cycle is laying out the plans of

25  my deviancy.  Okay?  My, my attacks on the little girls

1    and stuff like this.  Cycle is how we -- cycle is laying

2    out what we did to our victims.

3              THE COURT:  What you did?

4              THE WITNESS:  Yes.

5              THE COURT:  In a group setting?

6              THE WITNESS:  Yes.  And you have to remember every

7    little detail that you have done.  You can't leave nothing

8    out.  You always have to go over it and over it and over

9    it.  And by the time you get around to your chance to

10   present your cycle, it's already almost eight to a year

11   down the line.  And we're not allowed to file a writ of

12   recovery for every two years.  And...

13   Q.       (BY MR. STOBBS)  How many hours a week do you have

14   of therapy, that you are taking --

15   A.       Well, I had one hour, before I quit.

16   Q.       And you told the judge that it's not a full hour;

17   right?

18   A.       No, it is not a full hour.

19   Q.       And are there, are there other kind of classes

20   that you can volunteer for, like Empathy or those kinds of

21   classes?

22   A.       I had volunteered to go to the Anger Management

23   with Heather Young, I think her name was at that time.

24   Q.       Mm-hmm.

25   A.       I had signed up to go to schooling -- to school.

1    Q.      Right.

2    A.      I have signed up to go in chapel for -- I can't

3    pronounce the word.  It's a weird name.  But as in, as in

4    the program, to be frank, I really have not really went to

5    Dr. Holts or Jessica or any of the staff and asked to be

6    placed in any other programs.

7    Q.      All right.  Now, if you don't understand this

8    question, please stop me and I'll rephrase it.  All right?

9    A.      All right.

10   Q.      Now, we have heard a little bit about different

11   phases in the program.  Do you remember that?  Do you

12   remember that?

13   A.      Yes.

14   Q.      And there's four phases; is that correct?

15   A.      There's four phases, yes.

16   Q.      These other programs that you are talking about,

17   are those programs that can be -- are those that can be

18   used in the phases to move up?

19   A.      As I understand it, the four phases -- the Phase

20   1, which you are supposed to come into the program, which

21   they do evaluations and place you in a, in a place of --

22   when you are new there.

23           And in Phase 2, it's like -- this is how I

24   understand -- is that they move you up in the group and

25   they -- while you're there, you learn newer stuff.

1          And then Phase 3 is close to being released, so

2    you're placed in a place where you are about ready to be

3    released but you are not, because you're not in Phase 4

4    yet.  Okay?

5    Q.     Right.

6    A.     And Phase 4 is the release time.  This is where

7    they are supposed to have a place set aside outside that

8    you can go to, to be released, so, so you can -- well, so

9    you can have -- all right.  Can you give me a second,

10   please?

11   Q.     Absolutely.

12   A.     (Pause.)  Phase 4 is supposed to be for everybody

13   who's been processed through the program, done good, lived

14   and modeled their lives after what they believed to be

15   true, that they are truly empathetic -- I mean, empathy

16   for their victims for what they have done, and learned to

17   control themselves and they are ready to be released.

18          There is no release program.  Period.  There is no

19   support.

20   Q.     Listen.  Explain that to Judge Yandle.  Explain

21   what you just -- what you meant by that, to the release

22   program, to Judge Yandle.  This is important.

23   A.     The release program, like I said, is for a person

24   who -- is sympathy for what he has done to his victims.

25   He feels sorry -- he feels sorry about what he done to his

1   victims because of the harm and the, the -- the

2   destruction of their souls that you have done.  I have

3   hurt 23 victims.  I went out there and I didn't care.  No

4   one was going to stop me.  I did what I did because I

5   could do it.

6          Then they send me here and I'm expected to be in a

7   program that's supposed to get me to a place in life where

8   I learn the dangers that I have caused these individuals

9   with my actions.  And the thing is, they didn't.  They

10  don't have no programs.

11         They don't have nothing for release.  There's no

12  halfway houses anymore.  IDOC refuses us any halfway

13  houses that they have.  And the treatment staff simply

14  will not help us.  They said it.  They're not here to help

15  us.  They're here to keep us here.  I have a fear that I

16  am not going to make it out of here, as much as Tim does.

17  I have been in for 40 years.  I had a judge who I had

18  faith in, that I thought -- only to find out it's not true

19  because I'm being warehoused in a program that is meant to

20  keep me here.

21         And my only choice of action is why I'm here

22  today, is to effect change, any kind of change, anything

23  that will help us for release or for therapy.  Whatever it

24  takes.

25         Judge, that's why I'm here for you.  That's why

```
 1    I'm here in front of you, asking you, pleading with you,
 2    begging with you, please, help us.  Because we need your
 3    help.  It is not good there.  It is not good at all.
 4    Q.      Do some people -- in your experience, have you
 5    observed some people just give up?
 6    A.      Yes.
 7    Q.      And is that because of the difficulty going from
 8    one phase or stage to another?
 9            MR. ROCKERSHOUSEN:  Objection, calls for
10    speculation.
11            THE COURT:  Overruled.
12    A.      Because of that reason, I know that there has been
13    people who tried to commit suicide.  I have tried suicide
14    when I was in the County, when I went to court, when they
15    turned me down.  There is no hope in this program.  There
16    is none.
17    Q.      (BY MR. STOBBS)  And hope -- and you -- and what
18    hope do you have that's going to happen here today?
19    A.      My hope is that there will be change done, that we
20    will not be ignored or, or given the indifference of, of a
21    -- I don't know how to explain it.  Just the indifference.
22    I mean, we're treated with indifference.  We're inmates.
23    We're nothing more.  We're, we're basically garbage.
24            MR. STOBBS:  If I could have two seconds, Judge?
25            THE COURT:  (Nonverbal response.)
```

```
 1              MR. STOBBS:  I don't have any other questions,
 2     Judge.
 3              THE COURT:  Mr. Needs, just remember what I asked
 4     you the time --
 5              THE WITNESS:  Yes, ma'am.
 6              THE COURT:  -- with Mr. Stobbs.  Let him finish
 7     his question, and answer the question that he's asking
 8     you.  Okay?
 9              THE WITNESS:  Yes, ma'am.
10              THE COURT:  Okay.
11                         CROSS-EXAMINATION
12     BY MR. ROCKERSHOUSEN:
13     Q.       Good morning, Mr. Needs.
14     A.       Sir.
15     Q.       My name is Kyle Rockershousen.  I represent the
16     defendants in this case.
17     A.       Sir?  I -- how --
18     Q.       I'm sorry.  My name is Kyle Rockershousen and I
19     represent the defendants in the case.
20     A.       Okay.
21     Q.       Mr. Needs, since you have been -- strike that.
22              Mr. Needs, what County are you civilly committed
23     out of?
24     A.       Sangamon County.
25     Q.       Okay.  And since you have been civilly committed,
```

1    how many times have you petitioned Sangamon County for

2    your release?

3    A.    I'm not really sure, but I would say anywhere from

4    maybe five to six -- like I said, there's been several

5    times that I have stopped them.

6    Q.    And when was the most recent time that you

7    petitioned the Court in Sangamon County?

8    A.    At the time, I think it was 2016, 2015.

9    Q.    And you currently have a case pending for the

10    review of the treatment you are getting at Big Muddy in

11    Sangamon County?

12    A.    Judicial care review, yes.  I'm supposed to be

13    going November -- November the 14th.

14    Q.    And what is supposed to take place November the

15    14th?

16    A.    I have no idea.  I have never been to one and I'm

17    -- don't have a clue.

18    Q.    And the last time you petitioned the court in

19    Sangamon County for your release, who made the

20    determination to keep you civilly committed?

21    THE COURT:  Mr. Rockershousen?  Hold on for a

22    second.  Let me just stop and see if I can help to refocus

23    you because we're going to be here a few days.  This case

24    is not about, and they have not filed a claim, that they

25    are seeking release.  As you know, you point out in your

1   pleadings, that goes before in another forum.  So, we're

2   not here to talk about whether they have been

3   appropriately committed, whether the decisions to release

4   them are not -- I'm not judging that.

5         This case is about whether or not the treatment

6   they are receiving is constitutional and meets Fourteenth

7   Amendment standards, whether the conditions of confinement

8   meet Fourteenth Amendment standards.

9         MR. ROCKERSHOUSEN:  Yes, Your Honor.

10        THE COURT:  We don't need to be here going down

11  roads we don't need to go down.

12        MR. ROCKERSHOUSEN:  Yes, Your Honor.  It was my

13  understanding --

14        THE COURT:  I'll give you some leeway, but I want

15  to make sure we keep our eye on the prize because I don't

16  want to be here until Monday talking about irrelevant

17  stuff.

18        MR. ROCKERSHOUSEN:  Sure, Judge.  Basically, the

19  reason I was getting into that line of questioning is,

20  they're alleging that part of the reason why the treatment

21  that they're receiving is inadequate is because it

22  prevents them from ever being released.  And I'm just

23  trying to establish that the program doesn't make the

24  determination that they -- whether or not they are

25  released.

```
 1              THE COURT:  No, but the decision makers on whether
 2     or not they are released rely on information from the
 3     program.
 4              MR. ROCKERSHOUSEN:  Yes.
 5              THE COURT:  So, you don't need to get that from
 6     him.
 7              MR. ROCKERSHOUSEN:  Okay.
 8              THE COURT:  I got that.
 9              MR. ROCKERSHOUSEN:  Okay.  Thank you, Your Honor.
10              THE COURT:  All right.
11     Q.       (BY MR. ROCKERSHOUSEN)  So, Mr. Needs, since you
12     have been at Big Muddy have you had any further mental
13     health diagnoses given to you by a mental health
14     professional other than when you were first committed?
15     A.       Can you clarify that, please?
16     Q.       Sure.  I believe you testified earlier that you
17     were diagnosed with pedophilia when you were committed?
18     A.       Pedophilia and, and -- um -- there was a second
19     one.  I said the second one, first, though.  I forgot.
20     Sorry, sir.
21     Q.       That's okay.  So, other than those diagnoses that
22     you received when you were committed, have you received
23     any other diagnoses from any mental health professional
24     since you have been committed?
25     A.       Yeah, actually, I have been diagnose -- short
```

1    memory span -- let me see.  There was Dr. Tizala

2    [phonetic].  There was, there was quite a few doctors.

3    The most recent one, I would have to say, was during,

4    when, when I was supposed to go to court, Mrs. Padera, I

5    believe her name is.

6    Q.      Dr. Weldon-Padera?

7    A.      Yeah.  She -- I don't remember the diagnosis

8    though that she, that she had two other diagnoses on

9    there.

10   Q.      Have you ever been diagnosed with bipolar

11   disorder?

12   A.      To be truthful, I really don't know if I have or

13   not.

14   Q.      Have you ever been diagnosed with paranoia?

15   A.      Yes.

16   Q.      And, Mr. Needs, where do you currently reside at

17   Big Muddy River Correctional Center?

18   A.      On 4-B, 26 Cell.

19   Q.      And can you explain how 4-House is set up at Big

20   Muddy River Correctional Center?  How many wings are on

21   4-House?

22   A.      Okay, A Wing is a sex offender wing that is, that

23   is also run by our facilitator.  Then you got B Wing, the

24   wing I'm on.  It's SDP's only.  C Wing is also SDP's only.

25   And then D Wing is the drug wing, and they're only general

1   prison population, as well as A Wing.

2   Q.      Okay.  So, on your wing, there are only SDP's

3   housed on that wing; is that correct?

4   A.      Correct.  That's correct.

5   Q.      Since you have been at Big Muddy River

6   Correctional Center have you held any jobs at the

7   facility?

8   A.      Numerous jobs, yes.

9   Q.      What jobs have you had at Big Muddy?

10  A.      Well, recently, before I had to go because of my

11  medical reasons, I was a janitor for our 4-B Wing.  I have

12  been Dietary.  I have been -- well, when we got down here

13  in '95, I pretty much did everything because our

14  supervisor who was Lieutenant Adams.  We were his main

15  crew, where we did everything.  But that since went down.

16          Let's see.  I had laundry -- laundry porter,

17  wheelchair pusher.  I worked at a time that was more or

18  less unofficial because I was a wheelchair pusher, but

19  where I would help out in Health Care.  All right?  And

20  when I was in Health Care, no one would generally go up --

21  and there's always help, those who needed the help, even

22  though myself, I wasn't supposed to be walking around.

23  That's pretty much I can remember right now.  I can get

24  you a list though, if you want.

25  Q.      Thank you.  That's okay.  So, when you have these

1    jobs at Big Muddy River Correctional Center, do you

2    physically leave your wing to perform these job duties?

3    A.      Some jobs, yes.  When we take wheelchairs to chow,

4    we go into the chow hall to eat.  Healthcare, yard, gym,

5    library.  Over at the front gates, in case they're going

6    on writs, we take them down there.  Other jobs -- well,

7    actually that's pretty much the one that I was on, would

8    be wheelchair pusher.

9    Q.      You were in the courtroom when Mr. Charles was

10   testifying; correct?

11   A.      Yes.

12   Q.      Would you agree with him as to how much time in a

13   dayroom you got in a given week?

14   A.      Well, I'm not a mathematician or anything like

15   that.  Feeling wise, I would say maybe not.  But I would

16   say that we do spend a great deal dayroom wise in our

17   cells more.

18   Q.      Okay.

19   A.      I would say -- go ahead, sir.  I'm sorry.

20   Q.      That's okay.  You can finish your answer.

21   A.      When I was janitor, I could be out all day because

22   that was my job.  Okay?  But if you're not a janitor, then

23   you're not out.  I mean, you're in.

24           Look, you got guys who are live-in aides, who are

25   out 24/7 around the freaking clock.  They're SDP's.  We're

```
1    not allowed out that much time.  You know, why -- they're
2    inmates.  They're live-ins.  They're cellies.  What's the
3    difference?  I'm celing with my cellie.  We're in our
4    cell all the time.  But they're out working.  But they're
5    cellie's cellie and they're -- this is not right.  So, I
6    don't think that we are given the -- do you want my own
7    answer to this?  That's what I think.
8    Q.      No, that's okay.
9            THE COURT:  No, you're not going to cut him off.
10   You need to answer the question.
11   A.      This is what I think.  I think it's wrong for us
12   to be locked up that amount of time.  Period.  We're not
13   in criminally convicted -- excuse me, Lord, I know, sir,
14   I'm sorry.  We're not even criminally convicted.  You got
15   people who are criminally convicted, I could see them
16   being in that kind of condition.  We're criminally
17   convicted.  Why should we be locked up all that time?
18           THE COURT:  Mr. Needs, the question was how long,
19   and you have answered that question.  Okay?
20           THE WITNESS:  Okay.  Thank you.
21           THE COURT:  Next question, Mr. Rockershousen.
22           MR. ROCKERSHOUSEN:  Thank you, Your Honor.
23   Q.      (BY MR. ROCKERSHOUSEN)  How often do you leave the
24   cellhouse to go to Dietary to get meals?
25   A.      Well, see, we leave at 4:30 in the morning -- no,
```

 1    excuse me, 5:00 in the morning, and we're there for about,

 2    depending on when the officers let us out, anywhere from

 3    five to ten minutes.  Then we leave.  Then we go eat at

 4    noontime at 9:30 and we're there until 10:00.  And then at

 5    nighttime, we go eat at 5:00 until about 5:30.  And those

 6    are about the times we eat.

 7    Q.      Do you also get time to go to the yard?

 8    A.      Yes.

 9    Q.      How often do you get yard time?

10    A.      Well, we used to get yard two hours in the

11    morning, two hours at night, two hours in the afternoon,

12    but they stopped that.  And now it's like one hour in the

13    morning and night, or noon, depending on when the schedule

14    is displayed for us to let us know when that happens.

15            THE COURT:  A total of one hour?

16            THE WITNESS:  A total of one hour.

17    Q.      (BY MR. ROCKERSHOUSEN)  Do you also get gym time?

18    A.      Yes.

19    Q.      How often do you get gym time?

20    A.      I don't.  I don't go to gym because they put a

21    cage on it.

22    Q.      What do you mean by that?

23    A.      Meaning, they were supposed to bring down the

24    Tamms prison, when they were closing down Tamms, so they

25    built a cage.  They put up a mesh fence on the front of

1    there, and they were supposed to house them in there.  But

2    they never showed up, so now they use us in a cage and so

3    I don't like being in a cage.

4    Q.      When you were last participating in therapy, were

5    you ever given homework assignments?

6    A.      No.

7    Q.      Did you ever spend time working on therapy in your

8    cell or in the dayroom other than when you were in a group

9    therapy session?

10   A.      No.

11   Q.      Does Big Muddy River Correctional Center have a

12   library?

13   A.      Yes, sir.

14   Q.      And is there also a library for the SDP program?

15   A.      They used to have one on D Wing.  Before it became

16   that of a drug wing, it used to be the sex offender's

17   wing.  D Wing used to be on A Wing.  Well, they switched

18   them.  The library that was on D Wing, that was there,

19   went to A Wing.  We cannot check out books in the A Wing,

20   at least not that I'm aware of.

21   Q.      Are you able to check out books regarding your

22   treatment?

23   A.      No.  They have no, no -- the books that they did

24   have, the blue books, the brown books, the green books, or

25   whatever the books they had -- the ones for the program?

```
 1    They completely took them out.  Matter of fact, they're
 2    the reasons why we have so much problem with this phase
 3    thing, because in these books was the reason why we, we
 4    could understand the phases.  But we can't do it if we
 5    don't have the books.
 6    Q.     So, I'm not talking about workbooks, I'm just
 7    talking about literature in general.  Are there any books
 8    that you can check out?
 9    A.     Oh, yeah, in the library.
10    Q.     Okay.  And are there books that you can check out
11    that have to deal specifically with your treatment?
12    A.     No.  But you can check out books that has anger
13    management, sexual addictions.  There are books that are
14    therapeutic that you can check out.
15    Q.     And you testified earlier that you quit therapy;
16    is that correct?
17    A.     That's correct.
18    Q.     Did you tell someone you were quitting or did you
19    just stop showing up?
20    A.     Stopped showing up.  Didn't even want to talk to
21    them.
22    Q.     And before you quit therapy, you testified earlier
23    about the cycles; is that correct?
24    A.     Yes.
25    Q.     Is that your understanding, that the cycles are
```

1  the same thing as the semi annual evaluation?

2  A.      As -- I'm not really for sure how you are going

3  with that one.  Can you give me an idea?

4  Q.      Sure.  So, the cycles that you were talking about,

5  did you sit down with one your therapists every six months

6  to do an evaluation?

7  A.      No.  They just came in on the wing, have us sign

8  for them, and then take it back to our house and expect us

9  to understand it.

10  Q.      Did you ever sign your evaluations?

11  A.      Before I did, at one time.  But then I stopped

12  signing them.

13  Q.      And why did you stop signing them?

14  A.      Because they didn't -- they -- they weren't

15  helping, one.  Two, is they didn't, they didn't explain

16  nothing.  I didn't even understand them.  I mean, it's one

17  thing when you have a person sitting there telling you --

18  I don't know how to explain it.  They -- it's just -- I

19  just didn't understand the darn things.

20          I mean, it's like the phase, you know.  You got 1,

21  2, 3, 4 phase.  I understand them over the course of a

22  period of time, but I just don't understand 'em stand 'em.

23  I don't know how to explain it.

24  Q.      Do you have any opportunity to talk to your

25  therapist about your treatment plan?

1    A.      Yes.  Every Wednesday, they have staffing.

2    Q.      Okay.  Did you ever use that time to talk to

3    anyone about your treatment plan?

4    A.      No.  Actually, I had complaints about things that

5    were going on in the wing, and when I talked to them.

6    Q.      Thank you, Mr. Needs.

7            MR. ROCKERSHOUSEN:  That's all the questions that

8    I have.

9                    REDIRECT EXAMINATION

10   BY MR. STOBBS:

11   Q.      George, You said there are certain things you

12   don't understand; right?

13   A.      Correct.

14   Q.      Not trying to put you down or anything, but you

15   have trouble understanding a lot of things; right?

16   A.      Yes.

17   Q.      When it comes to book stuff; right?

18   A.      I've always had -- I've always been a slow

19   learner.  I've always been hard put when it comes to stuff

20   like that.

21   Q.      Do you remember when Dr. Holt gave you that test

22   for -- with 60 questions on it?

23   A.      Yes.

24   Q.      Could you tell Judge Yandle about that?

25   A.      Actually, to be frank, not really because I really

1    don't remember it.

2    Q.      Did you understand the test?

3    A.      No, I didn't even understand the test.

4    Q.      Do you remember how many questions of the 60 you

5    answered correctly?

6            THE WITNESS:  No, ma'am, I don't.

7    Q.      (BY MR. STOBBS)  As a result of the, the result

8    that you got on that, did that make you change from one

9    group to another?

10   A.      No, I don't think it did.

11   Q.      The, the books that you were talking about, the

12   blue and black or gray, whatever the color books they

13   were, how old were they?

14   A.      They were 20 to 30 years old.

15   Q.      And suppose that you, you are sitting in there in

16   your jail cell, door locked, and you decide that maybe you

17   want to get some religious book.  All right?

18   A.      Right.

19   Q.      And that they don't have it in the library.  Okay?

20   Can you just order that from Amazon.com or something?

21   A.      You can order the books from Bargain By Mail

22   catalog, by Music By Mail catalog, or stuff like that.  Or

23   you can just go down to the chaplain and ask him for

24   books.  And they have books down there that you can check

25   out there.

```
1    Q.      If there's a book that they don't have, how does

2    George Needs get that book?

3    A.      You order it.

4    Q.      And does it come right to you unopened?

5    A.      No.

6    Q.      Has someone gone through it and cut out pictures

7    and stuff?

8    A.      When the mailroom receives it, they're supposed to

9    get -- Dr. Holts comes down and gets it and takes it back.

10   And they'll either black out, tear out, or whatever.

11   Q.      Do they burn 'em?

12   A.      Not surprised.  I wonder.

13   Q.      So, when you are in your cells, are the cells

14   locked or unlocked?

15   A.      They're locked, but you can jerry-rig 'em.  What I

16   mean by that --

17   Q.      I don't want to go there, George.

18   A.      Okay.  I don't think so either.

19   Q.      So, one of your jobs is a wheelchair pusher?

20   A.      Yes.  It's like a job.

21   Q.      You're not telling Judge Yandle that you are

22   pushing general population people in a wheelchair, are

23   you?

24   A.      No.  We're not allowed to.

25   Q.      The people you are pushing --
```

```
 1    A.        However, I have.

 2    Q.        George.  All right.  The people that you are

 3    pushing in a wheelchair, those are from the SDP unit;

 4    right?

 5    A.        Yes.

 6    Q.        They have enough people in a wheelchair that they

 7    actually have a job for it; right?

 8    A.        Yes.

 9    Q.        All right.

10              MR. STOBBS:  No other questions, Judge.

11    A.        On B Wing, they got 20 wheelchairs or more.  And

12    on C Wing, they got anywhere from 15 to 16 wheelchairs.

13              MR. STOBBS:  Thanks.

14                         RECROSS-EXAMINATION

15    BY MR. ROCKERSHOUSEN:

16    Q.        Mr. Needs, for the jobs that you have at Big Muddy

17    River Correctional Center, do you receive any kind of

18    compensation for those jobs?

19    A.        Compensation?  You mean pay?

20    Q.        Yes.

21    A.        Yeah.

22    Q.        Okay.

23    A.        We got paid for that.

24    Q.        All right.

25              MR. ROCKERSHOUSEN:  No further questions.
```

```
 1              THE COURT:  I just have a couple for you, myself,
 2    Mr. Needs.
 3                            EXAMINATION
 4    BY THE COURT:
 5    Q.      You said you quit therapy six to eight months ago?
 6    A.      Yes, ma'am.
 7    Q.      You said you quit therapy because -- I think I
 8    wrote it down -- you said it's punitive and not
 9    therapeutic.  Is that what you said?
10    A.      Yes, ma'am.
11    Q.      What do you mean by that?
12    A.      Means we are punished more than we are given
13    therapy.
14    Q.      Explain that to me.
15    A.      Well, show up to group late, you are kicked out.
16    If you question what the staff are doing, because if you
17    question them, you are removed from the program.  I mean
18    -- what I mean by that, I mean you are kicked out of
19    program.  You are given a program ticket.  And then if you
20    do it again, you get another program ticket.  And then you
21    are ticketed out of the program.  Okay?
22              And it is punitive in the sense that, if they feel
23    like they are losing control because a guy is expressing
24    their opinion, they'll go out and get the correctional
25    officer and bring his ass -- excuse me, Lord -- bring him
```

1    in here, you know, and then force me out of the program

2    because I don't want to leave.

3    Q.      Okay.  Let me ask you this:  You talked about

4    getting program tickets like if you are late or if they --

5    A.      Yes.

6    Q.      -- feel like you are disrupting the group, you get

7    a program ticket.  Do you also get DOC --

8    A.      Yes.

9    Q.      -- disciplinary tickets?

10   A.      Yes.

11   Q.      For what, what types of things do you do -- do you

12   have to do to get those?

13   A.      Refusing to leave the group is disobeying a direct

14   order from the treatment staff or from the officers.

15   Q.      That's a DOC ticket?

16   A.      That's a DOC ticket.

17   Q.      And what type of discipline do you get for that?

18   A.      Segregation.  Walked right there on the spot.

19   Q.      Segregation?

20   A.      Segregation.

21   Q.      For how long?

22   A.      Depends on after they have an investigation and

23   they hear the ticket and then they find you guilty of it,

24   they continue -- they take into consideration the time

25   that you are in there already.  And then if they find you

1    guilty, then they'll give you whatever they think is

2    warranted, a punishment for that.

3    Q.      And this is segregation on the SDP -- on, on B

4    Wing or --

5    A.      B Wing, C Wing, anywhere.  Also, I want to point

6    out, if it's okay, while I was there one time, I was

7    literally attacked by a correctional officer.  There's

8    evidence of it.  I mean, I brought it with me.

9    Q.      No.  No.  No.  We -- that's a whole different

10   incident.

11   A.      All right.

12   Q.      I just wanted to understand that.  Let me ask you

13   this question:  The way that you described therapy being

14   punitive versus therapeutic, was there any difference in

15   the therapy?  You have been there 40 years.

16   A.      Right.

17   Q.      Was there any difference in the therapy that you

18   were getting before 2014 and '15 and now?  Or -- tell me

19   how it compared.

20   A.      When I was -- when I was first brought to Menard,

21   okay, they had Mike Dolin [phonetic] was our facilitator.

22   He'd sit there, he would encourage us.  He would tell us,

23   *Hey, you know, you need to do this*.  I mean, he would sit

24   down with us and go over the work with the stuff.  Okay?

25   We would have encouragement.  I mean, things that would

1    let you know what you needed to do to improve.

2          Since Mark had left, that has changed with these,

3    because these --

4    Q.    You say "these," you're talking about Dr. Holt

5    and --

6    A.    I'm sorry.  I'm referring to the staff.

7    Q.    Okay.

8    A.    There is no encouragement of any kind that I'm --

9    towards me.  Now, I'm going to use towards me.  Towards

10   me, since I have been in that program with them, I have

11   not yet received any encouragement.

12         The only time I ever received encouragement, and

13   it literally brought me to tears, was because Marsha Woods

14   sit there and says, *But you have improved.*  And I was

15   devastated because I didn't know -- I literally was in

16   tears because I have never been complimented for anything

17   good I have done.

18         THE COURT:  Okay.  All right.  Thank you, Mr.

19   Needs.

20         Anybody else have anything -- Mr. Stobbs?

21         MR. STOBBS:  No, ma'am.

22         THE COURT:  Mr. Rockershousen?

23         MR. ROCKERSHOUSEN:  Briefly, Your Honor.

24                   FURTHER RECROSS-EXAMINATION

25   BY MR. ROCKERSHOUSEN:

1  Q.      Mr. Needs, you testified that you have received

2  program tickets for questioning staff; is that correct?

3  A.      Correct.

4  Q.      Could you tell me what that means, "questioning

5  staff"?

6  A.      Well, if you go by IDOC terms, it's questioning

7  their authority in the program or whatever else like that.

8  Q.      Could you give me an example of when you were

9  issued a ticket for questioning staff?

10 A.      Yeah.  Awhile back, Jessica wanted me to --

11 because I didn't write the cycle right, she wanted a

12 certain way, that I felt like she wasn't listening to me

13 by giving me directives on how to write the cycle.  I was

14 there.  She wasn't.  Her -- I started arguing with her,

15 and I guess we both got frustrated and she asked me to

16 leave.  Said, "Go, you're done here," and then -- so she

17 told me to leave.  So, I got up and I left.

18         Shortly right after that, I got a program ticket

19 for insolence and dis -- not disobeying but for insolence.

20         MR. ROCKERSHOUSEN:  I don't have any further

21 questions.  Thank you.

22                         RE-EXAMINATION

23 BY THE COURT:

24 Q.      What was the consequence of that program ticket

25 that you got?  What happened to you because of that

```
 1   ticket?
 2   A.      I was removed from the treatment program for about
 3   a month.
 4   Q.      So, about four sessions?
 5   A.      Yeah.
 6           THE COURT:  Anything else?
 7           MR. STOBBS:  No, ma'am.
 8           THE COURT:  Thank you, Mr. Needs.
 9           This would be a good time for us to go ahead and
10   take a break.  I've got that criminal proceeding.  And we
11   will -- we'll reconvene then at 12:45 -- you know what?
12   Let's do this, because I -- just to be safe, why don't we
13   reconvene at 1:00.  I do need to eat.  I don't intend to
14   pass out for you all.
15           (Court recessed from 11:41 a.m. to  1:07 p.m.)
16           (Proceedings continued in open court, parties
17   present.)
18           THE COURT:  Plaintiffs call their next witness.
19           MR. STOBBS:  Jacob Kallal.
20           THE COURT:  Mr. Kallal, please step forward.
21           THE WITNESS:  Jacob Kallal.
22                         JACOB KALLAL,
23   having been first duly sworn, was examined and testifies
24   as follows:
25                      DIRECT EXAMINATION
```

1    BY MR. STOBBS:

2    Q.      Jake, could you introduce yourself to Judge

3    Yandle?  Let her know where you are from and where you

4    were born?

5    A.      My name is Jacob Kallal.  I am from Springfield,

6    Illinois.  I was born in 1978.

7            THE COURT:  Thank you.

8    Q.      (BY MR. STOBBS)  And where were you -- when were

9    you first civilly committed?

10   A.      2001.

11   Q.      And what were you committed for?

12   A.      Exhibitionism.

13   Q.      Now, when I say, what you were committed for, is

14   -- were you charged with exhibitionism?

15   A.      No, I was charged with attempted predatory sexual

16   assault.

17   Q.      And if you could explain to Judge Yandle exactly

18   how it was that you were diagnosed with exhibitionism.

19   A.      I had flashed an 8-year-old girl -- two 8-year-old

20   girls.  And I had grabbed one them by the back of the

21   neck...

22   Q.      I'm not asking what you did.  I'm asking how you

23   were diagnosed.  Did you have someone that diagnosed you

24   with that before you were committed -- civilly committed?

25   A.      Yes.  Two doctors, Dr. Killian and Dr. -- I don't

1    remember the second doctor -- Boland.  Dr. Boland.

2    Q.      And these two fellas are doctors that are on the

3    outside; correct?

4    A.      Yes.  They were court-appointed psychiatrists or

5    psychologists.

6    Q.      All right.  So, so you get civilly committed;

7    right?

8    A.      Yes.

9    Q.      And was your diagnosis ever changed?

10   A.      It was changed the day that I got to Big Muddy.

11   Q.      All right.  And, and this is important.  Could you

12   explain to Judge Yandle how that happened.

13   A.      During my intake, Mark Carich, who was the program

14   administrator at the time, did the intake.  Read my case

15   history and changed the diagnosis from -- the committing

16   doctors diagnosed me with exhibitionism, anti-social

17   personality disorder, and NOS, which is Not Otherwise

18   Specified.  Dr. Carich changed it to pedophilia or some

19   other stuff.  I don't remember exactly what he changed it

20   to.

21   Q.      So, you get diagnosed with flashing; right?

22   A.      Yes, sir.

23   Q.      And you then, the first day at Big -- the first

24   day that you are committed at Big Muddy, it's changed?

25   A.      Within the first two days.  I didn't do the intake

1    until like the second or third day I was there.

2    Q.      So, let me ask you this:  What treatment have you

3    received for exhibitionism?

4    A.      None.

5    Q.      But that's what you were diagnosed with.

6    A.      Yes, sir.

7    Q.      Do you know why they haven't treated you?

8    A.      The treatment that is offered is sex offender

9    specific treatment.  It's not treatment for mental

10   disorders.

11   Q.      Have you, have you flashed anyone since you have

12   been in Big Muddy?

13   A.      I have been accused once.

14   Q.      That's not my question.  Did you do it?

15   A.      No.

16   Q.      So, tell the judge a little bit about the

17   accusation.

18   A.      I was in the library.  I was accused of flashing

19   the librarian.  And I wasn't taken to seg or anything

20   right then and there.  At the end of -- we was -- at that

21   time, we had library from 2:00 to 4:00 p.m.  I was up

22   there until 4:00.  The -- they did count twice because

23   they had a miscount, because count is at 3:00 in the

24   institution.  At the end, the librarian said something

25   about, "I don't appreciate you scratching yourself through

```
 1    your clothes.  Ticket will follow."
 2           I went back to the house.  We had study groups at
 3    the time.  I went to that.  Then we went to chow.  And
 4    then I went back to work that night, where I was working
 5    on the yard.  And after the yard was over, is when I got
 6    walked to seg -- segregation.  So, I didn't get walked to
 7    seg until almost four hours later.
 8    Q.     All right.  So, you are accused of flashing.  Did
 9    you offer to take a polygraph?
10    A.     Multiple times.
11    Q.     And when was this, do you remember?
12    A.     2008.
13    Q.     Were you allowed to take a polygraph?
14    A.     No.
15    Q.     And is it basically that would be a
16    he-said-she-said kind of thing?
17    A.     I believe so.
18    Q.     Now, I want to talk to you a little bit about the
19    group situation at Big Muddy.  And you know Dr. Holt's
20    sitting here; right?
21    A.     Yes, sir.
22    Q.     Since he has been there, that's what I'm asking
23    about.  I'm not asking about 2001, before.  I'm asking
24    about since Dr. Holt's been there.  All right?  What has
25    been the biggest group that you have been in?  How many
```

1    people?

2    A.      10 to 12, I believe.

3    Q.      That's the largest amount of people you have had

4    in a group?

5    A.      For myself, yes.

6    Q.      Do you know if there are other groups that are

7    larger than that?

8    A.      Yes.

9    Q.      How many are in those groups?

10   A.      When he first got there, anywhere from 14 to 18.

11   Q.      In your opinion, how many -- what's the maximum

12   number of people that should be in a group?

13           MR. TYRRELL:  Objection, Your Honor, calls for

14   opinion, speculation.

15           THE COURT:  Sustained.

16   Q.      (BY MR. STOBBS)  In your group, the 10 to 12

17   people that are in your group, do you know why that group

18   is smaller than the other group?

19   A.      No, sir.

20   Q.      And the staff at Big Muddy.  You have talked about

21   Dr. Holt.  Who else is there?

22   A.      Jessica Stover.

23   Q.      Do you see Jessica Stover sitting in the

24   courtroom?

25   A.      She's -- yeah, she's sitting right there.

1    Q.      Well, point her out.  Tell her what she's wearing.

2    A.      I can't really see her from here.

3            THE COURT:  There's only one female.  I'm going to

4    guess.

5            MR. STOBBS:  Okay.

6    Q.      (BY MR. STOBBS)  All right.  So, you have her, Dr.

7    Holt, and who else?

8    A.      Heather Young, who is my primary therapist right

9    now.

10   Q.      When you say primary therapist, is she the one who

11   runs your group?

12   A.      She's the one assigned my case file, I guess.

13   She's the one that runs my core group, yes.

14   Q.      And are there other people who run your groups?

15   A.      No.

16   Q.      Have you ever been in a group run by anyone else?

17   A.      Dr. Holt has, for like six months or so, before

18   Heather took it.

19   Q.      Do you know whether or not the groups have been

20   reduced because of staff shortages?

21   A.      I believe so.

22   Q.      Why do you say that?

23   A.      When I've got -- when I first got to Big Muddy in

24   2001, I had four to five groups per week, two hours

25   apiece.  Since Dr. Holt's taken over, I've got -- I get

1     one hour per week.

2     Q.      Do you think that's enough?

3     A.      No, sir.

4             MR. TYRRELL:  Objection, Your Honor, opinion.

5             THE COURT:  Sustained.

6             Mr. Stobbs?  This witness is not qualified to

7     render opinions regarding sufficiency of the treatment

8     plan.

9     Q.      (BY MR. STOBBS)  Do you -- if you could explain to

10    Judge Yandle how the groups run.

11    A.      I can explain how my group runs.  It's -- I have

12    group every Thursday morning from -- it's supposed to be

13    8:30 to 9:30.  It usually doesn't start until anywhere

14    between 8:35 to 8:40 because she don't come in until

15    around 8:30, then my group -- I live on C Wing, but our

16    group is held on B Wing.  And then we'll go and we'll

17    either present homework or talk about issues.  And then

18    they'll call chow and the group will break up right around

19    anywhere from 9:25 to 9:30.

20            Just like two weeks ago, they called chow early,

21    so we was -- group didn't start until 8:40 and it ended at

22    9:20.

23    Q.      Did you make up that time?

24    A.      No.  I, I record it every time.

25    Q.      Are you allowed to take notes during the meeting,

1    the group sessions?

2    A.      Yes, as long as we don't write down names or

3    things like that.  I -- the notes I take, I -- anything I

4    say in group, I write down.

5    Q.      If there were more treatment sessions offered,

6    would you take them?

7    A.      It depends on who the counselor is.

8    Q.      Why is that?

9    A.      Because there -- I'm being honest here, is I

10   already know I'm going to be retaliated against within --

11   for whatever I say here.  I refuse to have groups with

12   Jessica Stover.

13   Q.      Why is that?

14   A.      Because from what I have witnessed, what I have

15   seen, she's very vindictive and abusive.

16   Q.      Explain that to the judge.

17   A.      I have seen her where, if you disagree just a

18   little, it doesn't matter what it is, be kicked out of

19   group -- I can't really explain.  I just know.  Also with

20   my case history of the flashing, I don't want to be

21   falsely accused again.

22   Q.      When she runs the groups that you are in, do you

23   participate as much as in other group?

24   A.      Can you repeat that?

25   Q.      When you are in groups run by Miss Stover, do you

1   participate as much in those groups as others?

2   A.       No.

3   Q.       Why?

4   A.       Because I don't trust her.

5   Q.       Why?

6   A.       It's just the way she presents herself, the way

7   she acts towards us SDP's.

8   Q.       Could you give Judge Yandle some examples?

9   A.       (Pause.)  Not off the top of my head.

10  Q.       Now, there's additional groups that are offered;

11  is that correct?

12  A.       Yes.

13  Q.       Are those voluntary or mandatory?

14  A.       Both.

15  Q.       And if you take those additional groups, does that

16  help moving up and down the phases?

17  A.       It -- yes, I believe so.

18  Q.       And if you could explain to Judge Yandle the

19  different phases or stages.

20  A.       I couldn't really explain it because the criteria

21  changes on that.

22  Q.       Do you think you have an understanding of how the

23  stages or phases work?

24  A.       No, sir.

25  Q.       What's the highest phase you have ever achieved?

1    A.      Two.

2    Q.      Have you ever been reduced?

3    A.      Yes.  I was recently reduced within this past year

4    back to Phase 1.

5    Q.      In your mind, is the program more therapeutic or

6    is it more punitive or punishment?

7            MR. TYRRELL:  Objection, Your Honor, calls for

8    opinion.

9            THE COURT:  Sustained.

10   Q.      (BY MR. STOBBS)  Could you explain to Judge Yandle

11   some of the, some of the type of infractions that you can

12   receive a ticket for?

13   A.      Being late to group; being kicked out of group.

14   Q.      Let's start, if you are late to group, you just

15   said that sometimes the groups will start -- they don't

16   start -- always start on time?

17   A.      Yeah.

18   Q.      Are you expected to be there on time?

19   A.      Yes.

20   Q.      And what is the punishment for that?

21   A.      You are denied access to that group.

22   Q.      For how long?

23   A.      Just that, just that group.

24   Q.      Okay.  What are some other infractions?

25   A.      Being kicked out of the group; not wearing your --

1     we have an outfit, that's blues and shoes.  It's blue navy

2     pants and a blue shirt that are our prison uniform, that

3     we are supposed to wear when we leave the house, leave

4     4-House to go to passes or to the chow hall.  When staff

5     are there, we are supposed to wear those at all times.

6     Q.      What happens if you have your shirt untucked?

7     A.      You get a program ticket.

8     Q.      And what does that mean?

9     A.      If you get -- three puts you on probation, the

10    fourth one suspends you.

11    Q.      Let's assume you arrive 30 seconds late with your

12    shirt untucked, could you conceivably receive two tickets

13    for that?

14    A.      Yes.

15    Q.      What are some other infractions?

16    A.      If we go to take a shower and we forget our soap

17    or our towel or something and we go back to the cell to

18    get it and you go back to the, where the shower is at.

19    Q.      Any other ones?

20    A.      Are you talking program or institutional?

21    Q.      Well, that's, that's -- I don't want to keep

22    repeating what other people have testified to, but there's

23    a difference between what -- the institutional and

24    program; is that right?

25    A.      Yes.

1   Q.      Is it possible to get a ticket for both
2   institutional and program?
3   A.      Yes.  For the same thing, yes.
4   Q.      And if you are successful in the institutional
5   ticket, does the program ticket go away, too?
6   A.      Not always.
7   Q.      And if you receive an institution ticket, does
8   that have a larger impact on how you move up or down the
9   phases than a program ticket?
10  A.      They can, because they use it against you when,
11  when you file your writ of recovery.
12  Q.      Do you know anyone -- do you know about how many
13  guys are SDP's at Big Muddy?
14  A.      172.
15  Q.      Out of those 172, are you aware of anyone who has
16  never received a ticket?
17  A.      Maybe one or two.
18  Q.      And there's manual that has all of the different
19  infractions in it; right?
20  A.      For institutional?
21  Q.      For the program.
22  A.      For the program?  I -- there might be.  I don't
23  know.
24  Q.      For the institution there is, though; right?
25  A.      Yes.

```
1    Q.      Have you ever been moved down from one stage or
2    phase to another?
3    A.      Yes.
4    Q.      Can you explain that to Judge Yandle?
5    A.      Within the last year, I was placed in an REBT
6    group that was ran by Jessica Stover --
7            THE COURT:  A what, now?
8            THE WITNESS:  REBT.  Rational Emotive Behavioral
9    Therapy.
10           THE COURT:  Thank you.
11   A.      -- who, Jessica Stover was the facilitator of that
12   group.  I did not go to it, so I received program tickets
13   and was placed on probation.  Because I received just one
14   ticket, I was lowered from Phase 2 to Phase 1.
15   Q.      (BY MR. STOBBS)  Did you understand the reasoning
16   behind that?
17   A.      That was the program rules, yes, I understood
18   that.
19   Q.      What level are you at now?
20   A.      Right now, I'm at level one, I believe.  That's
21   according to my last six-month evaluation.
22           MR. STOBBS:  Judge, we have stipulated to Exhibits
23   -- to Plaintiff's Exhibits 64 to 85, which are photographs
24   taken by, I guess, members of the Big Muddy correctional
25   institution.  And we'd move for their admission at this
```

1    time.

2           THE COURT:  Any objections?

3           MR. TYRRELL:  No, Your Honor.

4           THE COURT:  Exhibits --

5           MR. STOBBS:  Plaintiff's Exhibits 64 to 85.

6           THE COURT:  I'm sorry.  Plaintiff's Exhibits 64 to

7    85 are admitted without objection.

8    Q.      (BY MR. STOBBS)  Jake what I'd like to do is, I'd

9    like -- we have photographs of the, of the institution

10   where you guys live.  And when you say "house," do you

11   mean your jail cell?

12   A.      Yes.

13   Q.      I'm going to have you take a look at Exhibit 64.

14   Now, could you tell -- could you tell Judge Yandle exactly

15   what that is?

16   A.      That is the front door to C Wing.

17   Q.      And, and if you could tell Judge Yandle what wings

18   are the sexually dangerous persons housed in?

19   A.      4-House, B Wing, and 4-House, C Wing.

20   Q.      Is one wing more for punishment than the other?

21   A.      That's the way it was before.  Now, they've split

22   the SDP's even -- try to even them out between the two

23   wings.

24   Q.      Okay.  When you, when you look into, to Exhibit

25   64, that's basically just a normal wing of a prison;

1    right?

2    A.      Yes, sir.

3    Q.      The doors that are there, when they're closed are

4    they locked?

5    A.      Yes, sir.

6    Q.      And basically the wings are all identical; is that

7    correct?

8    A.      Yes, sir.

9    Q.      So, if I show you a picture and it might be C Wing

10   or B Wing or whatever, it's still -- one is the same for

11   the other; right?

12   A.      Yes, sir.

13   Q.      All right.  So, Exhibit 65, if you could tell

14   Judge Yandle what that is.

15   A.      That is a view of the left side of the wing, if

16   you are standing at the front of the wing.

17   Q.      Now, we heard talk about something called a

18   dayroom.

19   A.      That is the dayroom, yes.

20   Q.      And how many hours a day are you in your --

21           THE COURT:  Sorry for a minute, Mr. Stobbs.

22           Mr. Kallal, is it?

23           THE WITNESS:  Kallal.

24           THE COURT:  Kallal?  I'm going to mess that up.

25   No disrespect.

1              THE WITNESS:  That's fine.  They all do.

2              THE COURT:  Okay.  You can actually, if you -- you

3     can actually mark on that screen in front of you.

4              THE WITNESS:  Okay.

5              THE COURT:  When you say, "this is the

6     dayroom," can you make a mark on the screen and show me

7     where you are talking about?

8              THE WITNESS:  That is the --

9              THE COURT:  You can put your finger on the screen

10    and mark it.

11             THE WITNESS:  This whole thing right here.

12    (Indicating.)

13             THE COURT:  That's the dayroom?

14             THE WITNESS:  Yeah.

15             THE COURT:  Okay.

16             THE WITNESS:  This is the left side -- if you are

17    standing at the front, this is the left side.  There's

18    another side, you can barely see it, about right here,

19    that's on the right side.

20             THE COURT:  Okay.

21    Q.      (BY MR. STOBBS)  And when you are allowed outside

22    of your cells, how many folks live on C Wing?

23    A.      There is, I think, between 65 and 70 of us on each

24    wing.

25    Q.      Does it get crowded in the dayroom?

1    A.       During the day, yes.  That is when everybody is

2    out of their cells, uppers and lowers.

3    Q.       If you could tell the judge, are these

4    wheelchairs?  (Indicating.)

5    A.       Yes.

6    Q.       And are these wheelchairs, too?  (Indicating)

7    A.       Where?

8    Q.       Mine's in yellow.

9    A.       Yeah.

10   Q.       Those are wheelchairs, as well?

11   A.       Right there and right here, yes.  (Indicating.)

12   Q.       Exhibit 66, is that just looking the other way or

13   is that on the other side?

14   A.       That is the other side.  That is the right side

15   view, looking down the wing.

16   Q.       What are these right here?  (Indicating.)

17   A.       That is the kiosk for emails and mp3 players.

18   Q.       Are there telephones here?

19   A.       No.  They're -- it's not shown in this picture.

20   Q.       Okay.  I'm sorry.

21   A.       Go ahead.

22   Q.       On Exhibit 66, if you could just show the judge

23   where the groups are held.

24   A.       Back here where the C is?  There's chairs right

25   there.  (Indicating.)

1    Q.      Okay.

2    A.      On the back of the wing.

3    Q.      Okay.  The wings are two floors?

4    A.      Yes, sir.

5    Q.      And Exhibit 67 shows the second floor; correct?

6    A.      Yes, sir.  This would be the left-hand view.

7    Q.      Sure.  And looking down on that, that's where the

8    -- where the C is, below that, is that where the groups

9    are held?

10   A.      Yes, sir.

11           THE COURT:  Are the groups held in an open area?

12           THE WITNESS:  Yes, ma'am.

13   Q.      (BY MR. STOBBS)  And the groups are held in an

14   open area and, when a group is being held, are there

15   certain rules and regulations in terms of noise?

16   A.      Yes.  They're -- they -- if you are talking, you

17   have to talk in a whisper.  If you talk any louder, you

18   get yelled at or asked to go to your cell.

19   Q.      If you are talking too loud could you conceivably

20   receive a ticket?

21   A.      Yes, sir.

22   Q.      Do you know if that's happened?

23   A.      There was somebody that got a ticket for talking

24   to -- I think it was Mr. Howe got a ticket for talking to

25   his 85-year-old grandmother on the phone too loud while a

```
 1    group was going on.
 2    Q.      Exhibit 69.  Is that just basically how the, all
 3    of the cells look?
 4    A.      The door to it, yes, sir.
 5    Q.      Are they -- and when they are closed, they are
 6    locked, you said; right?
 7    A.      Yes.
 8    Q.      And Exhibit 70, if you could tell Judge Yandle
 9    what that is?
10    A.      That is the view of the inside of Cell 36.
11    Q.      Do you have a roommate?
12    A.      Yes, I do.
13    Q.      So you're in this cell how many hours a day?
14    A.      Pretty much -- during the day, we're out -- if
15    staff's there, we can come in and out of our cell.  And at
16    night, we are locked up all, all but one hour.
17    Q.      How many hours a day is that?  If there's 24 hours
18    in a day.
19            THE COURT:  How about times?  Can you give us the
20    times?
21            THE WITNESS:  Okay.  We have -- when staff is
22    present, we have dayroom from 8:00 a.m. to 2:30 p.m.  When
23    they're not, we are locked up except for -- depending on
24    the day.  If it's an odd day, the lower deck is locked up
25    all day, except for an hour in the morning -- or, no, in
```

1    the afternoon.

2    Q.      (BY MR. STOBBS)  So, while you're locked up, the

3    two of you have to share a toilet; right?

4    A.      Yes, sir.

5    Q.      And what's this up here?  (Indicating.)

6    A.      That is a sink.

7    Q.      How many, how many desks are in that room?

8    A.      One.

9    Q.      How many chairs are in each room?

10   A.      One.

11   Q.      If someone wants to sit in the chair and write

12   something on the desk, does the other cellmate have to be

13   in bed then?

14   A.      He has to sit on his bed or lay in his bed or --

15   there ain't really nowhere else to sit.

16   Q.      Exhibit 72.  Is that just looking out of the cell?

17   A.      Yes, sir.

18   Q.      Exhibit 73, if you could tell Judge Yandle what

19   that is?

20   A.      That is where we have group at.  And I live in

21   this cell right here.  (Indicating.)

22   Q.      All right.  When they're having group, is your

23   door locked or unlocked?

24   A.      It's on access where we can come in and out of it,

25   but it's locked.  The doors are supposed to be kept shut

1    at all times.

2    Q.     Can you -- are you able to -- if -- are you able

3    to have radios in your rooms?

4    A.     Yes.

5    Q.     So, if you have a radio in your cell, are you

6    allowed to play it while someone's -- while they're having

7    group?

8    A.     If it's not very loud, yes.

9    Q.     What if someone's hard of hearing?

10   A.     No --

11          MR. TYRRELL:  Objection, Your Honor, calls for

12   speculation.

13          THE COURT:  Sustained.

14   Q.     (BY MR. STOBBS)  The group is something that

15   they're seated around these -- is this how all the groups

16   are, are held?

17   A.     Yes.

18   Q.     And if the groups are larger, do you know if

19   there's -- they just bring in more chairs?

20   A.     If the group is -- if the group would have been

21   larger, yes, there, there's extra chairs back there for

22   more people.

23   Q.     And Exhibit 74, what is that?

24   A.     That is the view from behind the group to down the

25   dayroom, the opposite view of the first photo you showed

1    me.

2    Q.      And Exhibit 84, if you could tell Judge Yandle

3    what that is.

4    A.      That is a group setup on 4-D-Wing, which is the

5    drug, drug program.

6    Q.      So, the D Wing -- do -- are there ever any groups

7    over on the D Wing?

8    A.      No.  Not that we have access to.

9    Q.      So, this photograph is taken of something that's

10   not even useful; is that right?

11   A.      Yes, sir.

12          THE COURT:  Is that 84, Mr. Stobbs?

13          MR. STOBBS:  Judge, it's 84 but, I mean, it's --

14          THE COURT:  No, I'm just saying --

15          MR. STOBBS:  Yes, ma'am.

16          THE COURT:  Okay.

17   Q.      (BY MR. STOBBS)  Judge, I have to go through these

18   photos because I don't know why photos of D Wing were

19   taken, when our clients aren't in D Wing.  So, what I'm

20   going to do is go through --

21          THE COURT:  You can go through and ask him to

22   identify.

23          MR. STOBBS:  I'll do that.

24          THE COURT:  That's pretty quick.

25   Q.      (BY MR. STOBBS)  Exhibit 75, that's, that's a

```
 1    photo taken of D Wing as well; right?

 2    A.      Yes, sir.

 3    Q.      It has nothing to do with your case, does it?

 4    A.      No, sir.

 5            THE COURT:  Perhaps they were taken for comparison

 6    sake, Mr. Stobbs?  (Pause.)  Is that all of them?

 7            MR. STOBBS:  Yes, ma'am.

 8    Q.      (BY MR. STOBBS)  Was there ever a time you were

 9    housed in the same block as Mr. Howe, Mr. Needs, and Mr.

10    Charles?

11    A.      Yes.  When we first filed the lawsuit, all of us

12    were on the same wing.

13    Q.      Are you on the same wing now?

14    A.      No, sir.

15    Q.      Who is on what wing?

16    A.      Me and Charles were cellies.  They split us up and

17    they put him on B Wing.  And they put -- well, now I'm on

18    C Wing.  Needs is on B Wing.  Howe is currently in seg,

19    but he was on B Wing before that.  And Charles is in

20    Health Care.

21    Q.      Could you tell Judge Yandle what segregation is?

22    A.      It is -- it's a section of the prison that's set

23    aside for people who violate the rules.  Their property is

24    taken from them, televisions.  The only thing you get in

25    segregation is a pair of boxers, your T-shirt, a pair of
```

1   socks and a jumpsuit, your blanket, pillow and your

2   correspondence box.

3   Q.      How does one get to segregation?  Do you know?

4   A.      A violation -- well, it depends on the offense.

5   It is up to the Adjustment Committee to place you on

6   segregation.

7   Q.      Are you able to appeal that decision?

8   A.      You can, but usually by the time the investigation

9   is done or you grieve it, you have already done the time

10  and...

11  Q.      You indicated that there's four staff there?

12  A.      Yes, sir.

13  Q.      Do you know what kind of training they have?

14  A.      No, sir.

15  Q.      When the, the groups are held, are you allowed to

16  talk within the group?

17  A.      With each other or, or --

18  Q.      Well, that's a good point.  First of all, when the

19  group is going on, are you able to talk -- suppose you are

20  in a group with Howe.  Are you and Howe able to speak to

21  each other?

22  A.      If it's briefly before or after the group, yes.

23  Very briefly.

24  Q.      And are the groups -- are you able to speak to

25  the, the person running the group?

1    A.       We can bring up issues or address issues.

2    Q.       Is there a way that you can talk to one of these

3    counselors one-on-one?

4    A.       If we go to staffing.  And, and with the staffing,

5    it's usually two or three people there.

6    Q.       Meaning, are you able to go -- suppose you want to

7    talk to Dr. Holt.  Are you able to do that?

8    A.       If we catch him on the wing, on the way to or from

9    a group and talk to him briefly, yes.

10   Q.       Are you able to say, "Dr. Holt, I -- something's

11   really bothering me about my -- about civil commitment,

12   I'd like to have a one-on-one talk with you, I mean,

13   sometime this week," are you able to do that?

14   A.       We probably could.

15   Q.       Have you ever tried to do that?

16   A.       No, sir.

17   Q.       Some of the, the rules and regulations involve

18   shorts; right?

19   A.       Yes, sir.

20   Q.       Have you ever received a ticket for wearing

21   shorts?

22   A.       No.

23   Q.       Have you ever -- in the summer, do they have air

24   conditioning there?

25   A.       No.  The -- when the blues and shoes rule was

1  first put into effect?

2  Q.     Yeah.

3  A.     In --

4         THE COURT:  When the what?  I'm sorry.

5         THE WITNESS:  Blues and shoes rule.  When the

6  staff is on the house -- or on the property, whenever

7  they're at Big Muddy, you have to have your blues and

8  shoes on in the dayroom at all times.  You can't wear

9  shorts and a T-shirt.  If they're not down there, the

10  first day that that was put into effect, I ended up going

11  to Health Care that night because I have a heart problem.

12  And it -- wearing the blues and shoes that day, I

13  overheated and got over -- and stressed out and I ended up

14  in the hospital overnight.

15         MR. STOBBS:  No other questions, Judge.

16                  CROSS-EXAMINATION

17  BY MR. TYRRELL:

18  Q.     Good afternoon.  Is it Mr. Kallal?

19  A.     Yes, sir.

20  Q.     Is that -- am I pronouncing it correctly?

21  A.     Yes, sir.

22  Q.     Okay.  Thank you.  My name is Jeremy Tyrrell and

23  I'm one the attorneys for the defendants and I have some

24  questions for you.  Do you need a drink of water or a

25  break or anything?

1    A.      No, sir.

2    Q.      So, seconds ago you just testified about a heart

3    condition you have that you claim resulted in you having

4    to go to the Health Care unit because of the blues and

5    shoes policy?

6    A.      Yes, sir.

7    Q.      What heart condition do you have?

8    A.      It's tachycardia.

9    Q.      And do you have an understanding what tachycardia

10   is?

11   A.      There is some other word that goes with that, that

12   I don't know how to pronounce or even spell.  But the way

13   my doctor explained it is, my heart can just start

14   speeding up and it can go so fast -- excuse me -- that I

15   can pass out and go into a coma.

16   Q.      So your understanding is, this is a condition that

17   could result in your heart beating faster than normal?

18   A.      Yes.

19   Q.      Okay.

20   A.      I have had issues.  I have had this since I was --

21   I was diagnosed when I was 17 or 18.

22   Q.      Now, this particular incident you were just

23   discussing when the blues and shoes policy first came out,

24   have you ever passed out or gone to the Health Care Unit

25   because of this heart condition before then?

1    A.      Yes, I have.  I have been to Health Care, I think,

2    three, four times over the years -- 17 years I have been

3    locked up for my condition.

4    Q.      Do you recall a particular -- or specifically when

5    the blues and shoes policy came out resulting in you going

6    to the Health Care Unit, in your opinion?

7    A.      It was on July 1st of 2014, I believe.

8    Q.      Did the medical professionals there give you any

9    permission to wear something other than the blues and

10   shoes?

11   A.      No.  I -- they put me in a -- they had me sit out

12   in the -- they gave me something to slow my heart rate

13   down, and had me sit out in the Health Care waiting room

14   to cool down.  Then they put me in the back for

15   observation for 24 hours, and then sent me back to the

16   house.

17   Q.      Have you received a medical permit or something

18   else giving you permission to wear shorts on hot days?

19   A.      No, sir.

20   Q.      Have you requested one?

21   A.      No, sir.

22   Q.      Since July 1st of 2014, has the blues and shoes

23   policy caused you to pass out?

24   A.      No, sir.  That's because I have pretty much kept

25   under a fan since then, when I was hot.

1  Q.      And do you have a fan inside your cell?

2  A.      Yes, sir.

3  Q.      And are there fans inside the open areas of B and

4  C Wing?

5  A.      There is, but the one on C Wing has been broke for

6  the last eight months.

7  Q.      And you are currently on C Wing?

8  A.      Yes, sir.

9  Q.      I want to shift gears and talk about some of the

10 first things your attorney mentioned with you,

11 specifically your diagnosis.  What's your current

12 understanding of your current diagnosis?

13 A.      My current diagnosis from Weldon-Padera is

14 exhibitionism, marijuana abuse, and anti-social person --

15 no -- I think -- anti-social personality disorder, yes.

16 Q.      As part of the SDP program, do you receive semi

17 annual evaluations?

18 A.      Yes.

19 Q.      Do you also receive treatment plans?

20 A.      Yes, sir.

21 Q.      To your knowledge, are those treatment plans and

22 semi annual evaluations created by your primary therapist?

23 A.      I believe they are.

24 Q.      Okay.  Does your therapist review your treatment

25 plan with you?

1    A.      We have a discussion in the group as a whole, not

2    one-on-one.

3    Q.      But your treatment plan is discussed with you and

4    your therapist?

5    A.      Sometimes, yeah.  They ask us if we have any

6    questions about it, and if we believe there's something

7    wrong with it or something like that.

8    Q.      As part of this treatment plan, you are asked to

9    sign off on it saying whether or not you agree or disagree

10   with it; correct?

11   A.      Yes, sir.

12   Q.      You are allowed to keep a copy of the treatment

13   plan?

14   A.      Yes, sir.

15   Q.      And now your attorney asked you questions about

16   reaching out to Dr. Holt, and I believe you said you never

17   tried to set up a one-on-one meeting with him.

18   A.      Yes, sir.

19   Q.      Is that correct?

20   A.      Yes, sir.

21   Q.      Have you tried to set up a one-on-one meeting with

22   any of the treatment providers in the SDP program?

23   A.      With this administration, no.  But prior

24   administration, yes.

25   Q.      Have you reached out to any of the current SDP

1   program staff members about your treatment plan?

2   A.      No, sir.

3   Q.      Now, with your semi annual evaluation, you also

4   receive a copy of that; correct?

5   A.      Yes, sir.

6   Q.      And you have the opportunity to discuss that with

7   your therapist?

8   A.      In group, yes.

9   Q.      Have you reached out to any of the current SDP

10  program staff members about your semi annual evaluation?

11  A.      I believe, a couple years ago, I questioned why I

12  was moved from Phase 2 back to Phase 1 when Dr. Holt first

13  took over the program.  They put me back all the way to

14  Pretreatment or something like that.  And about a year

15  later, I was in Phase 1 and I asked why I wasn't in

16  Phase 2.

17  Q.      Did someone discuss why you weren't in Phase 2?

18  A.      No.

19  Q.      Who did you ask?

20  A.      Heather Young.

21  Q.      Ms. Young didn't provide you an explanation for

22  why you didn't go from Pretreatment to Phase 2?

23  A.      No.

24          THE COURT:  Somebody's got a mic on.

25          Go ahead, Mr. Tyrrell.

```
 1              MR. TYRRELL:  Thank you, Your Honor.
 2     Q.       (BY MR. TYRRELL)  Now, when your attorney was
 3     asking you questions, Mr. Kallal, you said something to
 4     the effect that you feared retaliation by Jessica Stover.
 5     Do you recall that?
 6     A.       Yes, sir.
 7     Q.       Has Jessica Stover done anything to you
 8     specifically?
 9     A.       I have had my cell shook down on orders from Miss
10     Stover through the security staff.
11     Q.       Anything else?
12     A.       Not that I can think of, off the top of my head.
13     Q.       If you think of something during the testimony
14     today, please let me know.  But concerning the cell
15     shakedowns or shakedown, how do you know it was conducted
16     at the direction of Miss Stover?
17     A.       Because the security staff receive a number every
18     shift -- or on first and second shift -- that the cells
19     that they're supposed to shake down that day, and they
20     have already come in and conducted those searches.  Any
21     other cell shakedowns are because staff asked for them to
22     be shook down.
23     Q.       And so, in your mind, because the regular
24     shakedowns have already occurred, and a different
25     shakedown must have been -- come from Miss Stover?
```

1    A.      It came from either her or Dr. Holt.

2    Q.      Can anyone else at Big Muddy River Correctional

3    Center order a shakedown, to your knowledge?

4    A.      Any staff member.

5    Q.      So, do you have any evidence showing that Miss

6    Stover or Dr. Holt specifically ordered that shakedown or

7    is it just your belief?

8    A.      It's my belief.

9    Q.      Okay.  And now you mentioned kind of a regular

10   shakedown.  Do you have an understanding that cells in

11   general at Big Muddy River are shooken down on a regular

12   basis?

13   A.      Yes.

14   Q.      So, we have heard about a lot of tickets today in

15   general, so I'm going to use a term SDP program ticket and

16   IDOC ticket.

17   A.      Okay.

18   Q.      If I use those terms, do you understand what I

19   mean?

20   A.      Yes.

21   Q.      So, specifically an SDP program ticket is a ticket

22   from the SDP staff; correct?

23   A.      Yes, sir.

24   Q.      And then IDOC tickets are for violating an IDOC or

25   Big Muddy River policy or rule --

1    A.      Yes.

2    Q.      -- correct?  For the IDOC tickets, SDP program

3    staff can also issue an IDOC ticket; correct?

4    A.      Yes, sir.

5    Q.      Can nonSDP staff issue an SDP program ticket in

6    your -- to your knowledge?

7    A.      No.  No, sir.  Only SDP staff.

8    Q.      Have you been to segregation at Big Muddy River?

9    A.      Yes, sir.

10   Q.      To your knowledge, can an SDP program ticket send

11   you to segregation?

12   A.      It would be combined with an IDOC ticket.

13   Q.      An IDOC ticket can send you to segregation?

14   A.      Yes.

15   Q.      And IDOC tickets are for what?

16   A.      A rule violation of IDOC policy.

17   Q.      Okay.  But to your knowledge, an SDP program

18   ticket by itself can't send you to segregation?

19   A.      A program ticket, no.

20   Q.      Okay.  Now, you mentioned something about -- and I

21   apologize if I'm mistaken, and please correct me if I am.

22   But you mentioned that you don't receive any additional

23   mental health counseling?

24   A.      No, sir.

25   Q.      Okay.  You do actually receive mental health

1    counseling separate from the SDP program?

2    A.      No, sir.

3    Q.      You do not?

4    A.      I do not.

5    Q.      When you receive an IDOC ticket, that's subject to

6    appearing before the Adjustment Committee; correct?

7    A.      Yes, sir.

8    Q.      You can also a grieve an Adjustment Committee

9    decision through the grievance procedure?

10   A.      Yes, sir.

11   Q.      Did you receive a copy of the Big Muddy River

12   Correctional Center Orientation Manual?

13   A.      When I first got there, yes.  They have changed

14   that at least twice, I believe.

15   Q.      Are you familiar with the grievance procedure?

16   A.      Yes, I'm familiar with the grievance procedure.

17   Q.      And are you familiar with the disciplinary

18   procedure for IDOC tickets?

19   A.      Yes, sir.

20   Q.      Okay.  Have you received an SDP program manual?

21   A.      I believe I did a long time ago.  I don't remember

22   when.

23   Q.      Okay.  To your knowledge, does the SDP program

24   manual outline different offenses for which you can

25   received an SDP program ticket?

1    A.       I could not recall.

2    Q.       Does the SDP program ticket tell you the

3    consequences of receiving a program ticket?

4    A.       I believe so.  I believe there is something to do

5    with, if you violate the same rules more than -- or rule

6    more than three times in a row or something, you get

7    placed on IT, which is Intense Therapy.

8    Q.       Have you ever been placed on Intense Therapy?

9    A.       No, sir.

10   Q.       Okay.  I understand from today's testimony, in

11   addition to your testimony, that you have also been

12   suspended?

13   A.       I have been suspended.

14   Q.       Or placed on probation?

15   A.       I have been placed on probation and I have been

16   suspended.

17   Q.       Now, you mentioned earlier today an REBT, which I

18   believe I wrote it down correctly, is Rational Emotive

19   Behavioral Therapy; yes, sir?

20   A.       Yes, sir.

21   Q.       I know I kind of got you started with the

22   question, so please let me finish with the question so the

23   court reporter doesn't yell at us.

24            At one point were you enrolled in an REBT group?

25   A.       Yes, sir.

1    Q.      And isn't it true that you chose not to attend
2    REBT group?
3    A.      Yes, sir, because of who was facilitating that
4    group.  There is two REBT groups available and, if I was
5    placed in the other one, I would have no problem going to
6    it.
7    Q.      Were you also placed in a Victim Empathy group?
8    A.      Yes, sir.
9    Q.      And when you were placed in a Victim Empathy
10   group, wasn't it co-facilitated with Miss Stover and Miss
11   Young?
12   A.      Yes and no.  Miss Young was not always there.
13   Q.      Sure.  When I use the term co-facilitate, I mean
14   one therapist might have one week and another therapist
15   might have it a different week.
16   A.      No.  If Heather was there, both of them were
17   there.
18   Q.      So, Miss Stover was always in Victim Empathy --?
19   A.      The primary therapist over that group, yes.
20   Q.      Okay.  But Heather Young would also join on
21   occasion?
22   A.      On occasion, yes.
23   Q.      Isn't it true, you have missed Victim Empathy
24   group sessions when Miss Young was the lead therapist for
25   that session?

```
 1    A.      I don't believe so.  I believe that Miss Stover is
 2    the -- was the primary over that, and I don't believe Miss
 3    Young ran or facilitated that group without Jessica Stover
 4    being present.
 5    Q.      Let me ask the question this way:  Did you miss
 6    multiple sessions of Victim Empathy?
 7    A.      Yes, sir.
 8    Q.      How did you know who the therapist would be for
 9    that day or whether Miss Young would be there?
10    A.      I live on the same wing that the group was being
11    held.
12    Q.      And so if you saw -- if you didn't see Heather out
13    there, you would just skip the group?
14    A.      Yes.
15    Q.      Miss Young is your current therapist; correct?
16    A.      Yes, sir.
17    Q.      Have you missed any groups since Miss Young was
18    your primary therapist?
19    A.      For --
20    Q.      For unexcused reasons.
21    A.      Unexcused, maybe one or two because I have
22    overslept or I was late getting to the, to the door.
23    Q.      But it's your testimony you haven't actively
24    chosen not to attend one of Miss Young's groups because
25    you don't like her?
```

```
 1    A.       No, sir.
 2    Q.       Okay.  Your attorney asked you questions about a
 3    radio being in your cell.  Do you have a television in
 4    your cell?
 5    A.       Yes, sir.
 6    Q.       Do you have access to literature?
 7    A.       Yes, sir.
 8    Q.       Books, magazines, things like that?
 9    A.       Yes.
10    Q.       I know Big Muddy has the mp3 program.
11    A.       Yes.
12    Q.       Do you currently have an mp3?
13    A.       Yes.
14    Q.       So you can listen to that?
15    A.       Yeah.
16    Q.       And there's headphones that you have to listen to
17    that?
18    A.       Yes.
19    Q.       Have you ever refused additional treatment, beyond
20    your group therapy?
21    A.       I want to say no.  But if Miss Stover was running
22    that group, that would be yes.
23    Q.       So you, you admit that you have refused treatment
24    when Miss Stover was leading the group?
25    A.       Yes.
```

```
 1   Q.      And apart from the cell shakedown, you can't think
 2   of anything else that Miss Stover has done to you?
 3   A.      Not to me, personally.  It's from my observation
 4   of how she treats others.
 5   Q.      Okay.
 6           MR. TYRRELL:  I have nothing else, Your Honor.
 7                     REDIRECT EXAMINATION
 8   BY MR. STOBBS:
 9   Q.      You said, Jake, that in the prior administration
10   you did reach out; is that correct?
11   A.      Yes.
12   Q.      And in this administration, you haven't reached
13   out for help?
14   A.      No, sir.
15   Q.      Why is that?
16   A.      I don't trust this administration as much -- I, I
17   felt more comfortable talking to some of my past
18   counselors.
19   Q.      And you were talking to the Attorney General a
20   little bit about program tickets.  Do you remember that?
21   A.      Yes, sir.
22   Q.      In your opinion, are you subjected to punishment
23   on a regular basis?
24           MR. TYRRELL:  Objection, Your Honor, calls for
25   opinion.
```

1    MR. SPREHE:  Can I respond to that, Your Honor?

2    THE COURT:  No.  No.  No.  No.  We have one lawyer

3  at a time.  Objection is overruled.  This is not an expert

4  opinion.  He certainly --

5    MR. STOBBS:  Right.

6    THE COURT:  -- has an opinion as to whether or not

7  he's being punished.

8    MR. STOBBS:  Thanks, Taylor.

9    MR. TYRRELL:  Understood, Your Honor.

10    THE COURT:  So, objection overruled.

11    Ask the question again.  Let's get an answer.

12  Q.    (BY MR. STOBBS)  In your opinion, are you subject

13  to punishment on a regular basis?

14  A.    Yes, sir.

15  Q.    The -- all of these different sessions and

16  programs that you are talking about, what is your goal

17  here today?

18  A.    To make the program better, to where it actually

19  gets us ready -- I'm trying to think of the words --

20  Q.    It's okay.  Take your time.

21    THE COURT:  You don't have to be big words.

22    THE WITNESS:  Thank you.

23    THE COURT:  I understand the little ones, too.

24    THE WITNESS:  Yeah.  Thank you, ma'am.

25    THE COURT:  Mm-hmm.

1    A.      That more staff would be hired to where more

2    groups can be offered, to have access to more treatment,

3    to be treated more humane, I would say.

4    Q.      (BY MR. STOBBS)  You said you'd talk about more

5    staff being hired.  Had you ever heard someone on the

6    staff discussing budgeting concerns?  Like, that there's

7    not enough money to hire someone?

8    A.      I don't know.  I know there is no separate budget

9    from IDOC for the SDP program.

10           MR. STOBBS:  No other questions, Judge.

11           MR. TYRRELL:  I don't have any followup, Your

12   Honor.

13           THE COURT:  I have a couple myself.

14                          EXAMINATION

15   BY THE COURT:

16   Q.      Mr. Kallal, I think you mentioned that back in

17   2008 you participated in study groups?

18   A.      Yes.

19   Q.      What was that?  Tell me about that.

20   A.      That wasn't a ticket.  It was -- back then, we had

21   study group from 4:00 to 6:00 p.m.

22   Q.      Every day?

23   A.      Every day, five days a week.

24   Q.      And what was that about?  What did you do?

25   A.      We would go out to -- we'd go out on the wing.

```
1    There would be no staff members there, it would just be

2    SDP's, we'd go out to the tables and we would do group

3    work, homework assignments.  There was guys that were

4    assigned to help the slower guys that couldn't read or

5    write, and then there was -- when I first got there, there

6    was the REBT -- or it was RET then, and the Anger

7    Management and Inner Child, and a couple other groups were

8    all study groups, they was not staff facilitated.  That

9    means they was run by other SDP's.

10   Q.     So, the study groups were connected to your

11   treatment and your therapy.  They were to reinforce your

12   treatment and therapy?

13   A.     Can yes, ma'am.

14   Q.     When did that stop?

15   A.     That stopped 2014, 2015, because it violated the

16   very first rule in the IDOC rule book.

17   Q.     Which is?

18   A.     No inmate shall have power and control over

19   another inmate.

20   Q.     Okay.  Can you give me some idea or describe for

21   me in a typical group session -- I'm still trying to

22   understand how that's set up and what happens.  Let's say

23   it's 10 or 12 people, whatever it is.

24   A.     Okay.

25   Q.     As it is now, it runs an hour; correct?
```

1    A.      Yes, ma'am.

2    Q.      Tell me, give me some idea what happens in a

3    hour-long group therapy session.

4    A.      Okay.  We'll go to group.  The therapist will ask

5    if we have anything to talk about.  If nobody speaks up,

6    we'll go into our homework assignment that we got the

7    previous week.  Right now, we're working on definitions of

8    -- or definitions of putting a cycle together and the way,

9    and in order -- and which way to do that.

10   Q.      Now, is a cycle -- that's for your six-month

11   evaluation?

12   A.      No --

13   Q.      That's part of your six-month evaluation?

14   A.      No, ma'am.

15   Q.      Okay.

16   A.      The cycle work is your offense and your thoughts

17   and your behaviors leading up to and your offense.

18   Q.      So, what are you supposed to do, write that out?

19   A.      Yes, ma'am.

20   Q.      And then the therapist tells you how they want it

21   organized?

22   A.      Yes.

23   Q.      And you have been having to do that since 2001?

24   A.      Yes, ma'am.

25   Q.      How often?

1    A.       Repeatedly.

2    Q.       Has anybody explained to you the purpose of that?

3    A.       No, ma'am.

4    Q.       So, in this group session, is there one-on-one

5    interaction with a therapist, or no?

6    A.       It can be.  But the other guys in the group speak

7    up.

8    Q.       Do you have any -- have you received any therapy

9    let's say in the last four years, just one-on-one therapy,

10   yourself and a therapist?

11   A.       No, ma'am.

12   Q.       I want to ask you about these tickets.  You

13   mention -- I just want to clarify.  IDOC staff can't issue

14   SDP program tickets; right?

15   A.       No, ma'am.

16   Q.       But SDP program staff can issue IDOC tickets?

17   A.       Yes, ma'am.

18   Q.       And those IDOC tickets can lead to you being in

19   segregation?

20   A.       Can be -- we can go to segregation.  We can also

21   -- there's other punishments.  You can get 30 to --

22   anywhere from 30 days up to a year of C grade.  Which, on

23   C grade, you are only allowed to make -- you are allowed

24   -- you can't make no phone calls.  You are only allowed to

25   buy, I think, 15 dollars of cosmetics per month.  And, and

1    that's it for those.  You can't get a job while you are on

2    C grade or B grade.

3          B grade, when you -- say if you get a year of C

4    grade, you'll get a year of B grade, also.

5    Q.     And the segregation can go on for how long?

6    A.     Anywhere from a week -- or actually, like three

7    days, up to a year.

8    Q.     And then as far as when you are in segregation,

9    can you physically -- can you describe for me physically,

10   is that, is that in the SDP housing area or is that in the

11   general --

12   A.     No, ma'am.

13   Q.     -- population?

14   A.     That's in the general population area.  It's --

15   you have the Administration building where the visiting

16   room is, Health Care and Receiving.  And segregation is

17   right behind Receiving, or right next to it.

18   Q.     Okay.  When you are out in the, having a group

19   session in the area that you pointed out on the

20   photograph, are there -- is it at the same time where

21   other SDP participants who are not involved in group, are

22   they generally out in the dayroom?

23   A.     Yes, ma'am.

24   Q.     While you are having group session?

25   A.     Yes, ma'am.

```
 1   Q.      Okay.  And you said if staff is present then you
 2   are basically allowed to be out in the dayroom from 8:00
 3   a.m. to 2:30 p.m.?
 4   A.      Yes, ma'am.
 5   Q.      And then after 2:30 p.m. -- I'm sorry?
 6   A.      Then we have one hour at night.
 7   Q.      That you are out?
 8   A.      That we're out.
 9   Q.      What if the staff -- and if the staff is not
10   present, then you are locked up for all but one hour a
11   day?
12   A.      It -- there's an upper and lower schedule, for
13   uppers and lowers.  And that's upper deck and lower deck.
14   On even days, the lower deck is out from 12:30 to 2:30.
15   And then at -- from 8:10 to -- or, no, 8:15 to 9:20 that
16   night.
17           The lower deck is out from 8:00 to 9:00 a.m. and
18   7:05 to 8:10 p.m. at night.
19   Q.      And you said -- and that's when the staff is not
20   present.  How often does that happen?  I mean, what are
21   the reasons that the staff wouldn't be present and how
22   often generally does that happen?
23   A.      Court writs or --
24   Q.      Court appearances?
25   A.      Court appearances, if they're sick.
```

```
1   Q.      How often -- on the average, how often -- like in

2   a month's time, how often have you had days or do you have

3   days generally where staff is not present and you're

4   locked up primarily all day?

5   A.      I can give you an average over like a year.

6   Q.      Okay.

7   A.      It's like 30 to 35 percent.

8   Q.      Okay.  And the last thing, you mentioned the SDP

9   program manual.

10  A.      Yes, ma'am.

11  Q.      You got one when you first were committed?

12  A.      Yes.  I believe they passed one out a few years

13  ago, too, but I don't remember what it said.

14  Q.      Did you get one, though?

15  A.      I believe I did.

16  Q.      Okay.  All right.  That's -- thank you.  Anything

17  else, Mr. Stobbs?

18          MR. STOBBS:  No, ma'am.

19          THE COURT:  Mr. Tyrrell?

20          MR. TYRRELL:  No, Your Honor.

21          THE COURT:  Thank you, sir.  You may step down.

22          THE WITNESS:  Thank you.

23          MR. STOBBS:  Call Mr. Howe.  James Howe.

24          (Witness sworn by clerk.)

25          THE WITNESS:  James G. Howe.
```

```
 1                    JAMES G. HOWE,
 2  having been first duly sworn, was examined and testifies
 3  as follows:
 4                 DIRECT EXAMINATION
 5  BY MR. STOBBS:
 6  Q.      James, when were you born?
 7  A.      July 13th, 1979.
 8  Q.      Could you tell Judge Yandle a little bit about
 9  your educational history?
10  A.      I had went to high school.  I quit when I was 16
11  to go to work.  I got a GED and I attended two and a half
12  years of college.  I have approximately 76 hours with a
13  3.47 average.
14  Q.      All right.  What about your work history?
15  A.      When I was younger, I worked for several
16  contractors.  My dad owned a business, Sullivan and Howe,
17  Incorporated, in Indiana.  I started with him.  At 16, I
18  was leading a crew setting footers for modular homes.
19          And as I progressed, I went to work for McBride
20  and Son in St. Louis in the Carpenters' Union.  Then when
21  Dave Sadgee [phonetic] retired from McBride's, he took me
22  with him, and I ran a crew for him at 19.
23          And then from there, I progressed into working for
24  myself.  Construction in the summer, and I'm a cook in the
25  wintertime.
```

```
1    Q.      Could you kind of give Judge Yandle just the rough
2    years about that, the years that that happened, kind of
3    the --
4    A.      For the last 17 years, I have worked for different
5    contractors at different times, and I do my own jobs.  My
6    dad works at Barnes Jewish at St. Louis, so he gets me a
7    lot of work for the people that he works with.  My mom's
8    been at Alton Memorial for years, so I get a lot of their
9    work.  I'm licensed and insured.  And when I'm not busy,
10   there are several other contractors that I work for.
11   Q.      Well, obviously you are not working now, so --
12   A.      No.
13   Q.      And you are civilly committed?
14   A.      Yes, sir.
15   Q.      And I just want to ask you:  The first time that
16   you were civilly committed, what year was that?
17   A.      November 1st, 2013.
18   Q.      And for how long were you committed then?
19   A.      I was committed until late -- or February of '16.
20   Q.      And when did you go back in?
21   A.      July 13th -- my birthday -- 2017.
22   Q.      All right.  Now, the first time that you went in,
23   if you could -- in 2013, if you could explain to Judge
24   Yandle how that process works in terms of a diagnosis.
25   A.      Yeah, sure.  The State filed charges -- I had
```

1   filed for divorce from my then wife.  She subsequently

2   accused me of rape.  When I denied to take the five-year

3   plea deal for the offense, the State filed a petition to

4   -- for a sexually dangerous persons.  The court appointed

5   Dr. Terry Killian M.D., Dr. Lawrence Jekyll, M.D., both of

6   which were state witnesses.  And then I had Dr. Kirk

7   Witherspoon, Ph.D, as a defense expert.  All three of them

8   unanimous -- well, two of them, Dr. Jekyll and Dr.

9   Witherspoon, diagnosed me with alcohol abuse, cannabis

10   abuse, personality traits NOS of the anti-social variety.

11          Dr. Killian's diagnosis was probable personality

12   disorder, anti-social traits.  But they were -- both sides

13   were pretty unanimous in diagnosis.

14   Q.     The first part I'd like to talk about is the

15   alcoholism.  Okay?

16   A.     Okay.

17   Q.     So, you have these guys say that you are, for lack

18   of a better reason, an alcoholic?

19   A.     Yes, sir.

20   Q.     Did you contest that?

21   A.     No, sir.

22   Q.     And you are civilly committed?

23   A.     Yes, sir.

24   Q.     What treatment did you receive for alcoholism?

25   A.     None.  To this day, none.

```
 1   Q.      When you were committed in 2013, was your

 2   diagnoses changed when you got to Big Muddy?

 3   A.      It was changed during a recovery evaluation, per

 4   the Act you file.

 5   Q.      Okay.  Now, some of us aren't familiar with that

 6   as it is.  So, what is a recovery?

 7   A.      Per Section 9 of the Act, every two years from the

 8   date of the last disposition, or any time after six months

 9   if you are initially committed, you can file for what's

10   called recovery for release, conditional release and/or

11   discharge.

12   Q.      All right.  Now, and is that something that Dr.

13   Holt and his crew has to deal with?

14   A.      Not directly, but their names were mentioned 18

15   times in 12 pages in my recovery evaluation.

16   Q.      In terms of what?

17   A.      Their opinions.

18   Q.      Which were what?

19   A.      That I wasn't ready to go.  That I didn't know

20   anything or any treatment concepts.  I mean, essentially.

21   Q.      When you were released, when the judge released

22   you, was it a judge or a jury?

23   A.      It was a jury.  I went to trial.

24   Q.      When the jury released you, what treatment had you

25   received at Big Muddy for -- lack of a better word, I'll
```

1    say it -- life on the outside?

2    A.      Well, I received sex offense specific treatment,

3    is what they call it, while at Big Muddy.  As far as any

4    preparation to leave, I was not backed by staff to leave.

5    I won my trial, pro se.  So, there was no preparation for

6    me to go to the next step.

7    Q.      I got that.  And that's, and that's what I'm

8    saying, is that it's -- when you left, do you remember

9    what phase you were in?

10   A.      I have always been in Phase 1.

11   Q.      You have never advanced?

12   A.      I -- I cannot advance because I do not admit my

13   index offense.

14   Q.      If you can explain to Judge Yandle what that

15   means.

16   A.      Essentially, if I don't admit that I raped my

17   wife, when I didn't, I'll never, ever advance in this

18   program.

19   Q.      When you're -- and do you attend group therapies?

20   A.      Yes.

21   Q.      And we have heard about the three other guys that,

22   that are plaintiffs here.  You heard about how those,

23   those sessions work; is that right?

24   A.      Yes, sir.

25   Q.      And do you have anything to add to that, so we can

1    kind of speed things up?

2    A.      The group process is, you know, they have lowered

3    the number of people that are in the groups now to around

4    10, maybe 12 at the most.  You know, we show up.  I

5    haven't personally been given an assignment in a few

6    years, but there's things we are maybe told to work on in

7    a group.

8          Like in my group, we are doing definitions right

9    now.  So, we'll come in.  Miss Stover will give me two or

10   three definitions.  I will go through it, say

11   justifications and minimizations.  How I minimize, you

12   know, my alleged offense or different crimes, or justify

13   them.

14   Q.      Sure.

15   A.      And then we will explain them on a

16   person-by-person basis.

17   Q.      Now, if you know this, does each therapist, I

18   guess, run their group their own way?

19   A.      I have only ever had one, until recently.  I'm in

20   segregation.  I have been meeting with Dr. Holt an hour a

21   week on Friday afternoons.

22   Q.      Have you ever met -- the time you've been -- all

23   the time you have been at Big Muddy, have you ever met for

24   more than a week?

25   A.      What do you mean?

```
1   Q.      Your groups.
2   A.      What do you mean by more than a week?  More than
3   once a week?
4   Q.      Yes.
5   A.      No, sir.
6   Q.      What do you do with the notes that you take in
7   your group sessions?
8   A.      We are not allowed to take notes in our groups.
9   Q.      What -- again, explain this to Judge Yandle.
10  A.      I have seen a couple guys that were taking notes,
11  and the notes were taken from them and they were issued
12  program tickets because, you know, other people, different
13  people talk in the groups.  And, I mean, even though we
14  live together and we're together every day, I guess having
15  another person's information or writing it down is an
16  issue.  I don't really know the purpose behind it, but I
17  know that we have been instructed not to take notes.
18  Q.      And when you -- you talked about your experience
19  with the judicial system.  If you could tell Judge Yandle
20  the ways to, to, to get released from Big Muddy?
21  A.      There is one way.  You get backed -- well, there's
22  no way to get discharged.  I don't ever know of the
23  program ever recommending anybody for release, and I've
24  got extensive knowledge in the cases and appellate
25  decisions for each case that's been heard.
```

```
 1            I don't know that the program staff of late has
 2   ever recommended anybody for release.  You can get
 3   evaluated by Wexford.  I believe their evaluations are
 4   pretty subjective to the opinion of the treatment
 5   providers, but they have occasionally recommended people
 6   for conditional release.
 7            THE COURT:  Is that what you were on?  Conditional
 8   release?
 9            THE WITNESS:  I was on sex offender parole,
10   basically.
11   Q.     (BY MR. STOBBS)  Okay.  So, those are the two
12   ways.  Are there any other ways to get out of the program?
13   A.     Die.
14   Q.     Have anyone that you know that, since you've been
15   there, died in the program?
16   A.     I think there's --
17            MR. ROCKERSHOUSEN:  Objection, relevance.
18            THE COURT:  Overruled.
19   A.     I think there's been six people die, since I have
20   been there.
21   Q.     (BY MR. STOBBS)  And it's difficult to ask this
22   delicately.  There's only really one way to ask it:
23   You're in, and then you got yourself out; right?
24   A.     Yes, sir.
25   Q.     And then you got yourself back in?
```

1   A.      Yes, sir.

2   Q.      Was the diagnosis the same or different when you

3   were returned -- when you returned?  If you know.

4   A.      When I was -- June 4, 2015, is the date that I met

5   with Dr. Kristopher Clounch of Wexford.

6           THE COURT:  Were you in or out, at that time?

7           THE WITNESS:  I was in.  This was my evaluation to

8   be released.  He changed my diagnosis to contradict the

9   three experts that I had -- two psychiatrists and

10  psychologist, I had in the beginning, and he diagnosed me

11  with sexual sadism.

12  Q.      (BY MR. STOBBS)  Okay.  And that -- again, not to

13  beat a dead horse, but that's a different diagnosis than

14  what you originally had?

15  A.      It's completely and utterly different.

16  Q.      And are you receiving treatment for that?

17  A.      No.

18  Q.      Did you receive any treatment or any classes or

19  any education to prepare you for the outside world?

20  A.      No, sir.

21  Q.      Do you know if those classes exist?

22  A.      Big Muddy River Correctional Center, itself, is

23  not licensed to provide substance abuse treatment approved

24  by DASA, nor is the program accredited to do such.

25  Q.      Which is what you have?

1    A.      Yes, which is my diagnosis.

2    Q.      Have you ever been concerned about funding at Big

3    Muddy?

4            MR. ROCKERSHOUSEN:  Objection, foundation.

5            THE COURT:  Sustained.

6    Q.      (BY MR. STOBBS)  Have you ever -- do you have any

7    knowledge whatsoever about the funding at Big Muddy?

8    A.      Yes, I do.

9    Q.      And have you ever inquired about that?

10   A.      Yes.  I wrote Freedom of Information for Illinois

11   Department of Corrections at 1301 Concordia Court, to

12   request budgetary information and program expenditures.

13   Q.      I'm going to show you what's been marked as

14   Plaintiff's Exhibit 10.

15           THE CLERK:  Has it been admitted?

16   Q.      (BY MR. STOBBS)  I'm going to show you what's been

17   marked as Plaintiff's Exhibit 10.  I'm going to ask if you

18   could identify it, please.

19   A.      Yes, I can.  It's from Lisa Whitecamp.  A response

20   to my request.

21   Q.      (BY MR. STOBBS)  And do you know why she responded

22   to your request?

23   A.      Because the law says she has five days to do so

24   upon requesting Freedom of Information information.

25           MR. STOBBS:  I'd move for the admission of

1    Plaintiff's Exhibit 10, Judge.

2             THE COURT:  Any objections?

3             MR. ROCKERSHOUSEN:  No, Your Honor.

4             THE COURT:  Plaintiff's Exhibit 10 is admitted.

5    Q.      (BY MR. STOBBS)  And, James, if you could just

6    tell Judge Yandle essentially what that says?

7    A.      What I did was, I wrote the Illinois Department of

8    Corrections, and I wanted to find out -- it was right

9    around the time I filed this, right before I filed this

10   suit.  I wanted to find out if the program was budgeted

11   separately, due to my research of the other 19 programs in

12   the United States having large budgets for treatment

13   providers and research and development and whatnot.

14            So, I wrote Freedom of Information.  What I found

15   out was exactly what it says, that the money is not

16   budgeted separately for this program.  And on the next

17   page, I believe it's on the next page, it states that no

18   money has been spent or no expenditures in this program in

19   the last two years.

20   Q.      James, as someone who's housed at Big Muddy in the

21   SDP program, does funding affect you?

22            MR. ROCKERSHOUSEN:  Objection, foundation.

23            THE COURT:  Sustained.  It's pretty obvious

24   anyway.

25            MR. STOBBS:  Yeah, I'll withdraw the question.  It

1   is obvious.

2   Q.      (BY MR. STOBBS)  Have you ever spoken with someone

3   at staff regarding funding?

4   A.      I have had a few exchanges with Dr. Holt during

5   staffing sessions about -- in one instance, I went to him

6   and I asked to have my treatment provider changed.  I just

7   -- it's not a personal issue, I just don't see eye to eye

8   with my personal -- or primary therapist, and I don't

9   believe she does with myself, either.  And he said, you

10  know, *this is what I've got*.  So, essentially, you know,

11  *this is the staff I've got, this is what I have to offer*.

12  Q.      Did he specifically say anything about budgeting?

13  A.      No.  Other than, it is what it is.

14  Q.      What did you take that to mean?

15  A.      That it is exactly what it's not.

16  Q.      I'd like to talk a second, James, about the

17  lawsuit that's been filed here.  Okay?

18  A.      Okay.

19  Q.      Why did you file it?

20  A.      When I first got to Big Muddy, I came in with high

21  expectations like, you know, I am an alcoholic, I have

22  been domestically violent with my wife and multiple

23  girlfriends, I need this help.

24          I came into that situation there and I met people

25  like Tim Charles and Jake Kallal and George, and

1    essentially these people, including those guys, made fun

2    of me for having hope.  Like, I'm not going to die here.

3    That may be your plight, but that's not going to be mine.

4          And then after so long after I was there, I kept

5    seeing this -- I would go to group with something that I

6    thought was a really good idea, something -- and I had

7    really put a lot of work into it, and it was nothing.

8    Like, you're not admitting that you raped somebody.

9    You're not admitting to a sexual crime that you weren't

10   convicted of, that the State chose not to prosecute you.

11   You might as well not be here, is the feeling I got.  You

12   might as well not bother showing up because you're never

13   going to advance.

14         So, when I seen this and I developed myself, I

15   thought, you know, I'm going to be here forever if I don't

16   do something about it.  And I talked to my dad, and my dad

17   said, "I raised you to do what it takes to -- you know,

18   you got yourself in this, you are smart enough to get

19   yourself out."  So, I filed this in hopes it would make

20   things better and that we would have opportunities.

21   Q.        What do you hope Judge Yandle's going to do?

22   A.        That's a long list.  But in the short, I hope that

23   somebody will take this seriously to see that it's not

24   what's being displayed.  I am an inmate.  I am an inmate

25   167 hours out of 168 a week.  I am a person that sits in a

1    group the other hour.  I have been written tickets for

2    talking to my 78-year-old grandmother on the phone too

3    loud.  Twice in one month, I got two tickets for this,

4    from one person.

5         I was attempting to do my job as a pusher in July

6    of 2014.  And on our job -- we got a list of jobs on the

7    wall, like a bulletin board.  And on the bottom of it, it

8    says "pushers be proactive, do your job, find somebody to

9    push."

10         THE COURT:  In a wheelchair?

11         THE WITNESS:  Yeah, a wheelchair pusher.

12    A.    There was a gentleman by the name of Doug Grove

13    who had a problem with an older black gentleman, they were

14    going back and forth calling each other racist names.  So,

15    the black gentleman asked me to push this guy.  He had

16    already went out the door to go to the chow hall out on

17    the sidewalk, so I went to walk out the door, trying to do

18    my job at the -- you know, the guy said *this guy went out*

19    *without a pusher.*  Miss Stover stopped me, wrote me a

20    ticket for unauthorized movement.  Violation of rules.

21         I went to the Adjustment Committee to hear the

22    ticket.  They dismissed it.  Three days later, I was

23    placed on 30 days room restriction, where I couldn't leave

24    my room, despite the ticket being dismissed.

25         And I had to go hear another ticket, and the lady

1   that heard the ticket, Kathy Hutchinson, showed me the

2   paper that said the ticket was dismissed but yet I was

3   punished anyway.  So, I filed a grievance.  And I get it

4   back and all of a sudden the paper that said it was

5   dismissed disappeared.

6           THE COURT:  Was that a program ticket?

7           THE WITNESS:  That was an institutional and a

8   program ticket for the same event.

9           THE COURT:  Where you were placed on room

10  restriction?

11          THE WITNESS:  Yes, ma'am, 30 days.

12  Q.      (BY MR. STOBBS)  James, how many guys out of the

13  172 are in a wheelchair?

14          MR. ROCKERSHOUSEN:  Objection, relevance.

15          THE COURT:  Overruled.  It goes to conditions of

16  confinement.

17  A.      33 to 37, give or take one or two either way.

18  Q.      (BY MR. STOBBS)  Has any staff member made any

19  statements about the lawsuit?

20  A.      In group, I remember one time, a year or so ago,

21  maybe not quite, Miss Stover made a comment of --

22          MR. ROCKERSHOUSEN:  Objection, hearsay.

23          THE COURT:  Sustained.

24  Q.      (BY MR. STOBBS)  The -- talking about nurse -- or

25  Jessica Stover, are you in her group now?

1    A.        Yes.  Yes, well, I'm in segregation now.

2    Q.        I got that.

3    A.        So when I'm not in segregation, yes, I'm in her

4    group.

5    Q.        And when you are in her group, are there ever any

6    group cancellations?

7    A.        Three out of ten.

8    Q.        Thirty percent of the time --

9    A.        Roughly, yeah.

10   Q.        Just when the groups are cancelled, are they made

11   up?

12   A.        On occasion.  Not frequently.  Like maybe Cycle

13   groups or RP groups, the higher groups, they would be made

14   up.  But core groups, it seems that they're not made up as

15   often.

16   Q.        I want to talk to you, James, you said a bunch of

17   stuff in a few words.  Are there other classes that are

18   offered at Big Muddy?

19   A.        What do you mean by class -- you mean treatment

20   modalities?

21   Q.        Yes.

22   A.        Yes, well, they don't have Victim Empathy right

23   now.  It's been on hold since 2015, maybe.  But they have:

24   Anger Management; REBT, which I have taken once; and

25   Relapse Prevention, which -- and Cycle group, which I

1    can't take either one of those two because I do not admit
2    the index offense.  But I have tried to.
3    Q.     When -- and we're going to talk a little bit about
4    the phases and stages in a second.
5    A.     Sure.
6    Q.     But just to speed along a little bit, are these
7    extra treatment programs, are those something that assists
8    you in moving up or down the phase or stage ladder?
9    A.     I'm not a really firm believer in, that the phases
10   many anything.
11   Q.     Why is that?
12   A.     Just because there's guys there that have
13   completed every one of these classes on multiple
14   occasions, and they're still Phase 1 or 2.  So, I think
15   it's based on the subjective opinion of your treatment
16   provider as to where you go, higher or lower.
17   Q.     Is it designed to show progress?
18   A.     No.
19   Q.     What do you mean by that?
20   A.     Well, there's no curriculum.  So, essentially any
21   progress that we would be able to show is based on that
22   one person's word for what we allegedly know or what we
23   do.  There's no -- you know, they used to have books that
24   they used.  I know they were 30 years old.  That still
25   gave you something that you could show, something tangible

```
1    that you had done this work.  Well, now there's nothing.
2           THE COURT:  Hold on for one second.  Let me get
3    clarification because, as the day fades on, I may not
4    remember the question I want to ask.
5           When you say there's nothing, what are you talking
6    about?
7           THE WITNESS:  There's no curriculum.  There's no
8    -- I mean, at least for me in my group, I have never been
9    given any materials to do treatment with, except for when
10   I first got there and I did the blue book.  And I
11   completed it, turned it in.  Other than that, I have been
12   given no -- there's no way for me to show what I know.
13          THE COURT:  Thank you.
14          Go ahead, Mr. Stobbs.
15   Q.     (BY MR. STOBBS)  And we have heard before, there's
16   basically Dr. Holt and three therapists; is that right?
17   A.     There's Dr. Holt, Jessica Stover, Heather Young, a
18   new lady Miss Wright, Heather Wright.  And then there's
19   Kara -- and I can't say her last name, but she doesn't
20   have a license yet, so -- it doesn't change -- the new
21   staff does not change the clinical hours.
22   Q.     What do you mean by that?
23   A.     In 2016, in the schedule there was 21 clinical
24   hours offered with all of the therapists, not including
25   the staffing or the study groups that we had at the time.
```

```
 1   Q.      Sure.

 2   A.      Now there's 20 clinical offers -- hours offered in

 3   the new 2018 schedule.

 4   Q.      Okay.

 5   A.      And that's all therapists, in all groups, 20.

 6   Q.      For 172 people?

 7   A.      110.  There's 60-some that choose not to

 8   participate due to helplessness, and they've been there

 9   100 years and they're not going anywhere.  So, they have

10   resigned to die there.

11          THE COURT:  Again, Mr. Stobbs, I'm going to stop

12   you.  I'm going to interrupt you for clarification.

13          You said 20 or 21 clinical hours.  What do you

14   mean by that?  Explain that.

15          THE WITNESS:  That means, out of all three

16   therapists, Miss Stover, Dr. Holt and Heather, there's

17   around 20 clinical hours offered simultaneously with all

18   three of them.  Like with core groups, RP -- Relapse

19   Prevention groups -- and Cycle groups, 20 total hours,

20   yes, in a week's time.  That is as of the new schedule.

21          THE COURT:  Thank you.  I'm sorry, Mr. Stobbs.

22          THE WITNESS:  Give or take one or two, for my

23   mistake.

24   Q.      (BY MR. STOBBS)  Do you think that basically you

25   have a personality -- just a personal problem with Miss
```

1    Stover?

2    A.      Absolutely not.

3    Q.      And when you are in the programs, do you try to

4    progress through?

5    A.      I do.

6    Q.      And if you could explain to Judge Yandle, in your

7    group what is that like?

8    A.      Well, if I give you an example, on my semi annual

9    evaluations, I'm scored nearly the highest for everything,

10   REBT Knowledge, Anger Management knowledge, RP, Victim

11   Empathy.  But I've been denied those groups.  So, you are

12   essentially scoring me the highest, but you have never

13   given me the opportunity to show what I know.

14          The week before last, Dr. Holt has been meeting

15   with me and two other SDPs that are in segregation.  And I

16   did a six stage and a four stage cycle in an REBT outline

17   to help a guy who's not up to par with his treatment for

18   his own reasons.  And Dr. Holt looked at him and he goes,

19   you know, these are good basic starter points.  Take your

20   knowledge and put them in there.  But I don't know any of

21   this stuff and I can't see Dr. Holt allowing that guy to

22   have that stuff if it was completely bogus, or there was

23   nothing right or good about it.  Not that it was perfect.

24          I think treatment is an ongoing thing.  You don't

25   learn it all.  You get to a point to where you are ready

1    to leave and, you know, do the things that you have

2    learned or show what you have learned.  But you have to be

3    given the opportunity to show those things and you just

4    can't do it there.  There's no program to do that, for me.

5             THE COURT:  Isn't that the purpose of the

6    evaluation?  Or is that the purpose of the evaluation?

7             THE WITNESS:  If the evaluations were objective

8    and done correctly, in my opinion, yes, that would be the

9    purpose.  But they're not.  They're very subjective.  And

10   the person who does my evaluation is the same person that

11   wrote me a ticket for filing this lawsuit.  So, I -- it

12   may not be, but I have to keep that in my mind that I am

13   being retaliated against on paper because of this.

14   Q.    (BY MR. STOBBS)  James, you talked -- you just

15   said a ticket.

16   A.    Yes.

17   Q.    Is that something that's subjective or objective?

18   A.    I don't want to sit here and say that I wasn't

19   talking too loud on the phone to my grandmother.  And

20   maybe I just -- you know, Miss Stover viewed it as a

21   disruption to her group, because we learn a lot of things

22   are perception, whether it's true or not, it's my

23   perception.  Her perception may have been that I disrupted

24   her group.

25             But if you take the ticket that I got for trying

1    to do my job with a simple, "hey, you're not needed, go

2    back on the wing" would have sufficed.

3    Q.      What are some of the reasons that someone could

4    get a ticket?

5    A.      Anything they choose.

6    Q.      What are some of the -- they're written down in a

7    book, though; right?

8    A.      Yeah, but it says in the book that they're subject

9    to change at any time.  I have seen people get tickets for

10   things that weren't rules and, a month later, they were

11   rules, so.

12   Q.      And in your dealings with Miss Stover, does -- has

13   she shown an interest in treatment?

14   A.      Has she shown an interest in my treatment?

15   Q.      Yes.

16   A.      No, not, not a professional interest in seeing me

17   do well.  I gotta say no.

18   Q.      How about in punishment?

19   A.      Oh, absolutely.

20   Q.      How many, just on a daily basis -- if you know, if

21   you don't know, you don't know -- are tickets written?

22           MR. ROCKERSHOUSEN:  Objection, calls for

23   speculation.

24           THE COURT:  It's only speculation if he doesn't

25   know.  He can answer whether he knows.

```
 1              THE WITNESS:  I certainly believe I do know.
 2              THE COURT:  Answer the question.
 3      A.      That's a very good point and good question
 4      because --
 5              THE COURT:  Okay, I don't need you to comment on
 6      his question.
 7              THE WITNESS:  Sorry.
 8              THE COURT:  I just want you to answer.
 9      A.      The only time that our staff is on the wing is
10      when groups, when they're actually holding a group.
11      They're not on our wing any other hours of the day to
12      observe, so the tickets are written on violations that are
13      happening while that therapist is in a group.  And they're
14      written quite often.  About every two weeks, Miss Stover
15      will come in with maybe 15 to 20 tickets.
16      Q.      (BY MR. STOBBS)  And those are program tickets?
17      A.      Program, yeah.  And there is institutional tickets
18      written by staff, as well.
19      Q.      Do you know what kind of training the staff has?
20      A.      I know what their college degrees are, their
21      professional training is, but.
22      Q.      But to work with sexually dangerous people, do you
23      know what their training is?
24      A.      They collect 400 hours of group therapy and get a
25      license through the Treatment Provider Act.
```

```
1   Q.      Do you know, like Miss Stover, anyone other than

2   Dr. Holt -- or even Dr. Holt -- do any of these people

3   work in the prison with just normal prisoners, as well?

4   A.      Dr. Holt does, does run, administrate a -- it's

5   called the SOP -- Sex Offender Program -- for general

6   population volunteer offenders.  And that would be on A

7   Wing in 4-House.  Miss Stover does not work with that

8   group of people.

9   Q.      So, it's just Dr. Holt, as far as you know?

10  A.      Yes.  But she does do other duties within the

11  prison.

12  Q.      How many people in your group?

13  A.      Right now, we have nine, I believe.

14  Q.      Has it ever been a different number?

15  A.      At one time, we had 17 to 19.

16  Q.      Do you know when that changed?

17  A.      It might have happened when I was gone, but it's

18  been within the last two years.  Maybe a year ago.  Maybe

19  right when I got back.  I'm not sure.

20  Q.      If you could tell Judge Yandle -- and if I have

21  asked it, tell me and I'll not ask it again -- but is

22  there a manual that's handed out that explains the

23  program?

24  A.      There's a manual that's handed out that explains

25  the punitive side of the program for violations.
```

Q.      What kind of violations?

A.      You gave a good example earlier, shirt untucked.
If I'm one minute late to group, I'm not allowed to attend
that group and I'm getting a program ticket.

        There's a lot of guys that have no money.  I mean,
they have nothing.  They get -- and if they're on C grade
or, you know, they have been in segregation, they don't
get nothing.  And, you know, most of them guys without
jobs that are handicapped, they get ten dollars a month.
George is one of those guys.  If I were to give George a
bar of soap and staff found out about it, I would receive
a program ticket and an institutional ticket for
trafficking and trading, which would then prevent me from
progressing through the phases.

Q.      And do you know, is the program set up so there's
a clear path to, to go from 1 to 2, to 2 to 3, to 3 to 4?

A.      No.

Q.      Is it subjective or objective in terms of going up
or down?

A.      It's --

        MR. ROCKERSHOUSEN:  Objection, foundation.

        THE COURT:  That does call for an opinion, I
think, Mr. Stobbs.  I'm going to sustain that objection.

Q.      (BY MR. STOBBS)  Have you ever moved above Level
One?

```
 1   A.      NO.  I can't move above Phase 1 because I do not
 2   admit my index offense.
 3   Q.      Have they ever administered a polygraph to you to
 4   determine the truthfulness?
 5   A.      They have not administered one on conditional
 6   release.  I took two and I passed the index offense
 7   specific polygraph, every question on it, as to the
 8   violent aspects of the offense.  Did I punch my wife in
 9   the head?  Did I pull her hair --
10           MR. ROCKERSHOUSEN:  Objection, relevance.
11           THE COURT:  Sustained.
12   Q.      (BY MR. STOBBS)  The -- have you volunteered to
13   enter other groups?
14   A.      I volunteered for every group they offer.
15   Q.      And what's the response been?
16   A.      98 percent of the time, I get denied because I do
17   not admit my index offense.
18   Q.      And then the semi annual evaluations, is there --
19   what -- is there a cycle in this?
20   A.      Yeah, you have -- well, yeah.  There's a section
21   that covers the knowledge that you would have about
22   cycles, like a relapse cycle.  Do you want me to explain?
23   Q.      Sure.
24   A.      Okay.  In the relapse cycle, you would have --
25   your pretend normal, which would be your pre-abuse cycle
```

1    behaviors.  And then you would go -- and I'm just going to
2    run through this real quick.  It's not going to be pretty.
3    Then you would go to like a triggering event.  And then at
4    the point -- once you master the cycle or you recognize
5    when you are in this relapse cycle, upon the triggering
6    event you would utilize your interventions.  But people
7    who don't have their interventions or know them, you would
8    go to maladaptive coping responses based on the triggers
9    event.  And then you would go to high risk factors.  And
10   then you would go to, say, lapses.
11          You would have seemingly unimportant decisions,
12   decisions that you make after the triggers event.  Like me
13   smacking somebody, that would be a, you know, at the time
14   that would probably be a SUD or maybe an MCR or a lapse.
15   Then you would go through and you would come to your, like
16   planning the relapse, planning the offending event.
17          After you reach the actual relapse, which is the
18   acting out part of it, you would go into like despair,
19   minimization, justification, denial, false remorse, false
20   resolved.  False resolved would be like, you know, *I'm*
21   *never going to do it again.*  False remorse:  *I'm sorry,*
22   when I'm really not.  Minimizing it, would be:  *I'm really*
23   *not drunk, I don't know why she's yelling at me*, in my
24   instance.
25          Justifying would be:  *I cheated on her because she*

1    *was going to leave me anyway, so I ruined the relationship*
2    *before she got a chance to.*  That would be the -- *she was*
3    *going to leave me anyway* would be the distortion.  And the
4    justification would be, *if I ruin it before she does, she*
5    *didn't hurt me, I hurt her.*
6          I mean, there's a lot much different variables and
7    there's a rough -- if I drew it out on a white board, it
8    would be a lot prettier.
9          THE COURT:  I don't know if it would be any
10   prettier.
11         THE WITNESS:  It might be.
12         MR. STOBBS:  No other questions, Judge.
13         THE COURT:  Cross-examine?  You know what?  Let's
14   go ahead and take a quick break.  We'll reconvene at 3:00.
15         (Court recessed from 2:46 p.m. to 3:08 p.m.)
16         (Proceedings continued in open court, parties
17   present.)
18         THE COURT:  You may proceed, Mr. Rockershousen.
19         MR. ROCKERSHOUSEN:  Thank you, Your Honor.
20                     CROSS-EXAMINATION
21   BY MR. ROCKERSHOUSEN:
22   Q.    Good afternoon, Mr. Howe.
23   A.    Good afternoon.
24   Q.    You have never finished high school; correct?
25   A.    No.  I quit to go to work and then obtained a GED.

```
 1   Q.      And when did you obtain a GED?

 2   A.      2003.

 3   Q.      Have you taken any college courses?

 4   A.      Yes.

 5           THE COURT:  What is the relevance of this?

 6           MR. ROCKERSHOUSEN:  I just wanted to est --

 7           THE COURT:  What's the relevance of this?

 8           MR. ROCKERSHOUSEN:  Your Honor --

 9           THE COURT:  Does it have anything to do with his

10   treatment, with the -- I mean, I understand Mr. Stobbs

11   went into it for some general background.  I think it was

12   just to give context.

13           MR. ROCKERSHOUSEN:  Your Honor, I'm just trying to

14   attack his credibility for when he was talking to, about

15   the progression through the treatment.

16           THE COURT:  I took it as a lay opinion.  He's not

17   an expert.  I recognize that.

18           MR. ROCKERSHOUSEN:  Okay.

19           THE COURT:  There's no jury here, Mr.

20   Rockershousen.

21           MR. ROCKERSHOUSEN:  Thank you.

22           THE COURT:  I got that.

23           MR. ROCKERSHOUSEN:  Thank you, Your Honor.

24   Q.      (BY MR. ROCKERSHOUSEN)  Mr. Howe, when you left

25   the facility and came back, was that because you were
```

1    recommitted in a new proceeding or because you violated

2    the terms of your conditional release?

3    A.      Technical violations.  I wasn't arrested for any

4    new crime.

5    Q.      And so now that you are back in the program, is

6    the process for you to be released again the same as it

7    was before?

8    A.      No.  Upon recommitment, that same day I filed for

9    release.  So, I didn't have to wait, you know, as if I

10   have been denied or wait two years.  I could have filed it

11   anytime.  So, that very day, five minutes later, I filed

12   for release again.

13   Q.      And that's currently pending?

14   A.      Yes, sir.

15   Q.      Mr. Howe, you are currently in segregation; is

16   that correct?

17   A.      Yes, sir.

18   Q.      And you were placed in segregation by the

19   Adjustment Committee?

20   A.      Yes, sir.

21   Q.      Who sits on the Adjustment Committee?

22   A.      Various people.  I mean, it's different every

23   time.

24   Q.      Do any of your therapists in the SDP program sit

25   on the Adjustment Committee?

1    A.      No.

2    Q.      And while you are in segregation, do you receive

3    therapy?

4    A.      I have been meeting with Dr. Holt once a week.

5    Q.      And Dr. Holt comes to the segregation unit and

6    provides therapy?

7    A.      He comes and discusses treatment concepts and

8    topics with us, yes.

9    Q.      And when you say "with us," is it other sexually

10   dangerous persons that have been confined to segregation?

11   A.      There's two others presently, yes.

12   Q.      And what was the charge that the Adjustment

13   Committee found you guilty of, to place you in

14   segregation?

15   A.      Threats and intimidation due to having -- they

16   alleged that I had personal information about a nurse that

17   works there.

18   Q.      Okay.  And you were in segregation earlier this

19   year, between April and May; is that correct?

20   A.      Yes, sir.

21   Q.      And the Adjustment Committee placed you in

22   segregation that time?

23   A.      Yes, sir.

24   Q.      And what was the offense that the Adjustment

25   Committee found you guilty of that time?

1    A.       Fighting.

2    Q.       When is the last time you reviewed the SDP program

3    manual?

4    A.       Two days ago.

5    Q.       Mr. Howe, you were in the courtroom earlier when

6    the other three plaintiffs testified.  Would you agree

7    with their testimony as far as how much time they get on

8    the dayroom each week?

9    A.       Well, it varies.  So, to say I agree -- I mean, I

10   did a six-week average, and it was 134 hours a week that

11   we spent inside the cells, out of 168.  I can say that.

12   So, a lot, yes, I guess I would agree with their

13   testimony.

14   Q.       You say you spent 134 hours in your cell --

15   A.       In a six-week average.

16   Q.       Okay.  When did you do that six-week average?

17   A.       From the end of July into August.

18   Q.       Of this year?

19   A.       Yes, sir.

20   Q.       Are SDP's at Big Muddy given the opportunity to

21   take college classes?

22   A.       Well, currently, yes.  But we're placed on the

23   waiting list.  It goes by your time.  So, like, we're kind

24   of considered lifers for the sake of college courses, like

25   a culinary class.  So, we would go last.  And everybody

1    that had a shorter amount of time, like general population

2    offenders, would go before us.

3            So, to give an example, I was on a list for over a

4    year for culinary arts.  So, while we are given the

5    opportunity, not many people make it, to get to actually

6    do it.

7    Q.      At the end of that year, were you actually placed

8    in a culinary arts class?

9    A.      No, I went home.

10   Q.      Have you signed up for any other skills or

11   educational classes besides culinary arts?

12   A.      I have taken two, I think two business classes

13   since I have been at Big Muddy.  So, yes.

14   Q.      Anything else?

15   A.      No.  I did sign up for -- there was a drug

16   education course that was just recently offered, but I got

17   -- Miss Murphy wrote me back and said it was full already.

18   Q.      Have you held any jobs while you were at Big Muddy

19   River Correctional Center?

20   A.      Yes.

21   Q.      What jobs have you had?

22   A.      I worked in the Dietary for seven months.  I was

23   an overnight shower guy.  And I was a pusher for some

24   time, wheelchair pusher.

25   Q.      And you were compensated for those jobs?

1    A.      Yes.

2    Q.      When you are found guilty of a disciplinary

3    infraction by the Adjustment Committee, do you have the

4    opportunity to appeal that decision?

5    A.      Well, I just recently did -- yeah, you do.  But by

6    the time you appeal it -- to give you an example, I asked

7    for a --

8            THE COURT:  Mr. Howe, just answer the question.

9    A.      Yes, you can.  Apologize.

10   Q.      (BY MR. ROCKERSHOUSEN)  Thank you.  And you are

11   given a copy of the orientation manual for Big Muddy River

12   Correctional Center when you arrive there; correct?

13   A.      Yes, I was given one when I arrived.

14   Q.      And the orientation manual lays out the grievance

15   process; correct?

16   A.      I believe it does, yes.

17   Q.      You testified earlier that Dr. Clounch changed

18   your diagnosis when you came back to Big Muddy River

19   Correctional Center; is that correct?

20   A.      Well, he changed it during a recovery evaluation.

21   Q.      Okay.  And is Dr. Clounch employed by the State,

22   if you know?

23   A.      He is a contractor for the State through Wexford

24   Health Sources, Inc.

25   Q.      In the therapy in segregation that you are

1  currently receiving from Dr. Holt, have you been provided
2  with any written materials?
3  A.     He provided us a book about inappropriate sexual
4  behaviors to read and look through.
5  Q.     And have you taken the time to read and look
6  through that book?
7  A.     Well, actually, I tried to buy a copy of that book
8  -- but he told me I couldn't -- so I could write in the
9  book.  But, yes, I have read the entire book.
10 Q.     Mr. Howe, do you understand what SUDs is?
11 A.     Seemingly Unimportant Decisions.
12 Q.     And what is your understanding is of what a
13 Seemingly Unimportant Decision is?
14 A.     Be a decision that at the time may seem
15 unimportant but would have adverse impact or be
16 victimizing to another.
17        MR. ROCKERSHOUSEN:  I don't have anything further.
18        MR. STOBBS:  No questions, Judge.
19        THE COURT:  I have a couple, Mr. Howe, before you
20 step down.
21        THE WITNESS:  Yes, ma'am.
22                         EXAMINATION
23 BY THE COURT:
24 Q.     How long have you been in segregation?
25 A.     A month -- I went on the 19th of September.

```
 1    Q.      And as I -- I just want to make sure I'm clear on
 2    this.  Since you have been in segregation, you and two
 3    other individuals have been receiving therapy directly
 4    from Dr. Holt, one hour a week?
 5    A.      For the -- you have to be there 16 days before you
 6    qualify for it.  But after that, yes, I have been in that
 7    group since.  I think I have had three sessions with Dr.
 8    Holt.
 9    Q.      And so you have gotten one-on-one interaction with
10    Dr. Holt since you have been in segregation?
11    A.      Well, it's a group.  There's three of us.
12    Q.      Okay.  As opposed to 10, 12 or 15?
13    A.      Yes.  Yes.  In that respect, yes, ma'am.
14    Q.      And you have been -- and you actually have a book
15    for it, now that you are in segregation?
16    A.      Yes.
17    Q.      It seems like you are getting more extensive
18    therapy in segregation than you do when you are not in
19    segregation.  Is that -- am I missing something here?
20    A.      In my opinion, I was just thinking about that last
21    night and I thought that I have been able to express more
22    knowledge of what I truly know in the last three weeks
23    than I have in the last four years in the group that I am
24    in.
25    Q.      You have mentioned -- and some of the other
```

1   plaintiffs mentioned -- staffing sessions.  When you say

2   staffing sessions, what are you talking about?  What does

3   that entail?

4   A.      I had an issue with my semi annual evaluation, so

5   the mechanism of going to Dr. Holt to speak to him about

6   that would be going to the staffing session.

7   Q.      Describe for me what a staffing session is.

8   A.      It's him and Miss Young.  They come on the wing.

9   I believe it's every Wednesday at 11:30, between 11:30 and

10  12:00.

11  Q.      Okay.

12  A.      And you get a chance to kind of air your

13  grievances at that point in time, for what it's worth.

14  Q.      Okay.  You said you did a six-week study and

15  determined that you all are in your cell versus the

16  dayroom 134 hours out of -- is that right?

17  A.      An average, give or take a couple hours, yes.

18  Q.      An average of 134 hours out of 168 hours, in a

19  six-week period, running from the end of July to August of

20  2018?

21  A.      Yes, ma'am.

22  Q.      Is that fair?

23  A.      Yes, ma'am.

24  Q.      Would that average be consistent with what you've

25  experienced since 2014, or variable in -- in other words,

1   knowing that that's an average based on what you have

2   experienced, have there been times when you spent

3   significantly less amount in your cell or -- I mean, how

4   has it varied?

5   A.       When I first got there, we were automatically out

6   every day from like 8:00 a.m. to maybe 2:45, right before

7   count.  There was an issue with -- I lived on B Wing for

8   sometime with general population, too.  So, they started

9   doing the upper and lower, the standard 21 and 3.  You

10  know, prison, dayroom, lockup schedule is an average of 21

11  hours in and three hours out.  That's what it would be for

12  general population.  So, we switched to that, unless staff

13  is present.

14  Q.       Were you in your cell 21 hours and out 3?

15  A.       If staff is not present, we spend an average of 21

16  hours a day.  We get like two hours and ten minutes --

17  like George explained, it's uppers and lowers.  Or Jake

18  explained.  It would be from 12:30 to, you know, 2:15., if

19  you had afternoon dayroom, or from 8:00 to 9:00 in the

20  morning.  You'd get an hour or two hours, and then one

21  hour at night.

22  Q.       How often does that happen on a monthly basis,

23  yearly basis?

24  A.       Every day.  If staff's not present, that's the

25  schedule.

```
1    Q.      No, I'm saying, but how often does that happen,

2    when staff is not present and you are on that schedule?

3    In a month's time or -- however you can describe it.

4    A.      Maybe, two, three times in a month.

5    Q.      Okay.  I guess the last thing I'm going to ask

6    you, for clarification:  From the time you were first

7    committed, all the way through now, as far as what you

8    have experienced, how many program participants that you

9    know of have been Phase 3 or 4?

10   A.      One.  One Phase 4.

11   Q.      Since 2013?

12   A.      Yes.  Yes.

13   Q.      Did that person get discharged?

14   A.      He did -- well, he got conditionally released.

15   Nobody gets discharged.  Wexford doesn't recommend

16   discharge.

17   Q.      He got conditionally released.

18   A.      Mm-hmm.

19   Q.      And that's the only person you are aware of that

20   was a Phase 4, since you've been there in 2013?

21   A.      That's -- period.  That's the only person I know

22   of, Mr. Ford, yes.

23   Q.      Thank you.

24   A.      You're welcome.

25           THE COURT:  Anybody else?
```

```
 1            MR. STOBBS:  No, thank you.

 2            MR. ROCKERSHOUSEN:  No, Your Honor.

 3            THE COURT:  Thank you, Mr. Howe.

 4            THE WITNESS:  Yes, ma'am.

 5            THE COURT:  Mr. Stobbs, you can call your next

 6    witness.

 7            MR. STOBBS:  Judge, we call Dr. Cauley.

 8            (Witness sworn by clerk.)

 9            THE WITNESS:  Dean Cauley, C-A-U-L-E-Y.

10                        DR. DEAN CAULEY,

11    having been first duly sworn, was examined and testifies

12    as follows:

13                     DIRECT EXAMINATION

14    BY MR. STOBBS:

15    Q.      Good afternoon, Dr. Cauley.  How are you today?

16    A.      Good.

17    Q.      First of all, before you get --

18            (Off the record.)

19    Q.      (BY MR. STOBBS)  Could you tell Judge Yandle a

20    little bit about yourself, Dr. Cauley?  Where you are

21    from, your educational background?

22    A.      I received a Bachelor's Degree from the University

23    of Michigan in Ann Arbor in psychology; started out of

24    school doing treatment with drug and alcohol parole and

25    probation.  When I started my Master's Degree, we were
```

1  getting a few sex offenders.  Now, this is 20 -- probably

2  27, 28 years ago, close to 30.  We were getting a few sex

3  offenders for treatment through parole, and I was at that

4  point in time the clinical supervisor.  So, I was taking

5  them onto my caseload.

6        By the time I finished my Master's Degree, the

7  entirety of my personal caseload were sexual offenders on

8  parole and probation.

9        THE COURT:  And about how far -- when was that?

10  About when?

11        THE WITNESS:  Probably '95, something like that.

12  A.        When I started the doctoral program at Wayne

13  University in Detroit, I knew going in, that was my area.

14  So, I went in for a degree in mental health counseling

15  with a -- they called it a cognate -- but a minor area in

16  criminal justice.  Went through the program and did my

17  dissertation on the treatment of sexual offenders and

18  defended it to two colleges.

19        When I got my doctorate degree in 2001, I then

20  moved from Michigan to Florida, where I live now, and

21  started working at the Florida Civil Commitment Center For

22  Sexually Violent Predators.  Started out doing the

23  assessments, the IQ testing, personality testing, risk

24  assessment.  And in less than a year, I was a clinical

25  team leader overseeing somewhat similarly, they had three

```
 1    stages of treatment and I was overseeing Stage Two, which
 2    was men that were actively involved in the program.
 3           I left there in 2003 and went into private
 4    practice again.  And since that time, I have been mainly
 5    doing either the -- the way that it would be in Florida is
 6    that there's a jury trial for the commitment process, and
 7    then the reviews for release would be a bench trial.  So,
 8    I have been involved in those quite a few times.
 9           THE COURT:  Providing expert opinions to the
10    juries and/or the court?
11           THE WITNESS:  Correct.
12    Q.    (BY MR. STOBBS)  About how many times?
13    A.    I would say I have done initial commitment jury
14    trial maybe close to 100 times.
15    Q.    As an expert?
16    A.    Yes.  And on -- the process there would be that
17    each year the men are entitled to a review, regardless of
18    whether they ask for it or not.  And then if they go
19    forward for it, and there's a hearing, I have done
20    probably 200 of those.
21    Q.    As an expert?
22    A.    Yes.
23    Q.    And have you ever been, other than being
24    recognized as an expert in state courts, have you ever
25    been recognized as an expert in federal courts?
```

```
 1   A.      Yes.
 2   Q.      Would you tell Judge Yandle a little bit about
 3   that.
 4   A.      I'm not sure of the year.  I would think four or
 5   five years ago, there was an issue in the Minnesota
 6   program.  It was somewhat different.  The program seemed
 7   to be pretty together.  It was a reasonable program but
 8   there was no one gaining release, ever.  And there was a
 9   question about what was it that was going on in the
10   program that was not getting men ready for release after
11   10 or 15 or 20 years of time.  And I was asked to come in
12   and offer an opinion on that.
13           MR. STOBBS:  Judge, at this time we would tender
14   Mr. -- or Dr. Cauley as an expert?
15           THE COURT:  Any objections?
16           MR. TYRRELL:  Your Honor, the defendants would
17   like to voir dire the -- Mr. Cauley -- Dr. Cauley
18   regarding his expert qualifications during the
19   cross-examination.  Will the Court permit that?
20           THE COURT:  The Court is satisfied that he's an
21   expert.  I mean, you can cross-examine him about his
22   qualifications, but there's no question he's an expert.
23           MR. TYRRELL:  Okay.  Thank you, Your Honor.
24           MR. STOBBS:  Thank you, Judge.
25   Q.      (BY MR. STOBBS)  Is -- Dr. Cauley, as part of --
```

1    and just so the record is clear, I want to talk about your

2    report in a bit, but the first report that you prepared,

3    the last seven pages contain your CV; is that correct?

4    A.      Yes.

5    Q.      Okay.  Dr. Cauley, how many programs have you

6    reviewed that deal with SDP individuals?

7    A.      I'm not --

8    Q.      Have you, have you reviewed other programs that

9    deal with SDP's?

10   A.      Not specifically.  I have reviewed other programs

11   under the, what would be the Sexually Dangerous Act for

12   civil commitment, of course.

13   Q.      Sure.  As part of your process you want to keep up

14   to date on things?

15   A.      Correct.

16   Q.      And does that involve reading different articles?

17   A.      Correct.

18   Q.      And checking out other programs throughout the

19   country?

20   A.      Yes.

21   Q.      Could you tell Judge Yandle what SOCCPN is?

22           THE COURT:  Spell it.

23           MR. STOBBS:  SOCCPN.

24   A.      It's the Sex Offender Civil Commitment Program

25   Network.  And what they do is go each year and gather up

1    information from all the active civil commitment programs

2    in the United States, and then they release -- they do a

3    presentation.  I think they do it at one of the

4    professional organizations each year, and go through what

5    the average program is doing, what are the staff comprised

6    of, what are the stages and phases, how many hours of

7    treatment they're getting, what's the staff ratio.  And

8    they just cover the whole spectrum.

9          And then go into what kind of programming they're

10   offering each year.  So, through that process you can get

11   a pretty good idea of what other programs throughout the

12   country are doing.

13   Q.     (BY MR. STOBBS)  And that's basically the SOCCPN.

14   Is it correct to say that that's just the, the standard

15   norm?

16   A.     Well, I think you could -- yes.  You could call it

17   generally accepted practice or the norm.  And what they do

18   is, they usually give, like, you know, how many hours of

19   group treatment do the offenders receive in this program,

20   and then they'll give you some range, and then they'll

21   give you the mean or average.  So, that's telling you

22   what's generally accepted.

23   Q.     Sure.  And if you -- part of the time that your

24   prepare an opinion, it involves comparing programs

25   throughout the country or within a state; is that correct?

1    A.       Correct.

2    Q.       And could you explain to Judge Yandle which is

3    more important when you are trying to form an opinion, is

4    it more important to view a program in Vermont versus

5    California or, say, two programs within Vermont?

6            MR. TYRRELL:  Your Honor, I'm going to make an

7    objection because I believe it's outside of the scope of

8    Dr. Cauley's disclosed expert opinions.

9            THE COURT:  It's background.  Overruled.

10   A.       If there are two programs in the same state, we

11   compare those, first.

12   Q.       (BY MR. STOBBS)  And why is that?

13   A.       I think if one is running within the generally

14   accepted standard and the other one may not be, I think

15   it's easier to compare -- because obviously you are

16   drawing on the same population.

17   Q.       Sure.

18   A.       You are falling on the same sorts of laws and

19   things.  So, it would be easier to point to the one as

20   generally complying with the standards than to point to

21   one four states away, as an example.

22   Q.       Do you review the programs themselves?

23   A.       Not really, no.

24   Q.       And how about like the records of the participants

25   who are in the program.

1    A.      In this case I did, yes.

2    Q.      And that's something that you would normally do as

3    an expert?

4    A.      Yes.

5    Q.      And how about looking at historical data?

6    A.      Yes.

7    Q.      Why is that important?

8    A.      In this case, it became important -- I have been

9    involved with this for quite awhile.

10   Q.      Sure.

11   A.      So, I received a lot of information.  And it

12   became initially relevant for some of the things that were

13   being focused on, like when I wrote the first report, to

14   have people's backgrounds, their offense history, things

15   like that.

16   Q.      What do you look for in a good program?

17   A.      That's a -- I think there's multiple features, but

18   I think the one feature, and it kind of came with --

19   stayed with me most of the day.  Now I think programs fall

20   under what's called a general -- they call it a Good Lives

21   Model.  It's what most programs are trying to aspire to.

22   And that is where the offender is treated as more than

23   simply a sex offender, when they're in treatment.

24           Other parts of their lives are brought into the

25   treatment, so they get auxiliary programming, educational

```
 1   programming, interpersonal skill training.  And rather
 2   than just labeling that one behavior and focusing on it
 3   for years, you are actually trying to bring up the whole
 4   holistic personality to be a better functioning person.
 5   And with that comes, I think, hope.  And one of the --
 6   probably the program I know best is the Florida program,
 7   and they call that "The Old Me, The New Me."  You are
 8   trying to create a new identity out of that Good Lives
 9   Model, a new way of functioning.
10   Q.      Mm-hmm.
11   A.      If the program doesn't offer hope, it's very hard
12   to have a Good Lives Model rising out of it.
13   Q.      And did you prepare different reports in this
14   case?
15   A.      I did.
16   Q.      And I'm going to hand you Plaintiff's Exhibits 53,
17   54 and 55.  I'm going to ask if you could take a look at
18   those and tell Judge Yandle what they are, and if you
19   prepared them and the circumstances under which they were
20   prepared.
21   A.      Starting with the report that was written in 2016.
22           THE COURT:  What exhibit number is that?
23           THE WITNESS:  53.
24           MR. STOBBS:  53, Judge.
25   A.      Very briefly, I'm involved with some networking
```

1    with other people who provide the same type of expertise

2    in the trial level or hearing level.  And one of them had

3    e-mailed me, it was Dr. -- his name came up earlier -- but

4    he's from this state.

5    Q.      Sure.

6    A.      And he had told me that somebody that he had

7    worked on their original case was looking for someone to

8    look over the program, and he was uncomfortable with it

9    because he had been involved in the person's original

10   case.  He knew I had done that before, and asked if I'd be

11   willing to take a look at it.  I said, sure.

12           Shortly after that, I begin receiving information

13   by and large from Mr. Howe.  Okay, he started sending me

14   -- sending me documents and things that he had accumulated

15   over the years, and we started corresponding.  And he

16   asked me to read through this material and to render some

17   opinion as to what was going on at the program.  And this

18   took quite awhile.  And that would be the first report.

19   Q.      And Exhibit 53 is a report that you prepared on

20   July 25th, 2016?

21   A.      Correct.

22           MR. STOBBS:  We'd now move for the admission of

23   Exhibit 53, Judge.

24           THE COURT:  Any objections?

25           MR. TYRRELL:  No objection to 53, Your Honor.

1   Q.      (BY MR. STOBBS)  And could you tell Judge Yandle a
2   little bit --
3           THE COURT:  Hold on, Mr. Stobbs.  I need to admit
4   it.
5           MR. STOBBS:  I'm sorry, Judge.
6           THE COURT:  Exhibit 53 is admitted, Chris.
7           Thank you, Mr. Stobbs.
8   Q.      (BY MR. STOBBS)  How about Exhibit 54, briefly, if
9   you could tell Judge Yandle what that is.
10  A.      54 is -- appears to be my fee schedule, a
11  four-year of where I testified, and that's it.
12          MR. STOBBS:  We would move for the admission of
13  Exhibit 54, Judge.
14          THE COURT:  Any objections?
15          MR. TYRRELL:  No objection to Plaintiff's Exhibit
16  54, Your Honor.
17          THE COURT:  Plaintiff's Exhibit 54 is admitted.
18  Q.      (BY MR. STOBBS)  Dr. Cauley, if you'd take a look
19  at Exhibit 55, I'd appreciate it.  And if you could tell
20  Judge Yandle what that is, as well.
21  A.      I had submitted the report in 2016.  I didn't hear
22  anything for a little -- I talked to Mr. Howe on the phone
23  when he was out in the community, and then I didn't hear
24  anything for a little while, until not real long ago when
25  I was contacted by the law firm that he had been appointed

1    to his case.

2         At that point, Mr. Howe and I more -- I think we

3    haven't really communicated directly since then.  And then

4    I got more information, more records at that point, and

5    was asked to submit an updated report.  And that would be

6    the 2018.

7    Q.    And Exhibit 55 deals with Rush -- the program at

8    Rushville; right?

9    A.    It involves that, yes.

10        MR. STOBBS:  And at this point, Judge, we would

11   move for the admission of Exhibit 55.

12        THE COURT:  Any objections?

13        MR. TYRRELL:  Yes, Your Honor.  We would object to

14   the admission of 55 on relevance and foundation.  The

15   defendant's position that the DHS Rushville program is not

16   relevant to any violations of the Sexually Dangerous

17   Persons Act.  They are two separate statutes, two separate

18   regimes.

19        THE COURT:  Hold on, Mr. Tyrrell.

20        MR. TYRRELL:  Sorry.

21        THE COURT:  It's my understanding that your

22   position is that this case doesn't involve whether or not

23   the Act was violated, which I agree.

24        MR. TYRRELL:  Yes, Your Honor.

25        THE COURT:  It's kind of inconsistent with your

1    objection.

2         MR. TYRRELL:  Your Honor, that the Rushville

3    program and consideration of the Rushville program

4    wouldn't aid in determining whether or not this program in

5    particular, the SDP program, is constitutional.

6         THE COURT:  I believe Mr. Stobbs has already laid

7    the foundation, but just so I'm clear -- so, let's do

8    this.  I'm going to sustain the objection at this point,

9    until you lay the foundation.  I assume that you are

10   looking at the Rushville program as evidence of the

11   accepted standards.

12        MR. STOBBS:  Yes, ma'am.

13        THE COURT:  When you lay that foundation -- and

14   that's -- I mean, I'm not -- so I'm clear that you are --

15   that Rushville is not at issue.  But I assume that Dr.

16   Cauley is going to testify and that you're -- this is part

17   of the -- his testimony as to what the accepted standards

18   are, the standards of practice, and it's reflected in that

19   program.  Am I right?

20        MR. STOBBS:  Yes, ma'am.

21        THE WITNESS:  Yes.

22        THE COURT:  Okay.  Well, I just laid the

23   foundation, so it's admitted for that purpose.

24        MR. STOBBS:  Thank you.  That's --

25        THE COURT:  For that limited purpose.

```
 1              MR. STOBBS:  Yes, that's what it's for, as well.
 2              Judge -- I don't get to ask you questions.
 3              THE COURT:  No, you don't get to ask me.
 4    Q.        (BY MR. STOBBS)  Dr. Cauley, have you been able to
 5    compare the program at Rushville with the program at Big
 6    Muddy?
 7    A.        I have.
 8    Q.        And specifically, I want to talk about some, just
 9    some kind of boilerplate things and we'll move on.  Have
10    you had a chance to compare Rushville, the time in group,
11    versus Big Muddy?
12    A.        If I could throw in, I looked at the SOCCPN things
13    to get the -- what's going on across the nation, what's
14    the average, on probably all the things we are going to
15    talk about.  I looked at Rushville, and they always fell
16    in that range.  So we're sort of -- this would be the
17    national way things are going, this is the way Rushville
18    is going, they're falling into that national range.
19              And then similarly, I looked at things like some
20    of the professional organizations, what they would say
21    about a group size or the length of a group.  So, there
22    was a lot of different components to getting an opinion.
23    Q.        How about times per week, as well?
24    A.        Well, that's the thing, is there were a couple
25    issues that came up.  One is the groups, as we have heard,
```

1    are an hour long, one time a week.  So, most are longer

2    than an hour.  Or if you look at the averages.

3    Q.      When -- in your experience, if a group is 60

4    minutes, does it last 60 minutes?

5    A.      No.  And the other thing, the group size is

6    playing into this.  So, when you have a group -- 12 is a

7    little high, 12 is a little heavy, when you have this kind

8    of group.  But that's, you know, that's up for debate.

9    When it gets up to 15 or 18, there is a lot going on in

10   the group, particularly with this population, which I have

11   treated.  It is very hard to get everybody settled in and

12   focused on one theme.  That could burn up 05 or 15

13   minutes.  So, they're actually running a little shorter,

14   whereas most people are running groups at least an hour

15   and a half, maybe closer to three.

16   Q.      Why is that?

17   A.      Because you are losing -- for a lot of reasons.

18   You are losing time because of disruption, distraction.

19   Now, it wasn't real clear to me that this is actually

20   taking place in the middle of a large dayroom, so there's

21   probably even more distractions yet than if you were in a

22   group room.  And the men always bring in some issue that

23   really is unrelated to your theme, about their roommate or

24   about what happened in chow hall, and he'd like to have

25   time to deal with that, too.

1          So, a three-hour group, you know, two and a half

2     or three or three with a break seems pretty common.

3     Q.     And how about the times -- times a week?

4     A.     That's the other thing, is, they get one hour, one

5     time a week, for a total of one hour a week.  Most are

6     getting an hour and a half to three hours, two or three

7     times a week.

8     Q.     How about Rushville?

9     A.     I believe they're close to --

10    Q.     If I told you about five, would that be right?

11    A.     Yeah, five hours.  That's -- they're getting five

12    -- a little better than five hours per week of core

13    treatment.  They're doing other things, too.  So, just on

14    the sex offender specific treatment, they're getting

15    better than five.

16    Q.     And what about the lockup at Rushville?  Do you

17    know if there's a lockup there?

18    A.     I looked at the schedule, which is in your things

19    there, and they have -- you know, obviously they have some

20    time in their cell, in their rooms or their cells or

21    whatever, but it wasn't through big chunks of the day.

22    When I looked at the daily schedule, I was seeing big

23    chunks of the day having things like computer lab,

24    Toastmasters, sort of activities that they can get --

25    which are great for building self-esteem.  And they seem

1     to have a full schedule, from morning time until evening

2     or a little beyond, of activity.

3     Q.      As opposed to being locked down for --

4     A.      20-some hours.

5     Q.      Right.

6     A.      Yes.

7     Q.      And at Rushville, do they have additional daily

8     activities related to treatment?

9     A.      They have -- that's -- that's -- the thing where

10    -- there are things that aren't directly related maybe to

11    sex offender treatment, but they are there to maybe get

12    the introverted guy into interpersonal skills.  Or you do

13    vocational training with some of the men who don't have

14    skills, for when they get out.  So, it's sort of tied into

15    that idea of a Good Lives Model, but it's not specifically

16    core.  But he had a lot of that at Rushville.

17    Q.      And does Rushville have a clearly presented

18    policy?

19    A.      That was another thing I looked at, and requested

20    twice in this case, was to look at the policies and

21    procedures.

22            THE COURT:  The program policies and procedures?

23            THE WITNESS:  Yes.

24    A.      And then later, after reviewing the policies and

25    procedures from Big Muddy, I received the policy from

1    Rushville.  Rushville has a very -- it's a program -- it's

2    a policy that, from what I gathered, the men there see.

3    That they get it, too.  And it clearly lays out, *this is*

4    *Stage One, this is what you need to do*.  And it was very

5    behavioral assessment rather than, you know, they come to

6    understand things.  They complete this book.  They attend

7    these classes.  They do these things.  Very clearly.  And

8    then, what is the process to phase up.

9         Generally, when there's a phase up, there's also a

10   kind of almost change in a security status.  So, men gain

11   even more freedom around the compound, they get more

12   incentive to keep moving up, and theirs was very clear.

13   Q.     (BY MR. STOBBS)  How about additional programming

14   at Rushville related to like I say anger, substance abuse,

15   or things like that?

16   A.     They had all of those available to them.  In my

17   opinion, Substance Abuse and Anger Management and Victim

18   Empathy are critical parts of programming and have to be

19   offered almost all the time.  Because in the case of drug

20   and alcohol, that's a trigger.  Empathy is something you

21   can learn and starts to build a barrier to reoffense.

22   They can't not be offered.  And most programs incorporate

23   them into the ongoing schedule.

24   Q.     And do they have that at Big Muddy, do you know?

25   A.     From what I was seeing or what I have read, a lot

1  of them are on hold.  I saw a lot of programs like Victim

2  Empathy -- I noticed Mr. Howe requested repeatedly to get

3  into substance abuse, and he tells me he never has been in

4  it, although he admits he has a problem in that area.  So,

5  they're either on hold or not being offered.

6  Q.    Have you ever, in your reviewing the records, have

7  you been able to ascertain how many people are in certain

8  groups?

9  A.    Yes.

10  Q.    And what -- if you could give Judge Yandle a

11  flavor of that, please.

12  A.    Well, I had heard through some of the records,

13  from the court records, some of the things the men had

14  said in different settings, that it was 12, 13, 14.  I

15  think Mr. Needs said it was going up to 15 or 16, which

16  seems remarkably high.  But when I was looking through Mr.

17  Kallal's group sign-in sheets, even though a lot of the

18  names -- the names have been redacted except for his name,

19  but there were 18 redactions.  That's a huge group.

20        THE COURT:  In what period of time did these

21  sign-in sheets -- I'm sorry, Mr. Stobbs.

22  A.    It was as late -- I saw them in his 2014, 2015,

23  2016, I purposely looked for different years.

24  Q.    (BY MR. STOBBS) In an hour, what could be gained

25  with 19 people?

A.      Nineteen men, many of whom have personality
disorders, not a lot.

Q.      Have you been able to form an opinion regarding
whether or not Big Muddy is underfunded?

A.      Well, that was the thing.  I had asked for that.
I forgot to mention, I also have an MBA from Florida Gulf
Coast University which I got while I was working at the
Civil Commitment Center.  So, I had asked for the funding.
I thought, this is a curious question, and I never
received it.

Q.      And how about whether or not it's understaffed?

A.      It's obviously understaffed.

Q.      Why is that?

A.      The ratio would generally be one clinical person
to ten.

Q.      That's from SOCCPN; right?

A.      Yes.

Q.      Okay.

A.      So, one to ten.  And there's a range in there.
But when you get to 1 to 30 or 1 to 45, that's remarkably
understaffed.

Q.      It's a problem.

A.      It's a big problem.

Q.      Does it make it -- does that impact the
effectiveness of the program?

```
 1    A.      The other thing is, is, before I get there, if --
 2    some of these programs have gone for accreditation through
 3    -- I think it's CARF or JCAH -- where they go through
 4    outside accreditation.  Accrediting bodies view everybody
 5    there as your client.  So, the idea that some men aren't
 6    enrolled in treatment, we're not treating them, they still
 7    need master treatment plans.  They still need some
 8    attention.  So, if you take the full number of people at
 9    the center at Big Muddy, what do we have, three, four
10    fulltime staff?
11    Q.      Right.
12    A.      It's remarkably understaffed.
13    Q.      And is something you look for whether or not the
14    program is treatment focused as opposed to punishment
15    focused?
16    A.      Yes.
17    Q.      And have you made an opinion regarding Big Muddy,
18    whether or not it's treatment focused or punishment
19    focused?
20    A.      Well, again, we're -- I'm kind of stuck on the one
21    hour, one time a week, so that's treatment.  But then when
22    I looked through all the things about shirts being
23    untucked, lead to, whatever, disciplinary tickets,
24    whatever that can result in interruption of treatment.  I
25    don't -- my opinion would be two things:  One is,
```

1    treatment really shouldn't be interrupted to that degree
2    unless there's some risk to the facility.  The other thing
3    is a lot of those things programs would ordinarily bring
4    into the group.  So, if you had a problem with your job or
5    you had a problem with your roommate or you were going to
6    be a pusher somewhere and somebody yelled at you, rather
7    than giving a ticket they might bring it into the group
8    and turn it into something, like one of the men mentioned
9    rational emotive behavioral.  Well, that's exactly what
10   that's designed for.
11        What happened, what was your response to it, what
12   could you have done differently, how could you handle it
13   differently in the future.  Rather than writing him a
14   ticket and sending him away, you would incorporate the
15   incident into the group.  That's usual.
16        THE COURT:  Mr. Stobbs, let me -- are you about to
17   go into another area?
18        MR. SIMMONS:  I am.
19        THE COURT:  I'm going to ask -- I don't need
20   everybody, how about you and -- who is -- whose witness is
21   this --
22        MR. TYRRELL:  Mine, Your Honor.
23        THE COURT:  You and Mr. Tyrrell approach for a
24   second.
25        (Off the record.)

1   Q.      (BY MR. STOBBS)  I have two more questions before

2   we break for today.  Okay?

3   A.      Okay.

4   Q.      The first one is:  Is it normal for more people to

5   die in a five-year period in an SDP program than who

6   graduate the program?

7              MR. TYRRELL:  Objection, Your Honor, relevance.

8              THE COURT:  Sustained.

9   Q.      (BY MR. STOBBS)  And the last question for today

10  is:  Do you know how many people are in the SDP program at

11  Big Muddy?

12  A.      I have heard 170 -- 173, something like that.

13             MR. STOBBS:  Okay.  We can break for today.

14             THE COURT:  Okay.  Thank you.

15  We will go ahead and recess for the day.  We will restart

16  tomorrow at 9:00 a.m.

17             (Court adjourned at 3:54 p.m.)

18

19

20

21

22

23

24

25

1                    <u>REPORTER'S CERTIFICATE</u>

2          I, Christine Dohack LaBuwi, RDR, RMR, Official

3     Court Reporter for the U.S. District Court, Southern

4     District of Illinois, do hereby certify that I reported

5     with mechanical stenography the proceedings contained in

6     pages 1-196; and that the same is a full, true, correct

7     and complete transcript from the record of proceedings in

8     the above-entitled matter.

9

10          DATED this 24th day of October, 2018,

11

12                         s/*Christine Dohack LaBuwi, RDR, RMR*

13                         _____
                           Christine Dohack LaBuwi, RDR, RMR

14

15

16

17

18

19

20

21

22

23

24

25