1
                    UNITED STATES OF AMERICA
                  SOUTHERN DISTRICT OF ILLINOIS
2

3    JAMES G. HOWE, et al.,          )
                                     )
4                 Plaintiffs,        )
     v.                              ) No. 3:14-cv-00844-SMY-RJD
5                                    )
     SALVADORE GODINEZ, et al.,      ) BENTON, IL
6                                    )
                  Defendants.        )
7

8

9

10             TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
                          VOLUME II
11
             BEFORE THE HONORABLE STACI M. YANDLE
12               UNITED STATES DISTRICT JUDGE

13                      October 25, 2018

14

15

16

17

18

19

20

21   REPORTED BY:       Christine Dohack LaBuwi, RDR, RMR
                         Official Court Reporter
22                       301 West Main Street
                         Benton, Illinois  62812
23                       (618) 439-7725
                         Christine_Dohack@ilsd.uscourts.gov
24
     Proceedings recorded by mechanical stenography, produced
25   by computer-aided transcription.

```
 1    APPEARANCES:

 2    FOR PLAINTIFF:      John D. Stobbs, II, Esq.
                          STOBBS LAW OFFICES
 3                        307 Henry Street, Suite 211
                          Alton, IL  62002
 4                        (618) 462-8484
                          jds2@stobbslaw.com
 5
                          John D. Simmons, Esq.
 6                        Gary L. Payne, Esq.
                          Taylor F. Sprehe, Esq.
 7                        SIMMONS HANLY CONROY
                          One Court Street
 8                        Alton, IL  62002
                          (618) 259-2222
 9                        jsimmons@simmonsfirm.com
                          gpayne@simmonsfirm.com
10                        tsprehe@simmonsfirm.com

11    FOR DEFENDANT:      Kyle Rockershousen, Esq.
                          Jeremy C. Tyrrell, Esq.
12                        OFFICE OF THE ATTORNEY GENERAL
                          500 South Second Street
13                        Springfield, IL  62706
                          (217) 782-1090
14                        krockershousen@atg.state.il.us
                          jtyrrell@atg.state.il.us
15

16

17

18

19

20

21

22

23

24

25
```

```
1                          I N D E X

2                          WITNESSES

3    ALL WITNESSES:                              PAGE:

4      DR. DEAN CAULEY for Plaintiff:
         Direct Examination by Mr. Stobbs (cont'd.) 201:11
5        Cross-Examination by Mr. Tyrrell          266:19
         Redirect Examination by Mr. Stobbs        302:11
6        Examination by the Court                  311:17

7      DANIEL SULLIVAN for Defense:
         Direct Examination by Mr. Rockershousen   314:11
8        Cross-Examination by Mr. Simmons          323:16

9      JESSICA STOVER for Defense:
         Direct Examination by Mr. Tyrrell         331:15
10       Cross-Examination by Mr. Stobbs           363:24
         Redirect Examination by Mr. Tyrrell       367:10
11       Examination by the Court                  369:14

12     DR. C. THOMAS HOLT for Defense:
         Direct Examination by Mr. Rockershousen   377:22
13       Cross-Examination by Mr. Sprehe           415:1
         Redirect Examination by Mr. Rockershousen 422:8
14       Examination by the Court                  424:8
         Recross-Examination by Mr. Sprehe         428:23

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Proceedings began in open court at 9:00 a.m.,
 2     parties present.)
 3              THE CLERK:  The Court calls Case No. 14-CV-844,
 4     Howe, et al. versus Godinez, et al.  This matter is called
 5     for day two of bench trial.
 6              THE COURT:  Good morning.
 7              MR. STOBBS:  Good morning, Judge.
 8              THE COURT:  Before we get started, I understand
 9     there was a -- Mr. Simmons had a question about closing
10     arguments.  At the final pretrial, I did indicate that I
11     thought I would take closing arguments as opposed to
12     findings of fact and conclusions of law.  But as I get
13     into this, and particularly given the status of the
14     Fourteenth Amendment law post Kingsley, and the circuit
15     splits in terms of what the legal standards are, I'm
16     definitely going to want findings of fact and conclusions
17     of law.  And we'll talk about the timeline with that.
18              And because of that, I'm happy to dispense with
19     closing arguments.  But if the parties want to do closing
20     arguments, I'm happy to -- if you want to do that, that's
21     fine, too.  I'll let guys decide and tell me later.
22              MR. STOBBS:  That's good.  We'll just talk about
23     it, I guess.
24              MR. ROCKERSHOUSEN:  Okay.
25              THE COURT:  So, I know Mr. Sprehe, you are happy
```

```
 1   about the findings of fact and conclusions --
 2          MR. SPREHE:  Absolutely, Your Honor.
 3          THE COURT:  Okay, are we ready to proceed with Dr.
 4   Cauley's testimony?
 5          MR. STOBBS:  We are.
 6          THE COURT:  You may proceed, Mr. Stobbs.
 7                    DR. DEAN CAULEY,
 8   having been first duly sworn, was examined and testifies
 9   as follows:
10               DIRECT EXAMINATION (cont'd.)
11   BY MR. STOBBS:
12   Q.     Dr. Cauley, yesterday we were talking about the
13   two different reports that wrote.  Do you remember that?
14   A.     I do.
15   Q.     And you basically wrote two reports for the Court;
16   right?
17   A.     Correct.
18   Q.     And you were telling us yesterday that you relied
19   on a boatload of documents; is that correct?
20   A.     Yes.
21   Q.     In order to form your opinion?
22   A.     Yes.
23   Q.     And I assume some you relied on more than others?
24   A.     Some, I completely disregarded because I thought
25   we were going in too many different directions.  And then
```

```
 1    as it got narrowed down, some I relied on a great deal.
 2    Q.      Good.  I put in front of you some exhibits.
 3            MR. STOBBS:  And, Judge, I don't know what your
 4    preference is.  I can list all of the numbers and ask him
 5    to tell what they are and then if he relied on them for
 6    his report, and then move to admit them, or individually,
 7    whatever you feel is the quickest.
 8            THE COURT:  Whatever is in the flow of your --
 9            MR. STOBBS:  Okay.
10            THE COURT:  However you want to do it, Mr. Stobbs.
11            MR. STOBBS:  Okay.  Thanks, Judge.
12    Q.      (BY MR. STOBBS)  Dr. Cauley, I put in front of you
13    Exhibit 1, Exhibit 2, Exhibit 3, Exhibit 6, Exhibit 7,
14    Exhibit 8, Exhibit 27, Exhibit 40, Exhibit 41, and Exhibit
15    42.  I'm going to go ask if you could look at all those
16    exhibits.
17    A.      Okay.
18    Q.      And for each exhibit number, say like "Exhibit 11,
19    the Rushville Handbook."
20    A.      Correct.
21    Q.      And Exhibit 2, if you could tell the judge what
22    that is?
23    A.      If I could just point out real quickly --
24    Q.      Sure.
25    A.      -- there's a particular portion of this that's
```

1    relevant, and that's --

2    Q.    That makes it move along much faster.

3    A.    It's a separate section having to do with their

4    treatment outline, where they spell out --

5          THE COURT:  Okay.  Hold on.  You're losing me

6    because I'm not sure what "this" -- what we're referring

7    to here.

8    Q.    (BY MR. STOBBS)  If you could tell Judge --

9    A.    Exhibit No. 1, which is a large Illinois

10   Department of Human Services --

11         THE COURT:  Why don't we do it this way.  If you

12   want to go through each individual exhibit, because we are

13   still laying a foundation --

14         MR. STOBBS:  Yes, ma'am.

15         THE COURT:  Dr. Cauley, if you could just tell me

16   -- give me the exhibit number, tell me what it is and tell

17   me what, if anything, you relied upon.

18         THE WITNESS:  Okay.

19   A.    So, Exhibit No. 1 would be the Illinois Department

20   of Human Services Treatment and Detention Facility

21   Handbook.  It says Resident Handbook at the bottom.  And I

22   relied a great deal on the treatment tracks which are

23   towards the end of that 128 pages.

24         THE COURT:  Okay.  And Exhibit No. 1 is already in

25   evidence, isn't it, Stacie?

```
1              MR. STOBBS:  No.

2              THE CLERK:  No.

3              MR. TYRRELL:  Your Honor, I think it was included

4    in Dr. Cauley's most recent report.

5              THE COURT:  Okay.  Okay.  I got it.

6              MR. STOBBS:  We would move for admission at this

7    time, Judge.  Exhibit 1.

8              THE COURT:  Any objections?

9              MR. TYRRELL:  Your Honor, the defendants would

10   maintain their same objection we provided in regards to

11   the treatment manual when it came in through Dr. Cauley's

12   report, which was foundation and relevance.

13             THE COURT:  Okay.  Overruled.

14   Q.    (BY MR. STOBBS)  And just for each document, like

15   Judge Yandle suggested, Dr. Cauley, Exhibit 2, please.

16   A.    Exhibit 2 is the Inmate Orientation Manual from

17   Big Muddy River Correctional Center.  And I relied on that

18   as far as how it outlined the treatment process.

19             THE COURT:  Okay.  And just let me clarify -- I'm

20   sorry.  Go ahead with your -- are you going to move that?

21             MR. STOBBS:  Yes, ma'am.

22             THE COURT:  Any objections?

23             MR. TYRRELL:  No objection, Your Honor.

24             THE COURT:  Let me just say, to any exhibits that

25   there is an objection, if I overrule the objection, that's
```

1    going to be provisional because it may be for a limited

2    purpose.

3           MR. STOBBS:  Yes, ma'am.

4           THE COURT:  Okay?

5           MR. STOBBS:  I understand that.

6           THE COURT:  And that may come -- all right.  Go

7    ahead.

8    A.      Exhibit No. 3 is the Sexually Dangerous Person

9    Program Procedures dated 2018, Dr. Holt.  And there's a

10   list of contents on the first page, and I paid a good deal

11   of attention to that.

12          MR. STOBBS:  We would move for its admission,

13   Judge.

14          MR. TYRRELL:  No objection.

15          THE COURT:  Okay.  So, Exhibit 3 is admitted

16   without objection.

17   A.      Exhibit 6 is the SDP schedule at the facility of

18   Rushville, which lists hours and activities that they're

19   involved in, and I relied on that.

20          MR. STOBBS:  We would move for its admission,

21   Judge.

22          MR. TYRRELL:  Your Honor, I would object on

23   relevance and foundation.  But separate from my objection

24   to Exhibit 1, there does appear some handwriting on this

25   document.  I don't believe there's any foundation for why

 1    that handwriting is there or who, who wrote it.

 2            THE COURT:  You can ask him.

 3            MR. TYRRELL:  Okay.

 4            THE COURT:  Overruled.  So, where are we -- you

 5    don't have any objections to 6; right?

 6            MR. TYRRELL:  Except for those objections that I

 7    stated, Your Honor.

 8            THE COURT:  Okay.  Exhibit 6 is admitted over

 9    objection.

10    Q.     (BY MR. STOBBS)  Exhibit 7, Dr. Cauley.

11    A.     Similarly, it's a daily schedule of activity but

12    it's a more updated schedule.  It's dated 2018 at the top

13    left.

14            MR. STOBBS:  We would move for its admission,

15    Judge.

16    A.     This is Rushville.

17            MR. TYRRELL:  Same objection to relevance, Your

18    Honor.

19            THE COURT:  Overruled and admitted.

20    Q.     (BY MR. STOBBS)  Could you tell Judge Yandle what

21    Exhibit 8 is, Dr. Cauley?

22    A.     Exhibit 8 is a schedule.  It has a floor layout,

23    which wasn't so important to me, but there are parts of

24    the schedule from Big Muddy.  Additionally, there's a

25    table on page four that I relied upon, as well as the

1    daily scheduling.

2          MR. STOBBS:  We would move for its admission,

3    Judge.

4          MR. TYRRELL:  No objection, Your Honor.

5          THE COURT:  Exhibit 8 is admitted without

6    objection.

7    Q.     (BY MR. STOBBS)  Exhibit 27, Dr. Cauley.

8    A.     Exhibit 27 is an outline of the Four Phase

9    Treatment process at Big Muddy dated 2016, and this also

10   was important to me.

11         MR. STOBBS:  We would move for its admission,

12   Judge.

13         MR. TYRRELL:  Apologize, Judge.  I didn't get the

14   exhibit number.

15         MR. STOBBS:  27.

16         THE COURT:  27.  Was there any objection?

17         MR. TYRRELL:  Your Honor, I don't have the exhibit

18   in front of me.  Apologize.

19         THE COURT:  It's your Four Phase Treatment

20   process.

21         MR. TYRRELL:  No objection to 27, Your Honor.

22         THE COURT:  Plaintiff's 27 is admitted.

23   Q.     (BY MR. STOBBS)  And Exhibit 40, Dr. Cauley.

24   A.     Exhibit 40 is the -- it's called the SOTIPS.  It's

25   a manual for rating sex offender progress and treatment.

1    And this is the manual from the publisher of that test.

2    Q.      And why is that -- did you use that to form your

3    opinion?

4    A.      To a certain degree.  There was discussion about

5    how the ratings were taking place, and Big Muddy said that

6    they were based on the SOTIPS model.  So, I referenced the

7    original manual.

8           MR. STOBBS:  We would move for its admission,

9    Judge.

10          MR. TYRRELL:  Your Honor, we would object on the

11   relevance and foundation of the document.

12          THE COURT:  Plaintiff's Exhibit 40 is admitted

13   over objection.

14   Q.      (BY MR. STOBBS)  And Exhibit 41, Dr. Cauley?

15   A.      Exhibit 41 is what would appear to be blank master

16   treatment plan templates from the Department of Human

17   Services.  And this was important to the degree that it

18   lists out what are the items of criteria in a treatment

19   plan.

20          MR. STOBBS:  We would move for its admission,

21   Judge.

22          MR. TYRRELL:  And, Your Honor, same objection, to

23   relevance and foundation concerning DHS documents.

24          THE COURT:  Exhibit 41 is admitted over objection.

25   Q.      (BY MR. STOBBS)  And if you could take a look at

1    Exhibit 42 and tell Judge Yandle what it is and if you

2    relied on it for your opinion.

3    A.      Well, similarly, it's a template for a treatment

4    plan.  And it would be the portion where someone would put

5    in clinical notes, diagnoses, and then do an evaluation of

6    the person as far as behavioral indicators of cooperation.

7         MR. STOBBS:  We would move for its admission,

8    Judge.

9         MR. TYRRELL:  Your Honor, same objection to

10   relevance and foundation.

11        THE COURT:  Exhibit 42 is admitted over objection.

12   Q.      (BY MR. STOBBS)  Yesterday, Dr. Cauley, you

13   indicated that it was important to look at the history of

14   Big Muddy; is that correct?

15   A.      It is.

16   Q.      And is that something you took into consideration

17   when you prepared your report?

18   A.      The history as far as the sort of concerns we've

19   talked about, not just the general history.

20   Q.      Now I'm going to ask you if you could take a look

21   at Plaintiff's Exhibit No. 11 and tell Judge Yandle what

22   that is, whether or not you relied on it, and how you

23   relied on it.

24   A.      11, right?

25   Q.      Yes.

1    A.      11.  Yes, I did.  I received this quite sometime

2    ago.  This is a copy of an article that was written in

3    2013.

4    Q.      By whom?

5    A.      It was -- it says on it Pantagraph.com.  And it

6    appears to be something like a repeat of a news article

7    that was printed.

8    Q.      And so you relied on that?

9    A.      I did.  Very early on, this was one of the things

10   that pointed out some concerns that had been there at that

11   point for several years.

12           MR. STOBBS:  We would move for its admission,

13   Judge.

14           MR. TYRRELL:  Your Honor, defendants would object

15   to this exhibit on hearsay and relevance.  Also,

16   foundation concerning handwriting on the document.

17           THE COURT:  I'm going to sustain that objection.

18   There is no problem with the fact that Dr. Cauley may have

19   relied on this to some degree for his opinions, but not

20   everything the expert relies on is independently

21   admissible.  This is subject to hearsay.  There is no

22   objection that I am aware of.

23           Again, he can -- he's established it as part of

24   what he relied upon.  Maybe he's cross-examined on it,

25   maybe not, but it is not independently admissible.  So,

1    the objection is sustained as to 11.

2    Q.     (BY MR. STOBBS)  And if you could tell Judge

3    Yandle what Exhibit 9 is?

4    A.     9 is a copy of John Howard Association of Illinois

5    Monitoring Visit of Big Muddy in 2013.

6    Q.     And did you rely on that?

7    A.     I did.  There were other documents by John Howard,

8    and I looked at all of them.

9    Q.     Why did you rely on that?

10   A.     Similarly, it's -- it was setting a time frame for

11   me that certain problems had been repeatedly brought up or

12   brought to the attention, and we were looking at them

13   again three or five years later.

14   Q.     And had the conditions changed?

15   A.     They had not.

16          MR. STOBBS:  We would move for admission of

17   Plaintiff's Exhibit 9, Judge.

18          MR. TYRRELL:  Your Honor, the defendants have the

19   exhibit -- or same objections, specifically hearsay and

20   relevance.

21          THE COURT:  I'm going to, again, provisionally

22   admit this over plaintiff's [sic] objection, and it is

23   going to be subject to a proper foundation whether or not

24   this is -- this remains independently admissible.

25          MR. STOBBS:  I understand.

```
 1            THE COURT:  I'm going to have to take that up in
 2   the flow of the testimony.
 3            MR. STOBBS:  I understand.
 4   Q.      (BY MR. STOBBS)  And if you could give those back
 5   to me, Dr. Cauley.
 6            (Pause.)
 7            Dr. Cauley, I am going to hand you what I have
 8   marked as Plaintiff's Exhibit 12.  And if you could please
 9   tell Judge Yandle what that is, whether or not you relied
10   upon it for your report, and how.
11   A.      I did.  This is the Standard Operating Procedure
12   Manual for Mental Health dated 2017.  And it --
13            THE COURT:  This is an IDOC manual?
14            MR. STOBBS:  I believe so.
15            THE COURT:  Is that an IDOC manual, Doctor?
16   Illinois Department of Corrections --
17            THE WITNESS:  It is.  Yes, it is.
18            THE COURT:  Okay.
19   A.      And it outlines services and, in some ways, what
20   would be the minimum standard in certain areas of
21   treatment.  And it goes into civil commitment towards page
22   48.
23            THE COURT:  Are you moving 12?
24            MR. STOBBS:  I'm moving 12, Judge, for admission.
25            MR. TYRRELL:  No objection, Your Honor.
```

```
 1            THE COURT:  Plaintiff's Exhibit 12 is admitted
 2    without objection.
 3    Q.      (BY MR. STOBBS)  Dr. Cauley, yesterday, you also
 4    indicated that it was important for you to review the
 5    records of the plaintiffs; is that correct?
 6    A.      It is.
 7    Q.      And if we could -- I don't think that, in our
 8    pretrial discussion with the Attorney General, they had
 9    any objection to these, so we can move through them
10    quickly.  If you could just tell -- like what we did at
11    the very beginning, if you could tell Judge Yandle what
12    they are, whether or not you relied on them, then I'll
13    move for the admission.
14            No. 4?
15    A.      No. 4 is some semi annual program evaluations.
16    One of is Mr. Howe.  The one that I looked at in
17    particular was behind that, and it's identified by an
18    inmate number which is in brackets.  And it's also a
19    rating sheet.
20            MR. STOBBS:  We would move for its admission,
21    Judge.
22            MR. TYRRELL:  No objection, Your Honor.
23            THE COURT:  Plaintiff's Exhibit 4 is admitted
24    without objection.
25    Q.      (BY MR. STOBBS)  And how about Exhibit 14, Dr.
```

1    Cauley.

2    A.      Exhibit 14 is a Wexford Health evaluation of Mr.

3    Howe and it is dated 2015.

4            MR. STOBBS:  We would move for its admission,

5    Judge.

6            MR. TYRRELL:  No objection, Your Honor.

7            THE COURT:  Plaintiff's Exhibit 14 is admitted

8    without objection.

9    Q.      (BY MR. STOBBS)  And how about Exhibit 15.

10   A.      15 is a Wexford evaluation of Mr. Kallal.

11           MR. STOBBS:  We would move for its admission,

12   Judge.

13           MR. TYRRELL:  No objection, Your Honor.

14   Q.      (BY MR. STOBBS)  And how about 16?

15           THE COURT:  Plaintiff's Exhibit 15 is admitted.

16   A.      16 is a Wexford evaluation of Mr. Needs.

17           MR. STOBBS:  We would move for its admission,

18   Judge.

19           MR. TYRRELL:  No objection, Your Honor.

20           THE COURT:  Plaintiff's Exhibit 16 is admitted.

21   Q.      (BY MR. STOBBS)  And how about 17, Dr. Cauley?

22   A.      17 is a sheet that is entitled Intensive Therapy

23   and it apparently outlines the ticket process.

24           MR. STOBBS:  And we would for move for its

25   admission, Judge.

```
 1          MR. TYRRELL:  Your Honor, defendants would object
 2   to this exhibit just because there IS additional
 3   handwriting in the document.  It appears to be from one of
 4   the plaintiffs.
 5          THE COURT:  And?
 6          MR. TYRRELL:  And there's a lack of foundation for
 7   the handwriting.
 8          THE COURT:  Okay.  The handwriting is not the
 9   evidence, Mr. Tyrrell.
10          MR. TYRRELL:  Yes, Your Honor.
11          THE COURT:  Objection is overruled.  17 is
12   admitted.
13   Q.     (BY MR. STOBBS)  How about No. 18, Dr. Cauley?
14   A.     I'm going to have to open this up.  This is a big
15   thing here.
16   Q.     Just don't drop them.
17   A.     It appears to be the file of Mr. Charles.  And it
18   has his program evaluations in it; it has treatment notes
19   in it, which would have been group notes; tickets he's
20   received; and handwritten notes from his group process.
21   And it's covering quite a period of time.
22   Q.     Did you rely on that to form your opinion?
23   A.     I did.
24          MR. STOBBS:  We would move for the admission of
25   Exhibit 18, Judge.
```

```
 1           MR. TYRRELL:  Your Honor, defendants would object
 2    to portions of Defendant's Exhibit 18.  This treatment
 3    packet goes all the way through and includes dates back to
 4    2010.  I think that's beyond the scope of injunctive
 5    relief sought in this case.
 6           THE COURT:  It's not beyond the scope of the
 7    relevant inquiry of this court.  Objection is overruled.
 8    Plaintiff's Exhibit 18 is admitted.
 9    Q.     (BY MR. STOBBS)  How about Exhibit 19, Dr. Cauley?
10    A.     Exhibit 19 is -- it is a schedule of activity for
11    Mr. Howe for 2014, 2015, and part of 2016, where he
12    calculated time of treatment.
13    Q.     Did you rely on that for your -- to form your
14    opinion?
15    A.     I did.
16           MR. STOBBS:  We would move for the admission of
17    19, Judge.
18           MR. TYRRELL:  No objection, Your Honor.
19           THE COURT:  Plaintiff's Exhibit 19 is admitted.
20    Q.     (BY MR. STOBBS)  And how about Exhibit 20, Dr.
21    Cauley.
22    A.     Exhibit 20 is also semi annual program reviews on
23    Holmes and Howe.  They're together in here.  And it also
24    lists Mr. Howe's treatment plan and then his program
25    evaluation.
```

```
1          MR. STOBBS:  We would move for its admission,
2     Judge.
3          MR. TYRRELL:  Your Honor, defendants would object
4     to the portions of Plaintiff's Exhibit 20 that includes
5     information on a Mr. Holmes.  He's not a plaintiff in this
6     case.  So, relevance.
7          THE COURT:  Overruled.  The Court is able to
8     decipher what portions of the documents may be relevant or
9     not, and what portions need to be disregarded.  Subject to
10    plaintiff's -- I mean, defendant's objection, 20 is
11    admitted.
12    Q.   (BY MR. STOBBS)  And how about Exhibit 21.
13    A.   21 is handwritten work done by Mr. Howe this year,
14    where he goes through issues that would normally arise out
15    of the treatment process like thinking errors, relapse,
16    seemingly unimportant decisions which we talked about a
17    little bit yesterday.  And it's a pretty substantial
18    package of his insight into his offending.
19         MR. STOBBS:  We would move for that, the admission
20    of that exhibit, Judge.
21         THE COURT:  Did you rely on that document?
22         THE WITNESS:  I did, in comparison to how he's
23    being rated at the facility.
24         THE COURT:  Okay.  Any objections?
25         MR. TYRRELL:  Yes, Your Honor, for hearsay.
```

1      THE COURT:  Plaintiff's Exhibit 21 is admitted

2  over objection.

3  Q.     (BY MR. STOBBS)  Exhibit 22.  If you will look at

4  that, Dr. Cauley, and the same thing?

5  A.     Well, this would be the, the facility's reports

6  starting out with a probation notice to Mr. Howe.  And

7  then there are, from the facility, group notes and

8  treatment reviews, much of which unfortunately have been

9  redacted.  And then the group notes, many them had been

10  redacted out before I got them.

11  Q.     Did you rely on those for your report?

12  A.     I did.

13      MR. STOBBS:  We would move for the admission of

14  that exhibit, Judge.

15      MR. TYRRELL:  No objection, Your Honor.

16      THE COURT:  Is that 22?

17      MR. TYRRELL:  Yes.

18      MR. STOBBS:  Yes, ma'am.

19      THE COURT:  Plaintiff's Exhibit 22 is admitted

20  without objection.

21  Q.     (BY MR. STOBBS)  How about Exhibit 23, Dr. Cauley?

22  A.     Similarly, these are group notes, program tickets,

23  and treatment reviews on Mr. Howe.

24  Q.     Did you rely on those to form your opinion?

25  A.     I did.

```
 1              MR. STOBBS:  We would move for the admission of
 2    Exhibit 23, Judge.
 3              MR. TYRRELL:  No objection, Your Honor.
 4              MR. STOBBS:  Exhibit 24, Dr. --
 5              THE COURT:  Plaintiff's Exhibit 23 is admitted.
 6              MR. STOBBS:  I'm sorry.
 7    Q.      (BY MR. STOBBS)  Exhibit 24, Dr. Cauley?
 8    A.      24 is -- it looks like the time calculation.
 9    Maybe I looked at that twice.  Is it a time calculation
10    sheet of treatment?
11    Q.      Kallal's therapy.
12    A.      Yes.
13    Q.      Did you rely on that?
14    A.      I did.
15              MR. STOBBS:  We would move for the admission of
16    24, Judge.
17              MR. TYRRELL:  No objection, Your Honor, to 24.
18              THE COURT:  Plaintiff's Exhibit 24 is admitted.
19    Q.      (BY MR. STOBBS)  How about Exhibit 25?
20    A.      25 would be the treatment -- coming from the
21    facility on Mr. Kallal, which would be treatment reviews,
22    treatment plans.  Looks like his evaluations that are done
23    and diagnoses, and then some group notes.
24    Q.      Did you rely on that to form your opinion?
25    A.      I did.
```

```
 1              MR. STOBBS:  We would move for the admission of
 2     25, Judge.
 3              MR. TYRRELL:  And, Your Honor, defendants would
 4     only object to the extent there's old records in there,
 5     but I understand the Court's ruling.
 6              THE COURT:  Plaintiff's Exhibit 25 is admitted
 7     over objection.
 8     Q.     (BY MR. STOBBS)  How about Exhibit 26?
 9     A.     These would be the notes from the facility as
10     related to Mr. Needs.
11     Q.     Did you rely on that to form your opinion?
12     A.     I did.
13              MR. STOBBS:  We would move for the admission of
14     that, Judge.
15              MR. TYRRELL:  No objection to Plaintiff's 26.
16              THE COURT:  Plaintiff's Exhibit 26 is admitted.
17     Q.     (BY MR. STOBBS)  How about Exhibit 27?
18              MR. ROCKERSHOUSEN:  I believe that was already --
19              THE COURT:  It's already been admitted.
20              THE WITNESS:  Yes.
21              MR. STOBBS:  Okay.
22     Q.     (BY MR. STOBBS)  Could you take a look at Exhibit
23     28, Dr. Cauley?
24     A.     I am.
25     Q.     And what is that?
```

1    A.      This relates to an issue from Mr. Howe regarding

2    his diagnoses and how it had been changed.

3    Q.      And is that something you relied on?

4    A.      I did.  It was a part of a larger file when I

5    looked at it, but I relied on that document.

6            MR. STOBBS:  We would move for its admission.

7            MR. TYRRELL:  Your Honor, defendants would object

8    to Exhibit 28 on hearsay grounds.

9            THE COURT:  Overruled.  Plaintiff's Exhibit 28 is

10   admitted.

11   Q.      (BY MR. STOBBS)  How about 29, Dr. Cauley?

12   A.      29 are grievance forms from Mr. Kallal, complaints

13   about property issues, and responses from the facility to

14   him.

15   Q.      And is that something you relied on?

16   A.      It was.

17           MR. STOBBS:  We would move for its admission,

18   Judge.

19           MR. TYRRELL:  Your Honor, defendants would object

20   to Plaintiff's 29 on relevance, hearsay, and foundation.

21           THE COURT:  Overruled.

22   Q.      (BY MR. STOBBS)  And Exhibits 30 and 31, those are

23   the same documents but one -- 30 is for Needs and 31 is

24   for Howe; is that correct?

25   A.      Correct.  There are grievances and responses.

```
 1   Q.      And did you rely on 30 and 31 to form your

 2   opinion?

 3   A.      I did.

 4           MR. STOBBS:  We would move for the admission of

 5   Plaintiff's Exhibit 30 and Plaintiff's Exhibit 31, Judge.

 6           MR. TYRRELL:  Your Honor, defendants object to

 7   both Plaintiff's Exhibit 30 and 31 because of hearsay,

 8   relevance, and foundation.

 9           THE COURT:  Admitted over objection.

10   Q.      (BY MR. STOBBS)  And how about Exhibit 34, Dr.

11   Cauley?

12   A.      These are copies of incident reports at the

13   facility describing things that had happened and the

14   response from the facility.

15   Q.      And did you rely on those?

16   A.      I did.

17   Q.      How?

18   A.      This came to the issue of how the disciplinary

19   issues might be interfering with the treatment process,

20   that they might do something that would lead to them being

21   removed either from treatment or from the housing unit.

22   It came into issues of segregation or suspension from

23   treatment.

24           MR. STOBBS:  We would move for the admission of

25   Plaintiff's Exhibit 34, Judge.
```

```
1              MR. TYRRELL:  Your Honor, just to clarify.
2    Plaintiff's Exhibit 34 is a two-page document?
3              THE WITNESS:  44?
4              MR. TYRRELL:  34.
5              THE WITNESS:  And 44.
6              MR. STOBBS:  And 44.
7              THE WITNESS:  44.  Okay, yes --
8              THE COURT:  No.  No.  Let's focus on 34.  He said
9    he has 44.
10             THE WITNESS:  Yes, I have 44.
11   Q.     (BY MR. STOBBS)  Look at 34.
12   A.     All right.
13   Q.     I think you misheard me.  Here's 34.  If you could
14   look at 34 and tell Judge Yandle what that is.
15   A.     It is a two-page document, and it's an incident
16   report like the other one I had talked about, where Mr.
17   Kallal received a major incident.
18   Q.     And is that something you relied on to form your
19   opinion?
20   A.     Yes.
21             MR. STOBBS:  Judge, we would move for the
22   admission of Document 34 -- Plaintiff's Exhibit 34.
23             MR. TYRRELL:  No objection, Your Honor.
24             THE COURT:  Plaintiff's Exhibit 34 is admitted
25   without objection.
```

1   Q.      (BY MR. STOBBS)  And if you could -- you have

2   already looked at 44.

3   A.      Correct.

4   Q.      And we'll go through the routine again.  This is

5   the last one in this batch.  So, if you could tell, again,

6   Judge Yandle what that is.

7   A.      It's the same sort of thing.  It's an incident

8   report on the unit, apparently, and then the facility's

9   response.  And then it's signed off at the bottom.

10  Q.      And how did you rely on that?

11  A.      Well, that's the same thing.  It was about issues

12  that are interrupting the treatment process, how they're

13  dealt with as far as institutional violations.

14  Q.      Okay.

15          MR. STOBBS:  And we would move for the admission

16  of 44, Judge.

17          MR. TYRRELL:  Your Honor, defendants object to

18  Plaintiff's Exhibit 44 on relevance because it isn't

19  concerning the plaintiffs in this case.

20          THE COURT:  Is it -- my understanding is, it's an

21  incident that reports on an entire incident on the unit.

22  Is that correct, Doctor?

23          THE WITNESS:  Well, the names are redacted.  So,

24  what it goes through is -- it appears to be an incident in

25  the unit, correct.

```
 1          THE COURT:  Okay.  And I understand you relied on
 2    it to give you context and for your total picture of how
 3    -- the relationship between disciplinary actions and
 4    treatment, et cetera, on the unit.
 5          THE WITNESS:  When I looked through them, of
 6    course, they were clumped in different arrangements.  And
 7    it was part of the process of things like institutional
 8    violations leading to an interruption of treatment.
 9          THE COURT:  Giving you the big picture.
10          THE WITNESS:  Giving me the big picture.
11          THE COURT:  All right.  But to the extent that the
12    document itself does not relate to any of these plaintiffs
13    -- I understand it gives you a picture.  I understand that
14    it's appropriate for you to rely on that.  But as to
15    whether or not it's independently admissible, I'm going to
16    sustain defendant's objection without any further
17    foundation -- subject to any further foundation.  But
18    it's, it's sustained and then will not be admitted.
19          Part of the problem --
20          MR. STOBBS:  I understand.
21          THE COURT:  Hold on.  Part of the problem -- and I
22    gave you the option, and so we're going to have to
23    backtrack.  But part of the problem is, is that even
24    though the expert relied on documents doesn't mean that
25    the documents themselves are independently relevant and
```

```
 1    admissible without foundation.  And some of these, I can
 2    tell right off the bat, they're not.
 3           The others, it's going to depend on where we are
 4    at the completion of Dr. Cauley's testimony because, at
 5    that point, what I'm going to instruct Michelle to do is
 6    to take me through each one of these that were admitted
 7    and then we're going to revisit whether they independently
 8    are admissible.
 9           MR. STOBBS:  What I was going through in my brain
10    was to figure out what, in my mind, is the most important,
11    so that I don't just waste everyone's time trying to get
12    something in just because I can.
13           THE COURT:  You're not wasting my time.  I mean --
14           MR. STOBBS:  I know what you're saying, though.  I
15    agree with you -- I got it.
16           THE COURT:  Yeah, either way -- you know what?  If
17    it would --
18           MR. STOBBS:  I got it.
19           THE COURT:  -- if it would split up the testimony
20    by going -- I'm happy doing it this way and then, because
21    we have a record at the close of evidence, what I'm going
22    to do is go back and revisit and see if the defendants
23    still have an objection.  And at that point, we will know
24    to what extent --
25           MR. STOBBS:  Yeah.
```

```
 1            THE COURT:  -- foundation was laid or not.  So, I
 2    think that's -- I actually think that's the easiest way.
 3            MR. STOBBS:  Yeah, and I got where you are going
 4    and I, I -- I got where you are going and I, I completely
 5    understand it.
 6    Q.      (BY MR. STOBBS)  Dr. Cauley, if I could get those
 7    back?  We're almost done with these.  And part of what you
 8    did, Dr. Cauley, in determining -- you're interested in
 9    how long the group sessions lasted; right?
10    A.      Correct.
11    Q.      And a way that you could learn about the -- who --
12    how many people were in the session, how long they lasted,
13    would be the sign-in sheets; is that right?
14    A.      In part.  Some of the men kept their own records,
15    also.
16    Q.      And the sign-in sheets are something that would
17    have been kept by IDOC?
18    A.      Correct.
19    Q.      And if you could take a look at Exhibits:
20            35, which is the sign-in sheet for Mr. Charles;
21            36, which is the sign-in sheet for Mr. Howe;
22            Exhibit 37, which is the sign-in sheet for Mr.
23    Kallal; and
24            Exhibit 38, which is the sign-in sheet for Mr.
25    Needs.
```

```
 1            If you could take a look at those, tell Judge
 2    Yandle whether or not you relied on those, and how you
 3    relied on those.
 4    A.     I did rely on these.  Basically, it was able to
 5    give me a count of the number of men in a group as it met.
 6    Q.     And you relied on those to form your opinion?
 7    A.     I did.
 8           MR. STOBBS:  We would move for the admissions of
 9    Exhibits 35, 36, 37, and 38.
10           MR. TYRRELL:  Your Honor, defendants would only
11    object to 35, 36, 37, and 38 to the extent they contain
12    old -- in defendant's position -- irrelevant documents.
13           THE COURT:  Overruled.  Plaintiff's Exhibits 35,
14    36, 37, and 38 are admitted over defendant's objection.
15    Q.     (BY MR. STOBBS)  And there also -- you indicated
16    in your report that you also relied on a deposition that
17    Dr. Holt gave; is that correct?
18    A.     I did.
19    Q.     I'm going to ask you if you could take a look at
20    Plaintiff's Exhibit 86 and tell the judge if that's the
21    deposition that you relied on and that you discuss in your
22    report?
23    A.     It is.
24           MR. STOBBS:  We would move for the admission of
25    Exhibit 86, Judge.
```

```
 1            MR. TYRRELL:  Hold on one moment, Your Honor.
 2    Apologize.  (Pause.)  Your Honor, defendants would object
 3    to Plaintiff's Exhibit 86.  It was a late disclosure.  It
 4    was not, I believe, part of plaintiff's pretrial
 5    disclosures.  Defendants would also object as relevance.
 6    It's a 2014 deposition of Dr. Holt concerning a
 7    nonplaintiff in this matter.
 8            THE COURT:  Mr. Stobbs, was the transcript timely
 9    disclosed?
10            MR. STOBBS:  I'm not sure, Judge.  (Pause.)  We
11    got it -- from what I understand, Judge, the -- what Dr.
12    Cauley relied on was a redacted -- was a redacted
13    deposition.
14    Q.    (BY MR. STOBBS)  Is that correct?
15    A.      Received through the men, prior to them being
16    represented.  It was a `redacted copy of the deposition
17    that I received prior to you being involved.
18            MR. STOBBS:  And, Judge, as an officer of the
19    court, I think what happened is, as soon as we found out
20    who it was, we contacted the attorney who represented the
21    inmate.  He got it to us.  It was sent to Mr.
22    Rockershousen in an e-mail.
23            THE COURT:  Okay.  Well, here's the deal with
24    that:  At best, the transcript would contain admissions of
25    a party even though it was not taken in this case.  For
```

1    instance, if there are admissions that Dr. Howe [sic] made

2    in that transcript relative to the program itself, that's

3    an admission of a party.  That would be relevant here.  It

4    could be used to impeach Dr. Howe, if he should testify.

5    But by itself, the transcript is not independently

6    admissible so I'm going to sustain the objection.

7          Again, he may be subject to cross-examination by

8    any statements that he may have made there, and if not, if

9    the plaintiffs determine that there are certain admissions

10   that are set forth in that transcript that are relevant to

11   the claims and defenses in this case, I will allow you to

12   read those admissions in the -- or make the -- or make

13   those excerpts.

14         MR. STOBBS:  Perfect.

15         THE COURT:  But as a whole, the transcript is

16   inadmissible.

17         MR. STOBBS:  I understand.

18   Q.    (BY MR. STOBBS)  Dr. Cauley, I'm going to ask you

19   to take a look at exhibit -- Plaintiff's Exhibit 5.  And

20   if you could tell Judge Yandle what that is?

21   A.    This is a copy of the Joint Committee on

22   Administrative Code, Administrative Rules.  And it's a

23   section of that document that I had looked at in response

24   to treatment methods and guidelines.

25         MR. STOBBS:  We would ask you to take judicial

1    notice of Exhibit 5, Judge.

2          THE COURT:  Mr. Tyrrell?

3          MR. TYRRELL:  Your Honor, defendants would object

4    to Plaintiff's Exhibit 5 on relevance.  As the Court made

5    it clear, the proper standards, the Fourteenth Amendment

6    standard, not whether or not we --

7          THE COURT:  I'm sorry?

8          MR. TYRRELL:  I'm sorry, Your Honor.  I think the

9    proper standard here is the Fourteenth Amendment standard,

10   not whether or not we comply with Administrative Code

11   provisions.

12         THE COURT:  I also indicated Administrative Code

13   provisions can be evidence of the professional standard.

14   And I take it that that's, in that context, that you

15   relied on or considered those?

16         THE WITNESS:  Well, as an additional note, this is

17   a recently updated version of that Code -- of that

18   Administrative Code.  I also looked at the prior one.  So,

19   I looked at both, both of those models in relation to this

20   case.

21         THE COURT:  Again, I'll provisionally admit

22   Plaintiff's Exhibit 5 over defendant's objection.

23   Q.    (BY MR. STOBBS)  I'm going to hand you Plaintiff's

24   Exhibit 13, Dr. Cauley.  And if you could tell Judge

25   Yandle what that is, whether or not you relied on it, and

1   how you relied on it.

2   A.      It's a copy of the Sex Offender Management Board

3   Act.  And I did review it more than once, and I relied on

4   a portion of it.

5           THE COURT:  And for what purpose did you rely on

6   that document?

7           THE WITNESS:  As I recall, it was -- (pause) --

8   towards the end of it, it speaks specifically about

9   sentencing and treatment based upon evaluation.  And there

10  was a portion of it that seemed relevant to me at the time

11  that I can't locate.

12          THE COURT:  Okay.

13          MR. STOBBS:  We would move for its admission.

14          THE COURT:  Mr. Tyrrell?

15          MR. TYRRELL:  Your Honor, defendants -- apologize,

16  Your Honor.  Defendants object on relevance.

17          THE COURT:  I'm going to sustain the objection, at

18  this point.  Of course, that's subject to if you laid a

19  proper foundation --

20          MR. STOBBS:  Sure.

21          THE COURT:  -- throughout the course of testimony,

22  we can revisit it.  But at this point, the relevancy and

23  materiality is not apparent to the Court.

24  Q.      (BY MR. STOBBS)  How about Plaintiff's Exhibit 39?

25  A.      This is an outline of the Sex Offender Evaluation

1    and Treatment Provider Act from the Illinois General

2    Assembly.

3    Q.      And how did you rely on that?

4    A.      If I could have a moment?

5    Q.      Sure.  Take your time.

6    A.      (Pause.)  Probably to a lesser degree.  This is

7    about licensing of the facilities for individuals.

8            THE COURT:  Are you going to move it?

9            MR. STOBBS:  We'd move for its admission.

10           MR. TYRRELL:  Your Honor, same objection, for

11   relevance.

12           THE COURT:  Objection is sustained.

13   Q.      (BY MR. STOBBS)  Dr. Cauley --

14           MR. STOBBS:  Thanks, Judge.

15   Q.      (BY MR. STOBBS)  And finally, regarding the

16   different things that you relied on, you relied on the

17   Sexually Dangerous Persons Act in Illinois; is that

18   correct?

19   A.      Correct.

20   Q.      And that's found at 725 ILCS 205?

21   A.      I assume, yes.

22   Q.      And we are finished with the exhibits.  So, what I

23   want to do now, Dr. Cauley, is to kind of talk a little

24   bit about if you are aware of the historical responses at

25   Big Muddy to some of these, these problems that you talked

1    about.

2    A.      I was, and that was part of my first report, and

3    that was what was going through a lot of the documents was

4    about.  That after I had formulated, I guess, my concerns

5    or what I thought were -- would be my concerns, I looked

6    through the records at length and found the articles we

7    had talked about, the John Howard publications, and then

8    actual reports from other people who we haven't talked

9    about that spelled out the similar concerns going back in

10   time.  And that was in my first report.  This has been --

11   the concerns we're having today have been consistent

12   concerns as far back as 2013, maybe further.

13   Q.      And do you remember the responses from Big Muddy?

14   A.      As I listed in the report, on the occasions that

15   they were brought to them as far as the prison setting or

16   overcrowding or staff ratios, there was some statement of

17   intending to correct it.  And then we would see another

18   review of someone else a year or two later saying the same

19   things.

20   Q.      And in your opinion regarding the actions of Big

21   Muddy, you indicated they were deficient?

22   A.      In some regards, yes.

23   Q.      Could you tell Judge Yandle how?

24   A.      Deficient in treatment, yes.  Treatment provided.

25   Obviously, an hour a week wouldn't be the generally

1    accepted standard of treatment.  Also, some of the

2    documents that had just been entered talked about groups

3    that are on hold or unavailable, despite the fact that I

4    had seen repeated requests by the gentlemen to have those

5    groups, Relapse Prevention or Substance Abuse, they were

6    not available.

7          One of the documents that was entered was a four

8    stage treatment model.  And if we look at it, we see that

9    actually to have gone through that you would have to have

10   taken programs that were on hold.  So, it was like classes

11   were prerequisites but we're not offering the

12   prerequisite.

13         I had also talked about the fact that an hour,

14   both as a weekly total and even in and of itself, is a

15   little too brief with the size of the population.  So that

16   -- I think a lot of it would just basically tie back into

17   understaffing.  When it's understaffed, you have fewer

18   groups, bigger groups, less programs available, and, and

19   the men can't move forward.  So, in that regard, yes.

20   Q.    And do you have an opinion regarding the barriers

21   to treatment at Big Muddy?

22   A.    I think there are several barriers to treatment.

23   Most obviously would be of something that someone needs to

24   take, particularly if that was their diagnosed disorder

25   for the referral, is not available to them.  That's an

1    immediate barrier to treatment.

2         If we get into incidents that are not

3    treatment-related being dealt with in a correctional way,

4    like one of the documents was talking about untucked

5    shirts and violation of policy that require the person be

6    suspended from treatment, that's a barrier, too.

7         I also think it's a barrier on a more subtle level

8    when a group's so large that people can get lost in it,

9    and so brief that people aren't getting attention.  They,

10   they -- somebody had talked about, or more than one person

11   had talked about yesterday, they're rotating around a

12   group.  So, if you've got 18 guys in the group, that's a

13   long, long wait to get some attention.  So, that would be

14   a barrier.

15        It would just be:  How much attention can a

16   treatment provider provide to an individual in that

17   situation?

18   Q.    Have you ever experienced outside intervention

19   into a program such as this?

20   A.    I have.

21   Q.    Could you explain that to Judge Yandle?

22        MR. TYRRELL:  Objection, Your Honor, just for

23   relevance.

24        THE COURT:  Overruled.

25   A.    Several times.  There was involvement in Florida

where, I think similarly to here, the special needs
residents weren't getting special programming; they
weren't getting programming being catered to them, being
illiterate or slow learners or whatever.  And there was an
action taken, that they needed to implement a separate
program for the people that would qualify for that, or
have the need for that.

In the Minnesota program, there were concerns
about how evaluations were being done and I was involved
in that, and that was the focus of my testimony.  And, as
a result, that judge appointed an overseer or a Special
Master to make sure the program started to steer a
different course.  And that was also done in Washington
State, where there was an oversight put on the program.

Q.      Do you remember how that worked?

A.      I'm not -- I don't know the particulars of the
concern, but I do know that the facility did not comply.
And that became news after awhile, that the facility did
not comply with the directive, and they started to receive
fines.

Q.      When you were talking a little bit about the
Sexually Dangerous Persons Act in Illinois, is that
similar to other statutes you have dealt with?

A.      Similar in some ways.  I think the treatment is
similar or if not identical, and the goals are similar.  I

1    think the criteria of how they got there is slightly

2    different, but I think the population is the same.

3    Q.      And what about in terms of treat and release after

4    the briefest time possible?  What's your experience with,

5    with that?

6    A.      That's the benchmark.  I have heard that over the

7    past 15 years.  That's the mantra of providing these types

8    of services, is that you, as quickly as possible, prepare

9    the person to return to the community as a lower risk

10   offender.  Give them the resources they need to succeed,

11   and return them to the community.

12   Q.      Is that based on any program from any other

13   country?

14   A.      In part, it's based on the Canadian programming.

15   The Canada programs, they have been doing it a little

16   longer.  They're also where a lot of the testing we use

17   was developed on their population.  And they don't make a

18   practice of detaining people as long as we do here.

19   Q.      What is the -- in your experience -- the general

20   amount of time that someone is civilly committed before

21   they are released?

22   A.      In that situation?

23           MR. TYRRELL:  Objection, Your Honor, foundation,

24   leading.

25           THE COURT:  Foundation.  It's sustained.

```
1    Q.      (BY MR. STOBBS)   What -- and you have -- you were
2    talking about the Canadian program.   If -- is that
3    something that's been applied to other states, in Florida,
4    for example?
5    A.      The treatment process?
6    Q.      Yes.
7    A.      Yes.
8    Q.      And what is your experience with that?
9    A.      The Canadian programs are the ones that started
10   the Good Lives Model that I mentioned of giving someone
11   the more holistic skills, education, interpersonal skills,
12   and returning them to the community as quickly as
13   possible.   And that has started to trickle into the
14   mindset that we're using here.
15   Q.      When, when you have -- in that situation, are
16   there any sort of empirical data that you have that's
17   relied on?
18   A.      As far as the effectiveness of the program?
19   Q.      No, in terms of like the age of the individual or
20   something like that.
21   A.      There was a study -- I, I -- I'm thinking this is
22   what you are asking.   There was a study that was done
23   where they compared one of the Canadian programs, which
24   was high risk sexual offenders, with one of the programs
25   in the United States and ran a bunch of demographics to
```

1    see if these are actually similar populations.  Is that
2    what you are asking?
3    Q.     No.  Suppose you have a guy who is 60 or 70 years
4    old.  Is there -- recidivism become lower?
5    A.     Oh, that's just -- yeah, that's just standard
6    accepted stuff, yeah.
7    Q.     If you could explain that to Judge Yandle.
8    A.     There was always a consistent feeling in the
9    research community that at a certain age, certain
10   disorders begin to decline as far as the risk.  And it was
11   not unfamiliar to people with a criminal justice
12   background that older criminals commit less crimes than
13   younger criminals, and there was some research to say that
14   maybe an anti-social personality declines at about 45 or
15   50.
16        A lot of research was done.  And in 2008, it was
17   brought out at one of the professional -- or probably the
18   most relied upon professional group in sex offender
19   treatment that they had now changed risk assessments to
20   incorporate age as, as -- it's almost like an actuarial
21   assessment of risk, and age is such a big mitigator that
22   they eventually included it in.  It wasn't really subject
23   to debate anymore.
24        So, an offender who clears the age of 60 could
25   have a significant reduction in their risk just based upon

1   age alone.

2   Q.      And you talked about the good life model.

3   A.      Yeah.

4   Q.      Is there another model called "New Me Versus Old

5   Me"?

6   A.      That's part of the, part of the same construct.

7   What they're doing is, rather than continuing labeling

8   someone as a sexual deviant and spending years talking

9   about that, they're bringing in a lot of different

10  programming, trying to build self-esteem, trying to

11  increase their skills, interpersonal skills, sometimes

12  trying to curb their criminogenic thinking if that's part

13  of the disorder.

14          And what they do, rather than the labeling process

15  of, you know, the sex offender thing, is to try to get

16  them to see that as a part of who they were, who are they

17  trying to be now, and build a more prosocial life-style

18  rather than having them labeled as being this thing over

19  time.

20          THE COURT:  And just so I understand the context,

21  that model -- I'm not sure where it, where it falls or for

22  what purpose we are discussing it -- is it part of -- I

23  guess it would be contained in your opinions.  Are you

24  saying in your -- that in your opinion, or are you giving

25  an opinion that this model is part of the professional

```
 1   standard?  Or -- I'm not sure what the -- I'm not sure
 2   what the relevance of this model is.
 3             THE WITNESS:  Can I go on?
 4             THE COURT:  Sure.
 5             THE WITNESS:  It would be part of the professional
 6   standards.  So, if we look at something like SOCCPN, which
 7   we talked about yesterday, we had noticed that in addition
 8   to sex offender programming they are incorporating 100
 9   percent of the programs have some form of addiction
10   counseling and treatment.  You would get occupational
11   skills, vocational skills.  Eighty percent of the
12   program's through vocational training.  Eighty percent do
13   some sort of job preparedness for them for when they're
14   released.  Some programs even bring in family members at
15   some point in the program to start participating, usually
16   when somebody's at a higher level of treatment.
17             And that's the generally accepted practice, that
18   this is approached as a whole person model and that we
19   need to provide them skills to survive.
20   Q.        (BY MR. STOBBS)  And you -- you said when you were
21   talking about your experience yesterday that you actually
22   worked in a facility?
23   A.        I have.
24   Q.        And where was that?
25   A.        That was the Sexually Violent Predator Program in
```

1    Florida.

2    Q.      And did they take into consideration the, to have

3    someone treated and released in the briefest time

4    possible?

5    A.      Not exactly, when I was there.  But the person who

6    held the contract for the State lost that contract.  And

7    the new provider that came in, in 2006, brought in a

8    Canadian model of treatment, which is the Good Lives

9    Model.

10   Q.      In the Good Lives Model, what's the average of how

11   someone takes to enter the program before they exit the

12   program?

13   A.      Three to five years.

14   Q.      Now, if we could turn a little bit and talk about

15   the treatment at Big Muddy.  Okay?  Now, you were here all

16   day yesterday and you heard the four plaintiffs testify;

17   right?

18   A.      Correct.

19   Q.      And from a treatment standpoint, what impact does

20   segregation have?

21   A.      I think it has quite a few impacts.  Obviously,

22   you are not in treatment while you are there because they

23   said treatment wasn't provided to them.  It's disruptive

24   to therapy, but I think they're also suffering some

25   reduction in their status if they are in Stage Two or

1    Phase 2, so that could happen, too.  So, it could

2    interrupt the whole, the whole process, everything they

3    are involved in as far as treatment.

4    Q.     And how about time that they're spent locked up in

5    their cells every day?

6    A.     As far as how that impacts?

7    Q.     Yes, sir.

8    A.     I think that impacts -- well, it impacts

9    everything because it's part of that labeling punishment

10   thing that would actually go against the kind of model

11   you'd prefer to have.

12   Q.     What do you mean by that?

13   A.     Well, they're in jail, basically.  They're in a

14   jail cell most of the day with a roommate, the way you

15   would be in jail.  I would imagine that there's a sense of

16   hopelessness or despair or shame or -- what would you call

17   it where you are -- you are labeled and you are stuck in

18   that label.  That you are an outcast.  Whatever -- however

19   you choose to view it, it certainly doesn't help repairing

20   self image or positive self-esteem to be locked in a cell.

21   Q.     And what about the, the discipline violations at

22   Big Muddy?  Are they more prison in nature or program in

23   nature, if you know?

24   A.     Well, they appear to be overlapping so that, as I

25   had said, a lot of programs will have the clinical staff

```
1    deal with the behavioral problems.  And I had that
2    pleasure for about nine months in Florida, where I was the
3    person who dealt with behavioral issues.  And we'd always
4    try to incorporate it into the treatment model.
5    Q.      What do you mean by that?
6    A.      Bring somebody into group and have them explain to
7    the group why they did what they did, or how they acted
8    the way they act, and would start getting feedback and it
9    would be part of the treatment.  And more often than not,
10   what you are seeing is some parallel process to what's
11   actually an actual concern for the person, whether it's --
12   whatever it might be, and bring it into treatment.
13          And then they would have them do thinking reports,
14   where they would write down what the situation was, how
15   did they handle that incorrectly, and they might get some
16   additional homework assignment as a result of the
17   write-up.  Unless it was a security or safety issue, they
18   weren't really thrown out of treatment.
19   Q.      What impact does being thrown out of treatment
20   have on the patient?
21   A.      Well, the obvious one, you are being dropped down
22   in treatment.  The hopelessness is now starting to cycle
23   because you are not -- you know, someone is at Stage One
24   for 10 or 15 years, that gets depressing.  And whatever
25   progress -- I, I could think of several.  Whatever
```

1   progress is being made is being stopped as the person is

2   taken out of treatment.  I also wonder, when we have few

3   groups and they're short groups and they're crowded

4   groups, and men are being taken out because of incidents,

5   where is the connection that should be there?

6           The counselor should be the, the person that's

7   taking these people deeper into why they offended, what

8   was the attraction, how are you going to deal with that in

9   the community?  And if it's being consistently disrupted,

10  it's very hard to build a good connection in a group that

11  size where somebody is always missing because something's

12  going on, you know.

13  Q.      Sure.  What impact does that have on the treatment

14  environment?

15  A.      It takes the treatment environment away.  There

16  should be an environment -- a lot of programs call it

17  therapeutic community, where they have staff, the staff is

18  trained in the therapeutic community, they are looking for

19  certain behaviors.  If it's a write-up, it's usually dealt

20  with by treatment Team Leaders.

21  Q.      Sure.

22  A.      So, the whole process is a therapeutic community.

23  And then with that, you can start to get a little bit of

24  trust and a little bit of honesty as you go deeper into

25  people's disorders.  Without that, it's very difficult to

1    get to a pretty genuine level.

2    Q.      Could you tell Judge Yandle the difference between

3    what you learned from the Rushville manual versus the

4    manual with Big Muddy with regard to punishment?

5    A.      The Rushville manual was very clearly describing

6    stages and phases; what are the criteria for moving up.

7    Similarly, the infractions appeared to be dealt with in a

8    more therapeutic way.  I think they had given information

9    to the residents that was very clear, and also went

10   through explaining items.  It had, almost had a vocabulary

11   list so the people don't get lost, of what happens when

12   this happens?  Who is -- what's a case manager to me?  And

13   it was very clearly spelled out.  And then if they got in

14   trouble, it was clearly spelled out in advance what would

15   be an infraction, what would be the result of an

16   infraction.

17           I assume that's what you're asking.

18   Q.      Yes.

19   A.      Okay.

20   Q.      And how about the manual of Big Muddy?  Does that

21   do the same?

22   A.      No.

23   Q.      Which one is more in line with a SOCCPN?

24   A.      The interesting thing about Rushville, when I went

25   through their program and looked at their manual, their

1    policy, how you move through treatment and what happens,

2    they also have the same incentive levels that, the more

3    you go up, the more perks you get.  Their group hours,

4    their group sizes, when I looked at their schedule.

5           And then I looked at the SOCCPN.  Rushville is

6    almost always falling in on the mean average, which is

7    perfect, which would be the mean average for a group size;

8    for the total hours of treatment a week; the length of the

9    group, which is close to two hours, three times a week.

10          And then when I looked at their schedule of

11   additional programming, it was a full day of computer lab

12   or GED or joining Toastmasters, whatever they were doing.

13   It was like being in school all day long.

14   Q.     They're getting out of their cells?

15   A.     They're -- well, they couldn't be in, because

16   they're involved in too many things to be in their cells

17   all day.

18   Q.     Are you familiar with a term where punishment

19   looks like treatment?

20   A.     Yes.

21   Q.     And could you tell Judge Yandle what that is?

22   A.     My understanding of it was, early on in the civil

23   commitment process that was a concern where something

24   would be presented as, *we need to detain this person for*

25   *treatment because they're so dangerous*, and then it

```
1    wouldn't rise to the treatment bar and it actually became
2    a further form of incarceration.
3    Q.      You talked a little bit about the, the group
4    sizes.  And I'm not going to go over it in too much
5    detail, but do you have an opinion as to how large or
6    small a group should be?
7    A.      About 10.  And that's coming from many different
8    sources, not only SOCCPN, but that's the recommended level
9    in the professional community.  That's the recommended
10   level by ATSA, which is treatment of sex abusers.  About
11   10, maybe 12, not much more than that.
12   Q.      Sure.  And how about -- do you have an opinion
13   about the time a session should last?
14   A.      No less than 90 minutes.
15   Q.      Why is that?
16   A.      Because there's, there's a lot of lost time in a
17   group.  So, 90 minutes would pretty much, in my opinion,
18   be the minimum.  A lot of programs go more towards three
19   hours, with breaks.  There's an enormous amount of time
20   lost then, because the men have their own individual
21   complaints from what happened about -- to them the day
22   before, and they don't have an opportunity to vent to
23   anyone because they have been in their cell all day.
24          So, they come into the group and you can lose a
25   lot of time just with that kind thing.  Maybe there's
```

```
 1     unfinished business from last group.  And then you want to
 2     go over some homework and then maybe you want to start on
 3     someone's history.  And it can't be done in less than an
 4     hour.  However, no one has group once a week except Big
 5     Muddy.  So, these are also -- they're meeting two, three
 6     times a week, two hours on an average per session, so
 7     there can be a continuum, you can build momentum on a
 8     theme.
 9     Q.     And how many times a week do you think they should
10     have to meet?
11     A.     Three.
12     Q.     What does a stagnant treatment facility mean?
13     A.     Stagnant?
14     Q.     A stagnant treatment facility.
15     A.     I would assume it means that it's just going day
16     after day after day, doing the same things, getting the
17     same results, which aren't very good.
18     Q.     What about someone who's been civilly committed
19     for flashing, and they haven't flashed for 15 years.  What
20     would your opinion be then?
21     A.     It would be a lot of things.  Age would have a
22     part to do with that.  But that's the thing is, somehow
23     these men get a diagnoses that they magically hold
24     forever, whereas the diagnostic manual says that's
25     probably not the case.  That if you haven't seen something
```

1    in six months to a year, you have to justify holding that
2    diagnoses that long.
3    Q.      What's your experience where someone is diagnosed
4    with an illness before they're civilly committed and then,
5    within two days, that diagnosis is changed?
6    A.      That's very concerning to me.
7    Q.      Why?
8    A.      For a lot of reasons.  When I looked at some of
9    the charts, I saw that.  I saw a, kind of a disparity,
10   like a different diagnoses at different times of the
11   person's history all since they have been detained or
12   committed, without explanation.  So, ordinarily, if
13   someone is going to go from being an alcohol abuser to a
14   sexual sadist, you'd have to write somewhere in the file
15   how that happened; what was your clinical justification
16   for making such a radical change in the diagnoses.
17           But instead, it just was -- I had looked through
18   treatment reviews and then someone's diagnoses had
19   changed, but there were no notes that I was given as to
20   why that happened.
21           The other thing that concerned me about that was,
22   they seem to be going upward in the severity.  Sexual
23   sadism is an extremely high bar to meet, really,
24   clinically, to reach that diagnoses.  And I wondered,
25   well, how could you have two or three evaluators that

```
 1    didn't see that at all, and then another one sees it and
 2    writes it down and gives you that diagnoses.  So, I don't
 3    have all the answers to that but it was very concerning.
 4    Q.     And how about when Mr. Howe went from being an
 5    alcoholic to a social sadist?
 6    A.     He did.  He went from being an alcohol abuse
 7    disorder to being a sexual sadist since the time he's been
 8    at the center.
 9    Q.     And do you have the same concern about that, as
10    well?
11    A.     Yes.
12           THE COURT:  Let me just, again, clarify.  Doctor,
13    when you say you have a concern, I understand you have a
14    professional concern.
15           THE WITNESS:  Yes.
16           THE COURT:  My concern or the issue, the question
17    I must answer is whether or not it meets the professional
18    acceptable standards.  And so when you say you have a
19    concern, for instance, with the different varying
20    diagnoses, I'm interested in knowing whether or not that
21    practice meets the professional standards or not.
22           THE WITNESS:  If there were no notes of
23    explanation, I think that it becomes a professional
24    concern.  If, if someone's being seen every day for a year
25    and have an alcohol abuse disorder, and then finally we
```

1   decide they're a sexual sadist and change the diagnoses,

2   without any clinical notation as to why that happened, I

3   think that becomes a professional concern.

4           I also think that each of those disorders requires

5   extremely different treatment but -- and different risk

6   levels.  So, a lot changes through that.  It would change

7   the whole course of treatment and it would change how we

8   would assess the risk in the community.  And to do that

9   without any notation is professionally concerning.

10  Q.      (BY MR. STOBBS)  Dr. Cauley, do you know what the

11  national ratio is for patient to therapist?

12  A.      I do.  It's, it's about --

13          MR. TYRRELL:  Your Honor, it appears the witness

14  is looking at something.  Could we have the witness

15  identify what he is looking at?

16          MR. STOBBS:  Sure.

17          THE WITNESS:  Do you want me to say what it is?

18          THE COURT:  Hold on for a minute.  He can look at

19  whatever he wants to look at, Mr. Tyrrell.

20          MR. TYRRELL:  I wasn't sure --

21          THE COURT:  If you want to cross-examine him by

22  what he's looking at, have at it.  But you don't, you know

23  -- so, objection's overruled.  But again, you're going to

24  get your chance to cross-examine.

25          MR. TYRRELL:  Thank you, Your Honor.

```
 1              THE COURT:  Mm-hmm.
 2    A.      Generally, it comes down, if we look at different
 3    -- like the SOCCPN.  Also, it's set forth in some of the
 4    professional guidelines, it should be about 10 to 1,
 5    meaning 10 residents or whatever, 10 residents per
 6    clinical staff.
 7    Q.      (BY MR. STOBBS)  How -- do you know what the
 8    number is -- the ratio is at Rushville?
 9    A.      Well, it came out in various ways.  But as I had
10    said yesterday, I guess there's really just two simple
11    ways of looking at it, is the staff, which was said to be
12    about three or four, and the number of men in treatment
13    which was said to be about 90 or thereabouts, so you'd
14    have 17 or, you know, maybe close to 20 to 1.
15              My feeling is, it's the entire population.  That
16    everyone there is there for -- you know, in custody for
17    care and treatment.  So, it's the entire population is who
18    your clientele.  And in that case, we'd have 4 -- 3 or 4
19    and, what, 177.
20    Q.      (BY MR. STOBBS)  And that's at Big Muddy?
21    A.      Yes.
22    Q.      And how about the national average for the group
23    size?
24    A.      Not only national average but your ethics would
25    dictate about 10 to 12.
```

Q.      And how many is at Rushville?

A.      About -- there -- they fall about the 9 to 10 range.

Q.      And do you know what it is at Big Muddy?

A.      I have seen different things.  As recent as 2018, I saw 18 on a sign-in sheet.

Q.      And how about the duration of the sessions? What's the national average?

A.      Close to two hours, 1.7 per meeting.

Q.      And how about at Rushville?

A.      90 minutes.

Q.      And Big Muddy?

A.      One.

Q.      One hour?

A.      One hour.

Q.      And how about how many times they meet weekly nationally?

A.      Well, this is where it gets real concerning to me, is, nationally, the men are receiving a mean average of about seven and a half hours a week of core treatment. Okay.  So, they'd have all their additional programming, but the core treatment is about seven and a half. Rushville is close to five.

Q.      And how about Big Muddy?

A.      One.

1   Q.      Now, does that take into consideration these,

2   these other classes that they were talking about

3   yesterday?

4   A.      No.  It would just be the core group, the core sex

5   offender specific group that's being talked about here.

6   Q.      And how about the programs that are on hold?  How

7   many average nationally is that?

8   A.      That's not something you see.  As I had said

9   earlier today, that every program always offers drug and

10  alcohol.  That was pretty much the only 100 percent thing

11  they got in their survey.  Everybody does that all the

12  time, for all the inmates or residents or whatever.

13          When we get into those models in looking at the

14  Rushville schedule, we can see it.  Things like Anger

15  Management, Relapse Prevention, Victim Empathy, they're

16  always ongoing because they're like, they're part of the

17  foundation of the core group.

18          So, if someone's offending was alcohol -- not

19  alcohol related but it was a trigger to them, or victim

20  empathy or anger was a trigger to them, they're working at

21  them at the same time.  So, actually what often happens

22  is, information is kind of being passed back and forth.

23  Kind of like when you take a college schedule and things

24  start to relate to each other because you are hearing them

25  at the same time.  All programming does that, that

1    additional program availability.

2    Q.      And how many programs are on hold at Big Muddy, do

3    you know?

4            THE COURT:  At what point in time?  I need some

5    context.

6            MR. STOBBS:  I'm sorry, Judge.

7    Q.      (BY MR. STOBBS)  From 19 -- from 2014 until today,

8    do you know?

9    A.      I don't know how many are on hold.  I know that

10   several that are critical are on hold, or were on hold at

11   times I looked at them.

12   Q.      Okay.

13   A.      And that was found through resident communications

14   that I looked at.  It was found through a program outline

15   that was submitted from the program, and in it were

16   notations that these groups are "currently on hold,"

17   "currently on hold."

18   Q.      Sure.

19   A.      And looking backwards in time, it appears that

20   that has been a recurring issue, but I don't know what's

21   going on right today, what's on hold.

22   Q.      I got it.  And the cell time, where the patients

23   are locked inside their cell or their room, whatever.  Do

24   you know what the national average is for that?

25   A.      That, I don't know.  That was one they didn't ask

1    on the national average.  But when they look at the daily

2    schedules, we get the answer because a full daily schedule

3    is an answer to the cell time.

4    Q.     Right.

5    A.     They can't be doing what they're doing.  So, when

6    we look at Rushville's schedule, those guys are getting

7    out of their rooms or their cells very early in the

8    morning, 7:15, 9:30, whatever, going to breakfast, and

9    they're able to move around until 10:45.  So, they have a

10   full day of outside activity available to them and they

11   have all this programming they can take.

12          Part of the -- some of these concerns are actually

13   linked one into the other.  So, if you pick up the

14   programming, you reduce the cell time by, by necessary

15   outcome.

16   Q.     And we heard that the inmates talk about -- the

17   plaintiffs talk about the times they were in their cell

18   yesterday, and does that meet the national average?

19   A.     No.  They were talking 17 -- I heard 17 to 22

20   hours through different sources.  So, not only is that

21   unusual, it's time that should be spent in programming.

22   Q.     You also -- is there a generally accepted practice

23   for a written policy, treatment policy?

24          THE COURT:  You mean a separate policy?  A manual?

25   I'm --

1          MR. STOBBS:  I'm sorry, Judge.

2     Q.     (BY MR. STOBBS)  For the sexually dangerous

3     persons, how they go up or down in stages or phases?

4     A.     I think the -- I don't know if it's generally

5     accepted, but I would say the programs that I know of and

6     that I have looked at, they spend a good deal of time

7     mapping it out and then presenting it to the resident as

8     to what things can move you up and what things can move

9     you down, and spelling it out in a way that even the, the

10    slow learner can benefit from it, so that they clearly

11    know.  And, and that was something I was surprised about,

12    that some of the men didn't know why they were where they

13    were in treatment, or what they needed to do to move up

14    from that level.  That should be really clearly spelled

15    out.

16          Typically, the men in a facility will know it

17    inside-out because they're -- they just retain that kind

18    thing because it's their daily schedule.

19    Q.     Sure.

20    A.     So, I guess what I'm saying is, it has to be clear

21    and it has to be understood for it to be a policy.

22    Q.     Do you have an opinion about someone who works

23    with the staff, like with the SDP's, and also works in the

24    prison environment?

25    A.     An opinion?

1   Q.      Yes.

2   A.      I noticed that and, and I found it confusing as

3   far as when we were talking about staff on-site or staff

4   availability.  I didn't know the details but I knew some

5   of these people were not actually full-time staff, so it

6   was making things look a little worse, if you follow.

7   Q.      Sure.  And what about with regard to staff?  What

8   impact does funding have on staff?

9   A.      Well, that's the whole thing, is, I think if you

10  have -- I think the whole thing networks together.  So, if

11  you have enough funding, hire enough staff.  And if you

12  have enough staff, you can reduce the head count in the

13  group.  Additionally, you can start offering more groups

14  and more programming, then the lock-up time solves itself.

15  They don't have time to be in their cell all day because

16  they're busy.  So, I think a lot of what we're looking at

17  is symptoms --

18  Q.      Mm-hmm.

19  A.      -- of a facility without resources.

20  Q.      And what impact would more staffing have on the

21  ability of the men to move through the program quicker?

22  A.      They would get more hours in group.  They would

23  get more groups per week.  They would, I think, have more

24  access to a counselor or a treatment provider that could

25  specifically help them with their individual issues.  Some

```
 1    of the men, no doubt, are slow learners, or some -- a good
 2    percentage of them may be functionally illiterate, and
 3    they would get time for that, special programming.  And
 4    then usually what is done is the counselor, who has some
 5    background in working with that sort of sub-specific
 6    population of the challenged ones, will work with them.
 7    And then that way everybody has access to move forward
 8    given their unique circumstances.
 9    Q.     Would it be safe to say that the program moves
10    only at the pace of its slowest person?
11    A.     For a lot of reasons.  When we talked about going
12    around the circle kind of thing, if somebody gets snagged
13    and spends a lot of time for whatever issue, a slower
14    person that didn't understand the assignment, that's
15    impacting the other, in this case, 16 or 17 people in the
16    group.  It's slowing them all down.
17    Q.     How would you take into consideration someone's
18    future risk?
19    A.     How would you?
20    Q.     Yes.
21           THE COURT:  I'm confused by the question.
22    Q.     (BY MR. STOBBS)  Well, if -- we were talking a
23    little bit -- I'm starting to wrap up.  But like you
24    talked a little bit before about someone's age would
25    impact the risk.  And are there other -- are there other
```

1    things regarding that which interest you?

2    A.      Well, I think the way it would normally be done

3    is, when somebody goes through the screening for a

4    referral to a commitment center, they would have a risk

5    assessment done at that time.  That would have imparted

6    their initial case.

7    Q.      Mm-hmm.

8    A.      The case that was made that they're high risk.

9    They go into treatment and as they make progress in

10   certain domains that are -- that you can assess

11   behaviorally, not just, *do they understand*, or, *do they*

12   *have a notion*, but actual behavioral changes of

13   compliance, cooperation, taking responsibility, emotional

14   stability over time, they are no longer acting

15   impulsively.  Those things are all ranked on a test.  And

16   then we would take the original risk that they were

17   referred with, and see if it's being reduced by these

18   other domains that are changeable.

19   Q.      And you were here when Tim Charles testified;

20   right?

21   A.      Yes.

22   Q.      And would you have an opinion as to his future

23   risk?

24   A.      Not without knowing his original case, no.

25   Q.      And are there any specific behavioral goals at Big

1    Muddy?

2    A.      That was part of the semi annual reviews, and I

3    mentioned it in my report.  They seemed more subject to

4    interpretation, like someone has an understanding or

5    someone indicates knowledge of.  And I had explained that

6    more in my report, but those, those are hard concepts to,

7    to hold stable.

8            And I -- there's a term they call inter-rater

9    reliability, which is like if another clinician came along

10   and saw the same thing, would they think the same thing?

11   So, things have to be pretty clearly set that somebody's

12   not acting impulsively; they haven't gotten a write-up in

13   X number of months; they are attending groups; they are

14   taking responsibility, as matches the records.

15           But when the ratings are more opinion based, it

16   gets a little murky as to what we're looking at.

17   Q.      Do you have an opinion regarding whether or not

18   the facility should let the offender know where they stand

19   regarding progress?

20   A.      I think they absolutely should.  I think that

21   should be part of a meeting, yes.

22   Q.      And how often should that meeting be?

23   A.      At least semi annually.

24   Q.      Are you familiar with ATSA?

25   A.      Yes.

1    Q.      Could you tell Judge Yandle what that is?

2    A.      We call it ATSA, and it's the Association of

3    Treatment for Sex Abusers.  It's an international program.

4    And that's where most of these ideas get presented each

5    year, is at a conference, and they go through the risk

6    assessment and the treatment models and the demographics

7    of what we're treating.  And they publish a peer-reviewed

8    journal called Sexual Abuse, and that's where a lot of the

9    information has come from.

10   Q.      Have they made -- if you are aware -- of anything

11   regarding providers offering treatment and the resources

12   they have?

13   A.      Well, both ATSA and Illinois Sex Offender

14   Management Board have said the treatment shouldn't be

15   offered when someone doesn't have the resources to provide

16   the treatment.

17   Q.      Well, you just said that in your opinion Big Muddy

18   doesn't have the resources to staff up; is that right?

19   A.      Well, I never actually saw the financial thing.  I

20   had asked for it and didn't see it.  I'm assuming that's

21   the cause.  It sure would appear to me that would be the

22   cause.

23   Q.      How would that impact what you just said ATSA

24   requires?

25   A.      Well, it would be contrary to professional opinion

```
1   that you shouldn't have an offer of treatment that you

2   can't provide.

3             MR. STOBBS:  If I could have a second with Mr.

4   Sprehe.

5             (Pause.)

6   Q.     (BY MR. STOBBS)  Suppose a patient denies that he

7   committed the crime for which he's civilly committed.  Do

8   you think that person should be denied treatment?

9   A.     No.

10  Q.     Why?

11  A.     That's, that's a good percentage of the people

12  we're going to wind up getting, is the people that are in

13  denial.  Just like an addiction.  The hard work is getting

14  them out of denial.  And almost every program I know of

15  offers programming to the offender in denial that's going

16  to start warming them up to the treatment process.  So,

17  they might not initially confront the denial but get them

18  into something like a "treatment readiness" group or a

19  "building better lives" group where they start to warm up

20  to a group process.  And then they wouldn't be really

21  confronted on the denial until they started advancing in

22  treatment and gotten into the history part of their

23  offending.

24            Also, we find ATSA and, again, the Sex Offender

25  Management Board stating that denial is an accepted part
```

1    of what we're dealing with, and denial should be addressed

2    in the therapeutic manner.

3         MR. STOBBS:  Judge, if I haven't already done so,

4    I'd like to have you take judicial notice of 725 ILCS 205,

5    which is the Sexually Dangerous Person Act.

6         THE COURT:  The Court takes judicial notice.

7         MR. STOBBS:  I have no further questions.  Thank

8    you, Dr. Cauley.

9         THE WITNESS:  Thank you.

10        THE COURT:  It's the perfect breaking time.  So,

11   we're going to go ahead and take our morning break and we

12   will reconvene at 10:45.

13        (Court recessed from 10:28 a.m. to 10:47 p.m.)

14        (Proceedings continued in open court, parties

15   present.)

16        THE COURT:  You may proceed, Mr. Tyrrell.

17        MR. TYRRELL:  Thank you, Your Honor.

18                      CROSS-EXAMINATION

19   BY MR. TYRRELL:

20   Q.    Good morning, Dr. Cauley.  My name is Jeremy

21   Tyrrell.  I'm one of the attorneys for the defendants.

22   A.    Good morning.

23   Q.    I'm going to start by talking a little bit about

24   your background history.  And you included a copy of your

25   resume or CV with your first initial report back in July

1    of 2016; do you recall doing that?

2    A.      I did.

3    Q.      Okay.  And, Dr. Cauley, I'm going to show you two

4    pages of Plaintiff's Exhibit 53, which has already been

5    admitted into evidence.  When I said two pages, apologize.

6    I actually meant a few pages.  It's actually your resume

7    which is attached to the back your report.

8            Doctor, until the technical difficulties have been

9    restored, I'm going to hand you what's been marked as

10   Plaintiff's Exhibit 53 and has been entered into evidence

11   already.

12   A.      Okay.

13   Q.      And just for purposes of the record, that is in

14   fact a copy of your July 25, 2016, report with your resume

15   attached?

16   A.      It is.

17   Q.      And it is two-sided.

18   A.      Yes.

19   Q.      So, turning your attention to page 13 of 17 of

20   Exhibit 53, this is the first page of your resume;

21   correct?

22   A.      It is.

23   Q.      And now, when the plaintiffs' attorney was asking

24   questions, you talked a little bit about your time with

25   the Florida Civil Commitment Center For Sexually Violent

```
1    Persons.  Do you recall that testimony?
2    A.      I do.
3    Q.      Okay.  Based on your resume, you were there for
4    approximately two years; is that accurate?
5    A.      Year and a half, actually.
6    Q.      Year and a half?
7    A.      Yeah.
8    Q.      And I believe during testimony you said that in
9    less than a year, or approximately one year, you were
10   promoted or moved up from Clinical Therapist to Clinical
11   Team Leader --
12   A.      Correct.
13   Q.      -- is that correct?
14   A.      It is.
15   Q.      Okay.  What was the difference in responsibilities
16   between Clinical Therapist and Clinical Team Leader?
17   A.      The primary difference, I think what I would call
18   it now was the testing and assessment.  If you move down
19   another bullet.  When I first started there, I was doing,
20   as I had said, primarily testing and assessing of the men
21   who were recently arrived or were about to consent to
22   treatment, which could be two different timetables.
23           And I would do the full battery of testing,
24   diagnoses, develop an initial treatment plan, and then put
25   them into Stage Two.  You were in Stage One by virtue of
```

1    being there and alive.  And they would go into Stage Two.

2         What I also was responsible for doing was, they

3    had the nonconsenting men in a separate housing unit from

4    the consenting men; they didn't want to mix the two.  And

5    them guys were my responsibility to do walk-throughs, to

6    talk about their disciplinary reports.

7         I started in August 2001.  In January 2002, they

8    asked me to take over Stage Two treatment and gave me a

9    staff of two master's and two bachelor level clinicians,

10   and I had the responsibility to make sure they were

11   getting all their treatment, any incidents in the housing

12   unit.

13        And then the bullet point about Clinical Therapist

14   is that I was providing treatment four days a week for

15   three hours on their core group.

16   Q.    And when you were serving as a Clinical Therapist

17   was that in addition to your responsibilities as Clinical

18   Team Leader?

19   A.    It was.

20   Q.    Okay.  And I believe you just testified that you

21   also had a group when you were the Clinical Therapist that

22   you were providing therapy to?

23   A.    The master's level people were running a lot of

24   the auxiliary groups like Thinking For Change, which is a

25   rational behavioral group, or -- those sort of things.

1    And generally, the Team Leaders are running the core

2    groups for their dorm.

3    Q.     What was the size of your core group when you were

4    a Team Leader or Clinical Therapist in the Florida

5    program?

6    A.     It was -- now, the four groups I ran were actually

7    each part of the dorm, was getting a group Monday,

8    Wednesday, and then Tuesday, Thursday.  And the groups

9    were 12 or under.

10   Q.     You said they met three times a week?

11   A.     They would meet with me twice a week.

12   Q.     Oh.

13   A.     For six hours total.

14   Q.     Apart from the Florida Civil Commitment Center,

15   have you ever worked at any other commitment centers

16   concerning the treatment of sexually dangerous persons or

17   sexually violent persons?

18   A.     In a prison setting but not in a commitment

19   center.

20   Q.     In a prison setting?

21   A.     Correct.

22   Q.     When was that?

23   A.     When I was -- if you go back to New Beginnings,

24   and I was providing sex offender treatment there -- I'm

25   sorry, Options.  And it said "supervise clinical staff in

1    three locations, one in a secured setting."  That was a

2    prison.

3    Q.     And what prison was that?

4    A.     I forget the name of it.  It was --

5    Q.     And actually, I can withdraw that question,

6    Doctor.

7    A.     Okay.  Yeah, it used to be a rehabilitation

8    facility and they turned it into a prison.

9    Q.     And that program you were just discussing, is this

10   a civil program or is this people that have been

11   criminally convicted?

12   A.     Criminally convicted.

13   Q.     Okay.  So, in terms of civil commitment for

14   sexually violent or sexually dangerous persons, the only

15   experience you have is -- working in is the Florida Civil

16   Commitment Center?

17   A.     Correct.

18   Q.     Do you recall when you left the Florida Civil

19   Commitment Center, what month?

20   A.     April 2003.

21   Q.     Why did you leave?

22   A.     Why?

23   Q.     Yes.

24   A.     A combination of reasons.  One was that I had an

25   offer from the local Department of Children and Family

```
 1    Services, that they wanted me to start providing
 2    outpatient treatment to juveniles.  The other was, there
 3    were some issues with the contract holder.  It wasn't run
 4    by DOC, it was run by Liberty Healthcare.  They ended up
 5    losing that contract about a year after I left, so there
 6    were problems.
 7            And I -- on a more personal level, I essentially
 8    wanted to go back into private practice.
 9    Q.    When you say there was a problem with the contract
10    holder, are these issues that you found to be problems?
11    A.    Some of them, yes.
12    Q.    What sort of problems were they?
13    A.    We were doing --
14            THE COURT:  Hold on.  Mr. Tyrrell?
15            MR. TYRRELL:  I'm just getting --
16            THE COURT:  No.  Relevance.  Relevance.  I mean,
17    I'm going to give you full blow of -- a clean shot at Dr.
18    Cauley, but it needs to be relevant.  You are not taking
19    his deposition.  You are cross-examining him.
20            MR. TYRRELL:  Understood, Your Honor.
21    Q.    (BY MR. TYRRELL)  During your time with the
22    Florida Civil Commitment Center, did you ever serve as the
23    Administrator of the program?
24    A.    No.
25    Q.    Have you ever served as Administrator of any civil
```

1    commitment program in the country?

2    A.      No.

3    Q.      In preparing your three reports which were

4    admitted into evidence as Plaintiff's Exhibit 53, 54, and

5    55, did you ever interview Dr. Holt?

6    A.      No.

7    Q.      Did you ever interview any of the SDP program

8    staff at Big Muddy River Correctional Center?

9    A.      No.

10   Q.      Have you ever toured Big Muddy River Correctional

11   Center?

12   A.      No.

13   Q.      Apart from the photographs that were admitted into

14   evidence and shown yesterday, have you ever seen any

15   pictures of the Big Muddy River Correctional Center

16   facility?

17   A.      From the internet, yes.  Just an aerial shot.

18   Q.      An aerial shot of the facility?

19   A.      Yeah.

20   Q.      And the pictures we saw yesterday were, I believe,

21   B Wing and D Wing; do you recall that?

22   A.      I do.

23   Q.      And so -- some of the plaintiffs have been housed

24   on C Wing.  You have never seen C Wing?

25   A.      No.

```
 1          MR. STOBBS:  Judge, if we could interpose an
 2    objection.  While we were at the Big Muddy, the attorneys,
 3    we requested photos of the C Wing.
 4          THE COURT:  You can -- you can -- I understand you
 5    also requested to tour.  I'm aware of that, as well.
 6          MR. STOBBS:  Yes, ma'am.
 7          THE COURT:  So, it's not actually an objection but
 8    I, I get it.
 9    Q.    (BY MR. TYRRELL)  Apart from a deposition of Dr.
10    Holt taken in 2014, have you read any other sworn
11    statements by Dr. Holt?
12    A.    Well, I don't know what were sworn.  I saw the
13    response to interrogatories and I think there were three,
14    as I recall.  And also, there was something else with a
15    legal name, where there were two or three of them.  I
16    think they were responses to specific questions.  So, I
17    read all those, too.
18    Q.    Okay.  As part of your work experience, have you
19    ever provided independent evaluations for people civilly
20    committed under a sexually violent person or a sexually
21    dangerous person statute?
22    A.    I have.
23    Q.    And that includes reviewing records and providing
24    recommendation concerning release?
25    A.    It does.
```

1    Q.      When you make a recommendation concerning release,

2    what is standard?  What -- when you say someone is, in

3    your opinion, ready for release, what standard are you

4    looking at?

5    A.      My -- I think my standard somewhat revolves around

6    "likely," which is the wording in Florida.  Are they

7    likely to commit a sexually violent act?  Truthfully, I go

8    a lot less far down on likely to where it's unlikely, and

9    I arrive at that through testing.

10   Q.      And so in your practice when you make a

11   recommendation, your recommendation means that to a

12   reasonable degree of medical certainty this person's

13   unlikely to reoffend?

14   A.      Correct.

15   Q.      Have you recommended persons civilly committed for

16   release that have later reoffended?

17           MR. STOBBS:  Objection, relevance, Judge.

18           MR. TYRRELL:  It goes to the credibility of his

19   evaluation process, Your Honor, and he's been challenging

20   the evaluation processes and the annual -- the review

21   processes in this case.

22           THE COURT:  Sustained.  I don't think that's

23   probative at all.  I'm sure everybody that's recommended

24   it has somebody come back.

25   Q.      (BY MR. TYRRELL)  Have you ever provided any

1    evaluations for persons civilly committed in the State of

2    Illinois?

3    A.      I don't believe so, no.

4    Q.      Is this your -- is this case the first time you

5    have had an expert opinion for an Illinois court

6    proceeding?

7    A.      Yes.

8    Q.      Are you aware that the State of Illinois has both

9    a Sexually Dangerous Person Program and a Sexually Violent

10   Person Program?

11   A.      I am.

12   Q.      How many other states to your knowledge have both

13   an SDP and SVP program?

14   A.      I'm not aware of others.

15   Q.      And are you aware there's a distinction between

16   the sexually dangerous person statute and the sexually

17   violent person statute?

18   A.      I am.

19   Q.      To your knowledge, how does someone civilly

20   committed under the Sexually Dangerous Person Program get

21   out of the program?

22   A.      I think they would have a couple different

23   avenues.  One would, to be phased up and do successfully

24   enough in the program that they be recommended for release

25   by the program.  The other would be where they petition

1    for release -- my understanding -- and they would get

2    evaluated, and the evaluators may think that they no

3    longer present a risk and they would be released that way.

4    And then they could oppose both, I think, and go to a jury

5    trial, like Mr. Howe did.

6    Q.      And in terms of the State of Illinois and the SDP

7    program, you understand that the evaluators are employed

8    by a contractual agency?

9    A.      Wexford, yes.

10   Q.      And the first kind of pathway you, you mentioned

11   was recommended for release by the program staff.  Based

12   on your review of the program manual, does Stage Four mean

13   that someone should be recommended for release?

14   A.      Not necessarily.  There could be a lot of

15   different variables involved in recommending someone.

16   Q.      So, from your understanding of the manuals and

17   understanding of processes, someone could be recommended

18   for release from any one of the phases?

19   A.      Theoretically, yes.

20   Q.      I want to talk a little bit about SOCCPN, which I

21   believe we said was -- actually, I'm probably going to end

22   up butchering it.  Could you tell me what SOCCPN stands

23   for?

24   A.      Sex Offender Civil Commitment Program Network.

25   Q.      What more generally is SOCCPN?

```
 1    A.      How it came about, and such?
 2    Q.      No.  Like is it, is it a private company?  Is it
 3    a --
 4    A.      No.  No.
 5    Q.      -- an organization?
 6    A.      It's probably -- you might call it a professional
 7    organization.  I think what they do is, they involve
 8    clinical directors or administrators or whatever you want
 9    to call them.  I know some of the people that are on the
10    board.  So they, they are pulling information from other
11    professionals in a similar role, which would be overseeing
12    a facility.
13    Q.      How many states in, in the United States, if you
14    know, have civil commitment programs?
15    A.      That, I don't know.  I know there were 19
16    responding to SOCCPN.
17    Q.      Okay.  Do you know if Illinois was one of the
18    states responding to SOCCPN?
19    A.      The Rushville program responded.  Not the Big
20    Muddy program.
21    Q.      When you say "responded to SOCCPN," how, how were
22    responses sought?
23    A.      The person who runs that program sends out -- I
24    don't know how he does it, whether he does it by mail or
25    e-mail -- questionnaires where the program directors from
```

1    different facilities would answer the questions.  Then,

2    when they put the information out, they'll disclose how

3    many was the total.  And then in total or in some areas,

4    if somebody elected not to respond to that question or to

5    any questions, they'll disclose that.

6    Q.      Do you know what the responsive rate for the study

7    was?

8    A.      I think it was 19 to 19 responded.

9    Q.      Do you know when the study was conducted?

10   A.      The one I was looking at was 2012.

11   Q.      Okay.  You mentioned this Good Lives Model of

12   treatment.

13   A.      Yes.

14   Q.      When did the Good Lives Model of treatment come

15   about?

16   A.      Probably -- I think it probably really gained

17   widespread steam maybe five years ago, thereabouts?  Maybe

18   more.

19   Q.      Is it your opinion that the Good Lives Model is

20   the only professionally accepted model for sex offender

21   treatment?

22   A.      No, it's not.

23   Q.      So, there are other models out there that are also

24   professionally accepted?

25   A.      Similar, but different names, yes.

1    Q.      Can you give me some other examples?

2    A.      You could use the, just the umbrella term of

3    cognitive behavioral therapy.  I don't think they're

4    exclusive.  I don't think you'd do one and not the other.

5    I think they could be run together.  But if you ask some

6    programs how they run it, they might say Good Lives Model

7    and others might say cognitive behavioral therapy.

8            That's been around for a long time.  That's way

9    back when I was in graduate school.  So, I would say there

10   aren't many more than those two that you would answer

11   with.

12   Q.      And cognitive behavioral therapy is also known as

13   CBT?

14   A.      Yes.

15   Q.      And CBT is a general method for conducting therapy

16   for all sorts of different disorders?

17   A.      It is, yes.  (Pause.)  If I might add --

18           THE COURT:  Doctor?  You answered his question.

19           THE WITNESS:  Okay.

20   Q.      (BY MR. TYRRELL)  Are you familiar with

21   anti-social personality disorder?

22   A.      I am.

23   Q.      And in fact, some of the plaintiffs have been

24   diagnosed with anti-social personality disorder.

25   A.      More than one, as I recall.

Q.      What is anti-social personality disorder?

A.      Well, two basic ideas.  A personality disorder is a diagnosis that doesn't change much over time and so it's put or it used to be put into the same category as something like intellectual problems, because they're not going to really solve themselves over the duration of a lifetime.  So, it has to start in childhood, in order to be diagnosed in an adult; there has to be some evidence that it's long running.

        And then what we'd run into is just somebody doesn't pay much attention to the rules; kind of leads a reckless life; doesn't honor obligations, whether they're financial or marital or whatever.  We would also call it just a criminogenic life-style.  It doesn't have to be crime.  They could go into other occupations, too.  But usually, it's people that use people, is the bottom line.

Q.      One way of saying anti-social personality disorder might be to say someone who manipulates other people to get a benefit out of it?  Is a very, I'm sure, dumbed-down way of saying it?

A.      That's not -- that could be a feature of it but that's not really the components of it.  It would be an enduring over time of a disregard for social norms in a way that's self-serving.

        THE COURT:  Have you got any current popular

```
1    examples of that?  I'm just joking.  I'm sorry.
2          Go ahead, Mr. Tyrrell.
3          MR. TYRRELL:  Thank you, Your Honor.
4    Q.    (BY MR. TYRRELL)  Have you read any studies
5    looking at the Good Lives Model for treating anti-social
6    personality disorder or sex offenders with anti-social
7    personality disorder?
8    A.    I think they're so overlapping when you get into
9    sex offenders, and then say with anti-social personality
10   disorder, that's a pretty overlapping group.  But the
11   research would say that, in all of these therapeutic
12   models, you need to look at either anti-social or
13   narcissism with a certain amount of caution.
14         So, it wouldn't say don't change -- I don't think
15   they recommend changing the treatment or doing something
16   completely different.  Some programs might gear things a
17   little different, but you'd still be in the Good Lives
18   Model.
19   Q.    Based on your understanding of the Good Lives
20   Model, would the Good Lives Model support a peer
21   facilitated group?
22   A.    Yes.
23   Q.    And would a peer facilitated group raise, or could
24   that -- would a peer facilitated group cause you concern
25   to have people with anti-social personality disorders in
```

1     that group?

2     A.      Not particularly.  I wouldn't say anti-social is

3     somebody that's just suddenly inclined towards violence or

4     somebody that's necessarily -- won't participate in a

5     group process.  I think we just have to look at it with

6     caution.

7          The other thing is, anti-social traits start to

8     wane at about 45, so we have to keep that in mind, too.

9     But as we had also talked about in incentive programs, you

10    can somehow get anti-social personalities to be very

11    cooperative because now they're offered an immediate

12    benefit to them, which would mean they would get more rec

13    time or more yard time or more property, or whatever it

14    is.  So, that can be dealt with.

15         THE COURT:  Can I ask a question?  What's a peer

16    facilitative group?  I just want to make sure I understand

17    what we're talking about.  You asked the question, so I

18    know you know what it is; right?

19         MR. TYRRELL:  Yes.  I was referring to one of the

20    plaintiffs talking about peer facilitative groups, where

21    they met in the dayroom area and challenged each other's

22    opinions as part of the therapy, which has since been

23    discontinued.

24         THE COURT:  Thank you.

25    Q.      (BY MR. TYRRELL)  Was that your understanding of

1    my use of the word --

2    A.      Yes, that was my understanding, is that either

3    they will run almost completely as -- yeah, like you might

4    say a self-help group.  Or occasionally, they'll put

5    somebody in there who's in an upper level programming into

6    a lower level programming, and have them help mentor or

7    peer facilitate.

8           THE COURT:  Thank you.

9    Q.      (BY MR. TYRRELL)  Now, I believe you said the Good

10   Lives Model has been picking up steam about five years

11   ago, in terms of sex offender treatment --

12   A.      Correct.

13   Q.      -- programs.  Are there any -- have you read any

14   documents or evidence critiquing the Good Lives Model and

15   challenging it for sex offender treatment programming?

16   A.      There was a challenge, and that's what I was

17   actually going to say earlier.  I had forgotten that there

18   was an older approach and they called it just the Relapse

19   Prevention model.  And it was really similar to an

20   addiction model, where you identify high risk and avoid

21   your triggers and then you'll never have a problem again.

22   And that started falling out of favor when the Good Lives

23   Model came in, which was much more holistic to the person

24   rather than just this one type of behavior.

25           And for a while, there were challenges back and

1  forth.  And what happened is, I think some of the more

2  well-known treatment providers started getting with --

3  that had previously been with the Relapse Prevention

4  model, got on with the Good Lives, and that was sort of

5  the end of the discussion.

6  Q.      I believe you said, and I might be paraphrasing

7  slightly, but the mantra of sex offender -- civilly

8  committed sex offender programs is treatment within the

9  shortest -- release within the shortest amount of time

10  possible.

11  A.      Treat and release, correct.

12  Q.      And I believe you said, at least in Florida, we're

13  looking at three to five years, people entering the

14  program and leaving?

15  A.      Well, when it started in that state in 1999, up

16  until about 2004 or '05, really, very few people were

17  getting out.  And that was one of the problems.  When GEO

18  or Correct Care took over in 2006, people started moving

19  through stages and phases more rapidly.

20        What I'm finding now is, now the men are entitled

21  -- whether they ask for it or not -- a review every year.

22  And many years, it's just a paper shuffle because they're

23  just simply not ready.  But then after about three or four

24  years, and if they're in Stage -- in this one, it would be

25  Stage 2-2, they will usually go into court and many, many

```
 1    of them are getting out now, yes.
 2    Q.      And I believe you said the Florida system adopted
 3    a Good Lives Model or some sort of modified version of the
 4    Good Lives Model in 2006?
 5    A.      What happened was, when GEO took over, they got a
 6    consultant from Canada to come in and help them figure out
 7    how to develop an up to date and functional treatment
 8    facility.  That consultant came in, helped them with the
 9    contract negotiations.  When they were awarded the
10    contract, they offered him a job there.  And he took over
11    in 2006, and he brought that model in with him.
12    Q.      The other states that have SDP or SVP programs,
13    how many others have adopted the Good Lives Model?
14    A.      You know, that might be in the SOCCPN chart, but I
15    don't know off the top of my head at all.
16    Q.      If a program -- if a civil commitment Sex Offender
17    Program is successful, would you expect to see people
18    released on an annual basis?
19    A.      What do you mean?  That each year some people
20    would be getting out?
21    Q.      Yeah.
22    A.      Probably, yeah.
23    Q.      Okay.  Doctor, I want to turn your attention back
24    to Plaintiff's Exhibit 53.  And, Doctor, as a general
25    question concerning your reports, you often used the
```

```
 1    phrase "most states."  Are you familiar with --
 2    A.      What --
 3    Q.      "Most states."
 4    A.      "Most states," okay.
 5    Q.      What do you mean by "most states"?  I could point
 6    to a specific example, if that helps.
 7    A.      Yes, would you please?
 8    Q.      Sure.  I'll come back to that, Doctor, as I go
 9    through your report.  I'm sure I'll find an example but,
10    on the spot, I can't point to it, but.
11            Do you happen to know what the national standard
12    is for treating and releasing people civilly committed
13    under the Sex Offender Program?
14    A.      As far as what the average duration of time is?
15    Q.      Yes.
16    A.      I do not.
17    Q.      From my reading of your first report, which is
18    Plaintiff's Exhibit 53, I believe one critique of the
19    program you have is deficiencies in training among the SDP
20    program staff members.
21    A.      Okay.
22    Q.      Did I understand that correctly?
23    A.      That was an initial concern, yeah, early on.  I
24    don't think I mention that in my second report.
25    Q.      Do you still have that concern?
```

1    A.      On some level, yes.

2    Q.      Why?

3    A.      Part of it was having to do with erratic ratings.

4    I think it's in evidence already about where a resident

5    would be rated on what should be an objective test taken

6    off the SOTIPS scale, and one year you get a 35 and the

7    next year you get a 70.  There shouldn't be that much

8    variability in a fixed test like that between two

9    clinicians, if they're both properly trained.  So, one of

10   them had to be wrong or they're both wrong.

11           There was also my concern about the variability of

12   diagnoses without explanation.  If you are -- even if you

13   didn't make the change in diagnoses but a change was made,

14   there should be some mention or acknowledgment of the fact

15   that you see and understand and either agree or don't

16   disagree with the change in someone's primary diagnoses.

17   Q.      When you are referring to this --

18   A.      Do you want me to go on?  That was it?  Okay.

19   Q.      Oh --

20           THE COURT:  Were you done?

21   A.      I was pretty much done, yeah.

22   Q.      (BY MR. TYRRELL)  Apologize.  I didn't mean to cut

23   you off.  But when you were referring to evaluations, are

24   you referring to the petitions for recovery or semi annual

25   evaluations?

1    A.       Semi annual at the facility.

2    Q.       Okay.  When you are concerning diagnoses, are you

3    concerning the diagnoses contained in treatment records at

4    the SDP program or the diagnoses of the evaluators for

5    petitions for recovery?

6    A.       Both.

7    Q.       Okay.  Doctor, I think you said, in terms of an

8    average session or a therapy session, the national average

9    is 1.7 hours; is that accurate?

10   A.       Per group, correct.

11   Q.       Per group.  Can a one-hour group be effective, in

12   your opinion?

13   A.       Depending on how many people are in it, and it

14   would depend on the topic.

15   Q.       Would you agree with me that the hour, number of

16   hours for one particular session doesn't necessarily speak

17   to one way or the other about whether or not a session's

18   effective -- I -- strike that.

19         Is it possible a session can be too long and

20   become ineffective?

21   A.       Sure.  It would have to be quite long but, yeah,

22   that could happen, too.

23   Q.       Isn't it possible a three-hour session, the

24   session could become ineffective?

25   A.       I ran three hours and we take a break in the

1    middle of it.  And I found it effective because we could
2    deal in a timely way both with immediate concerns,
3    facility concerns that -- because they knew I was a Team
4    Leader, so they were coming to me with all their problems
5    -- and we could get past that and then we could start
6    getting into some real issues.  It also allowed time, if
7    somebody became the focus of the group, that it didn't
8    completely take away from the other people that one person
9    had become the focus of the group.  And then we could talk
10   about homework assignments and what we're going to do
11   between now and the next group.  I thought it worked
12   pretty well.
13   Q.     When you say someone's the focus of a group, are
14   you saying that these groups shouldn't be, you know,
15   examining someone's treatment plans and shouldn't be
16   challenging their opinions?
17   A.     It shouldn't be doing that?
18   Q.     Shouldn't be, like other group members.
19   A.     I think it could do that, too.
20   Q.     Okay.  I believe you testified earlier that a
21   program only moves at its slowest person, or something to
22   that effect.
23   A.     Something to that effect, yes.
24   Q.     Okay.  When you -- in practice, and would you
25   expect that groups are to be arranged by skill levels,

1    meaning reading and writing ability?

2    A.      Is that my experience?

3    Q.      Yeah.

4    A.      It is.

5    Q.      And you also -- would you arrange groups based on

6    their level in their treatment?

7    A.      There would be a couple ways.  You could do a

8    special needs track, which would be the guys that are slow

9    learners, but they would still have the same stages and

10   phases of treatment.  And some facilities actually do a

11   separate track for the guys that are hard core

12   anti-socials, and -- but they have the same stages and

13   phases of treatment.

14   Q.      So, is it fair to say you would also take, in

15   addition to level and treatment, you would also take

16   diagnoses in arranging treatment groups --

17   A.      Um --

18   Q.      -- into consideration?

19   A.      More the intellectual diagnoses.  I don't think, I

20   don't think separating people out as rapists or pedophiles

21   is all that beneficial.  You would consider it, but I

22   don't see the need to do it.  But it would be more about

23   their capacity.  Because some of the men are extremely

24   intelligent and have gone to college and such, and some of

25   them are functionally illiterate, or worse.  And so when

1    you run one group with both men in it, both men like that,
2    the one is going to slow down the group and the other one
3    is going to start getting bored and anxious, which is a
4    bad thing.
5    Q.      I might have been using the wrong terminology.  It
6    might have been a poorly phrased question.  But would you,
7    for example, have one group of just anti-social
8    personality -- persons diagnosed with anti-social
9    personality disorder?  So, would you arrange groups
10   specifically by one mental illness and only focus on that
11   mental illness?
12   A.      No.  From what I see or what I have experienced,
13   is everybody follows the general same curriculum but
14   they're being separated out because of the impact they
15   could have on the group as a whole.  But each track is
16   following the same outline.
17   Q.      I want to shift gears a little bit and talk about
18   your critiques of the funding of the program.  To your
19   knowledge, has any Big Muddy River Correctional Center SDP
20   program request been denied, in terms of funding?
21   A.      Well, as I had said before, I asked about that.
22   And I had asked both when I was corresponding with Mr.
23   Howe, and then I asked it later when I was writing my
24   second report, and I wasn't provided information on
25   funding except what I got through the men at the facility.

1    Q.      So, your only basis or understanding of the

2    funding at Big Muddy River Correctional Center and the SDP

3    program is based on the plaintiffs?

4    A.      Well, my consideration was that it, it appeared to

5    be a tight limit of resources due to funding.  If there's

6    some other reason, then that's even more concerning to me.

7    If it's by design, that would be a bigger problem.  When I

8    received information that they weren't separately budgeted

9    -- and there were some depositions I read from Dr. Holt

10   that appeared to relate to funding -- I assumed that's

11   what it was.

12   Q.      Are you familiar with any other civilly committed

13   program where people are civilly committed or kept in the

14   same facility as people that have been criminally

15   convicted?

16   A.      There may be.  I'm not aware of them, no.  But

17   that was actually part of -- and I know in Florida and

18   Minnesota and Washington, that was a part of the initial

19   structure of the law, that they should not be housed in

20   the same facilities because it runs too close to appearing

21   punitive.

22   Q.      You would agree with me, there are certain safety

23   and security concerns about working in a prison?

24   A.      There are.

25   Q.      I want to turn your attention to your latest

| | |
|---|---|
| 1 | report which was admitted into evidence as Plaintiff's |
| 2 | Exhibit 55.  In this fifth paragraph down starting "as a |
| 3 | result of the low staffing the groups" and then it |
| 4 | continues on, you mentioned specifically number of hours. |
| 5 | What documents were you reviewing to determine the number |
| 6 | of hours of treatment for the plaintiffs in this case? |
| 7 | A.      You mean the one hour a week? |
| 8 | Q.      Yeah. |
| 9 | A.      Sign-in sheets, statements from Dr. Holt, |
| 10 | statements from the men at the facility.  There were also |
| 11 | group sheets submitted by the counselor that would give |
| 12 | the time of the group.  I didn't see anything that |
| 13 | contradicted one hour a week. |
| 14 | Q.      Okay.  In the very bottom of -- in the very last |
| 15 | sentence of that paragraph, you say:  "Further, there was |
| 16 | a mention of a 38 percent cancellation rate of these |
| 17 | groups." |
| 18 | A.      Yes. |
| 19 | Q.      Do you see that?  Where did you come up with that |
| 20 | number? |
| 21 | A.      I think one of the men, and I'm not certain, had |
| 22 | done a tally.  And what I didn't know if that was related |
| 23 | to heat because it was said in a deposition that groups |
| 24 | are cancelled if it's too hot, and those sort of came |
| 25 | together in what I looked at.  So, the 38 cancellation was |

1    either heat and other reasons, or just as a result of some
2    sort of policy about heat.
3    Q.      In the second page of Plaintiff's Exhibit 55, you
4    state:  "Both the staff ratio and the group sizes go
5    against the standards as listed in the Illinois Sex
6    Offender Management Board's Administrative Code."
7    A.      Yes.
8    Q.      Where in the Administrative Code of the Sex
9    Offender Management Board does it state that?
10   A.      It says it in the edition before the 2018, and it
11   specifically says that group sizes should be limited, I
12   think, 12 -- no greater than 12, was from Sex Offender
13   Management Board previous policy.
14           And what was your other question?
15   Q.      I believe that was my -- I think that answered my
16   question.
17   A.      Okay.
18   Q.      But, Doctor, I noticed when you were answering
19   that question you looked at some papers in front of you.
20   Tell me what those are.
21   A.      Essentially, I wrote a list of columns which would
22   be -- I just -- it's just numbers because I'm not -- I
23   don't have a great memory, as it turns out -- which would
24   be the national average, and then in the middle would be
25   Rushville, when we talk about that, and then the far

1    column would be the case at Big Muddy.

2    Q.      When you are referring to these national average

3    numbers, is this coming from the SOCCPN data?

4    A.      It is -- yes, it is.

5    Q.      Okay.  And the SOCCPN data hasn't been introduced

6    into this proceeding as an exhibit for evidence; correct?

7    A.      Well, that I don't know.  But the reason I

8    hesitated was, some of the numbers that I hold to also

9    come from ethical guidelines of professional

10   organizations.  So, like group size might have to do with

11   the American Counselor Association or with ATSA.  So, most

12   of them are covered by SOCCPN, but they are also

13   additionally covered by other places.

14   Q.      In the last full paragraph of page two of

15   Plaintiff's Exhibit 55, towards the very last sentence, it

16   states:  "It is also not clear the program uses a

17   recognized arousal management program which necessarily

18   includes a PPG."

19   A.      Yes.

20   Q.      What's a PPG?

21   A.      Penile plethysmograph.

22   Q.      More generally speaking, what is this?

23           THE COURT:  What page are we -- where are we?

24           MR. TYRRELL:  Page two of Plaintiff's Exhibit 55,

25   last sentence of the last full paragraph.

1          THE COURT:  Oh, okay.

2     A.      What is it or what do we call it?

3     Q.      (BY MR. TYRRELL)  What is it.

4     A.      It is -- it's a -- I forget what you call those

5     types of tests, like a polygraph.  But it's a physical

6     test and it detects arousal at a very minimal level in

7     men.  They have to consent to do it, of course.  And it

8     gives a graph result kind of like a polygraph would, a

9     line result, when the men see different types of stimuli

10    in some PPG's, or if they hear it auditory in other PPG's.

11    And so they might do children; they might do coercive,

12    like a rape scenario; and then do young, teen, adult.  And

13    try to see if the men are responding to some specific

14    portion of that group.

15    Q.      Based on my reading of this report, a PPG in your

16    opinion is necessary in terms of evaluating a sex

17    offender's -- a civilly committed sex offender's treatment

18    process?

19    A.      No.  No.  Personally, I don't think a PPG should

20    ever be brought into court and say he's better or not

21    better.

22            What I had said was that if a program is saying

23    they are using an arousal management program, that that's

24    part of the module or that's part of the training that

25    they're saying they do, you would almost necessarily have

1    to have a PPG in there to see if it's working.  Because,

2    needless to say, you can't take their word for it.  "Do

3    you still find that attractive?"  "No."  You know.  So,

4    you have to get some sort of biological measure of, do

5    they still find that arousing.

6    Q.       Other critiques of the PPG?

7    A.       Not that I'm aware of.

8    Q.       Have you looked or reviewed any research or --

9    A.       Yeah, I was actually trained in it when I worked

10   at the Florida Civil Commitment Center.  I have seen it

11   come in and out of court for the last 15 years.  I don't

12   think it's -- like a polygraph, I don't think it should be

13   used as, you know, "he is one" or "he isn't one," but I

14   think as a part of treatment it's critical, particularly

15   when you get guys that are in advanced stages of

16   treatment, they are no longer in denial, they're

17   motivated, and you start working on arousal management,

18   which would almost be akin to like a systematic

19   desensitization where they just don't get triggered by

20   seeing or hearing that kind of thing anymore.  And you do

21   it gradually over time with workbooks.

22   Q.       I'm going to turn your attention to the third page

23   of your report.  In the third full paragraph, you seem to

24   raise some criticism or at least some questions of the

25   diagnosis of sexual sadism.

```
1    A.      Yes.

2    Q.      What is sexual sadism?

3    A.      Sexual sadism is a pretty high bar.  And I have

4    met my fair sure, unfortunately, but it is not simply

5    rape.  It is where -- and this sounds pretty jaded -- but

6    it's where somebody continues to hurt the victim beyond

7    what was necessary to commit the crime.  They take

8    pleasure in torture.  They burn the victims with

9    cigarettes.  They get off on suffering.  That's pretty

10   high bar.  So, a simple rape, or even several of them,

11   generally wouldn't qualify for sexual sadism.

12   Q.      Would you agree with me that not everyone with a

13   sexual disorder is civilly committed?

14   A.      Absolutely.

15   Q.      And in fact, the people that are civilly committed

16   are perhaps, you know, the -- either the people that are

17   caught the most or the people that have the most severe

18   sexual disorders; correct?

19   A.      Ideally.

20   Q.      Ideally, it would be the most severe sexual

21   disorders?

22   A.      It would be the most dangerous, ideally.

23   Q.      So, wouldn't you expect to see a rise in these

24   more uncommon sexual disorders among the most severe

25   population?
```

```
1    A.      I have seen sexual sadism very, very few times
2    that there wasn't some argument about how somebody arrived
3    at that diagnoses, and it was horrific.  And if you -- and
4    I knew who this label was applied to and I looked at his
5    files.  That's not sexual sadism.
6    Q.      And so that was Mr. Howe you are referring to?
7    A.      Correct.
8    Q.      And you reviewed Mr. Howe's files?
9    A.      There can be a diagnosis for a nonconsensual
10   sexual activity, it's call paraphelia NOS nonconsent.
11   That's where somebody commits rape.  I don't know his
12   legal case, but if that was the case that's what you would
13   diagnose it.
14           To go from a paraphelia NOS nonconsent to a sexual
15   sadism would have to be a string of victims who were
16   injured for his gratification.
17           MR. TYRRELL:  One moment, Your Honor.
18           (Pause.)
19   Q.      (BY MR. TYRRELL)  Doctor, I just have a few more
20   questions for you.  In any of your work experience have
21   you had any training in prison safety and security
22   measures?
23   A.      Yes.  If you look at my vitae, when I was a Team
24   Leader -- I forget what they called me but, it's kind of
25   silly, actually -- but I got trained as a Hostage
```

1    Negotiator Team Leader for the facility because they

2    actually did have a riot at the place that I worked at,

3    and they needed somebody on-site that would be on call in

4    case another riot occurred.  And I got trained by an

5    outside agency, and they went through a lot of the

6    correctional stuff, what's protocol and what are the

7    rules, and all that kind of stuff.

8    Q.      Would you agree with me then, that in a prison

9    setting sometimes a safety and security concern might

10   impact treatment?

11   A.      It can, sure.

12   Q.      For example, have you ever been in a situation

13   where there's a prison lockdown?

14   A.      Yes, I have.

15   Q.      In that case, a lockdown, necessarily group

16   therapy cannot take place?

17   A.      Correct.

18   Q.      As part of the documents you reviewed, I think

19   specifically Plaintiff's Exhibit 1, I believe you said you

20   reviewed the Rushville Treatment and Detention Center's

21   schedules?

22   A.      Yes.  I don't think it was 1 but, yes.

23   Q.      Okay.  It was one of the exhibits that was --

24   A.      Yes.

25   Q.      -- reviewed.  Is the Rushville Treatment and

```
 1    Detention Center treatment schedule the only

 2    professionally accepted schedule?

 3    A.      No.

 4    Q.      And is the Rushville Treatment and Detention

 5    Center treatment plan the only professionally accepted

 6    plan?

 7    A.      No.

 8            MR. TYRRELL:  Thank you, Doctor.  Those are all

 9    the questions I have at this time.

10                    REDIRECT EXAMINATION

11    BY MR. STOBBS:

12    Q.      Dr. Cauley, did you need to talk to Dr. Holt or

13    anyone else at Big Muddy to reach your opinion?

14    A.      I did not.

15    Q.      Did you need to walk through both wings to reach

16    your opinion?

17    A.      I did not.

18    Q.      And you were asked questions about the SDP and SVP

19    program; do you remember that?

20    A.      I do.

21    Q.      And they're both mental disorders?

22    A.      Correct.

23    Q.      Just because one has a different consonant, D

24    versus V, do the people receive different treatment?

25    A.      It would be the same disorder, so it would
```

1    probably be the same treatment.

2    Q.      And would SOCCPN apply to both of those?

3    A.      It would.

4    Q.      SOCCPN, is that something that -- would you tell

5    Judge Yandle how SOCCPN came about?

6    A.      Well, my understanding was, it was a network of

7    facility administrators or directors that were talking

8    behind the scenes of some of the professional

9    organizations, and then they started to put out surveys.

10   I know one of the surveyors, Rebecca Jackson, worked at

11   the Florida Civil Commitment Center.  Another one, Shan

12   Jumper, works at Rushville.  And these people come

13   together and share their knowledge and information about

14   being the administrator of a commitment program.

15            THE COURT:  Is SOCCPN a set of guidelines?  Is it

16   something that's in written form or is it --

17            THE WITNESS:  It's -- usually comes -- it's

18   available online, and then they'll present it in -- at

19   something like an ATSA conference, they'll get a slated

20   thing.  And it's not guidelines as much as information

21   about what everybody else is doing.

22            And more -- beyond what we talked about, it will

23   also go into issues of like:  How do you deal with

24   personal property?  How do you deal with food?  How do you

25   -- what kind of jobs do you give the guys?  And it just

1    goes through the whole -- and then, who do you hire?

2              THE COURT:  But it's published data?

3              THE WITNESS:  It is.

4    Q.    (BY MR. STOBBS)  And Rushville responded to these

5    surveys; is that correct?

6    A.    Correct.

7    Q.    What does it mean to you if you have in the same

8    state that one facility responds and the other one just

9    ignores the survey?

10             MR. TYRRELL:  Objection, Your Honor, calls for

11   improper opinion.

12             THE COURT:  Overruled.

13   A.    I -- I'm not sure if they didn't -- if Big Muddy

14   elected not to respond or Big Muddy wasn't invited.  I'm

15   not really sure which it was.

16   Q.    (BY MR. STOBBS)  Assume that they were invited to

17   respond and didn't.  What would your opinion be?

18             MR. TYRRELL:  Objection, Your Honor, calls for

19   speculation.

20             THE COURT:  Sustained.

21   Q.    (BY MR. STOBBS)  Do you know what model Big Muddy

22   follows?

23   A.    Well, I don't know if I saw it specifically, but I

24   would, I would guess looking at the core groups and

25   looking at the other things that they are running under a

1    Relapse Prevention model.

2    Q.      In your opinion, which is the better standard?

3    The good vibes model or the relapse model?

4    A.      You know, there was a lot of publication came out

5    from some of the big people in the area, one of them being

6    Tony Ward, who does a lot of work with treatment.  And

7    there was a decline in the Relapse Prevention because it,

8    it was really very similarly modeled after addiction,

9    where you identify the singular problem is that you are an

10   alcoholic, and then start to deal with the triggers and

11   high risk.

12          So, if we look at some of the work like Mr. Howe

13   submitted, that would follow that, where he went into:

14   What's my trigger?  What's my cycle?  Specific to the

15   offending.  But it didn't take into account all of the

16   other rest of the person.  That might work in the

17   community for someone who is an alcoholic, who has a job,

18   and is married and has kids and stuff.

19          But with this type of population, usually you have

20   so many other issues of their family background, their

21   values, their ethical things, that you'd use a Good Lives

22   Model.

23   Q.      What challenges to the Good Lives Model have been

24   made in say the last two or three years?

25   A.      None.  None that I'm aware of.

```
 1   Q.      Do you consider that the gold standard?

 2   A.      At this time, yes.

 3   Q.      When you were talking to the Attorney General, you

 4   indicated that the anti-social disorder starts to wane at

 5   age 45?

 6   A.      40, 45, yes.

 7   Q.      Why is that?

 8   A.      That's not my opinion, that's in the DSM-V.

 9   Q.      Okay.

10   A.      And the reason it's in the DSM-V, and they talk

11   about it in there -- which is the Diagnostic Statistical

12   Manual for psychiatry and psychology, whatever -- they

13   talk about it as, it could be a combination of things.

14   Probably, it could be hormonal change.  It could be that

15   at the age of 45 or 50 -- and it's usually men that always

16   do these kind of things -- they start to get some

17   investment or they start to have some concern about where

18   they live and what they do, that they may not have had at

19   20.

20           But I have seen it happen, where you take the

21   declining risk in certain of these disorders and you

22   overlay it with the hormonal change in men, they're pretty

23   much matched up.

24   Q.      Their testosterone dries up?

25   A.      Yeah.  Yeah.
```

Q.      You indicated that on the treat and release and
the shortest time possible in Florida, that there are some
situation where it's reviewed every year?

A.      Correct.

Q.      Could you tell Judge Yandle why that is?

A.      Starting from the date that a person is committed,
often by jury, sometimes they self-commit.  Every year, it
comes up on the calendar that they're entitled to a
hearing.  That's done through the public defender's office
or private attorney.  And what will happen is -- it would
have to be the public defender or the individual,
actually, that would initiate moving forward.  Typically,
two, three years might go by where the attorney basically
says, *we're not going to do anything this year*, and then
the next year, *we're not going to do anything*.  Then there
comes a point where the person is in an advanced level of
programming and they can find some expert that will
support them, and then they petition for a probable cause
based on having an expert.  And then the State would
respond by hiring their own.

Q.      And you indicated there's a paper shuffle.  What
is that?

A.      The first couple years, they still have to come up
in front of the court, they still have to have their
moment, but then the attorney would say, "We're not going

1  to do anything this year," and it's signed and sent away

2  for that year.

3  Q.      The General asked you if you expect to see people

4  released on an annual basis.

5  A.      He did.

6  Q.      And you said that that -- you thought that they

7  should.

8  A.      If I understood the question correctly, yes.

9  Q.      Do you expect people be, not be released after say

10 40 years?

11 A.      No, I would not expect that at all.

12 Q.      Do you expect people to still be civilly committed

13 who are in a wheelchair with COPD and can't walk, and are

14 70 years old?

15 A.      I would not.

16 Q.      And is that because they don't pose a danger?

17 A.      It would be a combination of things.  It would be

18 the change in their diagnoses over time.  It would be the

19 change in their risk based on risk reduction and age.  It

20 would be -- then you would go into things like physical

21 mobility and stamina, which it's hard to commit crimes

22 when you can't move around very well.

23 Q.      And you can't get away from your oxygen tank.

24 A.      Correct.  So, all these things come together in a

25 good evaluation.

1    Q.      And you were talking about, with the General,

2    about the, what Big Muddy has -- the funding.  Do you

3    remember that?

4    A.      I do.

5    Q.      And do you know what they have requested?

6    A.      I do not.

7    Q.      Do you know if they have requested anything?

8    A.      I do not.

9    Q.      And I -- you talked about, you relied on various

10   different things.  I'm going to show you Plaintiff's

11   Exhibit 10, which has already been admitted into evidence.

12   And do you remember looking at that for -- when you --

13   before you prepared your report?

14   A.      I did.

15   Q.      And could you tell Judge Yandle what you relied on

16   and what that meant to you, Exhibit 10?

17   A.      Is there a second page to this?

18   Q.      Yeah.  There you go.

19   A.      It -- there were two, actually, documents.  I

20   don't know if it was on the first page, but somebody had

21   inquired about this and they said that there was not a

22   separate budget.  There was not a separate budget

23   facility.  And then this one says that there have been no

24   expenditures specific to this program.

25   Q.      What does that mean to you?

1    A.       Well, that's part of the reason I requested some

2    information further about the financial.  I'm not sure

3    what it means.  If they're, if they're in this -- I could

4    wonder if they're in the correctional facility and they're

5    not being budgeted at all, but they're continuing to --

6    I'm not really sure what it means, that they have asked

7    for no expenditures.

8    Q.       And you indicated that, in Washington, it was too

9    close to being punitive?

10   A.       Yes.

11   Q.       How about Big Muddy?

12   A.       I would think it would fall under the same

13   concern.

14   Q.       You were talking about the PPG.  Do you remember

15   that?

16   A.       Yep.

17   Q.       And is poly -- taking a polygraph part of

18   treatment, as well?

19   A.       It usually is.  It's not usually used specific to

20   the offenses, as to whether or not you did them.  What,

21   what happens is, somebody has to usually present a full

22   history in the group setting.  They present a full history

23   that includes all their sexual crimes.  Ideally, ones you

24   have not been charged with, either.  So, you include

25   everything.

```
 1              Then when they go to the polygraph, before they
 2    advance to the next stage, the polygraph is basically, Is
 3    this accurate?  Is this history accurate?
 4              What you will run into is men that might own up to
 5    several and deny others, but they pass as accurate.  And
 6    that's where that comes in.
 7    Q.      And when you were talking about the most serious
 8    sexual disorders -- do you remember that?
 9    A.      I do.
10    Q.      Do those, do those people deserve treatment?
11    A.      Absolutely.
12              MR. STOBBS:  I have no other questions, Judge.
13              MR. TYRRELL:  I don't have any followup, Your
14    Honor.
15              THE COURT:  I just have a couple for you, Doc.
16                        EXAMINATION
17    BY THE COURT:
18    Q.      In your review of this case, of the materials in
19    this case, did you gain any knowledge or become familiar,
20    at least generally, with the judicial process whereby
21    program participants can -- I guess they call it recovery
22    petition?
23    A.      Yes.
24    Q.      Are you generally familiar with that process and
25    how that goes in the State of Illinois?
```

1    A.      To a limited degree.  I know it happens.  I know

2    Mr. Howe went through it and I learned about it that way.

3    Q.      Are you familiar with the similar -- I guess all

4    programs have a similar process -- all states that have

5    the statute, there is a process by which the civilly

6    committed can go back to court at some point in time and,

7    and seek discharge or conditional discharge?

8    A.      I think the difference being that often they're

9    triggered at the judicial level rather than at being the

10   responsibility of the men to, to petition.

11   Q.      Okay.  Well, let me just ask you this:  Based on

12   your review of the information in this case, can you give

13   me an idea or tell me, when there is a recovery petition

14   that goes to certain -- goes back to the Circuit Court for

15   determination, what the court -- what information the

16   court considers?

17          In other words, I'm interested in, do they

18   consider the actual evaluative documents from the program

19   or is -- what information -- do you have an understanding

20   as to what they, what they consider in making their

21   determination?

22   A.      In this situation?

23   Q.      Yes.

24   A.      In this state?

25   Q.      Yes.

```
1    A.      I do not, no.

2            THE COURT:  All right.  I have nothing.

3            All right.  Another good time for a break.  Why

4    don't we go ahead and take a break for lunch until 12:50.

5            Mr. Stobbs, are you going to have any other

6    witnesses after --

7            MR. STOBBS:  No, ma'am.

8            THE COURT:  Or are you going to rest?

9            MR. STOBBS:  We would rest.

10           THE COURT:  Okay.  Well, why don't we do this.

11   Plaintiffs are resting.  Why don't we come back at 1:00 --

12   we'll come back at 1:00.  We'll take up the Rule 50

13   motions at the close of plaintiffs' case.  And then,

14   assuming that, that we're going to go forward, then we can

15   begin with the defendant's case.

16           (Court recessed from 11:49 a.m. to 1:00 p.m.)

17           (Proceedings continued in open court, parties

18   present.)

19           THE COURT:  Do we need to take up motions at the

20   end of plaintiff's case?

21           MR. ROCKERSHOUSEN:  Your Honor, the defendants are

22   not making a motion at this time.

23           THE COURT:  Okay.

24           MR. SPREHE:  Neither are the plaintiffs, Your

25   Honor.
```

```
 1          THE COURT:  All right.  We are in the defendants'
 2   case.  The defendants may call their first witness.
 3          MR. ROCKERSHOUSEN:  Your Honor, the defendants
 4   call Warden Daniel Sullivan to the stand.
 5          (Witness sworn by clerk.)
 6          THE WITNESS:  Daniel Sullivan, S-U-L-L-I-V-A-N.
 7                       DANIEL SULLIVAN,
 8   having been first duly sworn, was examined and testifies
 9   as follows:
10                       DIRECT EXAMINATION
11   BY MR. ROCKERSHOUSEN:
12   Q.     Good afternoon, Warden Sullivan.
13   A.     Good afternoon.
14   Q.     You are currently the Warden at Big Muddy River
15   Correctional Center?
16   A.     Correct.
17   Q.     How long have you been the Warden at Big Muddy?
18   A.     I was appointed the Acting Warden June of last
19   year.  Official capacity, I believe it was July 14th of
20   last year.
21   Q.     And how long have you worked for the Illinois
22   Department of Corrections?
23   A.     Twenty-eight years, eleven months.
24   Q.     And how long have worked at Big Muddy River
25   Correctional Center?
```

1    A.       Since August of 1996.

2    Q.       What other assignments have you held at Big Muddy

3    besides warden?

4    A.       A Correctional Officer, temporarily assigned as a

5    Sergeant, Lieutenant, Captain, Shift Commander, Security

6    Specialist, Assistant Warden of Operations.

7            THE COURT:  I'm sorry.  What was that last one?

8            THE WITNESS:  Assistant Warden of Operations.

9            THE COURT:  Okay.

10   Q.       (BY MR. ROCKERSHOUSEN)  As Warden of Big Muddy

11   River Correctional Center, are you familiar with the

12   policy and procedures in effect at that facility?

13   A.       Yes, sir.

14   Q.       At this time, I'd like to show you what's been

15   previously marked and admitted as Plaintiff's Exhibit 2.

16   And what is that document?

17   A.       That's the Inmate Orientation Manual.

18   Q.       And are both criminally convicted and civilly

19   committed offenders given a copy of this manual when they

20   arrive at Big Muddy River Correctional Center?

21   A.       I do believe so, yes.

22   Q.       And does this manual weigh out the policies and

23   procedures that apply to both criminally convicted and

24   civilly committed offenders that reside at Big Muddy?

25   A.       Yes.

1    Q.      As Warden, are you familiar with the disciplinary

2    procedure for offenders at Big Muddy?

3    A.      Yes, sir.

4    Q.      And is there an Adjustment Committee at Big Muddy?

5    A.      Yes, sir.

6    Q.      And what is the Adjustment Committee?

7    A.      The Adjustment Committee is made up of hearing

8    investigative officers, actual hearing officers and, for

9    lack of better terms, the court, that consisting of two

10   members.

11   Q.      And the Adjustment Committee hears disciplinary

12   tickets that are issued to both criminally and civilly

13   committed offenders; correct?

14   A.      Correct.

15   Q.      Is segregation one of the kinds of discipline that

16   the Adjustment Committee can recommend?

17   A.      Yes.

18   Q.      And as Warden, do you approve of any discipline

19   recommended by the Adjustment Committee or your designee?

20   A.      I have to approve and disapprove it.

21   Q.      What kind of offenses can an offender, both

22   criminally and civilly committed, be sent to segregation

23   for?

24   A.      Assault, both on staff or other inmates; dangerous

25   contraband; threats and intimidation; repeated offenses

1    of, of certain natures.

2        THE COURT:  Of what?

3        THE WITNESS:  Of certain natures.  Multiple,

4    multiple offenses.

5    Q.    (BY MR. ROCKERSHOUSEN)  If a civilly committed

6    offender -- which you understand to mean a sexually

7    dangerous person or SDP; correct?

8    A.    Right.

9    Q.    If one them is issued a ticket for disobeying a

10   direct order, is that a ticket that could result in

11   placement in segregation?

12   A.    It could, yes.

13       THE COURT:  Direct order of who?  I'm sorry, I

14   just ask for clarification.  Mr. Rockershousen, could you

15   clarify?

16       MR. ROCKERSHOUSEN:  I'm sorry.

17   Q.    (BY MR. ROCKERSHOUSEN) In what circumstances could

18   disobeying a direct order result in segregation?

19       THE COURT:  No, I meant clarify, you mean a direct

20   order of the program staff or a direct order of the

21   correctional staff?

22   Q.    (BY MR. ROCKERSHOUSEN)  When you say "disobeying a

23   direct order," what do you understand that to mean?

24   A.    First and foremost, correctional staff.  SDP staff

25   are allowed and sometimes are required to write IDR's, as

1    we call them, Inmate Discipline Reports.

2         THE COURT:  I understand.  I'm just trying to get

3    to -- you asked him whether the disregard of a direct

4    order can result in segregation.  I'm trying to understand

5    whether it's the same, whether it's a direct order of

6    program staff or direct order of correctional staff.  Is

7    there any difference?  In other words, can a program

8    participant end up in segregation for disregarding a

9    direct order of program staff?

10        THE WITNESS:  Yes.

11   Q.    (BY MR. ROCKERSHOUSEN)  And what are the

12   circumstances in which that could happen?

13   A.    In regards to disobeying a direct order?

14   Q.    Yes.

15   A.    Refusing housing.

16   Q.    And when you say "refuse housing," is that when an

17   offender is ordered to move to a cell and they refuse to

18   go?

19   A.    Yes.

20         (Pause.)

21         THE WITNESS:  May I elaborate on that, ma'am?

22         THE COURT:  Sure.

23   A.    When I say "refuse housing," now that is part of

24   the security makeup.  The SDP staff works with our

25   placement officer.  So, the actual order would come from a

1    security personnel.  I can't honestly think -- and I might

2    be wrong -- I can't honestly think of a time that a SDP

3    program staff would have given that order.  That would

4    have had to have come from one of our security personnel.

5            THE COURT:  So, in order to be subject to

6    segregation, the order would have had to -- would have had

7    to come from IDOC security staff?

8            THE WITNESS:  Yes, ma'am.

9            THE COURT:  That's all I was trying to get, that

10   clarification.

11           THE WITNESS:  Okay.

12           THE COURT:  Thank you.

13   Q.      (BY MR. ROCKERSHOUSEN)  And are you familiar with

14   the dress code for sexually dangerous persons at Big

15   Muddy?

16   A.      Yes.

17   Q.      And what is the dress code?

18   A.      Blue pants, blue shirt, ID.

19   Q.      And why aren't the SDP's allowed to wear whatever

20   they want?

21           MR. SPREHE:  Objection, Your Honor, foundation.

22           THE COURT:  Overruled.

23           You can answer.

24   A.      It's part of the programming requirement.

25           THE WITNESS:  Stop me if I go too far on this,

```
 1   ma'am.
 2          THE COURT:  I will, trust me.  Go ahead.
 3   A.      How do I say this?  By them wearing -- coming out
 4   and getting dressed every day, being on the deck dressed
 5   properly, I see a lot more respect for each other, a lot
 6   more organization.  Does that make sense?
 7   Q.      (BY MR. ROCKERSHOUSEN)  Yes.  Thank you.  Are
 8   there also criminally convicted inmates that are housed at
 9   Big Muddy River Correctional Center?
10   A.      Yes, sir.
11   Q.      Are there any security concerns with allowing
12   SDP's to wear civilian clothes?
13   A.      Absolutely.
14   Q.      And what are those security concerns?
15   A.      General population would have a big problem with
16   that.  That could turn into a very serious security issue.
17   If they are allowed to wear general population clothes or,
18   or street clothes, per se, it would be very easy for them
19   to walk out during a visit or something like that.
20   Q.      And are you aware that some medical conditions
21   require inmates to be on oxygen?
22   A.      Yes.
23   Q.      Are oxygen tanks allowed on the housing wings at
24   Big Muddy?
25   A.      No.
```

1   Q.      And why not?

2   A.      Basically, it's a -- it's weaponized.  You can put

3   a spark to that and that becomes a missile.  It's a

4   danger.

5   Q.      Are you aware of the schedule that SDP's have for

6   accessing the dayroom?

7   A.      (Nonverbal response.)

8   Q.      You need to answer out loud.

9   A.      Yes, sir.

10  Q.      And is that schedule something that you approve as

11  Warden?

12  A.      Yes.

13  Q.      Do the SDP's have more or less time on the dayroom

14  than criminally convicted inmates?

15  A.      They have more time.

16  Q.      Are there any security concerns with allowing the

17  SDP's to be in the dayroom whenever they want?

18  A.      Yes.  There would be staffing concerns, for lack

19  of better terms.  That would be chaos, having them out all

20  the time.  I believe you would see a rise in fights,

21  assaults, both of a physical kind and maybe of a sexual

22  kind.

23  Q.      Are there property restrictions as far as what

24  property sexually dangerous persons can own?

25  A.      I can't honestly answer that, not so far as

```
 1    property.  Are you talking about televisions, radios?  Are
 2    you talking about reading material?
 3    Q.      Sure.  That was a bad question.  In general, for
 4    all the residents at Big Muddy, both civilly and
 5    criminally convicted, are there certain property items
 6    that you don't want in the institution?
 7    A.      Yes.
 8    Q.      And what, what kinds of property might that be?
 9    A.      Pornographic material, would be one.  Any type of
10    material that can be utilized to escape, record, things of
11    that nature.
12    Q.      And are there certain materials that are
13    restricted because of what they're made of?  For example,
14    would a certain number of, or type of typewriters be
15    restricted for any reason?
16    A.      Absolutely.
17    Q.      And why is that?
18    A.      Some of the components can be utilized to
19    makeshift homemade weapons, homemade knives, shanks,
20    things of that nature.
21    Q.      Thank you.  Do the SDP's at Big Muddy have any
22    contact with general population inmates at Big Muddy?
23    A.      Minimal.
24    Q.      And where would that contact occur?
25    A.      Health Care Unit lobby, would be one.  Minimal
```

1    contact in the dining room, would be another one.  I'm not

2    100 percent sure on this one, but I believe we allow SDP's

3    to go to the physically challenged yard line, too.

4    Q.     And the situations where SDP's come into contact

5    with the general population inmates, is there any kind of

6    security staff present?

7    A.     More staff there.

8    Q.     More staff than there would otherwise be?

9    A.     Yes.

10   Q.     And are general population inmates housed on the

11   same wing as SDP's?

12   A.     No.

13          MR. ROCKERSHOUSEN:  Thank you, Warden.  That's all

14   the questions that I have.

15                        CROSS-EXAMINATION

16   BY MR. SIMMONS:

17   Q.     Good afternoon, Warden.

18   A.     Good afternoon.

19   Q.     Curious about what your day is like on the job at

20   Big Muddy.

21   A.     My day?

22   Q.     Yes.  What's a typical day?

23   A.     Typical day, I would go in, check my e-mails, see

24   what emails that I do have.

25   Q.     And that's in your office?

1    A.       Yes, that's in my office.

2    Q.       Is that at Big Muddy?

3    A.       Yes.

4    Q.       Okay.  Keep going.  Check your e-mails.

5    A.       Working on the various forms, paperworks, things I

6    have to sign off on, grievances, incident reports, things

7    of that nature.  Might be on a conference call, typically.

8    Q.       Who would that be with?

9    A.       Possibly Springfield; my Deputy Director; it might

10   be my Chief of Operations.

11   Q.       Who is your direct supervisor?

12   A.       My direct supervisor, Robert Mueller.

13   Q.       The head of IDOC; is that right?

14   A.       No.  He is the Deputy Director.  He is my direct

15   supervisor.

16   Q.       The Deputy Director, he is your direct supervisor.

17   Got it.  Thank you.  So, conference calls, just typical

18   office kinds of stuff?

19   A.       Things like that.

20   Q.       Do you get out in the prison much?

21   A.       Yes, I do.

22   Q.       I know you have been, because you have been there

23   since '96; correct?

24   A.       Yes.

25   Q.       Do you know the plaintiffs in this case?

```
1    A.      I know Mr. Needs very well.  I know Mr. Howe.  The
2    other gentlemen, no.
3    Q.      Okay.  What about the client that's not here,
4    Timothy Charles.
5    A.      Timothy Charles.  Mr. Charles lives in our Health
6    Care Unit.
7    Q.      Do you know him?
8    A.      I know him.  Not extremely well, no.
9    Q.      Do you recall meeting me in June at Big Muddy?
10   A.      In June?
11   Q.      I believe it was June.  Could have been July, I
12   don't know.
13   A.      No, I don't.
14   Q.      This summer sometime.  Do you ever go to the
15   Health area in Big Muddy?
16   A.      Yes.
17   Q.      Is there any reason I couldn't go to the Health
18   area in Big Muddy?
19   A.      You?
20   Q.      Yes.
21   A.      It would have to be approved.
22   Q.      Who approves that?
23   A.      My Deputy Director Robert Mueller.
24   Q.      In Springfield?
25   A.      You can say that.  He has an office in Marion,
```

1    too, sir.

2    Q.      So, I have to ask him to see my client who lives

3    in Health Care?

4    A.      You have to request it through me.  I have to get

5    it approved through him, due to you being a civilian.

6    Q.      Okay.  See, one of the things I wanted to ask you

7    about was:  Why, when you knew I was coming to see my

8    client in June, was I prevented from walking to the Health

9    Care thing, which you apparently do regularly, and talk to

10   my client there?

11          MR. ROCKERSHOUSEN:  Objection, relevance, exceeds

12   the scope of direct.

13          THE COURT:  I'm going to sustain that.  I'm not

14   sure this is relevant.

15          MR. SIMMONS:  Thank you.

16   Q.      (BY MR. SIMMONS)  So, you have been the Warden

17   since June of '17; correct?

18   A.      Correct.

19   Q.      I'm going to show you a few pictures.  I need to

20   be able to see those pictures, though.  I'm going to hand

21   you what's been marked Plaintiff's Exhibit 64.  Can you

22   identify that, please?  And this will be quick.  We can

23   just wrap through these.

24   A.      Yes.  This is C Wing.

25   Q.      C Wing?

```
 1    A.      Yes.

 2    Q.      And Exhibit, Plaintiff's 65?

 3    A.      I believe that would be C Wing, also.

 4    Q.      And 66?

 5    A.      C Wing.

 6    Q.      And 67?

 7    A.      C Wing.

 8    Q.      And 68?

 9    A.      C Wing.

10    Q.      I'm going to keep going, handing you exhibits --

11    Exhibit, Plaintiff's 75.

12    A.      D Wing.

13    Q.      Exhibit 76?

14    A.      D Wing.

15    Q.      Exhibit 77?

16    A.      D Wing.

17    Q.      Exhibit 78?

18    A.      D Wing.

19    Q.      And Exhibit 79?

20    A.      D Wing.

21    Q.      Thank you.  Would you agree those wings are pretty

22    identical?  Other than whatever color they are, because

23    I'm colorblind, I can't even tell that, but.

24    A.      Yes, I would agree to that.

25    Q.      Continue with the exercise here.  Plaintiff's
```

1    Exhibit 69.  What is that?

2    A.      Your question?

3    Q.      What is that?

4    A.      It's a cell door with No. 36 on it.

5    Q.      And it is in what wing?

6    A.      I have no idea.

7    Q.      Okay.  Plaintiff's Exhibit 70, what is that?

8    A.      That is a cell.

9    Q.      Can give me any more specific?  Can you tell me

10   what house it's in?  What wing it's in?

11   A.      No.

12   Q.      What about Plaintiff's Exhibit 71?  What is that?

13   A.      That's a cell.  By the observation -- from what I

14   see, this is just an estimated guess, this would be C Wing

15   due to the wheelchair that's currently on it.

16   Q.      Okay.

17   A.      And the color of the wing.

18   Q.      Very good.  What about Exhibit 82?

19   A.      A cell.

20   Q.      Any particular wing or --

21   A.      I can't make that determination.

22   Q.      Okay.  Thank you.  I'll take those.  Thank you,

23   Warden.  What percentage of prisoners at Big Muddy are

24   illiterate?

25           MR. ROCKERSHOUSEN:  Objection, foundation.

1          THE COURT:  Overruled.

2   A.      I can't honestly answer that.

3   Q.      (BY MR. SIMMONS)  Is there anyone that could

4   answer that?  Could your direct supervisor answer that?

5   A.      I don't know that he would be able to.

6   Q.      Do you even test for that?

7   A.      I'm sure that our school district might be able to

8   give us a better answer than that.

9   Q.      So, like the Marion Elementary School, or what are

10   we talking about?

11   A.      No.  The school district within the Department of

12   Corrections.

13   Q.      So, if somebody wants to go to college, you're

14   going to know they're not illiterate and put them in this

15   column?  And if somebody doesn't ever go to school, you

16   would never -- have no way of knowing, would you?

17   A.      I don't, I don't follow your --

18   Q.      Okay.  Well, withdraw that.  Sorry.

19          Tell me about that -- I think you called it a

20   court, your disciplinary court?

21   A.      For lack of a better terms.

22   Q.      Okay.  Tell me about that.

23   A.      The Adjustment Committee?

24   Q.      Yes.  That's adjusting tickets that are issued to

25   the inmates?

1   A.      That's, that's what it's called, yes.

2   Q.      Okay.  What's the procedure should an inmate

3   decide to vote?  Obviously, felon inmates cannot.  But

4   civilly committed who are not felons, how do they vote?

5           MR. ROCKERSHOUSEN:  Objection, relevance, exceeds

6   the scope of direct.

7           THE COURT:  Sustained.

8   Q.      (BY MR. SIMMONS)  Can you tell me which of the

9   plaintiffs you know again?  You told me once.

10  A.      Mr. Needs, Mr. Howe.

11  Q.      Let's talk about George Needs for a second.

12          As Warden of Big Muddy, do you find it a little

13  odd that someone is civilly committed there for over 40

14  years --

15          MR. ROCKERSHOUSEN:  Objection, exceeds the scope

16  of direct, foundation.

17          THE COURT:  If a Warden doesn't have an opinion on

18  that, it would be pretty interesting.  Overruled.

19  A.      Please repeat the question.

20  Q.      (BY MR. SIMMONS)  Do you find it, as Warden,

21  someone who's been at Big Muddy River since 1996 and

22  Warden since June of 2017, do you find it unusual that a

23  civilly committed inmate has been there for over 40 years?

24  A.      No.  No, I wouldn't.

25  Q.      Does -- thank you.

1        MR. SIMMONS:  I don't have anything else.

2        MR. ROCKERSHOUSEN:  Nothing further, Your Honor.

3        THE COURT:  You may step down, Warden.  Thank you.

4        THE WITNESS:  Thank you, ma'am.

5        THE COURT:  Call your next witness.

6        MR. TYRRELL:  Your Honor, defendants call Jessica

7   Stover.

8        (Witness sworn by clerk.)

9        THE WITNESS:  My name is Jessica Stover.

10   S-T-O-V-E-R.

11                    JESSICA STOVER,

12   having been first duly sworn, was examined and testifies

13   as follows:

14                    DIRECT EXAMINATION

15   BY MR. TYRRELL:

16   Q.    Miss Stover, can you tell me where you are

17   currently employed?

18   A.    I am currently employed at the Illinois Department

19   of Corrections at Big Muddy River correctional facility.

20   Q.    And what is your title with the Department of

21   Corrections at Big Muddy River Correctional Center?

22   A.    Social Worker IV.

23   Q.    And is there an unofficial title, apart from

24   Social Worker IV?

25   A.    I am primarily assigned to the Sexually Dangerous

 1    Persons Treatment Program.

 2    Q.      I just have some general background questions.

 3    Can you tell me what the highest level of education you

 4    have achieved is?

 5    A.      I have a Master's in Social Work and then an

 6    Advanced Clinical license.

 7    Q.      And where did receive your Master's in Social Work

 8    from?

 9    A.      Southern Illinois University, Edwardsville.

10    Q.      And you said it is an Advanced Clinical license?

11    A.      Yes, Licensed Clinical Social Worker.

12    Q.      Is this a license from the State of Illinois?

13    A.      Yes, through the Illinois Department of

14    Professional Regulation.

15    Q.      What sort of training or experience do you need,

16    if any, to attain the Licensed Clinical Social Worker,

17    Advanced Clinical license?

18    A.      To receive the LCSW, the Licensed Clinical Social

19    Worker, I had to complete a number of hours under

20    supervision from somebody who is also licensed as a

21    clinical professional, I believe it was 300 hours, and

22    half of that had to be in direct service with client

23    populations.  And then I also had to take a test approved

24    by the Illinois Department of Professional Regulation and

25    pass that test to be licensed.

```
 1    Q.      When did you first obtain your LCSW?

 2    A.      I believe 2008.

 3    Q.      Do you currently hold any other licensures?

 4    A.      Yes.

 5    Q.      What other licensures do hold?

 6    A.      I am also licensed through the Illinois Department

 7    of Professional Regulation as a licensed Sex Offender

 8    Treatment Provider and licensed Sex Offender Evaluator.

 9    Q.      And when did you obtain -- when did you obtain

10    your license to be a Sex Offender Treatment Provider?

11    A.      Both the treatment provider and the evaluator

12    license were new licenses that were enacted in 2014, and I

13    received both of them in 2014.

14    Q.      So, prior to 2014, there was no Sex Offender

15    Treatment Provider, Sex Offender Treatment Evaluator

16    license in the State of Illinois?

17    A.      Not a specific license, no.

18    Q.      Okay.  Have there been any lapses in your licenses

19    since you have obtained them?

20    A.      No.

21    Q.      Have you ever been disciplined by any regulatory

22    board?

23    A.      No.

24    Q.      When did you first join the staff at Big Muddy

25    River Correctional Center?
```

1    A.       In October of 2010.

2    Q.       What was your job title when you joined in October

3    of 2010?

4    A.       Social Worker IV.

5    Q.       When you started in October of 2010 as a Social

6    Worker IV, were you hired on to work in the sexually

7    dangerous person or Sex Offender Program?

8    A.       Yes.

9    Q.       Prior to coming to Big Muddy River Correctional

10   Center in October of 2010, have you ever worked in the sex

11   offender treatment provider field?

12   A.       Yes.

13   Q.       What sort of work did you do before you came to

14   Big Muddy?

15   A.       Prior to employment at Big Muddy, I worked in

16   private practice in the community doing sex offender

17   treatment and evaluation for individuals on probation

18   and/or parole.  And then also in several different

19   juvenile residential homes where we had a number of youth

20   that had sexual behavior problems, and I was doing

21   treatment with them, as well.

22   Q.       So, if you had to estimate, how long have you been

23   in the field of sex offender treatment providing?

24   A.       Twelve years.

25   Q.       Twelve years.  Who was the program Administrator

1    for the SDP program when you came to Big Muddy in October

2    of 2010?

3    A.       Dr. Mark Carich, C-A-R-I-C-H.

4    Q.       And I understand at some point Mr. Carich left the

5    program and Dr. Holt became the Administrator?

6    A.       Yes.

7    Q.       Do you recall when Dr. Holt joined the program?

8    A.       I believe Dr. Holt began toward the end of 2013.

9    Q.       So, you worked for a period of time under Dr.

10   Carich but also under Dr. Holt?

11   A.       Yes.

12   Q.       And I should clarify, Dr. Holt is your immediate

13   supervisor at Big Muddy?

14   A.       Yes.

15   Q.       It's my understanding that Big Muddy generally has

16   a Sex Offender Program; is that correct?

17   A.       Yes.

18   Q.       And that's kind of an overarching umbrella also

19   covering the Sexually Dangerous Person Program?

20   A.       Yes.

21   Q.       Do you do work outside the Sexually Dangerous

22   Person Program?

23   A.       I have also other duties assigned to me within the

24   institution, yes.

25   Q.       I guess I should ask more generally.  So, there's

1   general population inmates at Big Muddy that are receiving

2   sex offender treatment; correct?

3   A.      Yes.

4   Q.      Do you provide treatment to those offenders?

5   A.      No.

6   Q.      So, the only treatment you provide is to the SDP's

7   in the SDP program?

8   A.      Yes.

9   Q.      Now, I mentioned other duties and responsibilities

10  at Big Muddy.  What other duties and responsibilities do

11  you have at Big Muddy?

12  A.      Currently, I am one of two co-compliance managers

13  for PREA, the Prison Rape Elimination Act.

14  Q.      Anything else?

15  A.      Not that I can think of, no.

16  Q.      So apart from being a, a co-PREA compliance

17  manager --

18  A.      Yes.

19  Q.      -- is that correct?  Apart from being a co-PREA

20  compliance manager, you are also a provider in the SDP

21  program?

22  A.      Yes.

23  Q.      How many sexually dangerous persons are at Big

24  Muddy River Correctional Center?

25  A.      Currently, there is 170.

1    Q.      And to your knowledge, are there any other SDP's

2    civilly committed in the State of Illinois apart from

3    those at Big Muddy?

4    A.      I believe there is one, maybe two female SDP's

5    housed at the female facility.

6    Q.      Okay.  Out of the 170 SDP's at Big Muddy, how many

7    are currently receiving treatment?

8    A.      By statute, they're all considered in treatment.

9    There is currently 109 that are choosing to participate in

10   treatment groups at this time.

11   Q.      Now, that would mean there are 61 SDP's that are

12   considered treatment by statute but not electing to

13   receive therapy?

14   A.      Yes.

15   Q.      How are, how are your patients arranged?  Is there

16   -- are you assigned a certain number of patients at Big

17   Muddy or certain patients at Big Muddy?

18   A.      I have -- I am assigned, I guess, as the primary

19   facilitator for several of the SDP's within the program.

20   Q.      Okay.  Do you know how many SDP's you are the

21   primary therapist for?

22   A.      I have a number of therapy groups, core treatment

23   groups, so anybody that's in my therapy groups would be

24   considered my primary clients.  And I would say there's

25   between probably 60 to 70.  And then I also complete the

1    semi annual treatment plans and semi annual evaluations

2    for the 60-some SDP's that choose not to participate in

3    the program.

4    Q.      Okay.  I see the confusion with my question.  So,

5    there are 60 to 70 SDP's who are electing to receive

6    treatment that you are the primary therapist for?

7    A.      Yes.

8    Q.      How many -- I believe you mentioned that some are

9    in your core groups.

10   A.      Yes.

11   Q.      How many core groups do you have?

12   A.      Seven, currently.

13   Q.      And what is the size of these core groups?

14   A.      Between 8 to 10.

15   Q.      Do you currently have any core groups that exceed

16   10 people?

17   A.      No.

18   Q.      We've already heard testimony about some core

19   groups, but how long does a core group session take?

20   A.      They generally last an hour.  Sometimes, depending

21   on the conversation, they can run over.  But generally, an

22   hour.

23   Q.      And that's one time a week for core groups?

24   A.      Yes.

25   Q.      And it's my understanding that there are other

1    groups that take place at Big Muddy as part of the SDP

2    program; is that correct?

3    A.      Yes.

4    Q.      What other groups take place at Big Muddy?

5    A.      Within the SDP treatment program there is an REBT

6    program, Rational Emotive Behavior group that's offered.

7    There is an Anger Management group that's offered.  There

8    are two Cycle specific groups that are offered, and then

9    also a Relapse Prevention specific group.

10   Q.      Between REBT, Anger Management, the two Cycle

11   groups and the Relapse Prevention groups, do you oversee

12   any of those?

13   A.      Yes.

14   Q.      How many of those do you oversee?

15   A.      I facilitate one REBT group, both of the Cycle

16   groups, and the Relapse Prevention group.

17   Q.      And what's the approximate group sizes for these

18   other groups?

19   A.      The REBT group, it's what we call a didactic

20   group, it's more of a teaching group, and those typically

21   start with a slightly larger population.  We generally

22   start those around 13 or 14 because within the first two

23   or three weeks of starting that, several people because of

24   conflicts or because of their choice not to attend, will

25   be removed from the group.  So, by the time that module is

1    completed, we often only end with four or five people in

2    that group.  So, we start those a little bit larger.  But

3    my Cycle groups and RP group have no more than 10.

4    Q.      And RP is Relapse Prevention?

5    A.      Yes.

6    Q.      You used the term "didactic" group.  Can you tell

7    us what that means?

8    A.      The didactic groups like REBT and Anger Management

9    are more educational groups, so those are structured in

10   generally about 24 week sessions.  In each session, there

11   is more or less a lesson that's presented.  So, there is a

12   technique or a tool specific to the topic of the group

13   that's presented, and the SDP's are taught each week how

14   to build toward that, that intervention or that skill that

15   then they can take back and use in their core group or

16   their therapy group.

17   Q.      Are these didactic groups considered optional

18   groups?

19   A.      Yes.  The SDP's have the option to sign into the

20   group before we start each new module.  A posting is

21   posted on each of the wings where they can sign into it,

22   if they electively choose to participate.  And then the

23   primary therapist or us collectively as a treatment staff

24   can suggest a particular person for the group, recognizing

25   a benefit that they might receive from participating in

1    it.

2    Q.      So, an SDP who wanted to participate in one of

3    these didactic groups might end up signing up for it and

4    be allowed in the group, other times they might sign up

5    through their primary therapist?

6    A.      Yes.

7    Q.      The didactic groups, do they also meet one hour

8    once a week?

9    A.      Yes.

10   Q.      Are there ever occasions where groups are

11   cancelled?

12   A.      Yes.

13   Q.      And that's for core groups as well as the didactic

14   group?

15   A.      Yes.

16   Q.      How often on average are, is a core group

17   cancelled?

18   A.      I typically -- I will try to reschedule groups

19   when I can.  Today, I rescheduled my group since I was in

20   court.

21           THE COURT:  I think the question was cancelled,

22   though.

23           THE WITNESS:  Yes.

24   A.      There are times where they might be cancelled due

25   to a state holiday, a court appearance.  There are also

1    security needs, if there is maintenance being done on the

2    wing or a security issue where the SDP's are placed on

3    lockdown, then we are unable to have groups during those

4    times.

5    Q.    (BY MR. TYRRELL)  And I believe you already

6    answered, when a group is cancelled, do you try to

7    reschedule?

8    A.    I primarily try to reschedule -- I try to

9    reschedule all the groups and, unfortunately, time doesn't

10   always permit that.  So, I focus specifically on the core

11   groups and try to reschedule those before I give

12   consideration to rescheduling one of the additional

13   groups.

14   Q.    What therapy is covered by the core groups?

15   A.    Within the core therapy group, basically

16   everything is on the table to be discussed.  So, the SDP's

17   can discuss issues within their family, grief, loss,

18   death, dying.  They can discuss problems on the wing,

19   issues with their cellie, issues with security officers.

20         Sex offender specific issues we discuss might be

21   offense disclosure, acceptance of responsibility,

22   identifying cognitive distortions, beginning the cognitive

23   restructuring process.

24         We will talk about victim empathy and intervention

25   skills, both internal and external.

1       So, within the core group basically everything is

2   open for discussion.

3   Q.      When you say "everything is open for discussion"

4   in a core group, is it that when you lead a core group,

5   it's free reign and everyone talks about whatever they

6   feel like?  Or is it more of a structured, there's a plan

7   for that core group?

8   A.      In the core groups that I facilitate, there is

9   generally a plan for the group.  They might be working on

10  treatment concepts and treatment terms and then how that

11  relates to their own life history, or they might be

12  presenting a life history and then trying to pull out

13  determining factors or cognitive distortions or those

14  kinds of things.

15      But at the beginning of every single group, the

16  participants are asked if they have anything they'd like

17  to present, anything they have been working on that they

18  would like feedback on, either from myself or the other

19  group members.  So, time is allotted for both of those

20  things to occur.

21  Q.      Do you have any role in the structuring of the

22  actual groups?  So, what I mean by that is, which SDP's

23  will be in which group?

24  A.      Yes.

25  Q.      How are these groups structured?

1   A.      Within the SDP treatment program, we, as staff,

2   will attempt to structure groups based on the clients'

3   progress and treatment, based on maybe particular skills

4   or deficits in skills.  Their cognitive processing is also

5   assessed.  If there is SDP's with certain intellectual

6   disabilities or physical disabilities, those are taken

7   into consideration when we set up the group structure.

8   Q.      Is there any individual therapy within the SDP

9   program?

10  A.      No.

11  Q.      Does that mean that the SDP's do not receive

12  individualized treatment?

13  A.      No.

14  Q.      How does an SDP receive individualized treatment

15  if there's no individual therapy?

16          MR. STOBBS:   Judge, I'm going to object.  I think

17  this is starting to get into expert testimony under 701.

18          THE COURT:   Individualized is not an opinion.

19  I'll overrule that.

20  A.      Every SDP, whether they choose to participate in

21  treatment groups or not, is assessed every six months in

22  regards to treatment progress, treatment need.  And then

23  also, they are given an individualized treatment plan

24  identifying two to three goals generally to work on over

25  that six-month period of time that is specifically geared

1    toward their current presenting needs.

2    Q.     (BY MR. TYRRELL)  So, you said there was an

3    individual --

4              THE COURT:  Wait.  I thought your question was

5    treatment, how do they get individualized treatment.

6              MR. TYRRELL:  Correct.  I believe Miss Stover was

7    answering that question by saying there's individual

8    treatment plans with goals for each individual to work on.

9    A.     Yes.

10    Q.     (BY MR. TYRRELL)  And are the SDP's made aware of

11    the goals they are supposed to be working on?

12    A.     Yes.  Those are presented to them every six

13    months.  Before the treatment plans are updated, each SDP

14    currently participating in treatment groups is asked if

15    they have any input or suggestions or questions about

16    their treatment goals.  Any input they have is

17    incorporated into their treatment plan, generally.

18              THE COURT:  Okay.  I just want -- I'm sorry.  I'm

19    confused and -- I'm sorry, Jeremy, to stop you.

20              MR. TYRRELL:  You're fine.

21              THE COURT:  But since I have to be the fact finder

22    here, I want to be sure I understand.

23              You asked -- Miss Stover, the question was whether

24    the participants receive individualized treatment.  And I

25    think you said that they, they all get a individualized --

1     so I take that to mean a separate treatment plan.

2              THE WITNESS:  Yes.

3              THE COURT:  But do they get individualized

4     treatment on -- according to that plan?  So, they don't --

5     they may have an individualized treatment plan.  I

6     understand that.  But I want to make sure I understand

7     whether or not they ever get individualized treatment.

8              THE WITNESS:  We do not do one-on-one sessions or

9     individualized therapy, but each SDP's treatment is geared

10    toward their particular treatment needs.

11             THE COURT:  This is a question of your definition

12    of individualized, that's why I wanted to clarify.

13             MR. TYRRELL:  Thank you, Your Honor.  I appreciate

14    that.

15    Q.    (BY MR. TYRRELL)  Since therapy is provided in

16    group settings, how in a group setting do you meet an

17    individualized treatment plan's needs -- or an

18    individual's treatment needs?

19    A.    Right.  Like I already stated, each individual in

20    group is given the opportunity to speak at each group

21    setting, if they choose.  There is continual homework that

22    is recommended for a group participant to work on in

23    between the group sessions.  At different times, even in a

24    group or not, 8 or 9 or 10 different participants in a

25    group might be working on their particular goals or their

1    particular treatment need, and then bringing that to group

2    to present for, for feedback.

3    Q.     In terms of individual treatment goals and plans,

4    I imagine there's probably some overlap between each of

5    the SDP's; is that accurate?

6    A.     Yes.

7    Q.     And so even though -- I'm assuming there's various

8    diagnoses that might lead to somebody being civilly

9    committed?

10   A.     Yes.

11   Q.     And I'm sure there's a wide range of these in the

12   SDP program?

13   A.     Yes.

14   Q.     But some, some of these goals, are they overlap

15   depending on the diagnosis?

16   A.     Yes.  There are commonalities within sex offender

17   treatment, even with differing primary diagnoses.  An

18   example of that would be cognitive distortions.  Whether

19   the individual is diagnosed with pedophilia, paraphelia,

20   sexual sadism, one of the things in treatment program we

21   would look at is the cognitive distortions or the, the

22   messed up thinking, or the thought distortions that would

23   lead them to engage in those kinds of criminal behaviors.

24   Q.     And cognitive distortions are something that's

25   addressed in group therapy?

1    A.      Yes.

2    Q.      You mentioned the semi annual evaluations.  Who,

3    who does these evaluations?

4    A.      Each primary therapist is the primary author of

5    the semi annual evaluation for their -- the particular SDP

6    that's assigned to their group; however, as a treatment

7    group, we all, staff, each of the -- the semi annuals

8    together.  If a client that is assigned as my primary

9    client was in another therapist's group during that period

10   of time, I'm going to speak with that therapist about

11   their progress in that group.

12   Q.      And are the semi annual evaluations given to the

13   SDP's?

14   A.      Yes.

15   Q.      And they're discussed with them?

16   A.      Yes.

17   Q.      You have been present yesterday and today for most

18   of the trial, excluding breaks; correct?

19   A.      Yes.

20   Q.      Have you heard the term Intensive Therapy being

21   used?

22   A.      Yes.

23   Q.      What is Intensive Therapy?

24           MR. STOBBS:  Judge, I'm going to object.  This is

25   an expert opinion based on specialized knowledge.

 1           MR. TYRRELL:  I'm asking -- I can rephrase the

 2     question.  I meant Intensive Therapy in the use in the SDP

 3     program in particular at Big Muddy.

 4           MR. STOBBS:  It's still based on special

 5     knowledge, Judge.

 6           THE COURT:  Overruled.

 7           You can answer.

 8           THE WITNESS:  Thank you.

 9     A.     Intensive Therapy is the title of, I guess, a, a

10     program or an intervention that we have brought into the

11     SDP treatment program.  If an individual is displaying

12     significant and reoccurring maladaptive behaviors, they

13     can be placed on what we kind of entitled Intensive

14     Therapy, which during a allotted period of time they are

15     maintained in their cell.  Generally, the maladaptive

16     behaviors that they are displaying is creating some kind

17     of disturbance within the wing, within the treatment

18     program, or within the facility.  However, they are given

19     additional levels of treatment during the time that they

20     are placed on Intensive Therapy.

21           So, every time that one of the SDP treatment staff

22     is on the wing, if we were running groups, that individual

23     that's placed on Intensive Therapy is being offered time

24     to come out of the cell, they are asked to sit at a table

25     where they are given very specific treatment focused work

1    from the SDP treatment staff to work on.

2         THE COURT:  Before you -- Mr. Stobbs, who is going

3    to cross-examine this --

4         MR. STOBBS:  I am.

5         THE COURT:  Okay.  I'm sorry.  Go ahead.

6         MR. TYRRELL:  Thank you.

7    Q.    (BY MR. TYRRELL)  Miss Stover, are notes or

8    progress notes recorded as part of these group sessions

9    at --

10   A.    Yes.

11   Q.    -- in the SDP program?

12   A.    Yes.

13   Q.    Thank you.  And they're maintained by the SDP

14   program staff?

15   A.    Yes.

16   Q.    Okay.  Are you currently the primary therapist or

17   have you been the primary therapist for any of the four

18   plaintiffs in this case?

19   A.    Yes.

20   Q.    Who have you been the primary therapist for?

21   A.    I am currently the primary therapist for Mr. Howe,

22   for Mr. Needs, and for Mr. Charles.  And I believe there

23   was a very brief period of time where I might have been

24   the primary therapist for Mr. Kallal, in between one

25   therapist leaving and another therapist being hired within

1    the program.

2    Q.      In preparation for your testimony here in court,

3    have you reviewed the progress notes and treatment plans

4    and different records for the four plaintiffs in this

5    case?

6    A.      Yes.

7    Q.      Have any of the four plaintiffs in this case been

8    on Intensive Therapy?

9    A.      No.

10   Q.      If an individual in the SDP program has a problem

11   with their therapy, whether it's their therapy plan or

12   their therapist or anything at all, is there a means of

13   addressing that?

14   A.      Yes.

15   Q.      How can an SDP address a problem with their

16   therapy?

17   A.      They are welcome to discuss it and do discuss it

18   in the treatment groups on a weekly basis.  They can sign

19   up for and be seen at the weekly staffing, which is held

20   on the wing primarily with Dr. Holt and Heather Young at

21   this time.  They can send an Offender Request through the

22   mail and we can respond that way, as well.

23   Q.      There's multiple different methods of contacting

24   you if there's a problem?

25   A.      Yes.  And I'm on the wing five days a week.

1    Q.      And just to clarify, I believe you testified just

2    now that you are the primary therapist for Mr. Howe.  Mr.

3    Howe is currently receiving therapy from Dr. Holt, though;

4    is that correct?

5    A.      Yes, because of his placement in segregation.

6    Q.      But is it anticipated that, when Mr. Howe is

7    released from segregation, he'll return to your caseload,

8    for lack of a better word?

9    A.      Yes.

10   Q.      It's my understanding that every SDP that is

11   civilly committed at Big Muddy has been civilly committed

12   because of some sort of diagnosis.  Is that your

13   understanding?

14   A.      Yes.

15   Q.      What role, if any, do these diagnoses play in the

16   treatment that the SDP is given at Big Muddy?

17          MR. STOBBS:  Judge, again I'm going to object

18   because this is the -- it's based on specialized

19   knowledge.  She's looking at these documents.

20          THE COURT:  He's asking her a factual question.

21   He's asked her, *how do the diagnoses relate to the*

22   *treatment that they give*.  I mean, she implements this.

23   This is not an opinion.  Overruled.

24          You are not asking a theoretical question, you're

25   asking her --

```
 1          MR. TYRRELL:  I'm asking her specifically.
 2          THE COURT:  You're asking her, in the program what
 3   role do diagnoses play in the development of their
 4   treatment plans.
 5          MR. TYRRELL:  Yes, that's precisely my question,
 6   Your Honor.
 7   A.        Within the, the varying diagnoses that are present
 8   within our program, there are commonalities between them.
 9   Like I spoke earlier, there's common cognitive distortions
10   that support sexual offending behaviors which can be the
11   very same distortions that support rape versus child
12   molestation.  So, there's a lot of crossover.  We also use
13   the diagnosis in assisting the client in understanding
14   their diagnosis, as well.  So it, it does occur in group
15   where we can discuss the diagnosis with the client,
16   helping them understand the different features, and then
17   how that might present in their life.
18          One of the things that we do primarily in the core
19   group is to assist the offender in going back in their
20   history and, and looking at where this diagnosis, where
21   this, this deviancy started at.  And in understanding
22   their past, we can help them choose to restructure some of
23   their belief systems.  We can help them identify places to
24   put in interventions for the future so that they can
25   maintain a victim-free life.
```

1   Q.      (BY MR. TYRRELL)  In developing an individualized
2   treatment plan at Big Muddy in the SDP program, is the
3   diagnosis the most important consideration?
4   A.      Not -- no, not for the treatment plan.
5   Q.      It's just a consideration in terms of the
6   treatment plan and the treatment an SDP receives?
7   A.      With the treatment plan, we are specifically
8   looking at the needs based on the individual, dynamic risk
9   factors that they might present with, and targeting the
10  treatment goals specific to their dynamic risk factors.
11  Q.      Okay.  There's been some talk about these SDP
12  program tickets.  What is a program ticket?
13  A.      A program ticket is simply a documentation of
14  noncompliance with the SDP program rules.
15          THE COURT:  It's not simple.  It results in
16  discipline, doesn't it?
17          THE WITNESS:  The SDP tickets do not result in
18  discipline.
19  Q.      (BY MR. TYRRELL)  So, that was kind of getting
20  ahead to my next couple questions.
21          THE COURT:  That's good to hear.
22  Q.      (BY MR. TYRRELL)  What can an SDP program
23  participant receive an SDP program ticket for?  Some
24  examples.
25  A.      Like I stated already, they can attend -- or they

```
 1    can receive program tickets for failing to attend an
 2    assigned group.  They can receive a program ticket for
 3    using profanity.  Not in the accidental slip-up of
 4    profanity, but the continued progression of using
 5    profanity in their language, whether inside of the
 6    treatment group or on the wing.  They can receive program
 7    tickets for disruptive behavior that disrupts the
 8    treatment or the programming that's occurring on the wing.
 9    They can receive program tickets for stealing; blues and
10    shoes -- the policy regarding the dress code --
11    violations.  Having pictures that have been determined to
12    be sexually stimulating or inappropriate in one way or
13    another could all result in a program ticket.
14    Q.      And I apologize, I missed it or she didn't say it,
15    but can you also get an SDP program ticket for showing up
16    late to group?
17    A.      You could, yes.
18    Q.      In terms of your -- you have issued SDP program
19    tickets before; correct?
20    A.      Yes.
21    Q.      And have you issued SDP program tickets for
22    someone being late to group?
23    A.      Yes.
24    Q.      Do you have a number for how late someone can be
25    before you issue a ticket?
```

1   A.      When the group first begins to sit down, there's

2   usually a little bit of chitchat at the beginning of

3   group.  If it's within the first couple of minutes of

4   group, the individual is, is permitted to sit down and no

5   program ticket would be issued.

6           If, in the cases where I know that it's been

7   issued or I have issued it, it's usually the participant

8   attending 10, 15, 20 minutes late, and that's when

9   they're, they're not permitted to sit in the group and

10  then they're issued a ticket.

11  Q.      So, in your practice you are not one for issuing

12  tickets for someone who is just a minute late?

13  A.      No.

14  Q.      And I believe, in response to one of the judge's

15  questions just a minute ago, you said SDP program tickets

16  do not result in discipline.  What do you mean by that?

17  A.      The SDP program tickets are, are a record of

18  noncompliance.  They are more of a warning, I guess, for

19  the SDP.  It's, it's an identification that they violated

20  a rule.

21          One of the things that we focus in the treatment

22  program is being aware.  Being aware of your surroundings,

23  being aware of what you are doing, recognizing when you

24  are moving into certain situations, which is one of the,

25  the overall goals in the treatment program is being able

1    to then intervene in those situations.

2          So, by having the program tickets in the program,

3    it's a warning.  It's kind of a check to the SDP that they

4    have violated a rule.  Very often, the SDP will say, "I

5    didn't even realize that I had done that," "I didn't

6    realize I had overslept," so it's a way to help them to

7    continue to learn responsibility and just being aware of

8    things.

9          If, within a three-month period of time, so a

10   90-day period of time, if the SDP receives three program

11   tickets, so three different times they have been informed

12   that they have, they have violated one of the program

13   rules, they are placed on probation.  And probation is

14   just another level of, *You need to be aware of what's*

15   *going on.  This isn't a one-time slipup, this is a*

16   *multiple thing*.  And so they are given a piece of paper

17   that shows during this period they received three tickets

18   and what the tickets were for, and also the period of time

19   that they are placed on probation, which is usually --

20         THE COURT:  What does probation mean?

21         THE WITNESS:  Probation is, is --

22         THE COURT:  I mean, what happens when they're on

23   probation?

24         THE WITNESS:  Really nothing.  I relate it to,

25   say, court supervision if you get a speeding ticket.

1    Probation is a 30-day period of time where nothing changes

2    for the SDP.  They still come to treatment.  Really,

3    nothing changes.  However, and in just like court

4    supervision with a speeding ticket, if you are successful

5    during that period of time, the ticket goes away.  If they

6    are successful during the period of probation, nothing

7    further occurs.  It's simply just an acknowledgment of a

8    violation of rules and a continued pattern of a violation

9    of rules.

10          If, during that 30-day period of time, if they

11   violate another SDP treatment rule, they're issued another

12   program ticket and then that places them on suspension.

13   So, this is potentially during a four-month period of time

14   they have continued to violate program rules.  So, this

15   time it's really acknowledgment of noncompliance with the

16   treatment program and they are placed on suspension and

17   that's when they are removed from the treatment groups for

18   a 30-day period of time.  And after that 30-day period of

19   time is over, they are placed back in the groups that they

20   were in before.

21          THE COURT:  Can somebody get a program ticket,

22   four or five program tickets in a four-month period for

23   not tucking in their shirts, and end up suspended?

24          THE WITNESS:  They --

25          THE COURT:  So the first -- they come in three

```
 1    days untucked -- right?
 2            THE WITNESS:  Yes.
 3            THE COURT:  They get a program ticket.  They come
 4    in the fourth group, now they get probation.
 5            THE WITNESS:  (Nonverbal response.)
 6            THE COURT:  They come in the next group, same
 7    behavior, same noncompliance, and now they get suspended?
 8            THE WITNESS:  They could.  But I am not aware of a
 9    time where that's happened.  The majority --
10            THE COURT:  But they could?
11            THE WITNESS:  Yes.
12            THE COURT:  There's nothing to stop that from
13    happening.
14            THE WITNESS:  Yes.
15            THE COURT:  In other words, there's no distinction
16    between the noncompliant behavior, whether it's treatment
17    related or whether it's untucked shirt.
18            THE WITNESS:  I would say that a pattern of having
19    your shirt untucked like you just described would be an
20    indication of, of treatment.
21    Q.    (BY MR. TYRRELL)  You mentioned just in response
22    to Judge Yandle's question that you are not familiar of a
23    time when there's been, you know, four or five tickets in
24    a four-month period of specifically untucking a shirt that
25    resulted in suspension.
```

1   A.      Correct.

2   Q.      Is there some discretion in who receives a

3   suspension?

4   A.      Um --

5   Q.      Or is it more the case that you have just never

6   encountered that before?

7   A.      Yeah, I have never encountered that.  Typically,

8   if someone is placed on suspension, it is nonattendance of

9   groups, is, is what I have seen more prevalent.

10  Historically, in the program, there was discretion over

11  whether somebody was on suspension or not suspension.  And

12  this is early in my time at Big Muddy.  So, now it is more

13  streamlined.  So, not only as staff do we know what the

14  expectations are, but the SDP participants know what the

15  expectations are, as well.

16          So, each program ticket that's issued, that ticket

17  is brought to them.  They have an opportunity to check

18  guilty, not guilty, write any comments.  If they reach the

19  three in the 90-day period of time, they are given a sheet

20  that shows probation.  If they get the next ticket, they

21  are given the sheet that shows the suspension.  So, it's

22  that we all know what the expectation is.  And the SDP

23  knows what the expectation is, as they are approaching

24  that period of time where they might be placed on

25  suspension.  So, we try to keep it, three tickets, 30

1    days, one ticket, suspension.

2    Q.      Are the SDP expectations and this SDP program

3    ticket process memorialized somewhere?

4    A.      Yes.

5    Q.      Where is it?

6    A.      It is in the SOP program manual that each SDP has

7    been provided a copy of.

8    Q.      Are updates made regularly to this manual?

9    A.      When -- on occasion.  And when updates are made,

10   either an updated manual is passed out and then the SDP

11   signs in receipt of that, or if it's a, a small change and

12   we don't want to print the entire manual again, it will be

13   posted on both of the wings behind Plexiglas where it --

14   all of the SDP's have opportunity to see it.

15   Q.      When someone's on suspension, are they prohibited

16   from leaving their cell?

17   A.      No.

18   Q.      So, they're still free to leave the cell during

19   the Staffing time when groups are taking place?

20   A.      Yes.  They still have the opportunity for open

21   dayroom Monday through Friday, 8:00 to 2:30.

22   Q.      As part of open dayroom, do they have access to

23   any sort of therapy materials even when they're on a

24   suspension?

25   A.      Yes.  Somebody on suspension can still request

1    treatment-specific books, self-help books, workbooks from

2    the SOP library.

3    Q.       And the SOP library is made available to the

4    SDP's?

5    A.       Yes.

6    Q.       Do you also give -- do you give homework

7    assignments as part of your core group?

8    A.       I do.

9    Q.       And does the homework assignments include

10   discussing behaviors and certain things with other SDP

11   members?

12   A.       Yes.

13   Q.       Outside of class even -- or outside of the group

14   session?

15   A.       Yes.

16   Q.       And are SDP's expected to be discussing their

17   treatment during this 8:00 to 2:30 period where they are

18   allowed to leave their cells?

19   A.       Yes, that -- they are given opportunity for that

20   during that time, yes.

21   Q.       I apologize again if you already mentioned this

22   for the SDP program ticket, but can an SDP also receive an

23   SDP program ticket for arguing with staff?

24   A.       Yes.

25   Q.       What in your experience is a situation where you

1    would issue an SDP ticket for someone arguing with staff?

2    A.      It's, it's a commonplace in group where the SDP

3    participants and the staff might disagree, or SDP

4    participants might disagree with each other, and that's

5    all part of the treatment process.  And in assisting the,

6    the SDP in identifying their cognitive distortions and

7    restructuring, thinking errors, a program ticket would

8    only be issued when it goes beyond that level.  When there

9    is derogatory language being used.  When there is elevated

10   voice tones, even after the participant has been

11   encouraged to maybe quiet down or watch their language.

12   There are some derogatory statements or insolent

13   statements that could be made toward the group facilitator

14   that would reach that level of a program ticket being

15   issued for argumentative behaviors.

16   Q.      So, it's not a minor "I'm upset about

17   something," it's a repeated bad behavior of "I'm very

18   loud, I'm not participating," somewhere along those lines?

19   A.      Yes.  Yes.

20           MR. TYRRELL:  I believe, Miss Stover, that's all

21   the questions I have at this time.

22           THE WITNESS:  Thank you.

23                        CROSS-EXAMINATION

24   BY MR. STOBBS:

25   Q.      Would you say you are a rules-oriented person?

```
1    A.       I believe there is importance in following rules.
2    I don't know if I'd necessarily say I'm rule-oriented, but
3    I believe rules are important.
4    Q.       And are you a rules-oriented person?
5            MR. TYRRELL:  Your Honor, I'll object for
6    relevance.
7            THE COURT:  Overruled.
8    A.       Can you explain what you mean by oriented?
9    Q.       (BY MR. STOBBS)  Are you someone that believes
10   that rules should be followed?
11   A.       Yes.
12   Q.       And at Big Muddy, there are rules that are set out
13   in the manual that's given to the SDP's when they arrive;
14   right?
15   A.       Yes.
16   Q.       And you expect those rules to be followed; right?
17   A.       The Inmate Orientation Manual or the SOP program
18   manual?
19   Q.       Either.
20   A.       Yes.
21   Q.       And you have the determination objectively to
22   issue a ticket for -- any of those rules are violated;
23   right?
24   A.       As a staff member in the SDP program, I have the
25   ability to issue SDP program tickets.  And as an employee
```

1    of IDOC, I have the ability --

2          THE COURT:  Ma'am, that was a yes or no --

3          THE WITNESS:  I'm sorry.

4          THE COURT:  -- answer.

5          THE WITNESS:  Yes.

6          THE COURT:  And if you are given a direct

7    question, I expect that you answer directly.

8          THE WITNESS:  Yes, ma'am.

9    Q.     (BY MR. STOBBS)  And you can issue a ticket if any

10   of these rules are violated; right?

11   A.     Yes.

12   Q.     And that is objective in your opinion, isn't it?

13   A.     By IDOC and SDP standards.

14   Q.     Well, suppose some guy has his shirt that is kinda

15   tucked in, but not really tucked in.  You can give him a

16   ticket for that; right?

17   A.     I could, yes.

18   Q.     And at the same time, if you are in a really good

19   mood, you might not give a ticket; right?

20   A.     In the example that you just displayed, I would

21   not write a program ticket for that.

22   Q.     Have there ever been times that you have seen a

23   rule violation that you did not issue a ticket?

24   A.     Yes.

25   Q.     And there could be someone where, a guy is going

1    to the shower and he forgets his soap, and he could get a

2    ticket for that; right?

3    A.      Yes.

4    Q.      And where they reside, it's not like a studio

5    apartment, is it?

6    A.      No.

7    Q.      It's a jail cell; right?

8    A.      Yes.

9    Q.      And there -- they have a TV in there; right?

10   A.      If they have purchased a TV, yes.

11   Q.      Sure.  And if they want to take advantage of the

12   mp3 player, they can take advantage of that, too; right?

13   A.      Yes, they can purchase one.

14   Q.      They can also have a hot plate in there; right?

15   A.      Yes.

16   Q.      But it's still a jail cell.

17   A.      Yes.

18   Q.      And you talked a little bit about the, the group

19   -- the core groups are -- I think you said now they're

20   like -- if I got the numbers wrong, I apologize -- they're

21   around 10 people; is that right?

22   A.      Typically 8 to 10.

23   Q.      And that's now; correct?

24   A.      Yes.

25   Q.      Have they ever been more than 8 to 10?

1    A.      Yes.

2    Q.      And all of the stuff that you are talking about,

3    it's still one hour a week, isn't it?

4    A.      Each group is run for one hour.

5    Q.      A week?

6    A.      Yes.

7            MR. STOBBS:  No other questions, Judge.

8            MR. TYRRELL:  A brief followup, Your Honor.

9                         REDIRECT EXAMINATION

10   BY MR. TYRRELL:

11   Q.      Miss Stover, plaintiff's counsel mentioned an

12   incident involving forgetting soap and going to the

13   shower.  Have you issued a ticket for that?

14   A.      The violation is not forgetting your soap.  With

15   the blues and shoes policy, the dress code policy within

16   the SDP program, there is consideration written into the

17   policy that -- the showers are on the wing.  So, if an

18   individual is coming straight back from yard or from work,

19   where they might be hot and sweaty, we do not expect them

20   to put blues on, to then go and wait in front of the

21   shower.  So, they are permitted to go stand by the shower

22   area and wait their turn.

23           One of the expectations in that is that they stay

24   by the shower area.  They are not permitted to be sitting

25   at the tables or walking around the wing or socializing

1    because that would be a violation of the dress code

2    policy.  They would be then walking around the wing in

3    shorts or tank tops or T-shirts or things like that.  So,

4    they are expected to take the things they need with them

5    to the shower area so they're not walking back and forth

6    to their cell.

7            If they are walking back and forth to their cell

8    or socializing on the wing while they have something other

9    than their blues and shoes on, then that's when they would

10   be issued a program ticket.

11   Q.    Is it fair to say that following the rules is an

12   important part of the treatment process at Big Muddy River

13   Correctional Center?

14   A.    Yes.

15   Q.    And learning about following expectations is an

16   important part of the treatment process in place in the

17   SDP program at Big Muddy River?

18   A.    Yes.

19   Q.    And counsel asked you a question about group size

20   exceeding 10, and I believe you said that occurred in the

21   past.

22   A.    Yes.

23   Q.    When, when are we talking about where there was

24   more than 10?

25   A.    Steadily, over the years since I started in 2010,

```
 1   we have been reducing the number of participants in each
 2   group, and then adding additional therapy groups to
 3   accommodate that.  I think in 2016, 2017, there might have
 4   been 12 to 14 on occasion, and we have it down now to
 5   where every group is run with 10 or under.
 6   Q.      And do you have any expectation that will change?
 7   A.      Not, not in regards to the groups getting bigger,
 8   but continuing to be able to offer more groups and
 9   potentially smaller groups as the need occurs.
10           MR. TYRRELL:  Thank you.
11           MR. STOBBS:  No questions, Judge.
12           THE COURT:  I have a couple.
13                           EXAMINATION
14   BY THE COURT:
15   Q.      Miss Stover, since 2013, you mentioned I think
16   2016 and '17, but from 2013 up to today, have there been
17   periods of time where the core treatment group exceeded 10
18   to 12 --
19   A.      Yes.
20   Q.      -- individuals?  How do you measure treatment
21   progress?  In other words, I take it, I assume, the
22   progress of the SDP participants in treatment is something
23   that's important to you?
24   A.      Yes.
25   Q.      And how do you measure an individual's progress in
```

1    treatment?  How is that measured?

2    A.      Every six months, a semi annual evaluation is

3    completed on every SDP.  The ones that are choosing not to

4    participate, they're not scored because we don't have a

5    good account, an ability to score them, so that is

6    identified at the top.  There's a blurb about that.

7           But every SDP that is participating in the

8    treatment group, I think there are 18 different sections,

9    and then each of those sections have subsections, but

10   there are areas specific to sex offender treatment,

11   dynamic risk factors that are assessed.  And those would

12   include:  Sexual offense disclosure; acceptance of

13   responsibility; identifying cognitive distortions and

14   restructuring those; criminal behaviors; life-style

15   impulsivity; problem solving; ability to understand and

16   use REBT skills; Anger Management; ability to identify and

17   understand their Cycle process, their offending pattern;

18   and then, also, to identify while they are currently

19   displaying indicators of their offending pattern, as well.

20   So, those are all considered on a six month basis.

21   Q.      And you, as a therapist, you prepare the

22   evaluations for the members of your groups; correct?

23   A.      Yes.

24   Q.      And is the information in the evaluation based

25   solely on your interaction with them during group?

```
 1   A.      It is based on the group case note, so their group
 2   progress and participation.  It's also based on
 3   observation while they are on the wing in the housing
 4   unit.
 5   Q.      Your observation?
 6   A.      Yes.
 7   Q.      Anybody else's observation?  Anybody else's
 8   feedback?
 9   A.      We, as an SDP treatment staff, will, will discuss
10   them, as well.
11   Q.      Do you discuss all of them or is it, does it
12   depend on -- I mean, is it -- in other words, do you
13   discuss with the other staff members all of the evaluation
14   during the preparation, or does it just depend?  (Pause.)
15   Do you understand what I'm saying?
16   A.      Yes.
17   Q.      Do you get feedback on each person's evaluation or
18   just some?
19   A.      Not in the formal sense that we sit and go through
20   170, and each of us discuss it.  But the SDP treatment
21   staff, we share an office, so there's ongoing dialogue
22   throughout the entire period of time where we are
23   completing the semi annual evaluations.
24   Q.      And I think you said you may have like 60 to 70
25   SDP participants for which you are the primary therapist;
```

1    correct?

2    A.    Yes.

3    Q.    When you do your evaluation every six months, do

4    you sit down with each one of, of the individuals in your

5    groups and go through their evaluations with them?

6    A.    Not on -- not in a one-on-one setting, not on an

7    individual setting.

8    Q.    Do you ever go through the evaluation with the

9    individual participants on a one-on-one setting?

10   A.    Not one-on-one.  That's done in the group setting.

11   Q.    So, so -- and is that only done if they come to

12   you and say, "I want to discuss my evaluation"?

13   A.    In the group setting, I will pass out their semi

14   annuals.  They sign in receipt of those, but then they

15   keep the semi annuals.  And then in that, that group

16   setting and in any subsequent groups after that, they are

17   absolutely able to ask any questions or discuss anything

18   about their semi annuals.

19   Q.    They can?

20   A.    Yes.

21   Q.    So, in other words, the only way you discuss with

22   them what's on their evaluation is if they bring it up to

23   you?

24   A.    Yes.

25   Q.    And from the information that I have been

1    listening to for the last two days, it's my understanding

2    there are like four phases to you all's program?

3    A.      Yes.

4    Q.      And do you have an expectation that the

5    participants will progress through the four phases?  I

6    mean, is that your -- is that a goal of your, of the

7    program?  Is that an expectation?

8    A.      In regards to a goal, yes, that would be a goal.

9    That would display progress with each of the treatment

10   targets.

11   Q.      And would -- that would reflect that the program

12   is doing what it's supposed to do; right?

13   A.      It would reflect that the individual participant

14   is accepting the opportunities for treatment that's being

15   provided for them.

16   Q.      So, if the -- if all of the participants accept

17   the opportunity of the treatment that's being provided to

18   them, the expectation would be that they each would go

19   from Phase 1 to Phase 4 at some point?

20   A.      That would be my hope for them, yes.

21   Q.      How many times has that happened since you have

22   been at Big Muddy?  How many times has somebody gone from

23   Phase 1 to Phase 4, to your knowledge?

24   A.      Since I have been at Big Muddy, I can't give a

25   specific answer.  But I did review --

1    Q.      Give me an estimate.

2    A.      Yeah, I did review some of the notes that I had

3    prepared for this hearing.  And since 2012, 11 of the

4    SDP's that have been granted conditional release were in

5    either Phase 3 or Phase 4 of the program.

6    Q.      Since 2012?

7    A.      Since 2012.

8    Q.      How many, since 2012 -- so, 11 folks in the

9    program since 2012 --

10   A.      That have been released.

11   Q.      That have been -- and they have all been on

12   conditional discharge; right?

13   A.      Yes.

14   Q.      Okay.  Those were Phase 3 and 4's?

15   A.      Mm-hmm, yes.

16   Q.      How many folks since that, during that time have

17   been conditionally discharged and they were on other

18   phases?

19   A.      Since 2011, there have been 22 SDP's that have

20   either been granted discharge or conditional release.

21   Q.      Period.

22   A.      Period.

23   Q.      Twenty-two?

24   A.      Yes.  So, 11 of those were on 3 to 4, so the other

25   11 would have been on other phases.

1    Q.      So -- you said 2011?

2    A.      Since 2011, yes.

3    Q.      So, in the last seven years, 22 participants have

4    been conditionally discharged?

5    A.      Conditional release or discharged.  We have had

6    four that's been discharged.

7    Q.      And has that been based on program recommend --

8    how many based on program recommendation and how many have

9    gone to court and gotten it on their own?

10   A.      The SDP treatment program itself, we don't

11   recommend.  We just speak about treatment progress.  So,

12   that would be indicated in the phases.  But all but two or

13   three of those 22 have been recommended by the Wexford

14   evaluators for conditional release or discharge.

15   Q.      And then my last question:  When they go for the

16   recovery petition or when they go back to court, whatever

17   you call it --

18   A.      Yes.

19   Q.      -- to seek discharge or conditional discharge,

20   what involvement do the therapists and your reports have

21   in that?  In other words, do you all prepare -- are you

22   all requested and/or do you prepare evaluations,

23   documentations, reports to the courts, for them to review

24   and to make the assessments?

25   A.      We maintain the SDP treatment file.

1    Q.      Okay.

2    A.      And that's where we keep the semi annuals, the

3    treatment plans, and then the case notes that we type from

4    each group.  The Wexford evaluators have their own office

5    associate that comes in --

6    Q.      Who are they?  Who are the Wexford evaluators?

7    A.      Wexford is the contractual company.

8    Q.      I know who they are.  Who are the Wexford

9    evaluators and tell me how they interface with the

10   program.

11   A.      Dr. Weldon-Padera and Dr. Kristopher Clounch are

12   currently assigned through Wexford.  They are hired by

13   Wexford, employed by Wexford, to do the SDP recovery

14   evaluations.  And they have their own office associate --

15   Q.      So, they're the ones --

16   A.      -- that will gather the files.

17   Q.      -- that do the evaluations for recovery petitions?

18   A.      Yes.

19   Q.      They get their information from you all?

20   A.      Their office associate pulls it from our files,

21   yes.

22           THE COURT:  Thank you.

23           MR. TYRRELL:  I don't have any additional

24   followup, Your Honor.

25           THE COURT:  Thank you, Miss Stover.

```
 1              THE WITNESS:  Thank you.
 2              MR. ROCKERSHOUSEN:  Your Honor, we would next call
 3    Dr. Holt.  But could we take a five-minute break, first?
 4              THE COURT:  Sure.  Why don't we go ahead and take
 5    15 minutes.
 6              MR. ROCKERSHOUSEN:  Thank you.
 7              THE COURT:  It will be the last break of the day.
 8              (Court recessed from 2:23 p.m. to 2:40 p.m.)
 9              (Proceedings continued in open court, parties
10    present.)
11              THE COURT:  You can call your next witness.
12              MR. ROCKERSHOUSEN:  Your Honor, the defendants
13    call Dr. Holt to the stand.
14              THE COURT:  Dr. Holt, please step forward and be
15    sworn.
16              (Witness sworn by clerk.)
17              THE WITNESS:  I'm Dr. Thomas Holt, H-O-L-T.
18                        DR. C. THOMAS HOLT,
19    having been first duly sworn, was examined and testifies
20    as follows:
21                        DIRECT EXAMINATION
22    BY MR. ROCKERSHOUSEN:
23    Q.    Good afternoon, Dr. Holt.
24    A.    Good afternoon.
25    Q.    What is your highest level of education?
```

1    A.        Ph.D.

2    Q.        And when did you obtain a Ph.D?

3    A.        I defended my Ph.D in 2005.

4    Q.        And where did obtain your Ph.D from?

5    A.        Cappella University.

6    Q.        And since 2005, what was your first full-time work

7    assignment after you obtained your Ph.D?

8    A.        I worked as a contractual psychologist at

9    Taylorville Correctional Center.

10   Q.        How long did you work at Taylorville?

11   A.        I believe I was there two years.

12   Q.        And after Taylorville, where did you go?

13   A.        I went to Jacksonville Developmental Center.

14   Q.        How long were you at Jacksonville Developmental

15   Center?

16   A.        Just over a year.

17   Q.        And after that, where did go?

18   A.        I went to Chester Mental Health.

19   Q.        How long were you at Chester Mental Health?

20   A.        Five years, approximately.

21   Q.        And after that, where did go?

22   A.        I went to Big Muddy correction center.

23   Q.        And are you currently working at Big Muddy

24   Correctional Center?

25   A.        Yes, I am.

```
1   Q.       And are you an employee of the Illinois Department
2   of Corrections?
3   A.       Yes, I am.
4   Q.       How long have you been at Big Muddy River
5   Correctional Center?
6   A.       Five years this month.
7   Q.       And what is your job title at Big Muddy River
8   Correctional Center?
9   A.       I'm the Administrator of the Sex Offender Program.
10  Q.       Do you have any professional licenses?
11  A.       Yes, do.  I'm a Licensed Clinical Professional
12  Counselor.  I am a Licensed Sex Offender Treatment
13  Provider and a Licensed Sex Offender Evaluator.
14  Q.       How long have you had your LCPC license?
15  A.       Since 2000 -- I had the LPC in 2000, and I would
16  have had the LCPC from 2002.
17  Q.       How long have you been a licensed Sex Offender
18  Treatment Provider?
19  A.       Since 2014, when the license was required.
20  Q.       And how long have you been a Licensed Sex Offender
21  Evaluator?
22  A.       Since 2014, when the license was required.
23  Q.       And has your job title and assignment at Big Muddy
24  River been the same the entire time that you have been
25  there?
```

1    A.      Yes.

2    Q.      And in general, what are some of your job duties

3    at Big Muddy River Correctional Center as the

4    Administrator of the Sex Offender Program?

5    A.      I have oversight of the Sexually Dangerous Person

6    Program, as well as the Volunteer Sex Offender Program.

7    Q.      And is the Volunteer Sex Offender Program for

8    criminally convicted inmates who wish to voluntarily

9    participate in sex offender treatment?

10   A.      Yes.

11   Q.      As part of your position overseeing the Sexually

12   Dangers Persons Program, do you provide treatment to the

13   civilly committed sexually dangerous persons?

14   A.      Yes.

15   Q.      And in addition to providing treatment, what other

16   tasks do you do for the SDP program as Administrator?

17   A.      I oversee the therapists.  I oversee the training

18   of new therapists.  I, I write new programs.  I oversee

19   the policy and the procedures.  I do run groups.  I

20   liaison with the security staff.  I have other duties as

21   assigned, which I liaison as well with the security staff.

22   Q.      When it comes to security measures, is there

23   anyone at the facility that has authority over you?

24   A.      Yes.

25   Q.      And who is that?

```
 1    A.      All of the wardens.  My direct supervisor is the
 2    Warden of Operations.
 3    Q.      And when it comes to providing treatment or
 4    therapy, is there anyone at the facility that has
 5    supervision over you?
 6    A.      No.
 7            THE COURT:  Mr. Rockershousen, do you have your
 8    laptop on our Elmo?
 9            MR. ROCKERSHOUSEN:  I do.
10            THE COURT:  Should he -- I'm concerned about
11    scratching it.
12            MR. ROCKERSHOUSEN:  Okay.  Sorry.
13            THE COURT:  Are you going to show something on
14    your laptop?
15            MR. ROCKERSHOUSEN:  I was going to.  I can just
16    use the paper exhibit.
17            THE COURT:  That's fine.  I mean, I don't have a
18    problem with doing that, I'm just -- they'll kill me if
19    something happens to that piece of machinery.
20    Q.      (BY MR. ROCKERSHOUSEN)  I'm going to show you
21    what's been previously marked and admitted as Plaintiff's
22    Exhibit 3.  And, Dr. Holt, are you familiar with this
23    document?
24    A.      Yes, I am.
25    Q.      And what is this?
```

1    A.      This is the Sexually Dangerous Persons Program

2    procedures.

3    Q.      And who puts together the Sexually Dangerous

4    Persons Program procedures?

5    A.      I did.

6    Q.      Okay.  And how long has this version of the

7    program procedures been in effect?

8    A.      I believe it was last updated in March.

9    Q.      Of this year?

10   A.      Yes.

11   Q.      When you first got to Big Muddy River Correctional

12   Center in 2013, who did you replace as Administrator of

13   the Sex Offender Program?

14   A.      When I arrived at Big Muddy in October of 2013,

15   there was no Administrator.

16   Q.      Okay.  Who had, who had last been the

17   Administrator before you arrived?

18   A.      Dr. Mark Carich.  C-A-R-I-C-H.

19   Q.      And did Dr. Carich have programs and procedures

20   that were in place when he, when he was at the facility?

21   A.      Yes.

22   Q.      And when you arrived at the facility and took over

23   as Administrator, did you make any changes to the policies

24   and procedures that had been in place under Dr. Carich?

25   A.      Yes, I did.

1   Q.      And what are some of the changes that made to Dr.

2   Carich's policies and procedures?

3   A.      Some of the very first changes I made address the

4   sizes of the groups.  The groups that Dr. Carich had

5   typically met for three hours or more.  They could be 14,

6   15, 18, 20 people in a group.  People came in and out of

7   the group as they chose to, to go to the restroom, to get

8   a drink.

9         THE COURT:  He just asked what changes you made.

10  A.      I stopped that.  I consolidated and streamlined

11  the groups.  We began at that point with the goal of

12  reducing the groups to 10.

13        THE COURT:  Doctor?  He asked what changes you

14  made to the policies.

15        THE WITNESS:  Those are --

16        THE COURT:  That's what you are describing?

17        THE WITNESS:  Yes, ma'am.

18        THE COURT:  Okay.

19  A.      Some of the rules were related to that.  People

20  coming and going, obviously, was a change that was made

21  because they were allowed to come and go.  What's called

22  the blues and shoes, the dress code, was something else

23  that I tightened down and implemented.

24        We also, we also manualized or codified some of

25  the didactic groups so that each therapist who is

1    presenting a didactic group was doing exactly the same

2    thing as the other therapist presenting the same group.

3         THE COURT:  Mr. Rockershousen?  Let me just get

4    something clarified.

5         On Plaintiff's Exhibit 3, Doctor, the program

6    policies and procedures?

7         THE WITNESS:  Yes, ma'am.

8         THE COURT:  You said you, I guess, implemented

9    these or --

10        THE WITNESS:  Yes, I wrote --

11        THE COURT:  -- established these and put these in

12   effect; right?

13        THE WITNESS:  Yes.  I wrote many of them, changed

14   some others, and put them in effect.

15        THE COURT:  I'm just trying to get a clarification

16   for -- I know this version was updated effective in March

17   of this year.  If I look at -- but when I'm looking at

18   Plaintiff's Exhibit 3, is there any way to tell me what

19   portions or what policies and procedures you've revised

20   since you have been there?  Is there any way -- you know,

21   I want to -- I'm trying to under -- when I look at

22   Plaintiff's 3, I want to be able to tell what the

23   situation was, if any of these were in effect before you

24   got there, or if all of these represent changes since you

25   have been there.  I just -- I don't know.

1          THE WITNESS:  First of all, I misspoke.  The last

2    time this was changed was last month.  There was an

3    addition made.  That, I believe, you can see in here.  But

4    as to the other changes prior?  You would not be able to

5    tell by looking at this document.

6          THE COURT:  And so all of these -- every section,

7    you didn't -- these are not new with you.  Some of these

8    existed before you?

9          THE WITNESS:  In some form, yes.

10         THE COURT:  In some form?

11         THE WITNESS:  Yes.

12         THE COURT:  Some of them may be in the same form,

13   some of them may be in revised form?

14         THE WITNESS:  Correct.

15         THE COURT:  So -- okay --

16         THE WITNESS:  Although, there would be very few

17   that would be the same form.  Similar, but not the same.

18         THE COURT:  And would I be able to tell that by

19   looking at the revision date?

20         THE WITNESS:  Yes.

21         THE COURT:  Okay.  All right.  Thanks.

22   Q.     (BY MR. ROCKERSHOUSEN)  And, Dr. Holt, are there

23   some policies and procedures from Dr. Carich that you did

24   not change?

25   A.     In essence, yes.

1    Q.      Okay.  But the policies that did not change, you

2    approved of those policies; is that correct?

3    A.      That is correct.

4    Q.      So, all the policies and procedures in Plaintiff's

5    Exhibit 3 were either created or approved by you; correct?

6    A.      That is correct.

7    Q.      I'm going to show you page 14 of 26 of Plaintiff's

8    Exhibit 3.  And we have heard testimony during the course

9    of this trial about DOC tickets and program tickets.  And

10   does this policy kind of explain the program tickets at --

11   for the SDP program?

12   A.      Yes.

13   Q.      And it looks like for minor infractions, staff may

14   give a warning without issuing a program ticket; is that

15   correct?

16   A.      That is correct.

17   Q.      And the second violation of the same infraction

18   may lead to a program ticket, Intensive Therapy, or an

19   institutional ticket; is that correct?

20   A.      Yes.

21   Q.      I am now showing you page 20 of 26 in Plaintiff's

22   Exhibit 3.  And does this describe generally how the

23   therapy groups are set up for the SDP's at Big Muddy?

24   A.      Yes, generally.

25   Q.      What is general group therapy at Big Muddy River

1    Correctional Center?

2    A.      A general therapy group is a process group.  The

3    purpose, the intent, as it says there, is:

4            "To develop insight into/resolving motivational

5    and developmental issues;

6            "To process interpersonal relationship dynamics,

7    which can include family of origin, core issues, things

8    like that;

9            "Identifying and learning to control deviant

10   arousal, fantasies;

11           "Identifying and learning to change offending

12   behaviors, lifestyles."

13   Q.      And of the 170 SDP's at Big Muddy, approximately

14   109 are currently participating in treatment; is that

15   correct?

16   A.      As of Monday, it was exactly 109.

17   Q.      And are those 109 individuals divided up into

18   different core groups?

19   A.      Yes.

20   Q.      And as the Administrator of the program, are you

21   familiar with how many of the SDP's are in each group?

22   A.      Yes.

23   Q.      Currently, are there any core or general groups

24   that have more than 10 SDP's in them?

25   A.      No.

```
 1   Q.      When is the last time a core or general group had
 2   more than 10 SDP's in them?
 3   A.      It's difficult to put a date on that.  That has
 4   been a process.  I would say it -- should I speculate?
 5           THE COURT:  If you don't know --
 6           THE WITNESS:  I do not know.
 7   Q.      (BY MR. ROCKERSHOUSEN)  Okay.  Is it a goal of the
 8   staff at Big Muddy to keep the general or core groups to
 9   10 members or less?
10   A.      Yes.
11   Q.      What is sexual -- what is a sexual offense
12   specific group?
13   A.      A sexual offense specific group is a, is a
14   structured, it's time-limited, it's a clinical, closed
15   therapy group.  It teaches specific strategies specific to
16   the individual's sexual offense.  These groups are both
17   sex offender as well as sex offense specific.  They will
18   deal with victim empathy, cycles of offending.  We can
19   talk -- as it says here, Relapse Prevention.  Although,
20   it's not a Relapse Prevention program, the topic of
21   relapse prevention is here, including advanced relapse
22   prevention.
23   Q.      So, can a SDP be in both a general group and a sex
24   offense specific group?
25   A.      Certainly.
```

1    Q.      How does the staff at Big Muddy determine who goes

2    into what general or core group?

3    A.      That is staffed, discussed among the staff, based

4    on intellectual ability, cognitive ability, treatment,

5    treatment readiness, treatment motivation.

6            Our goal very much is to put people in groups with

7    like people.  I guess an example would be, it's not

8    advantageous to an individual to be in a group that is

9    lower or slower than he is, nor is it advantageous to be

10   in a group where the whole group is faster than they are.

11   Q.      What is a didactic group?

12   A.      A didactic group is a teaching group.

13           THE COURT:  We already got that information.

14           MR. ROCKERSHOUSEN:  Okay.

15   Q.      (BY MR. ROCKERSHOUSEN)  And can a SDP be placed in

16   a general or core group, a offense specific group, and a

17   didactic group?

18   A.      Most certainly.

19   Q.      Is it possible for an SDP to be in more than one

20   offense specific group or more than one didactic group?

21   A.      Certainly.

22   Q.      Now I'm going to show you what's page 23 of

23   Plaintiff's Exhibit 3.  And is this the Four Phase

24   Treatment process at Big Muddy River Correctional Center?

25   A.      Yes, it is.

```
1    Q.      What is the Four Phase Treatment process?
2    A.      The Four Phase Treatment process is a tool that we
3    use to help the individual understand where they are in
4    the treatment process.
5    Q.      Was the Four Phase Treatment process in place when
6    you arrived at Big Muddy River Correctional Center?
7    A.      In a different form, yes, it was.
8            THE COURT:  What was the different form, Doctor?
9            THE WITNESS:  The, the progression indicators were
10   not as tight.
11           THE COURT:  Explain that to me.
12           THE WITNESS:  It doesn't show up as -- oh, yeah,
13   it does.  In Phase 1, you'll see the bullet point "as
14   evidenced by."
15           THE COURT:  Yes.
16           THE WITNESS:  "As evidenced by" -- if we just go
17   to the first one, "as evidenced by a basic knowledge of
18   sexual offenses."  These kind of indicators were not a
19   part of the process before I arrived.  So --
20           THE COURT:  The first one says, "as evidenced by
21   no tickets."
22           THE WITNESS:  Okay.  You're right.  I'm sorry.
23   That wouldn't have been there.  It would have just been
24   "adherence to program rules."  I wanted something more
25   concrete.  So, I moved through the different phases and
```

1    put movement indicators, and they're all behavioral and

2    they're observable and evidence based.

3            THE COURT:  Can you take me through this, just the

4    description, just this policy, and generally summarize for

5    me so I have an understanding of what changes you made.

6    Like you just explained one of them.

7            THE WITNESS:  Okay.

8            THE COURT:  Would you take me through and tell me

9    how you changed or tightened up or tweaked the Four Phase

10   Treatment process?

11           THE WITNESS:  Okay.  I think I understand your

12   question, Your Honor.

13           THE COURT:  Right.

14           THE WITNESS:  For example, in this phase, in

15   initial treatment, Phase 1, completion of initial -- an

16   initial victimology outline.  It is now going to be

17   evidenced by a basic knowledge of sexual offenses.

18           The individual who is not acknowledging a sexual

19   offense or minimizing their sexual offense would not be

20   said to have a completion of an initial victimology

21   outline.

22           THE COURT:  So, they couldn't move from Phase 1.

23           THE WITNESS:  They probably would not, no.

24           THE COURT:  Was that the same before you got

25   there?

 1          THE WITNESS:  No.  It was much more vague.  It

 2     would have just said "completion of initial victimology

 3     outline."

 4          THE COURT:  So, before you got there, even though

 5     Mr. Howe still says he didn't commit the rape that put him

 6     there, he would have been able to move through the phases.

 7     But since you have been there, he could not because he

 8     couldn't get past that piece; is that fair?

 9          THE WITNESS:  No.  Because this is a basic

10     knowledge of sexual offenses, at this point.  There are

11     other indicators on here that will fit your question, Your

12     Honor.

13          THE COURT:  No, but I'm saying -- you said "the

14     completion of initial victimology outline."  Does that

15     include the acknowledgement of having created the offense

16     -- I mean, committed the offense?

17          THE WITNESS:  Yes.

18          THE COURT:  So, if he never acknowledges

19     committing the offense, he can't move past Phase 1?

20          THE WITNESS:  He probably would stay in Phase 1,

21     yes, ma'am.

22          THE COURT:  Go ahead, Mr. Rockershousen.

23          MR. ROCKERSHOUSEN:  Thank you, Your Honor.

24     Q.   (BY MR. ROCKERSHOUSEN)  And once an individual

25     makes it to Phase 4, does that mean that they get

1  released?

2  A.      No.

3  Q.      Once an individual completes Phase 4, does that

4  mean they get released?

5  A.      No.

6  Q.      So, how does the staff at Big Muddy use the four

7  phases in providing treatment to the SDP's?

8  A.      The phase process is a tool.  It shows the

9  individual, it shows staff, where the individual is in

10 treatment; allows the therapist, the facilitator of that

11 individual's specific core group to direct their therapy

12 and their interventions to where the individual is in the

13 process.  It's not a linear program that says, if they

14 start at Pretreatment and when they get to Phase 4, they

15 leave.

16         And part of the purpose is that -- part of the

17 reason that we only use it as a tool for treatment

18 progression is because we really can't control when a

19 person leaves.  They can leave in any phase.

20 Q.      And as Administrator of the Sex Offender Program

21 at Big Muddy, do you ever directly make recommendations to

22 the court as to whether or not an SDP should be released?

23 A.      I have not done that, no.

24 Q.      And it's your understanding that it is the Wexford

25 evaluators who make the recommendation to the courts?

```
 1    A.      Yes.
 2    Q.      And do the Wexford evaluators only recommend
 3    someone to be released if they are in Phase 4?
 4    A.      No.
 5    Q.      And have Wexford evaluators recommended SDP's for
 6    release who have not been in Phase 4?
 7    A.      Certainly.
 8            THE COURT:  I'm sorry, Mr. Rockershousen.  Let me
 9    clarify one thing.  And I might have cut you off.  Could
10    you put that back up there?
11            MR. ROCKERSHOUSEN:  Yes, Your Honor.
12            THE COURT:  Did you finish summarizing for me the
13    changes that you made?
14            THE WITNESS:  Yes, ma'am.
15            THE COURT:  That was the only change --
16            THE WITNESS:  It would have been the same exactly
17    through the -- when we get to --
18            THE COURT:  -- the victimology piece?
19            THE WITNESS:  When we get to Phase 4, those are --
20    we could call the bullet points "as evidenced by" in
21    Phase 4, we could call those completion indicators, an
22    individual who had attained those things in Phase 4, I
23    would expect an evaluator.
24            THE COURT:  Okay.  So, when I'm looking back at
25    this after all this is said and done, I'll know the bullet
```

1    points that say, "as evidenced by," those are your

2    revisions?

3          THE WITNESS:  Yes, ma'am.

4          THE COURT:  Okay.  Thank you.

5          MR. ROCKERSHOUSEN:  Your Honor, do you want me to

6    go through --

7          THE COURT:  (Nonverbal response.)

8          MR. ROCKERSHOUSEN:  Okay.

9          THE COURT:  No, thank you, Mr. Rockershousen.

10   Q.    (BY MR. ROCKERSHOUSEN)  And you heard Miss Stover

11   testify earlier that, since 2011, 22 individuals have been

12   either conditionally released or discharged.  To your

13   knowledge, have there been any other individuals that have

14   been recommended for release by the evaluator but not

15   released or discharged?

16   A.    Yes.  That number moves up to 33, at that point.

17   Q.    Okay.  So, the total number of people who have

18   been released, discharged, or recommended for release or

19   discharge is 33 individuals?

20   A.    Yes, sir.

21   Q.    And that's since approximately 2011?

22   A.    Since 2011, yes.

23   Q.    When the Wexford evaluators do their evaluations,

24   do they interview the SDP's?

25   A.    Yes, they do.  If I could rephrase?  They offer an

```
 1    interview to the SDP's.
 2    Q.      And it's up to the SDP's to choose whether or
 3    not --
 4    A.      That's correct.
 5    Q.      -- whether or not to do the interview?
 6    A.      That's correct.
 7    Q.      Okay.  Thank you.  Dr. Holt, you were in the
 8    courtroom when Mr. Needs was testifying; correct?
 9    A.      I was.
10    Q.      And you heard Mr. Needs testify that you
11    disciplined him by taking away his underwear?
12    A.      I did.
13    Q.      Did you ever discipline Mr. Needs by taking away
14    his underwear?
15    A.      I did not.
16    Q.      Did you ever have a conversation with Mr. Needs
17    about his underwear?
18    A.      I did.
19    Q.      What was that conversation?
20    A.      I was on the core, just outside the door of the
21    wing.  Mr. Needs came to me, asked if I would do him a
22    favor.  I asked him what he needed.  He said that he
23    didn't have any underwear, and he wanted me to get a hold
24    of Clothing and have them send a call over to him so he
25    could go and get underwear.
```

```
 1              I turned to the officer who was sitting at the
 2    desk and I relayed that information to the officer at the
 3    desk, whose role it is to connect Mr. Needs to the
 4    Clothing.  And he said that he would do that but, first of
 5    all, they needed to go to Mr. Needs' cell and make sure
 6    that he didn't have any underwear.
 7              I don't know if it was later that day or the next
 8    day, that officer told me that he had gone to Mr. Needs'
 9    cell and they had found two pair of underwear in his cell,
10    so that he was not sent to Clothing to get underwear.  I
11    believe this was August of last year.
12    Q.      Have you ever deprived an SDP of underwear as a
13    punishment for a rule violation?
14    A.      Never.
15    Q.      Are you aware of anyone else at the facility
16    punishing anyone by taking aware their underwear for a
17    rule violation?
18    A.      I am not.
19    Q.      I'm going to show you page 34 of 34 of Plaintiff's
20    Exhibit 8, which has been admitted into evidence.  What is
21    this document?
22    A.      This is a therapy schedule for the Sex Offender
23    Program, as well as the Volunteer Sex Offender Program.
24    Q.      And who puts together this schedule?
25    A.      We all do.  I approve it.  But we all put it
```

1    together, depending on the changes that are made.  We have

2    it on a common drive on the computer.

3    Q.      And it appears that every Wednesday from 2:30 to

4    4:00 there's something called Staffing; is that correct?

5    A.      Yes.  That is an official staff meeting with all

6    of the therapists and myself.  Although, Staffing

7    continues almost all the time through the day, but that is

8    the official time.

9    Q.      Okay.  And then if you look earlier in the day on

10   Wednesday, it looks like from approximately 12:00 to -- or

11   11:30 to 12:30, there's staffing on C Wing?

12   A.      What that is, is an opportunity for any of the

13   SDP's -- well, along the left where it says Alternative

14   Staff and Wing Meeting, that is for the Volunteer program.

15   It's the same description.

16          The one on the right, C Wing and B Wing, you'll

17   see there -- that is an opportunity for any participant in

18   the program to bring their concerns, their complaints,

19   their desires for new groups, their -- any information

20   that they think we need, or any question that they may

21   have, that's their opportunity to do that.  We hang a

22   sign-up sheet on the wing for anyone to sign up, although

23   individuals who don't sign up are still allowed to come.

24   Q.      And what staff members at Big Muddy attend

25   Staffing on the wings?

A.      Currently, I and Heather Young are doing those

Staffings.  The two newest staff members that we have are

coming along for training, so there's four of us at this

time.

Q.      And how many staff members does the Sex Offender

Program at Big Muddy have?  How many treatment providers?

A.      Total?

        THE COURT:  Now?

        MR. ROCKERSHOUSEN:  Now, yes.

A.      There are four therapists and myself.  And I

provide therapy as well as administration.

        THE COURT:  Has that been the same since 2013?

        THE WITNESS:  No, ma'am.

        THE COURT:  How has it changed?

        THE WITNESS:  We just received -- the two were

just hired, I want to say, last month, middle of last

month.

        THE COURT:  And before then, how many -- what was

the staffing?

        THE WITNESS:  There were three of us for -- and I

do not remember how long it was three of us.

        THE COURT:  When you first came in 2013, how many

were there, including yourself?

        THE WITNESS:  Four.  In 2013.  One went out on --

she was injured and left and has not returned; later,

```
 1    another left for medical reasons and she had not returned.
 2    In that time, one was hired, so at that point there were
 3    three.  And for approximately a year or so --
 4            THE COURT:  Three, including yourself?  Or three
 5    plus --
 6            THE WITNESS:  Three, including me.
 7            THE COURT:  Okay.
 8            THE WITNESS:  And for a year or so, there was
 9    three.  Then we just hired these other two.  And we put a
10    bid out for another therapist, and I believe that bid came
11    down a week ago, so we've got one on the way.
12            THE COURT:  So, since you have been there it's
13    been either three or four, including yourself?
14            THE WITNESS:  Yes, ma'am.
15    Q.      (BY MR. ROCKERSHOUSEN)  And, Dr. Holt, does the
16    Sex Offender Program at Big Muddy have a separate budget?
17    A.      I'm sorry?
18    Q.      Does the Sex Offender Program at Big Muddy have
19    its own budget?
20    A.      It does not.
21    Q.      Okay.  Does that mean that you are not allowed to
22    obtain any materials?
23    A.      No.
24    Q.      Okay.  So, even though you don't have your own
25    budget, you are still able to obtain materials for the
```

1   program?

2   A.      That's correct.

3   Q.      And how do you obtain -- for example, if you need

4   a book for the program, how do you obtain the book?

5   A.      I communicated -- the last book, we received

6   approximately 90 days ago.  We got 120 of them, I believe.

7   I communicated with Springfield, to the individual who at

8   that time was the Administer of Sex Offender Services for

9   the State of Illinois.  She talked to the appropriate

10  people, and the books showed up at Big Muddy for us.

11  Q.      And what kinds of therapy-specific books do the

12  SDP's at Big Muddy have access to?

13          THE COURT:  Mr. Rockershousen, it would be helpful

14  for me if you can identify in your question what time

15  period you are asking him about.

16          MR. ROCKERSHOUSEN:  Sure.  I apologize, Your

17  Honor.

18  Q.      (BY MR. ROCKERSHOUSEN)  Dr. Holt, currently what

19  books do -- what kind of therapy-specific books do the

20  SDP's at Big Muddy have access to?

21  A.      They have access to all of the therapy books that

22  they ever had access to.

23  Q.      And is there any kind of library or, or other

24  place where SDP's can check out therapeutic books?

25  A.      Yes, there is.  We have an extensive library on A

1    Wing.  Individuals, when they come to Staffing, can

2    indicate that they would like to check out a book or

3    books.  They'll be provided a list of every book that we

4    have in the entire library.  They'll write out what they

5    want.

6         Heather Young takes that to the other wing.  They

7    go into the library, they give her the book.  She brings

8    the book back.  She gives it to the SDP with a, kind of a

9    library card, check-in, check-out kind of thing on it, so

10   they know how long they get to keep the book.  If they

11   decide they need to keep it longer, they just indicate to

12   her at the next Staffing they need it more.  She just

13   extends it.  And they have full access.

14   Q.    And the --

15        THE COURT:  Hold on for a second.  I need

16   clarification again.

17        Doctor, you said they have access to every therapy

18   book they ever had access to?

19        THE WITNESS:  Yes, ma'am.

20        THE COURT:  I don't know what that means.  Could

21   you explain what you mean?

22        THE WITNESS:  Yes, ma'am.  One of the things that

23   I changed when I arrived there, they were going through

24   workbooks.  They were designated by different colors.

25   There was a green book and the yellow book and the gray

```
 1   book and the blue book, and they all had different topics.
 2   And one of the things that the SDP's had done, prior to my
 3   arrival, is they filled out these books, or had someone
 4   else fill them out, but the books were filled out.  And
 5   they would turn them in and they would say, Yes, I'm done.
 6   I have completed this portion of my therapy.
 7           But what I saw, was that individuals --
 8           THE COURT:  I'm not asking you about your opinion
 9   or what you saw.  My question was much more direct and
10   simpler than that.
11           THE WITNESS:  Those books are still available to
12   them.
13           THE COURT:  Okay.  But now you are saying they
14   have access to additional therapy books?
15           THE WITNESS:  Many more books than that, yes.
16           THE COURT:  And that's since when?  (Pause.)  I
17   mean, as soon as you came in, in 2013, did you start
18   getting them --
19           THE WITNESS:  They had access to those books, yes.
20           THE COURT:  No.  I mean additional books.
21           THE WITNESS:  Yes.
22           THE COURT:  Okay.
23           THE WITNESS:  Maybe '14.  It took some time to get
24   that up and running, but very soon after I arrived.
25   Q.      (BY MR. ROCKERSHOUSEN)  And the library of therapy
```

1    books that you have in 4-House, that's separate from the

2    general library at Big Muddy; correct?

3    A.      Yes, sir.

4    Q.      And the SDP's are still allowed to check out other

5    books from the library at Big Muddy; correct?

6    A.      Yes.

7            MR. ROCKERSHOUSEN:  I apologize, Your Honor.

8            THE COURT:  It's okay.

9            (Pause.)

10   Q.      (BY MR. ROCKERSHOUSEN)  Dr. Holt, I'm going to

11   show you Plaintiff's Exhibit 20, and I'm going to show you

12   page 5 of 26 of Plaintiff's Exhibit 20.  And what is this

13   document?

14   A.      This document is Mr. Howe's treatment plan.

15   Q.      And these treatment plans are prepared every six

16   months; is that correct?

17   A.      That's correct.

18   Q.      And a treatment plan is prepared for all the

19   individuals at Big Muddy that are participating in -- all

20   the SDP's in Big Muddy that are participating in therapy?

21   A.      There is a treatment plan prepared for every

22   individual.

23   Q.      Okay.

24   A.      All 170.

25   Q.      Okay.  And you heard testimony earlier that Mr.

1    Howe was diagnosed with sexual sadism.  Is that a

2    diagnosis that anyone -- any staff member at Big Muddy

3    made?

4    A.      No.

5    Q.      Who made that diagnosis?

6    A.      That would have been made by the Wexford

7    evaluator.

8    Q.      And the, the diagnosis that the offender is

9    committed to the institution for, is that a diagnosis that

10   treatment staff at Big Muddy make?

11   A.      No.

12   Q.      Who makes those diagnoses?

13   A.      That would be the committing evaluators.

14   Q.      And just to be clear, the committing evaluators

15   are not employed by the Illinois Department of

16   Corrections?

17   A.      No.

18   Q.      Thank you.  So, on the left-hand side of this,

19   there's -- the first column is problem number; correct?

20   A.      Yes.

21   Q.      And is that just to indicate the number of, of

22   target problems for each individual receiving treatment?

23   A.      That is correct.

24   Q.      All right.  And then the second column is

25   description.  Is that just describing what the problem is?

1    A.      Yes.

2    Q.      All right.  And the third column is treatment

3    goal.  And what is that?

4    A.      That is the prescribed way that, in this case Mr.

5    Howe, will address the description of the problem.

6    Q.      And the fourth column is intervention or treatment

7    activities.

8    A.      This is what we will do to assist Mr. Howe in

9    meeting his treatment goals.

10   Q.      Okay.  And are all of the SDP's given or shown a

11   copy of their treatment plan?

12   A.      Yes.

13   Q.      And do they have an opportunity to review or

14   discuss their treatment plan with their treatment

15   providers?

16   A.      Yes, they do.

17   Q.      I am next going to show you pages 9 and 10 of

18   Plaintiff's Exhibit 20.  And what is this document?

19   A.      This is Mr. Howe's semi annual program evaluation.

20   Q.      And semi annual program evaluations are completed

21   for all the SDP's at Big Muddy every six months?

22   A.      That's correct.

23   Q.      And who fills out the semi annual evaluations?

24   A.      The primary author is the primary therapist,

25   although, all of the therapists who have interaction with

1    the individual would have input into that.

2    Q.      And is the semi annual program evaluation the same

3    as the petition for recovery evaluation?

4    A.      No.

5    Q.      Who completes the petition for recovery

6    evaluation?

7    A.      The SDP.

8    Q.      I'm sorry.  That was a bad question.  When an SDP

9    petitions the court, the committing court for recovery and

10   an evaluation is conducted, who does that evaluation?

11   A.      Who does the evaluation?  The Wexford evaluator

12   does that evaluation.

13   Q.      Right.  And the Wexford evaluator's evaluation is

14   separate from the semi annual program evaluation?

15   A.      Correct.

16   Q.      And is the semi annual program evaluation only

17   used internally?

18   A.      Yes.

19   Q.      And why do staff at Big Muddy River Correctional

20   Center do the semi annual program evaluations for each

21   SDP?

22   A.      This is a, a snapshot of that six-month time

23   period, a snapshot of that individual's participation and

24   progress and treatment.  It only covers the time period at

25   the top right.

1    Q.      And are, are the SDP's given a copy of their semi
2    annual program evaluations to review?
3    A.      Yes.
4    Q.      And are they given an opportunity to discuss their
5    semi annual program evaluations --
6              THE COURT:  Counsel, we have been through this.
7              MR. ROCKERSHOUSEN:  Okay.  Thank you, Your Honor.
8              THE COURT:  We went through this with Miss Stover.
9    Are you anticipating that they're going to have different
10   information?
11             MR. ROCKERSHOUSEN:  No, Your Honor.  I apologize.
12   Thank you.
13   Q.      (BY MR. ROCKERSHOUSEN)  And, Dr. Holt, you
14   currently provide therapy to individuals who are in
15   segregation; correct?
16   A.      That's correct.
17   Q.      How does the treatment that you provide in
18   segregation differ from the treatment that's given to the
19   SDP's who are not in segregation?
20   A.      Content-wise, there is no difference.  It is an
21   hour -- an hour of structured group therapy.
22   Q.      And do you physically go to segregation to provide
23   this treatment?
24   A.      Yes.
25   Q.      Does the SDP treatment program follow a treatment

1    model?

2    A.      Yes.

3    Q.      What model does it follow?

4           MR. SPREHE:  I'm going to object to this as an

5    expert opinion because the treatment model isn't listed

6    anywhere in the policy.  It's going to be based on factors

7    through his specialized knowledge.

8           THE COURT:  Is there an identified model, a named

9    model that you are coming -- that you are getting to here?

10          MR. ROCKERSHOUSEN:  I believe so.

11          THE COURT:  You believe so?  You don't know?  Is

12   there a particular model that your treatment follows?

13          THE WITNESS:  Yes, ma'am.

14          THE COURT:  A recognized or named model?

15          THE WITNESS:  Yes, ma'am.

16          THE COURT:  What's the name of it?

17          THE WITNESS:  It's the cognitive behavioral

18   therapy based on the containment model.

19          MR. ROCKERSHOUSEN:  Thank you, Your Honor.

20   Q.      (BY MR. ROCKERSHOUSEN)  Dr. Holt, I'm again going

21   to show you page 5 of Plaintiff's Exhibit 20, which is the

22   mental health treatment plan.  Since you've become the

23   Administrator of the program at Big Muddy, have you made

24   any changes to the treatment plan form that's filled out?

25   A.      I do believe this is a different form than we used

1    initially, yes.

2    Q.      Do you recall how the form was changed since you

3    arrived?

4    A.      I do not.  That was --

5    Q.      Okay.

6    A.      -- a long time ago.

7    Q.      Thank you.  And I'm again going to show you page 9

8    of what's been marked as Plaintiff's Exhibit 20, and this

9    is the semi annual program evaluation.

10   A.      Yes.

11   Q.      Do you know if you have made any changes to this

12   form since you have taken over as Administrator of the

13   program at Big Muddy?

14   A.      Yes.  This, this form has changed multiple times

15   since I have taken over.

16   Q.      In general, can you describe how it's changed

17   since you took over?

18   A.      The last change is, is the inclusion of the sex

19   offender treatment needs and progress scale.  That is the

20   last and probably the most major change to it.

21          THE COURT:  Can you tell us what other changes you

22   made?  I know you said that's the major.  I'd be

23   interested in --

24          THE WITNESS:  The other changes --

25          THE COURT:  -- what changes you made?

```
 1            THE WITNESS:  I, I took it from subjective to
 2   objective.  I wanted it to be more measurable.
 3            THE COURT:  Doc, I'm not asking for the
 4   theoretical.  I'm saying, can you tell me on this form
 5   what changes you made to the actual physical form?
 6            THE WITNESS:  No, ma'am, I cannot.
 7            THE COURT:  Thank you.
 8   Q.       (BY MR. ROCKERSHOUSEN)  Dr. Holt, you were in the
 9   courtroom earlier when the Warden was testifying about the
10   Adjustment Committee?
11   A.       Yes.
12   Q.       Are you familiar with the Adjustment Committee at
13   Big Muddy?
14   A.       Yes, I am.
15   Q.       Do you have a direct role in the Adjustment
16   Committee process?
17   A.       I do not.
18   Q.       Do you have any kind of indirect role in the
19   Adjustment Committee process?
20   A.       Yes, I can.
21   Q.       What is your indirect role?
22   A.       I advocate for the SDP's who --
23   Q.       Okay.  Could you explain that?
24   A.       -- who go before the Adjustment Committee.
25   Individuals who are seriously mentally ill or who are on
```

1    the mental health caseload, if we believe that there is a

2    psychological reason for the infraction that they were

3    involved in, we can intervene.  We can make suggestions

4    for reductions in segregation time or any other

5    consequence of a DOC infraction.  We can even mitigate to

6    the point where they are not placed in seg.

7            We have removed people from segregation early, so

8    that they could return to treatment.  There are several

9    times and several ways that we can advocate and intervene

10   in that process.

11   Q.      And why do you advocate for SDP's in the

12   disciplinary process?

13   A.      Because treatment is more important.

14   Q.      Can SDP's have job assignments at the prison?

15   A.      Yes.

16   Q.      Do you have any role in SDP's receiving job

17   assignments?

18   A.      Yes.

19   Q.      What is your role in that?

20   A.      The SDP comes to us at Staffing, typically,

21   sometimes a written kite, requests a job.  Miss Young

22   right now is the one who keeps track which people have

23   asked and who has which job.  If there is no reason that

24   we can see why an individual cannot have that job, no

25   treatment reason, no physical reason, et cetera, we pass

1    that on to the next level.  That is passed on to Internal

2    Affairs.  If no one has any problem with it down the line,

3    that individual is given that position.

4    Q.      And internal affairs is something outside of the

5    Sex Offender Program; correct?

6    A.      Yes.

7    Q.      And that's a security branch at the prison?

8    A.      Yes.

9    Q.      The SDP's at Big Muddy are assigned to a

10   particular cell on their wing; correct?

11   A.      Yes.

12   Q.      How are they assigned to a particular cell?

13   A.      SDP staff make that assignment.

14   Q.      Okay.

15   A.      Well, let me rephrase.  We make that

16   recommendation and we send it to Placement.  If there is a

17   security reason why that wouldn't happen, they would

18   override that.  But generally, we make that assignment.

19   Q.      And, and again, Placement is a security branch

20   within the prison?

21   A.      That's correct.

22   Q.      How do the SDP staff determine who to recommend

23   for what cell?

24   A.      That's a complicated process, typically.  Knowing

25   the SDP's is a big help; knowing who has problems with

1    whom; who has problems in the past; who celled with who in

2    the past; who could help whom in their treatment.  Safety

3    and security is paramount.  We would not put people

4    together who there could be a problem.

5    Q.      Are there currently any criminally convicted

6    persons residing on the same wing as civilly committed

7    SDP's?

8    A.      There is not.

9            THE COURT:  Has there ever been?

10           THE WITNESS:  Yes.

11           THE COURT:  When was the last time?

12           THE WITNESS:  January of 2015, the last general

13   population inmate was moved off of B Wing.  They were

14   separated by uppers and lowers, and that was the day they

15   were moved off.

16   Q.      (BY MR. ROCKERSHOUSEN)  We have heard a lot about

17   the four phases that the SDP's are placed in during their

18   evaluations.  Does the phase that they're in dictate

19   specifically what treatment is provided to the SDP?

20   A.      No.

21   Q.      And can members of the same group be at different

22   phases?

23   A.      Oh, certainly.

24           MR. ROCKERSHOUSEN:  No further questions.

25                           CROSS-EXAMINATION

1    BY MR. SPREHE:

2    Q.      Dr. Holt, you have been in charge since October of

3    2013; is that correct?

4    A.      That is correct.

5    Q.      From then, until now, how many months has the

6    Substance Abuse module been on hold?

7    A.      I believe it went -- May of '17 to present.

8    Q.      May of 2017 until October of 2018?

9    A.      That's correct.

10   Q.      No time before that?

11   A.      No.  It ran before that.

12   Q.      It ran consistently before that?

13   A.      I believe it ran two cycles before that, to --

14   Q.      Can you explain what that means?

15   A.      -- 50 weeks.

16           THE COURT:  Mr. Sprehe, could you -- I think the

17   microphone is either off or -- yeah, thanks.

18   Q.      (BY MR. SPREHE)  I'm sorry.  Could you repeat

19   that?

20   A.      Approximately 50 weeks.

21   Q.      50 weeks.  Dr. Holt, is your facility or any of

22   your therapists licensed or accredited for Substance Abuse

23   treatment?

24   A.      The facility is not.  Every therapist with an

25   independent license is.

```
1    Q.      Every therapist at the facility is --

2    A.      With an -- in my program, with an independent

3    license, is licensed to provide substance abuse treatment.

4    Q.      What's the name of that license?

5    A.      LCSW or LCPC.

6    Q.      Who issues that?

7    A.      State of Illinois.

8    Q.      Okay.  You mentioned earlier that you have never

9    recommended discharge from the SDP program to any court;

10   is that correct?

11   A.      That is correct.  I have not.

12   Q.      Do you have the authority to recommend to any

13   court that people be discharged from the program?

14   A.      Yes, per statute, I do.

15   Q.      You do?

16   A.      Yes.  I have not had occasion to do it yet.

17   Q.      You have not had occasion to do it.

18   A.      No, sir.

19   Q.      Can you explain what that means?

20   A.      It's -- no one has asked me to.  No one has --

21   Q.      That's why you have never recommended to anyone --

22   A.      -- no one has suggested -- no -- my therapists --

23   Q.      I'm sorry.  Can I state my question?  You have

24   never recommended discharge for anyone at the program

25   because no one has asked you to; is that correct?
```

1    A.      There's a different -- that's what I said, yes.

2    Q.      Are you aware of how many people have died while

3    in the program, since you have been in charge?

4            MR. ROCKERSHOUSEN:  Objection, relevance.

5            MR. SPREHE:  I think it goes to the quality of the

6    treatment.

7            THE COURT:  Overruled.

8            You can answer.

9    A.      Generally, yes.

10   Q.      (BY MR. SPREHE)  How many would that be?

11   A.      I believe it's eight, since I have been there.

12   Q.      Eight.  You mentioned before that it's the Wexford

13   evaluators who generally recommend discharge from the

14   program; is that right?

15   A.      Yes.

16   Q.      Do they base their recommendations on any of the

17   work done -- I'm sorry.  Let me rephrase.

18           Do they base their recommendation off of the semi

19   annual report created by the SDP program whatsoever?

20   A.      I guess I don't understand.  There's two questions

21   there.

22   Q.      Okay.  I'll rephrase.  I can rephrase.  When the

23   Wexford evaluators are in the process of completing their

24   evaluation, do they base that evaluation whatsoever on the

25   semi annual reports created by the SDP program?

1    A.    I can't answer that yes or no.

2    Q.    Do the Wexford evaluators consult with the SDP

3    therapists and/or yourself when making their evaluations?

4    A.    Yes.

5    Q.    Per evaluation, approximately how many hours do

6    they consult with you, personally?

7    A.    It's usually more minutes than hours, sir.

8    Q.    They consult with you for minutes --

9    A.    30 minutes, 40 minutes.

10   Q.    Do they have access to the semi annual reports

11   created by your program?

12   A.    Yes.

13   Q.    Do you have personal knowledge that they exercise

14   the right to that access?

15   A.    Yes.

16   Q.    Do you have any reason to believe they don't base

17   their evaluations off of the semi annual reports?

18   A.    Yes.

19   Q.    You do?

20   A.    Yes.

21   Q.    You mentioned before, whenever you need materials

22   such as books for your program, you contact the Sex

23   Offender Services in Springfield; is that correct?

24   A.    That's correct.

25   Q.    And then I believe you said they contact the

```
 1    appropriate people to get you what you need?
 2    A.      Yes.
 3    Q.      Do you know who that is?
 4    A.      No, I didn't.  They just ordered 'em and --
 5    Q.      Is it your understanding that the Sex Offender
 6    Services ordered the books or that they had to go through
 7    somebody else to order the books?
 8    A.      I don't know.
 9    Q.      Is this the case with any other materials besides
10    books?
11    A.      No.
12    Q.      Just books.
13    A.      It's -- no.  Yes, just books.
14    Q.      So, then is it your understanding that you don't
15    know where the funding comes from for your books?
16    A.      That's correct.
17    Q.      And I can assume you don't know what -- how much
18    funding?
19    A.      There was a price on the invoice when it came, but
20    I don't remember --
21    Q.      I'm sorry.  Let me rephrase.  I didn't mean for
22    the books, I meant what your funding is to get those
23    books?
24    A.      No.  I don't know.
25    Q.      You have no idea?
```

```
 1    A.       No.
 2    Q.       You mentioned earlier that you just hired two new
 3    therapists to work in your facility?
 4    A.       Yes.
 5    Q.       Are those two therapists licensed to do groups by
 6    themselves?
 7    A.       Yes.
 8    Q.       They are?
 9    A.       Yeah.
10    Q.       I'm going to show you page 26 of 26 of Plaintiff's
11    Exhibit 3.  You mentioned before that one of the purposes
12    of the four phases was for the SDP's themselves to
13    understand their treatment; is that correct?  Do you
14    remember that testimony?
15    A.       Yes.
16    Q.       And then you later said that the four phases are
17    also for the therapists and the treaters to track the
18    progress of the SDP's; is that correct?
19    A.       That's correct.
20    Q.       Does your program -- sorry.  Let me rephrase.
21             Do you or any of the therapists track the literacy
22    rates of the participants in your program?
23    A.       By number?
24    Q.       By any measure?
25    A.       Yes.
```

1    Q.      What measure would that be?

2    A.      Functioning level, most typically.

3    Q.      Okay.  Let me rephrase.  Do you know the number of

4    people in your program who are in one sense or another

5    illiterate?

6    A.      I could approximate.

7    Q.      You could approximate?  (Pause.)  Can you read the

8    third main bullet point, and followed by the third sub

9    bullet point for me, please?

10   A.      The third main bullet point:  "Advanced level of

11   understanding and acceptance of the negative impact of the

12   offending behavior on the victim or victims, others, and

13   himself, without toxic shame."

14           "As evidenced by the individual's ability to

15   verbalize and demonstrate victim empathy, identify

16   feelings, recognize victim impact, assume ownership of

17   offense, understand and take the perspective of others,

18   demonstrate emotional regret, and express feelings of

19   empathy and remorse."

20   Q.      Thank you very much.  Doctor, do you have any

21   doubt that George Needs went without underwear for an

22   extended period of time?

23   A.      Could you rephrase, please?

24   Q.      Do you have any reason to doubt that George Needs

25   went without underwear for an extended period of time?

```
1    A.      Yes.  Yes, I think I do.

2    Q.      Are you wearing underwear today, Doctor?

3    A.      I am.

4            MR. SPREHE:  No more questions.

5            THE COURT:  Okay.  Mr. Rockershousen?

6            MR. ROCKERSHOUSEN:  Thank you, Your Honor.

7                        REDIRECT EXAMINATION

8    BY MR. ROCKERSHOUSEN:

9    Q.      Dr. Holt, you were asked by plaintiff's counsel

10   whether you have ever recommended anyone for release or

11   discharge, and you said that you had never had the

12   opportunity.  Can you explain what you mean by that?

13   A.      That would be a staffing decision.  I misspoke

14   when I said I had never been asked.  What I meant was,

15   that had never been brought to me by staff, saying that

16   they believed that this individual in their group was

17   ready for release.  That, that occasion has not come up,

18   to date.

19           THE COURT:  Since you have been there?

20           THE WITNESS:  Since I have been there.

21   Q.      (BY MR. ROCKERSHOUSEN)  And you have never been

22   asked in a legal proceeding to provide a recommendation

23   whether or not an individual should be released?

24   A.      I have not.

25   Q.      And as the Administrator, you do not initiate the
```

1   legal proceeding that determines whether or not an SDP is

2   released or discharged?

3   A.      I do not.

4   Q.      So, you would never independently have occasion to

5   approach a court and recommend that someone be released?

6   A.      No.

7   Q.      You were asked some questions about purchasing

8   supplies.

9   A.      Yes.

10  Q.      Other than books, how do you get other supplies

11  you might need for the program?

12  A.      We fill out a supply requisition and turn that

13  into the warehouse, and they send the supplies to us.

14  Q.      And the warehouse is at Big Muddy Correctional

15  Center; correct?

16  A.      That's correct.

17  Q.      And you were asked whether you had reason to doubt

18  that Mr. Needs had -- did not have underwear for an

19  extended period of time.  Can you --

20          THE COURT:  I'm done with the underwear.

21          MR. ROCKERSHOUSEN:  Okay.  Okay.

22          THE COURT:  I promise you, it's not going to --

23          MR. ROCKERSHOUSEN:  Sure.

24          THE COURT:  -- I'm not going to make my

25  determination on whether Mr. Needs had underwear.

1        But I really don't -- Mr. Needs, no offense, but I

2   don't want to hear about your underwear no more.

3        MR. ROCKERSHOUSEN:  Thank you, Your Honor.  I

4   don't have anything further, Your Honor.

5        MR. SPREHE:  Nothing further, Your Honor.

6        THE COURT:  I just have a couple, Doctor.

7                        EXAMINATION

8   BY THE COURT:

9   Q.      Yesterday, one of -- it might have been Mr. Howe

10  testified that on some occasions, I guess, as a

11  disciplinary measure they can be restricted to their rooms

12  as opposed to segregation.

13  A.      Mm-hmm.

14  Q.      A room or a cell restriction.  Is that something

15  that happens as a disciplinary measure?  I mean, are they

16  sometimes restricted to their rooms for disciplinary

17  purposes?

18  A.      May I be clear with what you are saying?

19  Q.      Sure.

20  A.      There are two ways that that can occur.

21  Q.      Okay.

22  A.      A violation of an institutional rule, and that

23  violation having occurred in the dayroom, the Adjustment

24  Committee can give them dayroom restriction, which means

25  they would be in their cell.

```
 1              We have intervene --
 2   Q.    That would be violations issued to them by SDP
 3   program staff.
 4   A.    No, that would be from --
 5   Q.    Correct --
 6   A.    -- DOC staff.
 7   Q.    How do they know what they're doing in the
 8   dayroom?
 9   A.    If they were written a ticket by an officer or by
10   anyone, a nurse, whatever, for something that occurred in
11   the dayroom, and that went to the Adjustment Committee,
12   they would see where that infraction occurred and they
13   could restrict them from that dayroom.
14   Q.    Okay.  I'm just trying to get a clear
15   understanding.  Would that ticket -- would the ticket
16   initiate -- I don't care who ultimately issues it -- would
17   it initiate from your staff?
18   A.    It could, but it wouldn't have to.
19   Q.    So, other than SDP staff, what -- are there IDOC
20   employees or staff that are posted or, or who work out of
21   the dayroom area?
22   A.    Yes.  They walk through the dayroom on a regular
23   basis.
24   Q.    Just walking through on their rounds?
25   A.    Yes.  And if they chose to write a ticket for an
```

1     infraction, that individual would be -- they could be

2     given a dayroom restriction.  However, we have intervened

3     in the Adjustment Committee.  And if they are given

4     dayroom restriction, they are allowed to come out for

5     treatment.

6     Q.      Do they ever get dayroom restriction initiated by

7     any means by your staff?

8     A.      It's called a different name but, yes, they can.

9     It's called Intensive Therapy.  And if an individual shows

10    by their maladaptive behavior that they are disruptive to

11    the process on the wing, since we run most of our groups

12    and our program on the wing itself, they can be placed on

13    Intensive Therapy.  When they are placed on Intensive

14    Therapy, they would be restricted to their cell except for

15    those times when therapy -- when a therapist is on the

16    wing.  They would be allowed to come out and participate

17    in --

18    Q.      In group therapy.

19    A.      -- their group therapy or be offered to join group

20    therapy if they were not in therapy at that time.

21    Q.      What is --

22    A.      Or they would be offered extra therapy --

23    Q.      What is intense about that therapy, other than the

24    fact that they are restricted in their cell?  I mean, why

25    is that -- when I see the term "Intensive Therapy," I'm

1    assuming that means an enhanced degree of therapy.

2    Therapy on steroids.

3    A.      And that's what they get.  They get much more

4    therapy than just their core group or their didactic

5    group.  They would have therapy at a table every hour --

6    they would be offered that therapy every hour that there

7    is a therapist on the wing to monitor their behavior.

8    Q.      So, in order to get meaningful or to really get

9    some really, really good bumped-up therapy, I gotta have a

10   disciplinary violation so I can get on Intensive Therapy?

11   A.      No, ma'am.  They could volunteer for any, any

12   group that runs --

13   Q.      Okay.

14   A.      -- at any time.  Or they could be placed in any

15   group.

16   Q.      Gotcha.  A couple more really quick questions:

17   Since you have been there in 2013, have you ever -- has

18   your program ever been understaffed?

19   A.      No.

20   Q.      You never had --

21   A.      No.

22   Q.      Never been a period of time when you didn't feel

23   you had enough staff?

24   A.      No.

25   Q.      Never complained about not having enough staff?

1    A.      That's a different question.

2    Q.      No, it ain't.

3    A.      I could use, always use more staff.

4    Q.      Okay.  Well, let me clarify the question.  Have

5    you ever either requested from IDOC additional staff that

6    you did not receive or complained about the amount of

7    staffing that you have had since you have been there in

8    2013?

9    A.      Not officially, no.

10   Q.      Unofficially?

11   A.      I have asked when they're going to bid the ones

12   that are available, yes.

13   Q.      During the time that, that we -- that the whole

14   state was under that budgetary crisis, when the governor

15   -- when they didn't pass the budget, did that affect your

16   program in terms of the funding where you -- did that

17   affect how your program was funded?

18   A.      No, we functioned the same way.

19   Q.      Okay.  Thank you.

20           MR. ROCKERSHOUSEN:  Nothing further, Your Honor.

21           MR. SPREHE:  Briefly.  Very briefly, Your Honor.

22                    RECROSS-EXAMINATION

23   BY MR. SPREHE:

24   Q.      Dr. Holt, I want to return to Plaintiff's

25   Exhibit 3, page 6.  Can you just read that second full

1   paragraph for me?

2   A.      "Therefore, as a more intense therapy specific

3   environment, when maladaptive/noncompliant behaviors

4   indicate such a need, Intensive Therapy status may be

5   therapeutically indicated in conjunction with or in the

6   absence of Adjustment Committee sanctions."

7   Q.      Is maladaptive or noncompliant behavior a synonym

8   for bad behavior?

9   A.      Yes.

10          MR. SPREHE:  No further questions.

11          MR. ROCKERSHOUSEN:  Nothing further, Your Honor.

12          THE COURT:  Okay.  Thank you, Doctor.

13          Any additional evidence, Mr. Rockershousen?

14          MR. ROCKERSHOUSEN:  No, Your Honor.  The

15   defendants rest.

16          THE COURT:  Okay.  So, this is what we need to do.

17   Once again, to be totally honest, there's no need for

18   closing argument because the closing argument is designed

19   for me, to give me the information and pull the evidence

20   for me to make my decision.  That's not how we're going to

21   do this.

22          This case, I'm going to request specific findings

23   of fact and conclusions of law and at that time, from

24   that, I'm going to issue my ruling.  And depending on what

25   my ruling is, there may be a second part of that in terms

```
 1    of, because what's been requested is injunctive relief.
 2    If my ruling is a liability ruling for the plaintiffs, I
 3    may or may not bifurcate designing the relief.  It just
 4    depends on the situation.
 5            So, that process, the way we are going to proceed
 6    with that, Chris is going to have the transcript completed
 7    in seven days.
 8            Right?
 9            THE REPORTER:  Yes.
10            THE COURT:  And the proposed findings of fact and
11    conclusions of law will be due 30 days from whenever the
12    transcript is filed.  Both parties submit at the same
13    time.  It's not going to be staggered.
14            I will issue my ruling within 30 days after the
15    receipt of the findings of fact and conclusions of law.
16            Won't I, Michelle?
17            LAW CLERK:  Christmas.
18            THE COURT:  Christmas?  Yes.
19            LAW CLERK:  Yes.
20            THE COURT:  So that, that is the plan.
21            Now, before we break up today on the record, what
22    we need to do is, I need to go down those -- the list of
23    those exhibits that were provisionally entered during Dr.
24    Cauley's testimony.  And I need -- some of that, I need to
25    make a ruling on, because some of those exhibits based on
```

1    the testimony are not independently admissible as

2    substantive evidence.  So, I need to go back and do that.

3           MR. SPREHE:  Can I ask for quick clarification?

4           THE COURT:  Yes.

5           MR. SPREHE:  When you said the relief finding

6    might be bifurcated, did you mean in a separate writing or

7    in a separate hearing?

8           THE COURT:  I don't think it's going to be a

9    separate hearing, but I -- and I don't know.  What I'm

10   anticipating, the possibility -- so, one possibility is

11   that I do my findings of fact and conclusions of law and,

12   if there is a liability determination in favor of

13   plaintiffs, that the injunctive relief will be included

14   within that order.

15          But the other possibility is, because of the

16   situation, and I don't obviously know where we are, where

17   we're going to be, depending on the situation, I may

18   solicit proposals in the case of liability, proposals from

19   plaintiffs as to injunctive relief, proposed injunctive

20   relief as well, separately.  It just depends on the

21   situation.  I'm not there yet.  It's still marinating in

22   my head.  But right now, it's not a whole lot of stuff

23   happening in my brain.  So, that's why I said it may or

24   may not be.

25          MR. SPREHE:  Thank you.

```
 1              THE COURT:  Okay.  So, I think I have the ones in
 2    question circled.  And, Michelle and/or Stacie, you're
 3    just going to have to go along with me.
 4              And what I'd like to do, Mr. Tyrrell, I'm going to
 5    call off the number -- and I'm going on what I have -- I
 6    think I kept a good record of what you guys objected to,
 7    so let me go through the ones I know you objected to and
 8    then I can make a ruling on those.  And if I miss any,
 9    then we could come back and you can let me know.
10              MR. ROCKERSHOUSEN:  Yes, Your Honor.
11              THE COURT:  Okay.  So, Plaintiff's Exhibit 1,
12    which was the Illinois Department of Human Services
13    Treatment and Detention Facility Handbook, I believe --
14    and that's for Big Muddy; right?
15              MR. TYRRELL:  Exhibit 1 is for the Department of
16    Human Services Treatment and Detention Facility in
17    Rushville.
18              THE COURT:  Okay.  That's right.  Anyway, there
19    was testimony and, and not only did Dr. Cauley indicate
20    that he relied upon it, he gave specifics in terms of the
21    comparisons.  So, for that reason, again, I'm going to
22    stand on that admission.
23              MR. TYRRELL:  Yes, Your Honor.
24              THE COURT:  Plaintiff's No. 2, Big Muddy Inmate
25    Orientation Manual.  You did not object to that one.
```

```
 1              MR. TYRRELL:  Correct.
 2              THE COURT:  I think the next one I have that you
 3    objected to, it would have been No. 5?  Joint Committee on
 4    Administrative Rules?
 5              MR. TYRRELL:  Yes, Your Honor.
 6              THE COURT:  I'm going to sustain the objection
 7    again to No. 5.  Again, there was no testimony from which
 8    that exhibit would be independently admissible as
 9    substantive evidence.
10              No. 6.  It's the Rushville schedule.  Again, for
11    comparison sake, I'm going to maintain my ruling on that.
12    And it's admitted.  It will remain admitted.
13              Same thing for No. 8 -- I mean, No. 7.
14              Then I think you objected to No. 9, the John
15    Howard Association Monitoring Visit to Big Muddy.  Again,
16    that -- there was no real testimony regarding that.  That
17    report would be hearsay.  There has been no witness to
18    testify to that report that has any personal knowledge,
19    and for that reason it is inadmissible hearsay.
20              MR. SPREHE:  Your Honor, can I be heard on that?
21              THE COURT:  Yes.
22              MR. SPREHE:  We would contend that it falls under
23    the periodical exception to hearsay because it's from a
24    reliable source, and our expert did indeed rely on the
25    statistics within that report.
```

```
 1              THE COURT:  The empirical research exception to
 2    hearsay, I think, is -- only applies when the information
 3    is used to cross-examine another expert.  I believe that
 4    is the case.  However, once again, it is clearly hearsay.
 5    In other words -- and I understand the attempt.  I would
 6    attempt to get it in, too, if I had another organization
 7    that monitored the facility under different circumstances
 8    and they came back with their findings.  The problem is,
 9    their findings are not -- were not admissible in this
10    case.
11              So, as to Exhibit No. 9, that one will not -- so
12    that one is -- will not be admitted as substantive
13    evidence.
14              The next one that I have that you objected to,
15    I've got No. 25.  You objected to treatment plans and
16    evaluations.  Did you object to that, Mr. Tyrrell?  Maybe
17    I got that wrong.
18              MR. TYRRELL:  I believe I did, Your Honor, just as
19    some of the older records.
20              THE COURT:  Well, I maintain my ruling as to that
21    exhibit.  So, the objection is overruled.
22              All right.  The same thing as to Exhibits 29, 30,
23    and 31, I think you objected.
24              MR. TYRRELL:  Your Honor, I think 29, 30, and 31
25    were all grievance documents and we objected on hearsay
```

1    grounds.

2            MR. SPREHE:  May I respond, Your Honor?

3            THE COURT:  Yes.

4            MR. SPREHE:  They're not being used for the truth

5    of the matter asserted.

6            THE COURT:  What are they being admitted for?

7    What purpose?

8            MR. SPREHE:  It would go towards the grievance

9    procedure that they're subjected to in the facility.

10           THE COURT:  Just to show the grievance procedure?

11           MR. SPREHE:  (Nonverbal response.)

12           THE COURT:  It will be admitted for that limited

13   purpose.  So, the objections -- so my ruling on 29, 30,

14   and 31 will remain.  Again, I will not consider whatever

15   the specific grievances are.  That's not something I'm

16   going to take into consideration at all.  So, that would

17   be the only purpose of it.

18           Next, I have 35 and 36, which are treatment

19   records, group sign-up sheets.  Did you object to those,

20   Mr. Tyrrell?

21           MR. TYRRELL:  I did, Your Honor, just as to older

22   records.

23           THE COURT:  Okay.  Again, I'm going to maintain my

24   ruling.  The objections to 35, 36, 37, and 38 are

25   overruled.

1            Okay.  No. 40 is the SOTIPS Sex Offender Treatment

2       Intervention and Progress Scale Manual.

3            I don't believe Dr. Cauley addressed this or

4       discussed this, any portions of this manual during his

5       testimony.  So, I'm really not sure what the purpose of

6       that exhibit is, or how that exhibit is independently

7       admissible.  Mr. Sprehe, do you want to help me out?

8            MR. SPREHE:  No, Your Honor.  I would love to.

9            THE COURT:  Okay.  So, Plaintiff's Exhibit No. 40,

10      the objection in fact will be sustained and that one

11      should be removed from evidence.

12            No. 41, State of Illinois Department of Human

13      Services Treatment and Detention Facility Master Plan.

14      Again, there was no specific testimony regarding this plan

15      other than the fact that Dr. Cauley relied on it in some

16      way or considered it as part of the standards.  But again,

17      there was no specific testimony or comparison to any of

18      the plans in this case.  So again, for that reason, I

19      think --

20            MR. SPREHE:  May I be heard on that, Your Honor?

21            THE COURT:  After I finish what my thought is.

22            MR. SPREHE:  Sorry.

23            THE COURT:  -- for that reason, I don't think it

24      is independently admissible.

25            Now you may, Mr. Sprehe.

```
 1            MR. SPREHE:  We would maintain that our expert was
 2   using that to show that a treatment plan that meets
 3   national standards can be -- is possible to be implemented
 4   in the State of Illinois, and we do believe he referred to
 5   this plan specifically because it was a Rushville plan.
 6            THE COURT:  Because it was what?
 7            MR. SPREHE:  The Rushville plan.
 8            THE COURT:  Oh, so 40 and 41 are the Rushville?
 9            MR. SPREHE:  Yes, Your Honor.
10            THE COURT:  Okay.  All right.
11            MR. ROCKERSHOUSEN:  Not 40, just 41.
12            MR. SPREHE:  41 and 42, Your Honor.
13            THE COURT:  41 and 42.  Okay.  I didn't -- you
14   know what?  I didn't understand that those were the
15   Rushville plan.  For that, there was, there was definitely
16   a comparison to the Rushville plans, the Rushville
17   program, and Dr. Cauley specifically testified, he used
18   that comparison in testifying to the acceptable standards
19   in this case.  So, 41 and 42 --
20            MR. TYRRELL:  Your Honor?  Just briefly.  I
21   apologize.  I think 41 is just a blank treatment plan.
22            THE COURT:  Okay.
23            MR. TYRRELL:  I just wanted to make sure that was
24   clear, just because the only thing I think Dr. Cauley
25   referenced in regarding the Rushville treatment plan was
```

```
 1    the general plan set forth in the procedure, in the
 2    manual, which is Plaintiff's Exhibit 1.  He never
 3    discussed specifically the individualized treatment plans
 4    at the Rushville Treatment and Detention Facility.
 5              THE COURT:  What his opinion was, is that the
 6    program, including the treatment plan that they use, were
 7    consistent with acceptable standards.  I'd like to be able
 8    to look at the treatment plan that he's talking about.
 9              MR. TYRRELL:  Yes, Your Honor.
10              THE COURT:  So, now you lost me.  I told you, I
11    don't have much --
12              MR. TYRRELL:  Sorry, Your Honor.
13              THE COURT:  We're on 41 and 42.  Where were we?
14              MR. SPREHE:  You admitted 41 and 42, Your Honor.
15              THE COURT:  Yes, 41 and 42 will remain admitted.
16              Now we come to -- I think the next -- I think
17    that's it.  That's all I have, as far as -- oh, that's all
18    I have as far as -- what have you got, Stacie?
19              (Off the record.)
20              THE COURT:  Okay, Mr. Tyrrell, did you object to
21    Plaintiff's Exhibit 17?
22              MR. TYRRELL:  I did.  There is additional
23    commentary that was written on these documents, and it's
24    also repetitive of some of the other admitted exhibits
25    because they're just part of the treatment manual and part
```

```
1    of the semi annual program evaluations.
2              THE COURT:  Okay.  Well, I haven't seen them yet.
3              MR. TYRRELL:  Okay.
4              THE COURT:  They're not inadmissible for any other
5    reason, so I'm going to overrule the objection and they
6    will remain in evidence.
7              And finally, 28.  That was Mr. Howe's request for
8    substance abuse counseling.
9              MR. TYRRELL:  Yes, Your Honor.  We did object to
10   that as hearsay.
11             THE COURT:  Well, that remains overruled and that
12   -- No. 28 will stay in evidence.
13             I think that's all.
14             Michelle, do you have any additional?
15             LAW CLERK:  No.  Those are the ones that Stacie
16   and I had.
17             THE COURT:  That Stacie what?
18             LAW CLERK:  That Stacie and I talked about.
19             MR. SIMMONS:  Can we get a clarification on
20   Exhibit 24?
21             THE COURT:  What clarification, Mr. Simmons?
22             MR. SIMMONS:  Well, I think you made an oral
23   ruling and everyone jotted it down but me, and I didn't --
24   I wanted to make sure I got it right.
25             THE COURT:  Oh, it was admitted without objection.
```

```
 1              MR. SIMMONS:  Okay.  Thank you.
 2              THE COURT:  No. 24?
 3              MR. SIMMONS:  Yes.
 4              THE COURT:  The calculation of the hours?
 5              MR. SIMMONS:  Yes.
 6              THE COURT:  That wasn't objected to.  It's in
 7       evidence.
 8              MR. SIMMONS:  Thanks.
 9              THE COURT:  Okay.  Any other housekeeping matters?
10              MR. ROCKERSHOUSEN:  Your Honor, for the proposed
11       findings of fact and conclusions of law, is there a page
12       limit that's established in your procedures -- okay.
13              THE COURT:  I don't believe so.
14              LAW CLERK:  No.
15              MR. ROCKERSHOUSEN:  Okay.
16              THE COURT:  There might be a page limit
17       established by my ADD, but I can't give you that number.
18              MR. ROCKERSHOUSEN:  Sure.  Thank you, Your Honor.
19              THE COURT:  Anything else?
20              MR. SPREHE:  No, Your Honor.
21              THE COURT:  Okay.  All right.  So, we will end the
22       evidence in this case.  Chris has got some work to do.
23       The transcripts will be filed in seven days, and the
24       parties have until the 30th day thereafter to
25       simultaneously file their findings of fact and conclusions
```

1    of law.

2          And I know it's getting into the holiday piece but

3    I'm, I'm going to suggest that I might not be inclined to

4    give extensions simply because I know what our docket is

5    and I really, I think it's in everybody's interest to get

6    the rulings in and to get this -- this thing disposed of

7    and, you know, get the order in.  And if we get past a

8    certain point, then it may take longer.

9          So, I understand the holidays and everything but

10   -- and under exceptional circumstances, but if I give one

11   party an extension, I'm going to give them both because I

12   want them simultaneous.  I don't want to read tit for tat.

13   Okay?  I want everybody to put your best foot forward at

14   the outset and we'll go from there.

15          Okay?  All right.  Thank you.

16          (Court adjourned at 4:16 p.m.)

17

18

19

20

21

22

23

24

25

```
 1                    REPORTER'S CERTIFICATE

 2          I, Christine Dohack LaBuwi, RDR, RMR, Official

 3    Court Reporter for the U.S. District Court, Southern

 4    District of Illinois, do hereby certify that I reported

 5    with mechanical stenography the proceedings contained in

 6    pages 197-442; and that the same is a full, true, correct

 7    and complete transcript from the record of proceedings in

 8    the above-entitled matter.

 9

10          DATED this 26th day of October, 2018,

11

12                         s/Christine Dohack LaBuwi, RDR, RMR

13                         Christine Dohack LaBuwi, RDR, RMR

14

15

16

17

18

19

20

21

22

23

24

25
```