**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **JAMES G. HOWE,** | ) | |
| **TIMOTHY CHARLES,** | ) | |
| **JACOB KALLAL, and** | ) | |
| **GEORGE NEEDS,** | ) | |
| | ) | **Case No. 14-cv-844-SMY** |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **SALVADORE GODINEZ, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER FOLLOWING BENCH TRIAL

**YANDLE, District Judge:**

Plaintiffs are civil detainees classified as "sexually dangerous persons" under the Sexually Dangerous Persons Act ("SDPA"), 725 ILCS 205/0.1, *et seq.* The Act permits the State to involuntarily commit and indefinitely confine individuals who have not been convicted of a crime, but who have been determined likely to commit acts of sexual violence in the future. Plaintiffs filed the instant action pursuant to 42 U.S.C. § 1983 and allege that Defendants are violating their constitutional rights. They request declaratory and injunctive relief.

Upon conducting a merit review of the Complaint under 28 U.S.C. § 1915A, the Court noted and found:

> …the Court must first address the issue of class certification. Named in the case caption are six Plaintiffs, all of whom have confirmed in writing that they wish to proceed in this action together. However, Plaintiffs did not file a motion seeking class certification, and it would not have been appropriate to do so at this time. Plaintiffs do not yet have counsel to represent them, and a prisoner bringing a *pro se* action cannot represent a class of plaintiffs. *See Lewis v. Lenc- Smith Mfg. Co.*, 784 F.2d 829, 831 (7th Cir. 1986); FED. R. CIV. P. 11. **Therefore, to the extent that Plaintiffs seek class certification, the request is DENIED without prejudice.**

(Doc. 26).

Plaintiffs did not subsequently move for class certification.

The following individual claims survived summary judgment:

Count 1:        Defendants violated Plaintiffs' right to receive treatment as SDPs;

Count 2:        Defendants violated Plaintiffs' right to receive treatment for their mental illnesses and disorders under the Eighth and Fourteenth Amendments;

Count 4:        Defendants violated Plaintiffs' liberty interests under the Fourteenth Amendment by subjecting them to a punitive environment.

(Doc. 194).

The Court conducted a bench trial (*see* Docs. 260 and 261) and now makes the following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT

### Parties

At all relevant times, Plaintiffs James Howe, Timothy Charles, Jacob Kallal, and George Needs were and have been civilly committed to the Big Muddy River Correctional Center Sexually Dangerous Persons Program (the "SDPP").

Plaintiff Howe was first committed in November 2013 (*see* Doc. 260, Trial ("Tr.") Volume ("Vol.") I, p. 135). He successfully challenged his civil commitment and was conditionally released in February 2016. *Id*. at pp. 135-136. Howe was recommitted to the SDPP for parole violations in July 2017. *Id*.; *see also* Doc. 144. He is currently in Phase I of the SDPP and has never advanced past Phase I (Tr. Vol. I, p. 138).

Plaintiff Charles was committed to the SDPP in 1997 (Doc. 194, p. 5). At the time of trial, he was wheelchair-bound, required a constant external supply of oxygen, and was housed in the healthcare unit at Big Muddy (Tr. Vol. I, pp. 8, 10). He was in Phase I of the SDPP but was not

receiving treatment due to his placement in the healthcare unit.  *Id.* at pp. 12-13.  Charles was released from Big Muddy in October 2020.[1]

Plaintiff Needs was first committed in 1981 (Tr. Vol. I, pp. 46-47).  He has been housed at Big Muddy since 1995 (*Id.*) and has never achieved higher than Phase II of the program (Tr. Vol. I, p. 56).  Needs stopped attending group therapy sessions six to eight months before trial.  *Id.*

Plaintiff Kallal was first committed in 2001 and has never advanced past Phase II of the SDPP (Tr. Vol. I, p. 86).  He is currently in Phase I.  *Id.* at p. 95.

Defendants are employees of the Illinois Department of Corrections ("IDOC").  Defendant Dr. Thomas Holt is the former Administrator of the SDPP and held the position from 2013 until June 2019 (Tr. Vol. II, p. 379; Doc. 283-3).  He obtained his Ph.D. from Cappella University in 2005 and is a Licensed Clinical Professional Counselor ("LCPC"), a Licensed Sex Offender Treatment Provider, and a Licensed Sex Offender Evaluator (Tr. Vol. II, pp. 378-379).  Dr. Holt created the SDPP and modified it into its current form (Tr. Vol. II, pp. 385-386).  Heather Wright assumed the role on March 16, 2021 (Doc. 283-3).[2]

---

[1] A claim becomes moot, when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.  *Chafin v. Chafin*, 568 U.S. 165, 172 (2013).  In an action seeking injunctive relief, a live controversy must exist which "ordinarily means that, once the threat of the act sought to be enjoined dissipates, the suit must be dismissed as moot."  *Loertscher v. Anderson*, 893 F.3d 386, 392–93 (7th Cir. 2018).  An inmate's transfer from the facility complained of moots the equitable and declaratory claims unless his return to the facility is certain.  *See Ortiz v. Downey*, 561 F.3d 664 (7th Cir. 2009); *Preiser v. Newkirk,* 422 U.S. 395, 401–04 (1975); *Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996) (dismissing claims for declaratory and injunctive relief as moot because plaintiff had been transferred from the defendant's facility and failed to show that his return was a virtual certainty).  In this case, Charles was elderly, incapacitated and oxygen-dependent at the time of trial, and there is no realistic possibility that he will be re-committed to the SDPP.  Accordingly, his claims for injunctive relief are **DISMISSED** as **MOOT.**

[2] Heather Wright, as Holt's successor, is substituted as a party defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

Defendant John Baldwin was the Director of IDOC at the time of trial (Doc. 86)[3] and

Defendant Daniel Sullivan was the warden of Big Muddy (Tr. Vol. II, p. 314).[4]

**Civil Commitment**

An estimated 5400 individuals are civilly committed under state and federal sex offender

programs across the country.[5]  Illinois has enacted two sexual commitment statutes – the Sexually

Dangerous Persons Act ("SDPA") and the Sexually Violent Persons Act ("SVPA"), 725 ILCS

207/1 *et seq*.  Individuals committed under the SVPA have been criminally convicted and complete

treatment at the Rushville Treatment & Detention Center, which is operated by the Illinois

Department of Human Services.  Those committed under the SDPA have not been convicted of a

sexual offense and are housed at Big Muddy under the operation of the Illinois Department of

Corrections.  *See* 725 ILCS 207/1 *et seq*.

Under the SDPA:

> "When any person is charged with a criminal offense and it shall appear to the
> [prosecutor] that such person is a sexually dangerous person, within the meaning
> of this Act, then the [prosecutor] may file with the clerk of the court in the same
> proceeding wherein such person stands charged with criminal offense, a petition in
> writing setting forth facts tending to show that the person named is a sexually
> dangerous person."

725 ILCS 205/3.01.  A "sexually dangerous person" ("SDP") is defined as a person suffering from

a mental disorder for at least one year, "coupled with criminal propensities to the commission of

---

[3] The Court takes judicial notice that the current Director of IDOC is Rob Jeffreys.  *See*
https://www2.illinois.gov/idoc/aboutus/Pages/director.aspx.  Accordingly, Jeffreys is substituted for Baldwin as a
party defendant pursuant to Rule 25(d).

[4] The Court takes judicial notice that the current warden of Big Muddy is Greg Morgenthaler.  *See*
https://www2.illinois.gov/idoc/facilities/Pages/bigmuddyriver.aspx.  Accordingly, Morgenthaler is substituted for
Sullivan as a party defendant pursuant to Rule 25(d).

[5] *See* Arielle W. Tolman, *Sex Offender Civil Commitment to Prison Post-Kingsley*, 113 Nw. U. L. Rev. 155 (2018)
(noting that this statistic is likely an underestimate of the total population nationwide, as it only includes those people
confined under "sexually violent predator programs," which generally target post-conviction sex offenders, thus
excluding "sexually dangerous persons" programs that generally target pre-conviction sex offenders).

sex offenses, and who have demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children." 725 ILCS 205/1.01.

If a local state's attorney's office (or the Illinois Attorney General's office) files a petition to commit an individual to confinement as an SDP, the individual has a right to an attorney and a jury trial. 725 ILCS 205/5. If the individual is found beyond a reasonable doubt to be an SDP, they are placed in the custody of IDOC, and the Director of Corrections is required to provide "for care and treatment [of the committed individual] designed to effect recovery". 725 ILCS 205/3.01; 725 ILCS 205/8. The treatment provided must conform with the standards promulgated by the Sex Offender Management Board Act and be conducted by a treatment provider licensed under the Sex Offender Evaluation and Treatment Provider Act. *Id.*

An SDP may petition the committing court in writing to be released. 725 ILCS 205/9(a). Once an SDP petitions for release, he/she is evaluated by an evaluator licensed under the Illinois Sex Offender Evaluation and Treatment Provider Act ("recovery evaluation"). 725 ILCS 205/9(a). Recovery evaluations are performed by Wexford evaluators (Tr. Vol. II, p. 417).[6] To continue the commitment, the State must prove by clear and convincing evidence that the SDP remains a sexually dangerous person. 725 ILCS 205/9(b). "No additional application may be filed for two years after a finding that the person is still sexually dangerous or after the application is withdrawn" unless special circumstances are met. 725 ILCS 205/9(d)*.*

The committing court is required to discharge the SDP if, after a hearing, he or she is found to be no longer dangerous. *Id*. If the court finds that the person appears no longer to be dangerous but that it is impossible to determine with certainty under conditions of institutional care that the

---

[6] Wexford Health Sources Inc. is the contracted medical provider for IDOC. Tr. Vol. II, p. 375).

person has fully recovered, it is to enter an order of conditional or supervised release.  725 ILCS 205/9(e).

### Big Muddy's Sexually Dangerous Persons Program (SDPP)

At the time of trial, out of 170 SDPs being housed at Big Muddy, 109 were receiving treatment (Tr. Vol. II, pp. 336-337).

Between 2013 and September 2018, the SDPP was staffed with three therapists: Dr. Thomas Holt, Jessica Stover, and Heather Young (Tr. Vol. II, pp. 399-400).

Stover is employed by IDOC as a Social Worker IV and has been assigned to the SDPP in that position since 2010 (Tr. Vol. II, pp. 331-334).  She has a master's degree in social work from Southern Illinois University at Edwardsville (Tr. Vol. II, p. 332) and is a Licensed Clinical Social Worker (LCSW), Licensed Sex Offender Treatment Provider, and Licensed Sex Offender Evaluator (Tr. Vol. II, pp. 332-333).

Heather Young is employed by IDOC as a Sex Therapist II and is a Licensed Clinical Professional Counselor and Licensed SOMB Sex Offender Treatment Provider (Doc. 226).

Two additional therapists were hired in September 2018 and were undergoing training at the time of trial (Tr. Vol. II, p. 399).

Individual therapy is not provided through the SDPP (Tr. Vol. I, at p. 148).  The program utilizes cognitive behavioral therapy based on the containment model (Tr. Vol. II, pp. 408-409) and offers three categories of therapy: general group therapy, offense specific group therapy, and didactic (psycho-educational) group therapy (Tr. Vol. I, p. 192; Tr. Ex., pp. 2, 20).

An SDP may be in a general group, one or more sex-offense specific groups, and one or more didactic groups (Tr. Vol. II, pp. 338-389).  SDPs that do not admit to committing their index offense are prohibited from participating in sexual offense specific and didactic groups (Tr. Vol.

I, p. 159).  Therapy groups are led by either Stover or Young.  Stover was the primary therapist for 60 - 70 SDPs as of the time of trial (Tr. Vol. II, p. 337).

At the time of trial, the SDPP had twelve general therapy groups – "semi-structured, clinical, ongoing, open-ended therapy groups that encourage individuals to address and resolve issues specific to their treatment process." (Plf. Tr. Ex. 3, p. 20).  The goals of a general therapy group include: (1) developing insight into/resolving motivational and developmental issues; (2) processing interpersonal relationship dynamics (i.e. family of origin; core issues); (3) identifying and learning to control deviant arousal and fantasies; and (4) identifying and learning to change offending lifestyle behaviors.  *Id.*  Placement in general group therapy is determined by the clinical staff based on intellectual ability, cognitive ability, treatment, treatment readiness, and treatment motivation (Tr. Vol. II, p. 389).  SDPs are given homework to complete between group sessions and are encouraged to bring their homework to group therapy for feedback (Tr. Vol. II, pp. 346-347).

The SDPP therapy schedule is prepared by the clinical staff and approved by the Administrator (Tr. Vol. II, pp. 397-398; Plf. Tr. Ex. 8).  General therapy groups meet once a week for one hour (Tr. Vol. I, pp. 13, 57, 91-92, 169, 188; Tr. Vol. II, pp. 255, 294, 367).  Although one hour is allotted for therapy sessions, the SDPs often do not receive a full hour of therapy due to the nature of working in a group setting and the size of the group (Tr. Vol. I, pp. 59, 92, 187).  As recently as 2018, there were as many as eighteen SDPs in a single group therapy session (Tr. Vol. II, p. 255).  Attendance for general group therapy had been reduced to no more than 10 SDPs per group by the time of trial (Tr. Vol. II, p. 387).

Group therapy sessions are canceled at a rate as high as 38% (Tr. Vol. I, pp. 58, 149; Tr. Vol. II, pp. 294, 341; Plf. Tr. Ex. 55, p. 1).  Therapy may be cancelled if there is a state holiday, if

a therapist needs to be in court, or if there are security concerns at the facility (Tr. Vol. II, pp. 341-342).  Cancelled groups are rarely rescheduled.[7]

The SDPP offers sexual offense specific groups designed to teach strategies specific to the individual's sexual offense (Tr. Vol. II, p. 388).  Offense specific groups are both sex offender and sex offense specific.  *Id.*  The sexual offense specific group topics include "Victim Empathy," "Cycles of Sexual Offending," "Relapse Prevention," and "Advanced Relapse Prevention." (Plf. Tr. Ex. 3).  Stover teaches the Cycles of Sexual Offending groups and the Relapse Prevention group (Tr. Vol. II, p. 339).  The Victim Empathy group has not been offered since 2015 (Tr. Vol. I, p. 149).

The SDPP offers optional didactic groups on a rotating basis (Plf. Tr. Ex. 3).  The didactic groups are structured, time-limited, clinical, closed therapy groups that teach specific topics and strategies related to the treatment process while encouraging participating individuals to address and practice the behaviors in their other groups.  *Id.*  Didactic groups are generally conducted in 24-week sessions for one hour per week (Tr. Vol. II, pp. 340-341).  The didactic groups include Anger Management, Social Skills, Rational Emotive Behavior Therapy, Substance Abuse, and Expressive Art (Plf. Tr. Ex. 3).  At the time of trial, three didactic groups were on hold, including Social Skills, Substance Abuse, and Expressive Art.  *Id*.

### Four Phase Program

The SDPP is organized into four phases of indeterminate length (Tr. Vol. II, pp. 389-390):

Phase One – Initial Treatment: For an SDP to transition to the next phase, he cannot receive any disciplinary tickets within a 6-month evaluation period.  (TR. Vol. I, pp.17, 150).  AN SDP must also complete the initial assessment packet, outline of psychosexual history and victimology outline as evidenced by a basic acknowledgment of sexual offenses.  *Id.*  Other Phase One goals include the ability to identify basic cognitive distortions; understand and

---

[7] While Defendant Stover testified that the clinical staff attempts to reschedule cancelled group therapy sessions (Tr. Vol. II, pp. 341-342, the Court finds Plaintiffs' testimony to the contrary to be consistent and credible.

accept the offender's lifestyle that led him to this point, including the ability to discuss basic dysfunctional core beliefs without assuming a victim stance; identification of basic deficits in social and interpersonal relationships; and a desire to learn/practice new relational/behavioral skills by holding oneself accountable for his behavior in general. *Id.*

Phase Two – Early Treatment: The goals of Phase Two include completion of ongoing assessments, intermediate outlines of psychosexual history and victimology outline as evidence by progressive lessening of denial and defensiveness; an ability to identify intermediate cognitive distortions as evidenced by the individual's ability to identify and discuss offense-specific cognitive distortions; intermediate level of understanding and acceptance of how the offender lifestyle has led to this point as evidence by the individual's ability to discuss dysfunctional lifestyle patterns, characteristics, behaviors and disorders without assuming the victim stance; a basic level of understanding and acceptance of arousal identification, the thoughts and behaviors associated with sexual offending, and acceptance of the negative impact of offending behavior on the victim, others, and the offender; a desire to learn and discuss appropriate boundaries within the individual's current environment; and an adequate level of participation. *Id.*

Phase Three – Treatment: Phase Three continues the goals for Phases I and II. *Id.* SDPs in Phase Three may not have any tickets within two six-month evaluation periods. They must complete ongoing assessments and have a progressive understanding and acceptance of their psychosexual history, victimology, cognitive distortions, and deficits in their social/emotional skills and relationships. SDPs must also exhibit a desire to learn and practice increasingly complex relational/behavioral skills as evidence by the individual's ability to disengage from relationships in his current environment that support denial, minimization and resistance to treatment and the demonstrated ability to avoid high-risk social/relational/behavioral situations and environments. *Id.*

Phase Four – Advanced Treatment: In addition to reaching the goals established in the previous phases, Phase Four requires the SDP to develop advanced understanding and acceptance of aftercare concepts prior to release as evidenced by the individual's stated/demonstrated awareness that treatment completion is the successful transition from IDOC offense-specific treatment into community offense-specific treatment. *Id.*

The phases are outlined in the SDPP Procedures (Plf. Tr. Ex. 3, p. 23). Progression requires an SDP to demonstrate the stated goals per phase. *Id.* Advancement in phases is an important factor in determining whether an SDP is ready for conditional release or discharge (Tr. Vol. II, p. 393). Completion of all four phases does not guarantee that the SDP will be released. *Id.* at pp. 392-

393.  Plaintiffs are not made aware of how phase placements are determined or what they need to do to advance (Tr. Vol. I, pp. 17, 150).

### *SDP Treatment Evaluations*

Primary therapists conduct semi-annual evaluations for their assigned SDPs (Tr. Vol. II, p. 406).  The purpose of the semi-annual evaluation is to measure the individual's progress in treatment (Tr. Vol. II, pp. 369-370).  SDPs may move up or down between phases as they progress or regress in treatment.  The semi-annual evaluation utilizes a numerical scoring mechanism "designed to reflect an individual's relative treatment need for each risk factor." *Id*.  "The total score is intended to provide an estimation of an individual's overall level of treatment need." *Id*.  "Higher total scores are associated with higher levels of risk for sexual reoffending." *Id*.  Individuals that do not participate in treatment are not scored (Tr. Vol. II, p. 370).  Each SDP is to be assessed regarding dynamic risk factors including: sexual offense disclosure; acceptance of responsibility; identifying cognitive distortions and restructuring those; criminal behaviors; lifestyle impulsivity; problem solving; ability to understand and use REBT skills; Anger Management; ability to identify and understand their Cycle process, their offending pattern; and then, also, to identify while they are currently displaying indicators of their offending pattern. *Id*.  The assessments are based on group case notes and treatment staff observations. *Id*. at p. 371.

SDPs are provided copies of the semi-annual evaluations and may discuss them in general group (Tr. Vol. II, p. 348; p. 372).  There is no opportunity for the SDP to discuss their semi-annual evaluations with their primary therapist outside of group therapy. *Id*. at p. 372.  The semi-annual evaluation is used by the SDP's primary therapist to develop a six-month treatment plan for the SDP (Tr. Vol. II, p. 354).  Every SDP, whether they choose to participate in treatment groups or not, is provided a treatment plan with individualized goals to work towards over a six-

month period based on their current presenting needs (Tr. Vol. II, pp. 344-345). Each SDP currently participating in treatment groups is asked for input, suggestions, and questions about their treatment goals before treatment plans are updated. *Id.* Any input provided by the SDPs is incorporated into their treatment plan. *Id.*

### SDP Recovery/Release Evaluations

When an SDP petitions the committing court for a recovery evaluation, the evaluation is conducted by Wexford Health Sources, Inc. evaluators who are under contract with IDOC (at the time or trial, the evaluators were Dr. Melissa Weldon- Padera and Dr. Kristopher Clounch) (Tr. Vol. II, p. 376). The purpose of the Wexford evaluation is to analyze the current and future risk the SDP poses and to ultimately make a recommendation for or against discharge or conditional release from the program. (*Id.*; Doc. 124-1, p. 18; Plf. Tr. Ex. 14-16). The Wexford evaluators base their evaluation and recommendation on the SDP treatment file maintained by the SDPP, including the semi-annual reports, treatment plans, and case notes created by the primary therapist, a brief consultation with the SDP's primary therapist and an interview with the SDP (Tr. Vol. II, pp. 417-418; Plf. Ex. 15).

Since 2011, 22 SDPs have been released, discharged, or recommended for release or discharge by an evaluator (Tr. Vol. II, p. 395). 11 SDPs have been discharged while in Phases 3 or 4 and 11 have been discharged while in other treatment phases. *Id.* at p. 395. Since 2011, 11 SDPs have been denied conditional release or discharge by the committing court, despite having been recommended for release by the evaluator. *Id.* at p. 395; p. 374. SDPP staff do not make recommendations regarding whether an SDP should be released or discharged. *Id.* at pp. 375-376.

**Conditions of Confinement**

SDPs are housed on Wings B and C at Big Muddy (Tr. Vol. I, p. 33) and may have contact with the general inmate population in the healthcare unit lobby, the dining room, or on the yard line. *Id*. at pp. 321-323. Inmates are no longer housed on the same wing as SDPs. *Id*. at p. 323.

SDPs are subject to IDOC Institutional Rules and SDPP Program Rules (Plf. Tr. Ex. 3, p. 2). The Big Muddy "Inmate Orientation Manual" contains policies and procedures applicable to inmates and SDPs (Tr. Vol. II, p. 315; Plf. Tr. Ex. 2). The SDPP Manual contains additional policies and procedures applicable to SDPs (Plf. Tr. Ex. 3).

An SDP may be issued a program ticket by clinical staff if he does not comply with SDPP rules (Tr. Vol. II, p. 354). Program tickets are a record of noncompliance but do not result in discipline for SDPs. *Id.* at pp. 356-357. A program ticket can be issued for failing to attend group, the continued use of profanity, disruptive behavior that hinders treatment, violating the dress code, or possessing pictures that have been determined to be sexually stimulating (Tr. Vol. II, pp. 354-355, 357-358). An SDP is placed on a 30-day probation if he receives three program tickets within 90 days. *Id.* An SDP that violates a program rule while on probation is placed on suspension and removed from treatment for 30 days. *Id.* An SDP on suspension may request treatment specific books, self-help books, and workbooks from the Sex Offender Program library (Tr. Vol. II, pp. 361-362).

SDPs can be written Inmate Disciplinary Reports ("IDRs") (Tr. Vol. II, pp. 317-318). SDPP staff, including primary therapists may issue IDOC tickets that result in an SDP being placed in segregation (Tr. Vol. I, p. 130). Big Muddy's Adjustment Committee adjudicates IDRs issued to SDPs and inmates (Tr. Vol. II, pp. 316; Plf. Tr. Ex. 2). The warden then approves disciplinary recommendations by the Adjustment Committee. *Id.* The Adjustment Committee may

recommend segregation if an SDP assaults staff, assaults other detainees, possess dangerous contraband, refuses their housing assignment, or has repeated disciplinary infractions (Tr. Vol. II, pp. 316-319).

SDPP therapists are not members of the Adjustment Committee but may intervene and make suggestions for reductions in segregation time or any other consequence of an IDOC infraction.  (Tr. Vol. I, pp. 163-164; Tr. Vol. II, pp. 411-412).  Treatment staff have removed SDPs from segregation early so that they could return to treatment.  *Id.*

SDPs are required to wear blue pants, blue shirts, and their state-issued identification (Tr. Vol. II, p. 319).  Due to safety and security concerns, SDPs are prohibited from wearing street clothes and are limited in the types of personal property they may possess.  *Id*. at pp. 320-322; p. 366.  Big Muddy restricts items which can be used by SDPs to attempt escape and restricts items whose components could be used to create homemade knives, shanks, or other weapons.  *Id.*

Although SDPs are permitted more time in the dayroom than inmates, safety and security concerns prevent SDPs from having unlimited access to the dayroom (Tr. Vol. II, p. 321).  SDPs are allowed out of their cells while staff is present; usually between 8:00 a.m. and 2:30 p.m. Monday thru Friday.  *Id*.  They are also provided one hour in the dayroom during the evenings and several hours on the weekends (similar to the inmate population) and are in their cell the remainder of the day.  (Tr. Vol. I, pp. 42-44; p. 132).

Vocational and educational classes are available to SDPs and inmates (Tr. Vol. I, pp. 165-166).  Because SDPs are detained for an indefinite period of time, they are considered "lifers" for the purposes of determining placement on waiting lists for the classes, leading to longer times on waitlists for classes.  *Id*.

**Plaintiffs' Expert – Dr. Dean R. Cauley**

Dr. Dean R. Cauley received a bachelor's degree in psychology from the University of Michigan, a master's degree in mental health counseling from Oakland University, a M.B.A. from Ludgert College of Business, and a Ph.D. in mental health counseling with a focus on criminal justice from Wayne State University (Doc. 124-1, pp. 26-27).  He has been in private practice since 2003 and has provided expert opinions and analysis in civil commitment cases in state and federal courts (Tr. Vol. I, pp. 175-176; *see also* Doc. 124-1, p. 25).  Prior to entering private practice, Dr. Cauley served in various roles at the Florida Civil Commitment Center for Sexually Violent Predators, including as clinical team leader and clinical therapist.  *Id.*  In the Florida program, he provided sex offender treatment in both group and individual sessions and supervised clinical team members.  *Id.*[8]

Dr. Cauley offered the following opinions at trial: The SDPP falls far below the generally accepted standards in the field of civilly committed sex offender treatment with respect to the amount of therapy offered to SDPs and group sizes (Doc. 124-1, pp. 15-18, 20-22).  The inherent flaws in the SDPP result in treatment that is slow, repetitive, and not catered to the mission of treating the men and returning them to the community as quickly as possible.  *Id.*

In reaching his conclusions, Dr. Cauley relied on the generally accepted practices of inpatient sex offender treatment as determined through a network called the Sex Offender Civil Commitment Program Network ("SOCCPN") (Tr. Vol.  I, pp. 177-186).  SOCCPN gathers information from sex offender civil commitment programs in 19 different states, including staff qualifications and ratios, phase descriptions, hours of treatment, etc., and determines generally

---

[8] The Court finds that Dr. Cauley is qualified as an expert based on knowledge, skill, experience, training, and education.  The Court further finds Dr. Cauley's testimony to be credible and persuasive.

accepted practices by calculating an acceptable range based on the information gathered.   (*Id.*; Doc. 261, p. 82).

Dr. Cauley compared the SDPP to SVP program at Rushville and opined that while Rushville consistently fell within the acceptable ranges of SOCCPN in the various aspects of its program, the SDPP was consistently far below the acceptable ranges.  *Id.*; Doc. 260, pp. 186-193.

The generally accepted duration for one session of group therapy is no less than 90 minutes (Tr. Vol. II, p. Doc. 261, p. 53).  The generally accepted number of hours for general group therapy is no less than five hours per week (Tr. Vol. I, p. 188).  The one hour per week group therapy SDPs receive is far below the generally accepted standard of treatment.  *Id.* at pp. 234-235; Plf. Ex. 55.  Dr. Cauley was aware of no other program that had group once a week; most programs meet two to three times a week for an average of two hours per session which promotes a continuum.  *Id.* at p. 250.  The national mean average for general group therapy in civil commitment programs is 7.5 hours per week.  *Id.* at p. 255.  Rushville is close to five.  *Id.*

The number of treatment modalities that are on hold also place the SDPP below generally accepted standards of treatment.  Anger management and substance abuse tie into offense and re-offense at a basic, primary level and without addressing these precursors to a sexual crime, other work is not grounded (Doc. 124-1, p. 21).  Treatment modalities, especially Substance Abuse, Anger Management, and Victim Empathy, are "critical parts" of treatment and should be available to SDPs at all times, regardless of the SDP's level of recognition of their history or offenses (Doc. 260, p. 190).  It is atypical to place critical modalities on hold (Tr. Vol. II, p. 256).

The generally accepted maximum number of individuals in a therapy group is ten. (Tr. Vol. II, p. 249).  Groups exceeding ten individuals handicap the delivery and effectiveness of treatment by allowing offenders who would rather not participate to "hide out" in large groups. (Doc. 124-

1, p. 17).   In large groups, "[c]ohesion, trust, and meaningful work are lost to simple issues of trying to simply organize and focus the group."  *Id*.  Large groups have the inevitable effect of slowing progress, "as the group members have long periods of time between presentations, times of exploring their own issues and processing their own offense cycles."  *Id*.

The SDPP's staff to resident ratio is far below generally accepted practice standards.  The ratio of treatment providers to SDPs at Big Muddy is approximately 1 to 42.5 (Tr. Vol. II, p. 254) while the generally accepted ratio is one treatment provider for every ten patients. (Tr. Vol. I, p. 192).  When the treatment provider to SDP ratio is substantially above the generally accepted ratio, "the quality and quantity of treatment – even under the very best circumstances with the very best intentions and in the best setting – is handicapped." (Doc. 124-1, p. 4).

The SDPP's lack of clear guidelines for treatment completion or projected timeframes for phase progression impedes the motivation of individuals.  In programs that meet the generally accepted standard, "there would be some section of the Procedures Manual that would outline the style or the orientation of treatment.  It would map out the initial evaluation, mental health assessment, 90-day reviews, Annual Reviews, etc. None of that is in [the SDPP] manual.  It should clarify the clinical orientation in more than a simple paragraph, and it should lay out the Stages and Phases of Treatment.  It should clarify how advancement occurs, and how demotions may occur.  It should present the curriculum, and the dispensation of treatment at different Stages.  This description should be provided to the men, so that they know what the process is and how they can advance." (Plf. Ex. 55, p. 2).  The most recent SDPP manual, "finally does mention treatment, however in looking at items like 'Treatment Groups' the entire entry is about behavioral "tickets," not about treatment, and the overall focus of the manual is rule compliance, dress code and policy regarding speech – not the clinical program."  *Id*.

With respect to the Wexford recovery/release evaluations, "tests were presented as having 'considerable predictive validity' when they actually have very little. Indicators of risk were underscored as predicting future sexual violence when these items have shown minimal research outcomes as being predictive" (Doc. 124-1, p. 18).  Important topics such as age or the passage of time are not given any attention in the evaluations. (*Id.*; Doc. 261, pp. 44-45).  The Wexford evaluations are based largely on past acts to assess the current condition of the SDP.  "Both sexual recidivism risk as well [as] antisocial traits decline beginning at age 40, and rapidly decline after age 60.  These reviews do not provide an accurate conception of current or future risk (Doc. 124-1, p. 18).  The Wexford evaluations "do not adhere to generally accepted practice or evidence-based decision making."  *Id*.

### Post-Trial Developments

According to supplemental declarations from Stover and Wright, core therapy groups were extended to 90-minute sessions in December 2019 (Doc. 283-1, at ¶ 9).  Since late 2019, group therapy location moved to the school building on the campus of Big Muddy River Correctional Center.  *Id.* at ¶ 12.  SDPs no longer receive program tickets for missing group sessions nor are they placed on probation or suspended from therapy.  *Id.* at ¶ 11.  SDPs are only removed from therapy if they "sign out" on their own volition.  *Id.*  If an SDP is disruptive during group or misses a group session, it is noted on program compliance sheet and no further action is taken.  *Id.*  There has been no group therapy since March 2020 due to COVID-19 restrictions (Doc. 283-2, ¶ 20).  SDPs have been provided homework to complete to further facilitate the tools and critical thinking learned in group.  *Id*.

In July 2020, the SDPP began using the STABLE 2007 and STATIC 99R to conduct evaluations (Doc. 838-2, at ¶¶ 13-17).  The STATIC 99R allows a treatment provider to identify

static (i.e., not changeable with treatment) risk factors. *Id.* The STABLE 2007 allows a treatment provider to identify dynamic risk factors that may change in treatment; these risk factors can then be targeted and used to determine treatment goals for the next six months per SDP. *Id.* The new evaluation process incorporates a one-on-one initial evaluation using the STABLE 2007 and STATIC 99R with a treatment provider and SDP. *Id.* This begins with a 1-2 hour meeting with an individual SDP. *Id.* After which the STABLE 2007 assessment with be completed and utilized in creating a treatment plan. *Id.* From July 2020 until October 2020, 17 new evaluations were conducted using this method. *Id.* Treatment providers have been unable to perform additional semi-annual evaluations due to COVID-19 quarantine and distancing protocols but anticipate resuming the process when guidelines permit. *Id*.

According to Plaintiffs, there are currently only three licensed therapists for the SDPP. No SDP has received a semi-evaluation in over one year (Doc. 280). There was no Administrator for the SDPP at Big Muddy between June 2019 and March 2021 (Doc. 283-2, ¶ 6). Wright assumed the role on March 16, 2021. *Id.*; *see also* Doc. 280.

## LEGAL STANDARDS

The Fourteenth Amendment prohibits the State from depriving any person of life, liberty, or property without due process of law. In the context of civil commitment, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed. *See Kansas v. Hendricks,* 521 U.S. 346, 356 (1997). "If the object or purpose of the [state] law [is] to provide treatment but the treatment provisions were adopted as a sham or mere pretext, there would [be] an indication of the forbidden purpose to punish…if civil confinement were to become a mechanism for retribution or general deterrence...[Supreme Court] precedents would not suffice to validate it." *Hendricks*, 521 U.S. at 371-73; *see also Bell v.*

*Wolfish,* 441 U.S. 520, 535 (1979) (the purpose must not be punitive, as punishment is reserved for the criminal system).  Thus, the Fourteenth Amendment mandates that civil detainees receive treatment for the disorders that led to their confinement and be released when they have improved enough no longer to be dangerous.  *Hughes v. Dimas*, 837 F.3d 807, 808 (7th Cir. 2016).

Detention under the SDPP is a rehabilitative civil remedy – not punitive – and is to be employed for incapacitation and treatment.  *See, e.g., Allison v. Snyder,* 332 F.3d 1076, 1079 (7th Cir. 2003); *see also Lane v. Williams*, 689 F.3d 879, 885 (7th Cir. 2012) (it is beyond dispute that the purpose of detention is not punitive – detainees' commitment is meant to be rehabilitative and aimed at the goal of their ultimate release).  Due process requires state officials to provide civilly-committed persons with access to mental health treatment that gives them a realistic opportunity to be cured or to improve the mental condition for which they were confined.  *See Youngberg v. Romeo,* 457 U.S. 307, 319–22 (1982).  The State "enjoy[s] wide latitude in developing treatment regimens [for sex offenders]," *Hendricks,* 521 U.S. at 368 n. 4, and "liability [on a claim of constitutional deprivation] may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."  *Youngberg,* 457 U.S. at 323; *Allison*, 332 F.3d at 108.

In the past, the Seventh Circuit applied the same standard to substantive due process claims arising under the Fourteenth Amendment and deliberate indifference claims arising under the Eighth Amendment.  *See Smith v. Dart*, 803 F.3d 304, 309-10 (7th Cir. 2015).  And in analyzing the professional judgment standard, the court initially concluded that there is minimal difference in what the two standards require of state actors and that the standard is "at least as demanding" as

the Eighth Amendment deliberate indifference standard.  *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998).

The subjective element of the deliberate indifference standard was recently rejected by the Supreme Court in *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015) ("The question before us is whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officers' use of that force was *objectively* unreasonable.  We conclude that the latter standard is the correct one.").  And in *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018), the Seventh Circuit expanded *Kingsley's* logic to medical care claims brought by pretrial detainees under the Fourteenth Amendment so that a pretrial detainee need only establish that the defendant's conduct was objectively unreasonable – not that the defendant was subjectively aware that it was unreasonable.  *Miranda*, 900 F.3d at 352-53.  The rationale of *Kingsley* and *Miranda* extends to *Youngberg's* "substantial departure from accepted professional judgment" standard – an objective inquiry into prevailing medical standards and whether a reasonable professional, applying those standards, would have made the same decision considering the facts in a case.

Civil detainees "may be subjected to conditions that advance goals such as preventing escape and assuring the safety of others," *Allison*, 332 F.3d at 1079, but the various aspects of those conditions must be justified on the basis of institutional security or treatment.  *West v. Schwebke*, 333 F.3d 745, 748 (7th Cir. 2003).  As long as prison officials have a legitimate interest in security that is reasonably related to the rules and regulations in effect, the Constitution has not been violated.  *Id*

## CONCLUSIONS OF LAW

### Counts I and II – Failure to Provide Adequate Treatment

Actual *treatment* of the civilly confined is what separates commitment from punishment and incarceration.[9]  Without adequate treatment designed to effectuate ultimate release, a civil commitment program is nothing more than a de facto prison disguised as a mental health facility. The Constitution clearly dictates that a civil detainee cannot simply be warehoused and put out of sight; they are not prisoners and must be afforded adequate treatment.  Specifically, they are entitled by law to "more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg,* 457 U.S. at 322; *see also Allen v. Illinois*, 478 U.S. 364, 370 (1986) ("In short, the State has disavowed any interest in punishment, provided for the treatment of those it commits, and established a system under which committed persons may be released after the briefest time in confinement.").  The Big Muddy SDPP operates contrary to these important principles.

Treatment must be more than mere window dressing to comply with the SDPA – it must enable a true path to release.  But the Big Muddy SDPP as constituted affords Plaintiffs no realistic opportunity to be cured or to improve their mental conditions.  Instead, it has transformed civil confinement into a punitive and potentially lifetime detention, which violates Plaintiffs' due process rights.

As Dr. Cauley explained, providing only one hour of general therapy per week is a substantial departure from accepted professional standards and is objectively unreasonable as it fails to provide a meaningful opportunity for SDPs to meet any of the milestones necessary to

---

[9] Given this obvious distinction in purpose, the Court finds the fact that convicted SVPAs complete treatment at the Rushville Treatment & Detention Center while non-convicted SDPs are committed under the auspices of the Department of Corrections to be curious at best.

move through the phases at an acceptable speed.  The credible evidence (data collected from SOCCPN and review of the Rushville program) establishes that five hours per week is the minimum acceptable number of hours for group therapy.

Additionally, the duration of group therapy – 60 minutes – does not satisfy the generally accepted professional standard of at least 90 minutes per session.  Although group therapy sessions were increased in December 2019 from 60 minutes to 90 minutes, the number of weekly sessions has not increased.  As such, Plaintiffs are only receiving 90 minutes of group therapy per week – still significantly below the minimum acceptable number of hours dictated by professional standards.  Moreover, purportedly due to COVID-19 restrictions, SDPs have not received any group therapy since March 2020.  The complete suspension of treatment – even with the availability of homework – makes it impossible for Plaintiffs to realize their treatment goals.

The SDPP's ratio of treatment providers to SDPs is also inadequate to meet meaningful treatment goals.  The ratio of therapists to SDPs has been as high as 1 to 42.5, which is a far departure from the generally accepted ratio of 1 to 10.[10]  And while Dr. Holt testified that general group therapy class sizes had been decreased, his testimony is belied by class sign-in sheets documenting classes as large as 15 to 18 SDPs as late as 2018.  As of Spring 2021, there were still only three licensed therapists at the facility.

Dr. Cauley persuasively testified that the single hour of general group therapy offered per week coupled with the ratio of therapist to SDPs handicaps the delivery and effectiveness of treatment: "[c]ohesion, trust, and meaningful work are lost to simple issues of trying to simply organize and focus the group."  Large groups have the inevitable effect of slowing progress, "as the group members have long periods of time between presentations, times of exploring their own

---

[10] Jessica Stover testified at trial that she was the primary therapist for 60 - 70 SDPs.

issues and processing their own offense cycles." These inherent flaws result in treatment that is slow, repetitive, and not catered to the mission of treating the plaintiffs and returning them to the community as quickly as possible.

The offense specific and didactic group modalities fare no better. The most glaring problem is the number of these groups that are on hold – some that have not been offered in years. These treatment modalities, especially Substance Abuse, Anger Management, and Victim Empathy, are critical treatment components and should be available to SDPs at all times, regardless of the SDP's level of recognition of their history or offenses. As Dr. Cauley opined, these essential programs "tie into offense and re-offense at a basic, primary level. Without addressing these precursors to a sexual crime other work is not grounded."

At the time of trial, Plaintiffs were evaluated twice a year by their primary therapists. These semi-annual evaluations were relied on by the therapists in developing six-month treatment plans. Since July 2020, the evaluations have been conducted utilizing STABLE 2007 and STATIC 99R, which according to Defendants are meant "to better inform treatment plans and goals for SDPs moving forward." Specifically, Defendants assert that SDPs are provided a one-on-one initial evaluation with their primary therapist from which a treatment plan is developed. The plan is utilized to help the SDP work toward their individual therapy goals. Evaluations are an integral part of an SDPs ability to move through the phases. Significantly, the revised evaluations were conducted for only three months – July 2020 to October 2020. Since then, no treatment providers have been able to perform semi-annual evaluations due to COVID-19 restrictions. The lack of semi-annual evaluations (whatever the cause) makes it impossible for SDPs to meaningfully advance in the program.

In sum, with respect to the claims asserted in Counts I and II, the Court concludes that Defendants have failed in their obligation to provide Plaintiffs with statutorily required rehabilitative treatment.  Consequently, the SDPP, as currently structured and implemented, fails to meet generally acceptable professional standards and violates Plaintiffs' right to due process as guaranteed by the Fourteenth Amendment.

### Count IV - Punitive Conditions

The evidence does not support Plaintiffs' contention that the conditions they are subjected to at Big Muddy are not rationally related to IDOC's legitimate interest in maintaining the safety and security of the facility.  *See, e.g., Rapier*, 172 F.3d at 1003 (quoting *Wolfish*, 441 U.S. at 535) ("These restraints may at times be "discomforting," but, as long as they are "reasonably related" to the effective management of the confinement facility, they are not considered punishment for the crime that the detainee is suspected to have committed.").  Although SDPs are prohibited from wearing street clothes, possessing various property, and having unlimited access to the dayroom based on legitimate safety and security concerns, they generally receive more time out of their cells than the general inmate population.  When staff is present, they are permitted out of their cells between 8:00 a.m. and 2:30 p.m. Monday thru Friday.  They also receive dayroom privileges on the weakened – staff permitted.  And while SDPs are subjected to SDPP program tickets and IDRs, only IDRs result in discipline.  SDPs may be subjected to segregation if they assault staff, assault other detainees, possess dangerous contraband, refuse housing assignment, or have repeated disciplinary infractions.  Based on this evidence, the Court finds that Plaintiffs are not entitled to injunctive relief on this basis.

## DISPOSITION

The Due Process Clause of the United States Constitution requires that the nature and duration of the confinement bear some reasonable relation to the confinement's non-punitive civil purpose.  Thus, the State must ensure that it civilly confines individuals only so long as they are both mentally ill and dangerous to the public.  Confinement beyond that point or confinement which imposes restrictions that are so excessive as to indicate the purpose is punitive rather than rehabilitative in nature is unconstitutional.

The evidence in this case establishes that the Sexually Dangerous Persons Program at Big Muddy River Correctional Center suffers from systemic failures which has resulted in Plaintiffs being detained indefinitely with no real hope of being released.  This Court therefore finds that Defendants have deprived Plaintiffs due process in violation of the Fourteenth Amendment.

The Court further finds the Plaintiffs have established by a preponderance of the evidence that the issuance of a permanent injunction is warranted and necessary.  The evidence establishes that there are systemic and gross deficiencies in the provision of therapy services, therapist to SDP staffing ratios, and recovery evaluation which place the plaintiffs at a significant risk of harm.  As such, the Court specifically concludes Plaintiffs have suffered or will suffer irreparable injury if a permanent injunction is not issued given the significant deficiencies in the delivery of mental health services via the SDPP.

The Court further finds that there are no adequate remedies available at law to compensate Plaintiffs for their injuries.  Plaintiffs are confined within the IDOC; Defendants are required to provide adequate mental care and treatment.  Thus, the balance of hardships and public interest weigh heavily in Plaintiffs' favor.

For the foregoing reasons, Plaintiffs James Howe, Jacob Kallal, and George Needs' Request for a Permanent Injunction with respect to the claims asserted in Counts I and II (Doc. 10) is **GRANTED**.

The Court simply cannot allow Plaintiffs' constitutional rights to continue to be so blatantly disregarded and violated.  While the Court recognizes that correcting systemic and structural deficiencies to comply with a court-imposed order to provide specific relief to the plaintiffs herein may pose a significant challenge to Defendants, the Constitution mandates that they meet the challenge and do so expeditiously.

Accordingly, the following permanent injunctive relief is **ORDERED**:[11]

1.  Beginning **no later than 30 days** from the entry of this Order, Plaintiffs shall receive a minimum of 7.5 hours of core group therapy per week – each core group therapy session shall last no less than 90 minutes;

2.  All offense specific and didactic groups that are currently suspended shall be reinstated and permanently maintained beginning **no later than 30 days** from the entry of this Order;

3.  **Within 6 months** from the entry of this Order, recovery/release evaluations shall be conducted of the plaintiffs herein by independent psychologists or psychiatrists (not employed by IDOC or Wexford).  **No later than 30 days** from the entry of this Order, Defendants shall provide Plaintiffs and the Court with a list of proposed independent psychologists/psychiatrists to conduct said evaluations.  Plaintiffs shall file any objections to the proposed providers within 30 days thereafter.

---

[11] Absent class certification, the Court may not order injunctive relief for SDPs other than the plaintiffs herein. Obviously however, Defendants' task would be made easier by addressing and correcting the program deficiencies across the board rather than in a piecemeal fashion.

Defendants are further **ORDERED** to file a status report **under seal** regarding their compliance with the instant Order **within 60 days** of its entry.

**IT IS SO ORDERED.**

**DATED:  September 6, 2021**

**STACI M. YANDLE**
**United States District Judge**