## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JAMES G. HOWE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) Case No. 3:14-cv-00844-SMY-RJD | |
| | ) | |
| DR. THOMAS HOLT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFFS' RESPONSE TO DEFENDANT'S POST-TRIAL MOTION

### *I. Introduction*

The two day bench trial before this Honorable Court acted as a cauldron of truth for what was really going on at the Big Muddy Prison in Ina, Illinois.  In a nutshell, Big Muddy was exposed as the prison version of the Hotel California described by the Eagles.  Big Muddy is a place where sex offenders could check in any time they'd like, but they could never leave.

All of the power wielded by the staff at Big Muddy melted away under cross-examination.  Probably for the first time since the program's inception, staff had to answer for their actions.  The trial laid bare what Plaintiffs alleged all along, namely that Big Muddy's civil commitment program is nothing more than a de facto prison disguised as a mental health facility, where the needs of the Plaintiffs were not adequately addressed and frequently ignored.  The trial showed that many of the complaints made by Plaintiffs were in fact true.

Defendants' Memorandum of Law is bereft of much law.  Their Memorandum of Law is devoid of affidavits which could have been used to bolster their claims, some of which are completely false, such as when Defendants state, without citing to the record, that lead Plaintiff, James Howe, "was conditionally released during the pendency of this case and reoffended, landing him back at Big Muddy River Correctional Center." (Doc. 290, p. 2). This completely misstates the record:

Q. (BY MR. ROCKERSHOUSEN) Mr. Howe, when you left the facility and came back, was that because you were recommitted in a new proceeding or because you violated the terms of your conditional release?

A. [HOWE] Technical violations. I wasn't arrested for any new crime.

(Tr. Vol. I, pp 162-163). James Howe did not reoffend. While Plaintiffs do not mean to impugn Defendants' motives (they may have been relying on their memories), this false information may cause the Court to look askance at Howe's testimony and/or imply that the program is doing its job and needs no correction.

In their Post-Trial Motion (Doc. 289) and accompanying Memorandum of Law (Doc. 290) Defendants now request that this Honorable Court amend its judgment or grant Defendants a new evidentiary hearing to review what they feel is current and admissible testimony.  As will be seen below, the program has failed, is unconstitutional-as-constituted and the Order and Injunction should not be disturbed.

Defendants cite many reasons for their displeasure with this Honorable Court's September 6, 2021 Order (Doc. 285), including:

- Its refusal to allow Dr. Holt to testify as an expert even though Defendants ignored their obligations regarding expert disclosures as set out in Federal Rule of Civil Procedure  Rule 26(a)(3);
- Its reliance on Dr. Cauley's report which allegedly contained hearsay;
- Its reliance on allegedly "stale evidence;"
- The relief granted is an alleged violation of the Prison Litigation Reform Act because of what Defendants feel is overly broad injunctive relief; and
- Defendants' belief that the terms of the Order were not narrowly tailored or the least intrusive means necessary to correct the violation of Federal right.

These objections will dealt with seriatim.

## II. *Defendants Blatantly Ignored The Rules Regarding Disclosure of Expert Witnesses*

Defendants violated Federal Rule of Civil Procedure 26(a)(2)(D) which states:

"Rule 26. Duty to Disclose; General Provisions Governing Discovery
(a) Required Disclosures.
        (2) *Disclosure of Expert Testimony.*
                *(D) Time to Disclose Expert Testimony.* A party must make
                these disclosures at the times and in the sequence that the court

orders. Absent a stipulation or a court order, the disclosures must be made:

> (i) at least 90 days before the date set for trial or for the case to be ready for trial; or
>
> (ii) if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure."

In reality, Defendants are asking this Honorable Court to treat them differently than how they wanted Plaintiffs treated. Defendants want the rules to apply to Plaintiffs, but not to themselves.

On August 29, 2016, Plaintiffs filed a Motion In Opposition to Summary Judgment (Doc. 124). Since counsel had not been appointed to represent Plaintiffs, this Motion was written on a prison typewriter. Plaintiffs were acting *pro se.* They had no legal training. Their Motion included a report from Dr. Cauley. About a month later, on September 19, 2016, Defendant's leaped at what they perceived to be Plaintiffs' failure to follow Federal Rule of Civil Procedure 26(a)(2). In their Motion to Strike (Doc. 129), which this Honorable Court can take judicial notice of, Defendants state:

"If a party fails to provide information or identify a witness as required by [Federal] Rule [of Civil Procedure] 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c). The exclusion of non-disclosed evidence is mandatory unless non-disclosure was justified or harmless. *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004)." [page 2]

Defendants go on to state:

"Federal Rule of Civil Procedure 26(a)(2)(D) directs each party to disclose its expert opinion reports "at the times and in the sequence directed by the court." Fed. R. Civ. P. 26(a)(2)(D). . .

A complete report must include the substance of the testimony which an expert is expected to give on direct examination together with the reasons thereof. *Salgado v. General Motors Corp.*, 150 F.3d 735, 741 n. 6 (7th Cir.1998). Expert reports must not be sketchy, vague, or preliminary in nature. Id. Expert reports must include "how" and "why" the expert reached a particular result, not merely the expert's conclusory opinions. Id. The

expert reporting requirement applies to reports created for the instant case, and any expert reports to be considered from separate cases. *Rossi v. Chicago*, 790 F.3d 729, 738 (7th Cir. 2015)."

Shockingly, in light of their lack of acting in a timely manner here, Defendants, in their attempt to strike *pro se* Plaintiffs' pleading, actually discuss the aspect of timeliness regarding the disclosure of Dr. Cauley when at page 4 they write:

"Even if the Court finds that Dr. Cauley's Report complies with Rule 26(a)(2)(B), Dr. Cauley's Report should be struck as it is untimely. Defendants were not provided with Dr. Cauley's Report until they were served with Plaintiffs' response to Defendants' Motion for Summary Judgment on August 27, 2016. As the discovery deadline in this case was May 2, 2016, Dr. Cauley's Report—which purports to have been prepared on July 25, 2016—is untimely. (Doc. 112.) See also *Sherrod v. Lingle*, 223 F.3d 605, 612 (7th Cir. 2000) (holding that in the absence of an explicit expert disclosure deadline, the overall discovery deadline applies). Accordingly, Dr. Cauley's Report [Exhibit 3] should be stricken as it is untimely."

Now that the shoe's on the other foot, Defendants want this Honorable Court to ignore the foregoing arguments. They prefer a much broader interpretation of the timeliness aspect of Rule 26(a)(2)(D) than that which they were willing to give when they were opposed by *pro se* litigants. Now, Defendants want this Honorable Court to do exactly the opposite of what they advocated for previously. This is hypocrisy.

Summary judgement was denied by this Honorable Court on January 31, 2018. (Doc. 194) Regarding Defendants' attempt to strike Dr. Cauley's affidavit, this Honorable Court concluded at page 11:

"Here, the Scheduling Order entered by former Magistrate Judge Philip Frazier (Doc.46) did not set a deadline for expert witness disclosures and the parties did not have a stipulation regarding the same. Thus, as the pro se plaintiffs correctly concluded, their expert witness disclosure was due 90 days before the trial date – not by the discovery deadline as argued by Defendants. That deadline had not passed when Plaintiffs responded to Defendants' summary judgment motion with Dr. Cauley's report and CV attached.

The Court recognizes that Dr. Cauley's report does not fully comply with the requirements set forth at Rule 26(a)(2) as he has not provided a list of cases

4

in which he has served as an expert witness nor has he disclosed the compensation he will receive for his work on the case. That said, these deficiencies can be rectified by a supplemental report and do not warrant the report being stricken for purposes of the Court's consideration of Defendants' summary judgment motion."

On July 18, 2018 Plaintiffs corrected any errors regarding Dr. Cauley by way of a Supplemental Report. (Doc 220)

Defendants got around to disclosing Dr. Holt as an expert less than a month before trial, when on September 24, 2018, (Doc. 226) for the first time they alerted Plaintiffs that:

"Dr. C. Thomas Holt. c/o Kyle Rockershousen; Office of the Illinois Attorney General; 500 S. 2nd St., Springfield, IL 62701. Dr. Holt is a named Defendant in this matter. He will be called to provide expert testimony regarding the allegations in the Complaint."

Plaintiffs moved to excluded Dr. Holt (Doc. 241) and at the October 10, 2018 final pre-trial the following colloquy took place:

"THE COURT:  That then brings us to Plaintiffs' Motion To Exclude Expert Testimony. That was filed, I believe, on -- yesterday -- and seeks to exclude or basically prohibit Dr. Holt from offering expert testimony in this case. Since it was filed on yesterday, obviously, the defendants haven't had an opportunity to respond but I will give Mr. Rockershousen an opportunity to respond now, if he wishes. Do you have a response?

MR. ROCKERSHOUSEN: Yes, Your Honor. I have not been able to look into detail into the motion because it was filed yesterday and I have been on the road. I did have a chance to read it briefly this morning.

THE COURT: Okay. Let me summarize it for. You didn't disclose Dr. Holt as an expert witness. You didn't disclose any expert opinions that you intended to offer from Dr. Holt until you disclosed the very vague – until you made the very vague disclosure that you anticipate him offering expert opinions regarding the allegations in the Complaint. And that was done for the first time when you filed your Rule 26(a)(3) disclosures about a month ago.

MR. ROCKERSHOUSEN: Yes, Your Honor.

THE COURT: That's the motion.

MR. ROCKERSHOUSEN: Thank you, Judge.

THE COURT: You're welcome.

MR. ROCKERSHOUSEN: The whole issue at this case is what treatment is being provided to the four STP's at Big Muddy River Correctional Center.

THE COURT: This is not a question about the issues. This is a question -- it's real simple. Did the defendants disclose any expert opinions or disclose the fact that Dr. Holt would be rendering expert opinions at trial, before you simply listed him in your Rule 26(a)(3) disclosures? Did you do a 26(a)(1)(2) disclosure?

MR. ROCKERSHOUSEN: No, Your Honor.

THE COURT: Okay. Then the motion is granted. Dr. Holt will not be permitted to provide or testify as to any expert opinions. Obviously, he's a fact witness regarding the program and whatever the conditions are, et cetera, et cetera. He can testify as a fact witness. What he cannot do is offer his own opinions based on his expertise, nor can he offer opinions to refute the plaintiffs' expert. Is that clear?

MR. ROCKERSHOUSEN: Yes, Your Honor.

THE COURT: Okay."

On October 18, 2018, Defendants requested this Honorable Court reconsider its decision to prevent Dr. Holt from testifying as an expert. (Doc. 249) The crux of the argument made then is the same as the one made here.

Defendants never bothered to follow the requirements clearly laid out in Federal Rule of Civil Procedure 26(a)(2)(D). Because they ignored the rules, like in October of 2018, Defendants now hope to convince this Honorable Court that this failure is "harmless" under *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003) Try as they might though, Defendants simply cannot put a square peg in a round hole.

Defendants' bare bones disclosure said absolutely nothing regarding what Dr. Holt was going to testify about. Defendants' disclosure of Dr. Holt as an expert consisted of 14 words, "He will be called to provide expert testimony regarding the allegations in the Complaint." How is an attorney or even a *pro se* litigant for that matter, supposed to prepare a meaningful cross-examination based on those 14 words, without any sort of supporting documentation? How is it fair that Defendants possessed a rafter of information

on Dr. Cauley which they used as a road map in cross-examination, but Plaintiffs only have 14 words to rely on?  It was shocking that Defendants ignored their obligation under Rule 26 and contained within that shock was the surprise that on the eve of trial Defendants would try to slide in their desire to use Dr. Holt as an expert.

Rather than doing what Plaintiffs did in July of 2018 and cure the prejudice and supplement their initial 26(a)(2) disclosure, Defendants still wanted to force Plaintiffs to guess at what Dr. Holt was going to testify to as an expert.  Defendants never supplemented Dr. Holt's report[1], even though they could have as part of their Motion to Reconsider.  To this date, they have never attempted to follow Rule 26(a)(2) with regard to Dr. Holt.

There is absolute willfulness on the part of Defendants to do what they did.  They didn't accidentally include 14 words in an expert disclosure less than a month before trial.  Had Plaintiffs not caught the untimely and improper attempt prior to trial to include Dr. Holt as an expert witness when they did, Defendants would no doubt have argued that Plaintiff waived any objection at trial.

At the bare minimum, Defendants could have orally provided an offer of proof to this Honorable Court as to precisely what Dr. Holt was going to testify to, followed up by an actual report.  Defendants could have produced a report that Dr. Holt had prepared and advised this Honorable Court the areas he would testify as an expert about or even why it was critical that he be allowed to offer expert testimony.  Instead, Defendants chose to do nothing and want to be rewarded for their sloppiness.  Had Defendants spent as much time following the rules and timely providing a report from Dr. Holt as they do in complaining about the consequences of not following the rules, this would not even be an issue.

This Honorable Court allowed Dr. Holt to testify as a treating physician.  As a sanction for Defendants' blatant refusal to follow the rules, this Honorable Court could have prohibited his testimony altogether.  Allowing Dr. Holt to testify as a treating

---

[1] "Supplement" is too strong of a word to use since to this day Defendants have not provided any sort of report from Dr. Holt.  *Pro se* litigants, using a prison typewriter, made a good faith effort to follow the rule and provided a report from Dr. Cauley which was supplemented once counsel was appointed.  Defendants have never attempted to follow the rule.

physician meant that he was able to testify at great length as to what he felt the appropriate treatment was for each Plaintiff.

Frankly, this Honorable Court's October 18, 2018 Order (Doc. 252), clearly and concisely explains why Dr. Holt was not allowed to testify as an expert witness at trial:

> "ORDER DENYING Defendants' Motion to Reconsider (Doc. 249 ). Defendants' failure to disclose their intent to elicit (unspecified) expert opinions from Dr. Holt prior to the filing of their Rule 26(a)(3) disclosures is not harmless. While Plaintiffs were aware of Dr. Holt's status as the administrator of the SDPP from the outset of the case, that knowledge does not equate to knowledge that Dr. Holt would offer expert opinions at trial or more importantly, what those opinions would be. Doctor Holt's Declaration submitted in support of Defendants' motion for summary judgment sets forth his credentials and areas of responsibilities as the program administrator, but no expert opinions. The unfair surprise and prejudice Plaintiffs would be subjected to if Defendants were permitted to blindside them with undisclosed expert opinions at trial is obvious and cannot be cured on the eve of trial."

This order and its reasoning should not be disturbed.   While Defendants understandably might want this Honorable Court to view Rule 26(a)(2)(D) as "best practice" suggestions, the reality is that rules have meaning.  Defendants should be held to the same standard they wanted the Court to hold *pro se* Plaintiffs to regarding 26(a)(2)(D). Because Defendants willfully decided to not follow the rules, it was proper to exclude Dr. Holt as an expert witness.

### III.  Dr. Dean Cauley

It's not surprising that Dr. Cauley's testimony causes such indigestion on the part of Defendants.  At trial, Dr. Cauley brought heat.  Like a kid shining the sun onto the grass through a magnifying glass, Dr. Cauley magnified the problems with the Sexually Dangerous Person's program run by Dr. Holt at the Big Muddy Prison.

Defendants complain that Dr. Cauley's report contained hearsay and that this Honorable Court relied on inadmissible evidence that was not testified to at trial or was subject to cross-examination.

Defendants opted for a bench trial. As such, this Honorable Court is presumed to ignore inadmissible evidence when making decisions.

Defendants discuss Federal Rule of Evidence 703, whose plain text is:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the *facts or data need not be admissible in evidence* in order for the opinion or inference to be admitted. Facts or data that are *otherwise inadmissible* shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in ***assisting the jury to evaluate*** the expert's opinion substantially outweighs their prejudicial effect." [Emphasis Added]

The highlighted portions are important because they discuss a ***jury*** evaluating the evidence.  In all cases, the trial court acts as a gatekeeper, but this role is significantly diminished in bench trials for the simple reason that there being no jury, there is no risk of tainting the trial by exposing a jury to unreliable evidence. *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) Common sense dictates that where the factfinder and the gatekeeper are the same, this Honorable Court would not err in admitting evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702.

"[I]n bench trials, the admission of incompetent or irrelevant evidence is not a ground for reversal 'when there is sufficient competent evidence to support the judgment and it does not appear that the court was induced by . . . [that] evidence to make essential findings that it otherwise would not have made.'" quoting *O'Connor v. Peru State College,* 781 F.2d 632, 639 (8th Cir. 1986)

The 2000 Amendment to Federal Rule of Evidence 703 uses the word "jury, and the commentary to the Amendment adding this sentence uniformly uses the word "jury.[2]" Here, it is logical to conclude that the facts and data relied upon by Dr. Cauley were admissible for the purposes of this Honorable Court evaluating his opinions and conclusions.

---

[2] *See* Adv. Comm. Notes to Fed. R. Evid. 703 (2000 amends.) ("When information is reasonably relied upon by an expert and yet is admissible only for the purpose of assisting the jury in evaluating an expert's opinion, a trial court applying this Rule must consider the information's probative value in assisting *the jury* to weigh the expert's opinion on the one hand, and the risk of prejudice resulting from the *jury's potential misuse* of the information for substantive purposes on the other.") (emphasis supplied).

It is worth noting that the two Federal Rules of Evidence that bookend Rule 703, namely 702 and 704, discuss other limitations on expert testimony using the words "*trier of fact*," as opposed to the word "*jury*" employed in the text of Rule 703.

A cursory review of the Advisory Committee Notes from the 2000 Amendments show that the word "jury" is used over a dozen times, which shows that the Rule applies to juries, not bench trials.

So, the combination of the written Rule along with the other Rules and the Advisory Committee notes, it is clear that Federal Rule of Evidence 703 has no application to a bench trial.

The "hearsay" issue complained of by Defendants is a red herring.  At the outset, it is important to note that during Dr. Cauley's testimony, Plaintiffs moved to admit each exhibit relied upon by Dr. Cauley separately.  Some exhibits were admitted and some were kept out of evidence by this Honorable Court.

Even though Defendants had Dr. Cauley's report for nearly 10 months, and a supplement for 3 months, they never filed a Motion In Limine to exclude the report at the bench trial.  Instead, Defendants chose to allow Dr. Cauley to testify as to his findings, but never objected to the report itself as hearsay.  (See Bench Trial Volume I pages 181 line 13 through page 185 line 25)

As this Honorable Court knows, experts may rely upon hearsay in forming their conclusions.  So, someone like Dr. Cauley who testifies as an expert in a bench trial should be allowed to state the facts or data underlying his opinions and conclusions, even if those facts or data might constitute hearsay. This Honorable Court could rely upon the underlying facts or data, even if they are otherwise inadmissible, to evaluate the soundness of Dr. Cauley's conclusion.  Defendants chose a bench trial, which allowed this Honorable Court to admit and exclude various pieces of evidence, most notably the items used by Dr. Cauley to prepare his report and make his findings.

The Court further assured the parties that only admissible evidence would be relied upon when it stated that at the completion of Dr. Cauley's testimony, "I'm going to instruct

Michelle to … take me through each one of these that were admitted and then we're going to revisit whether they independently are admissible." (Tr. Vol. II, p. 226).

### IV.  Evidence Is Not Stale

It takes a lot of gall to claim that the evidence relied upon by the Court is "stale." At any time since the trial ended, Defendants could have (a) asked for a status conference to advise this Honorable Court of major changes taking place at Big Muddy or (b) requested leave to supplement the record to advise this Honorable Court of major changes taking place at Big Muddy.  Plaintiffs, not Defendants, filed a Motion For A Status Conference on February 2, 2021. (Doc. 275) If there was some major change at Big Muddy as Defendants suggest, a Motion For Status Conference could have been filed to alert this Honorable Court to changes that had been made.  Instead, Defendants waited until this Honorable Court issued Orders before complaining about "stale" evidence.

Defendants want to tout the "fresh" developments going on at Big Muddy, yet fail to attach any affidavit, even though Federal Rule of Civil Procedure 59(c) allows them to do so.  Failing to attach any affidavit forces this Honorable Court to rely on conjecture.

At this point, the only "fresh" developments Defendants should make this Honorable Court aware of are the number of AARP eligible inmates who are in the program now as opposed to 2018, whether the number of wheelchairs has increased/decreased since 2018, the number of oxygen tanks at Big Muddy now as compared to 2018 or the number of inmates who have successfully completed the program since 2018.

Contrary to Defendants' claim that this Honorable Court needs to conduct another Hearing because the evidence relied on is "stale," the last Supplement filed by Defendants was on March 10, 2021 (Doc. 283) This Supplement consisted of Declarations from Jessica Stover and Heather Wright.  Defendants included in the Supplement those alleged facts they felt this Honorable Court should know before rendering its decision.  This Honorable Court certainly relied on this filing in reaching its decision.

Unfortunately for Defendants, what their March 10, 2021 Supplement and accompanying declarations show, is that they view minor adjustments to the status quo as

Herculean attempts to help Plaintiffs.  These Supplements actually show that Defendants are nibbling at the edges.

The reality is that Defendants have had three years since the trial took place and nearly seven years since this action was filed in which to make changes.  All litigants have "hope" that the trial is going to go their way.  At some point though, reality has to set in. Defendants did very little at trial to rebut Plaintiffs' testimony.  They did even less to rebut Dr. Cauley's findings. This "staleness" argument shows that Defendants were caught flat-footed by this Honorable Court's Orders.  This "staleness" argument shows that Defendants were operating under the belief that the Orders would not be expansive or would do very little to change the status quo.  Defendants were wrong all the way around.

Dr. Cauley provided Defendants a roadmap to legitimize the program.  Instead of making real changes immediately after the trial, Defendants have dawdled.  If  there  was the tidal wave of change at Big Muddy that Defendants suggest, complying with this Honorable Court's Orders should be easy.  By claiming that this Honorable Court relied on "stale" evidence and that a whole new round of hearings is necessary, Defendants simply want to do as little as possible to continue with the status quo.

Again, it cannot be stated strongly enough that at any time from the conclusion of trial until the entry of this Honorable Court's Judgment, Defendants could have supplemented the record.  They could have attached affidavits to their Post-Trial Motion.

Every second of every minute of every hour of every day that Defendants refuse to follow the roadmap given to them by Dr. Cauley is a "fresh" Constitutional violation. Plaintiffs are the victims of Defendants' actions.  They certainly do not feel that their "imprisonment" is based on "stale" evidence.

Asking for a new hearing based on "staleness" of evidence is ludicrous and should be denied out of hand.

### V. The Order Complies with the Prison Litigation Reform Act

Defendants state that "the Court makes no mention of the PLRA although the Plaintiffs as Sexually Dangerous Persons ('SDP') are subject to the Act." (Doc. 290, p. 5, citation omitted). They may be implying that this Court has not properly applied the PLRA

to this case. The record, however, leaves no doubt that from the outset, this Court has proceeded with an awareness of the requirements the Act imposes on this litigation. On October 1, 2014, this Court introduced its "Merits Review of the Complaint" by acknowledging that SDPs are subject to the PLRA and that the review of the Complaint will be conducted accordingly. (Doc. 10, pp. 2-3). A reasonable observer would conclude that the PLRA has factored into this Honorable Court's analysis throughout this litigation.

Defendants cite *Brown v. Plata*, 563 U.S. 493 (2011) for the proposition that "[t]he scope of the remedy must be proportional to the scope of the violation, and the order must extend no further than necessary to remedy the violation." (Doc. 290, p. 6). Plaintiffs embrace this proposition. *Brown* involved two suits brought by the inmates in California prisons. The violations at issue were the subject of class actions in two Federal District Courts, one involving prisoners with serious mental disorders the other, inmates with serious medical conditions. *Brown* at 500. "After years of litigation, it became apparent that a remedy for the Constitutional violations would not be effective absent a reduction in the prison system population." *Id*.

A three-judge court ordered California "to reduce its prison population to 137.5% of design capacity within two years." *Brown* at 509-510. As Justice Scalia stated in his dissent, the order would require California to release "the staggering number of 46,000 convicted criminals." *Brown* at 550. As seemingly overly broad and intrusive as this Order was, the Court held that "the PLRA does authorize the relief afforded in this case and that the court-mandated population limit is necessary to remedy the violation of prisoners' Constitutional rights." *Id*. at 502. Plaintiffs assert that the due-process violations at the heart of their case, though not as numerous as those in *Brown*, are just as egregious. Plaintiffs are suspended in a dead-end system of indefinite incarceration waiting to become members of what might properly be called the "wheelchair brigade." (Tr. Vol. I, p. 79).

*Doe v. Cook Cnty., Ill*., 798 F.3d 558 is cited for holding that "there must both be factual findings in a case and findings about the necessity for a particular remedy to cure any violation to conform to the PLRA." (Doc. 290, p. 5). Defendants then cite *Doe*, where it refers to the Supreme Court in *Brown* being divided over "whether even 184 pages of

findings and analysis by a District Court satisfied the statutory burden" *Doe*, 798 F.3d at 566. The next sentence, "Here, the Court entered a 27-page Memorandum and Order to address the factual and legal issues before it" (Doc. 290, p. 5) implies that this Court's 27 pages of fact and legal analysis are insufficient to support the Order. This is a *non sequitur*.

The issues in *Brown* affected every prison and all 156,00 prisoners in California. *Brown* at 501. Findings of fact included such things as the number of prisoners per toilet and the treatment of suicidal prisoners. *Id*. at 502, 503.  The voluminous finding of facts in *Brown* are not comparable to this case where 27 pages were sufficient to find that Plaintiff's rights were violated by Defendants, and that the Order is necessary to cure the violation.

*Armstrong v. Brown*, involved a suit against the State of California by disabled prisoners alleging violations of their rights under the ADA. 768 F.3d 975 983 (9th Cir. 2014). Defendants cite it for holding that while courts may provide guidance and set clear objectives, "the PLRA does not permit courts 'to micromanage prison administration or order relief that would require for its enforcement the continuous supervision by the federal court over the conduct of state officers.'" (*Id.* at 983). This, however, is not the totality of the court's PLRA inquiry nor is it the most important consideration:

> The overarching inquiry is ''whether the same vindication of federal rights could have been achieved with less involvement by the court in directing the details of defendants' operations.'' *Id.* at 983-984, internal citation omitted.

California had challenged the modified "accountability provisions of an earlier injunction ordering the State to take specified steps to ensure that disabled inmates were provided with needed accommodations." *Id.* at 978. After a complete analysis, the appellate court struck down one provision of the injunction, but upheld the rest, as complying with the PLRA. *Id.* at 982-983. Under very this same analysis, the level of this Court's involvement in the actions ordered is necessary and proper to vindicate flagrant and extraordinary violations of Plaintiffs' federal rights by the Defendants.

Defendants argue that "the Court did not make the findings required by the PLRA with respect to the relief entered – namely that it finds that the relief imposed by the Court's injunctive order is 'narrowly drawn, extends no further than necessary to correct the

violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.'" (Doc. 290, p. 5, citation omitted). To the contrary, the scope of the remedy ordered is proportional to the violation, is narrowly tailored and is the least intrusive means necessary to remedy the Constitutional violation.

## VI. *The Order Was Narrowly Tailored & Was The Least Intrusive Means Possible*

Although Defendants boast of accomplishing Herculean exploits to help Plaintiffs, they bemoan this Court's Order and Injunction like they were tasked with Cleaning the Stables of King Augeas, Capturing Cerberus or Bringing Back the Mares of Diomedes. Dr. Cauley outlined a plethora of shortcomings in the SDPP, which are properly characterized by the Court as "systemic failures" (Doc. 285, p. 25). The actions ordered by this Court are required to remedy a program that has left George Needs in custody since 1981. (Doc. 285, p. 3). Compared to the severity of the Defendants' Constitutional offenses and in light of the suggestions for improvement made by Dr. Cauley, the minor changes ordered by this Court are proportional to the violation, incredibly narrow and not intrusive.

The SDPP as it functions today is dramatically different from the one presented to the U.S. Supreme Court in *Allen v. Illinois.* The Court cites to *Allen* on page 21 of the Memorandum and Order:

> In short, the State has disavowed any interest in punishment, provided for the treatment of those it commits, and **established a system** under which committed persons may be released after **the briefest time** in confinement. 478 U.S. 364, 370 (1986) (emphasis added).

The Supreme Court found that Illinois' SDP Law did not violate Allen's right against self-incrimination because the commitment was civil, not criminal and Illinois had "established a system under which committed persons may be released after the briefest time in confinement." *Id.* In the over thirty years since *Allen* was decided, this "system" has broken down and this Court rightfully concluded that the "Big Muddy SDPP operates contrary to these important principles." (Doc. 285, p. 21). While it takes an average of three to five years for an SDP to enter and exit the program in the Good Lives Model, (Tri. Vol. 2, p. 243) George Needs, who had been committed to the SDPP for five years prior to *Allen*

being decided in 1986, is still there today, 35 years later.  The SDPP considered by the Supreme Court no longer exists. The program needs an overhaul not a tune-up.

This Court properly relied on the expert testimony of Dr. Cauley who, though not addressing the Constitutionality of the program, outlined its shortcomings as compared to generally accepted standards for similar programs across the country:

> The SDPP falls far below the generally accepted standards in the field of civilly committed sex offender treatment with respect to the amount of therapy offered to SDPs and group sizes (Doc. 124-1, pp. 15-18, 20-22). The inherent flaws in the SDPP result in treatment that is slow, repetitive, and not catered to the mission of treating the men and returning them to the community as quickly as possible. (Doc 285, p. 14).

Dr. Cauley's findings and recommendations were relied on to rehabilitate a failing and unconstitutional-as-constituted program.

> Beginning no later than 30 days from the entry of this Order, Plaintiffs shall receive a minimum of 7.5 hours of core group therapy per week – each core group therapy session shall last no less than 90 minutes. (Doc. 286, p. 1).

Defendants assert that "[t]he Court's injunctive order for Defendants to provide this number of core therapy hours, absent a finding that it is the constitutional minimum required, required, is clearly erroneous and violates the PLRA, and thus must be vacated" (Doc. 290, p. 8). This assertion is, itself, clearly erroneous as has been demonstrated and will be further.

> [T]he Court specifically concludes Plaintiffs have suffered or will suffer irreparable injury if a permanent injunction is not issued given the significant deficiencies in the delivery of mental health services via the SDPP. (Doc. 285, p. 25).

This Court found that 7.5 hours of therapy is necessary to cure the "significant deficiencies" in the SDPP and, by implication, to protect the constitutional rights of the plaintiffs. Defendants cite Dr. Cauley's testimony that "Rushville has five core therapy hours a week, which is still within the guidelines/range and appropriate" (Doc. 290, p. 7). Apparently, they are arguing that 5 hours would be sufficient. Dr. Cauley, however,

testified that Rushville is doing other things, too so that, "just on the sex offender specific treatment, they're getting better than five." (Tr. Vol. I, p. 188). Those other things include:

- Inmates at Rushville seem to have a full schedule of activity compared to the SDPs at Big Muddy who are confined to their cells 20-some hours-a-day. *Id.*, 188-189
- Rushville offers vocational training with some of the men who don't have skills, for when they get out. *Id.* at 189
- Rushville follows a Program Manual that provides clear guidelines for progressing through the phases of treatment (i.e. "phasing up"). *Id.* at 190.
- "Phasing up" means a kind of change in security status where men gain even more freedom around the compound. "This is further incentive to progress through the program." *Id.*
- Rushville provides other incentives to progress in treatment: the more you go up, the more perks you get. (Tr. Vol. II, p. 248).

Five hours of group per week might be sufficient if they would add these "other things" so that they are "getting better than five." Requiring Defendants to provide 7.5 hours of core group per week is proportional to the scope of the violation, narrowly tailored, is not intrusive and is necessary to remedy Big Muddy's substantial constitutional failings. Note also, this Court found that the program violates the generally accepted standards in group size, the number of sessions per week, the staff to patient ratio, and in its flawed and inadequate SDPP Manual (Doc. 285, pp. 15-16), yet these are not addressed in its Order. It is obvious that this Court practiced restraint in fashioning a narrowly tailored remedy.

### VII. A Permanent Injunction is Necessary to Insure that the Court's Order is Followed

The Court found that critical and necessary treatment modalities had been placed on hold which is "atypical" of similar programs. (Doc. 285, p. 15). Accordingly, the Court accordingly issued an injunction to guarantee that these would resume:

> All *offense specific* and didactic groups that are currently suspended shall be reinstated and permanently maintained beginning no later than 30 days from the entry of this Order. (Doc. 286, p. 2).

Defendants object to the need for injunctive relief. They imply that the "groups at issue, Substance Abuse, Anger Management and Victim have been resumed" and that "Plaintiff has not proven there is an ongoing constitutional violation and [therefore] the injunctive relief ordered is wholly improper and must be vacated." (Doc. 290, pp. 13-14).

If these programs have been resumed, Defendants made no mention of this in their March 10, 2021, Supplement (Doc. 283). No affidavits were attached to their Post-Trial Motion about the programs.  Assuming *arguendo* that they have been reinstated, the need for injunctive relief has not ended. Dr. Cauley, testified that the suspension of these critical treatment modalities appears to have been a "recurring issue." (Tri. Vol II, p. 257). The injunction requires that they not only be restored but that they be *permanently maintained*. Even if they have been resumed, they could be suspended again absent the injunction. Based on IDOC's recent history of repeated failure to abide by the settlement agreement in *Rasho v. Jeffreys*, No. 07-1298, WL 1602093 (C.D.Ill. April 23, 2021) [3] this Court is reasonably justified to exercise continued oversight of the SDPP via injunction.

*Rasho* is a class action case involving the delivery of mental health services to mentally ill prisoners by IDOC; the resulting settlement agreement; the Defendants' failure to abide by the agreement; and the permanent injunction ordered by the Central District of Illinois in April 209. *Id.* The back and forth is too lengthy to recite in this short brief. Of note and relevant to the instant case is where the Court discusses how the Defendants, to avoid a contempt hearing, had argued that an evidentiary hearing was not necessary. However, they later argued that a full evidentiary hearing *was* necessary before extending the injunction. *Id.* The Court, applying judicial estoppel, extended the stay while the case is pending before the Seventh Circuit:

> This gamesmanship is precisely the sort of behavior the doctrine of judicial estoppel seeks to prevent. *Id.*

Defendants are headed down the same path in this case, and the Court can stop them in their tracks by denying their combined motion and maintaining the injunction as is.

> The Constitutional necessity of these offense-specific groups cannot be overstated.

> Thus, the Fourteenth Amendment mandates that civil detainees receive treatment for the disorders that led to their confinement and be released when they have improved enough no longer to be dangerous. *Hughes v. Dimas*, 837 F.3d 807, 808 (7th Cir. 2016). (Doc. 285, p. 19).

---

[3] See also, "'Unconstitutional': Mental health access in Illinois prisons fails to meet standards." https://thesouthern.com/news/local/crime-and-courts/unconstitutional-mental-health-access-in-illinois-prisons-fails-to-meet-standards/article_feb1770d-ec31-563b-9a7a-0e476c7b9017.html.

It is difficult to imagine anything more unconstitutional than denying an SDP treatment for the disorder for which they have been committed, leaving them with little to no chance of recovery and release. This is where Plaintiffs find themselves without these programs. Defendants have demonstrated a willingness to start and stop these sessions and a permanent injunction is necessary to guarantee continued compliance.

Defendants also challenge this Court's injunction concerning the recovery/release evaluations with the heading: "The Court Erred in Entering an Injunction which violated the Prison Litigation Reform Act, requiring Defendants to no longer utilize Wexford Health Sources, Inc., as it is not narrowly tailored." (Doc. 290, p. 8). They argue that "there is no analysis as to whether or how a federal right is being violated" and "[a]s there are no violations of federal rights found by the Court as to recovery petitions, no injunctive relief is permissible and the injunctive order should be vacated." (*Id.*, p. 9).

Concerning the Wexford recovery/release evaluations this Court found:

These reviews do not provide an accurate conception of current or future risk (Doc. 124-1, p. 18). The Wexford evaluations "do not adhere to generally accepted practice or evidence based decision making." *Id* at 17.

The Court also found that "Since 2011, 22 SDPs have been released, discharged, or recommended for release or discharge by an evaluator (Tr. Vol. II, p. 395)." (Doc. 285, p. 11). At the time Plaintiffs filed their Statement of Supplemental Facts, 27 months post trial, only four more SDPs had been recommended for release. (Doc. 280). A few others had departed prison, but they had been recommended for release before the trial. (*Id.*). Plaintiffs state on information and belief that none had been recommended for release between the March Supplement and the Order. With such low numbers, a bias against release by the evaluators could rationally be found. Illinois' law allows State courts to require an independent examiner when bias is demonstrated:

There are numerous safeguards in place to ensure the reliability of the recovery proceeding. As the appellate court conceded, a respondent can move for the appointment of an independent psychiatric expert if he believes that the Department experts are biased and prejudiced. *People v. Burns*, 809 N.E.2d 107, 118-19 (Ill. 2004).

Even if the evaluators' bias is not an issue, the Court, relying on expert testimony, found that the Wexford evaluations do not provide an accurate conception of current or future risk, nor do they adhere to generally accepted practice or evidence based decision making. (Doc. 285, p. 17). An unbiased and reliable recovery review is necessary to protect the rights of the SDPs. As it stands now, the evaluation process is neither, and violates the letter and spirit of *Allen v. Illinois*. The Order and Injunction should not be disturbed.

### Conclusion

Defendants have taken baby-steps and represent that they have leaped tall buildings. They are ostensibly arguing that the program is fine with the changes they have made so far, and that there are no continuing Constitutional violations and, therefore, continued court involvement is no longer necessary. Unfortunately, IDOC's recent history has breathed new life into the old adage, "trust but verify." It is certain that one day, George Needs will leave the prison. What is not known is if it will be on his feet, in a wheelchair or in a box. For the foregoing reasons, Plaintiffs ask this Honorable Court to deny Defendants' combined Post-Trial Motion in its entirety.

JAMES HOWE et al.

SIMMONS HANLY CONROY

BY:
/s/John D. Simmons (By:JDSII)
John D. Simmons
Attorney for Plaintiffs
One Court Street
Alton, Illinois 62002
Telephone: (618)259-2222
FAX: (618)259-2251
Email: jsimmons@simmonsfirm.com

/s/Gary L. Payne (By:JDSII)
Gary L. Payne
Attorney for Plaintiffs
Telephone: (618)259-2222
FAX: (618)259-2251
Email: gpayne@simmonsfirm.com

STOBBS LAW OFFICES

BY:
/s/John D. Stobbs II
John D. Stobbs II, No. 06206358
Attorney for Plaintiffs
307 Henry St. Suite 211
Alton, Illinois 62002
Telephone: (618)462-8484
FAX: (618)462-8585
Email: jds2@stobbslaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 18, 2021, a copy of the attached *Plaintiffs' Response to Defendants' Post-Trial Motion* was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

Maria D. Gray
Office of the Attorney General-Springfield
500 South Second Street
Springfield, Illinois 62701

STOBBS LAW OFFICES

/s/ John D. Stobbs II
307 Henry St. Suite 211
Alton, Illinois 62002