**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JACOB KALLAL, and GEORGE NEEDS, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | )   Case No. 14-cv-844-SMY ) ) |
| SALVADORE GODINEZ, et al., | ) ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER FOLLOWING REMAND

**YANDLE, Chief District Judge:**

Plaintiffs are civil detainees classified as "sexually dangerous persons" under the Sexually Dangerous Persons Act ("SDPA"), 725 ILCS 205/0.1, *et seq.* The Act permits the State to involuntarily commit and indefinitely confine individuals who have not been convicted of a crime, but who have been determined likely to commit acts of sexual violence in the future. Plaintiffs filed the instant action pursuant to 42 U.S.C. § 1983, alleging Defendants are violating their constitutional rights. They requested declaratory and injunctive relief.

Following a bench trial, the Court issued its findings of fact and conclusions of law (Doc. 285). The Court also issued a permanent injunction requiring Defendants: (1) to provide Plaintiffs a minimum of 7.5 hours of core group therapy per, with each session lasting no less than 90 minutes; (2) to reinstate all inactive offense specific and didactic groups that were currently suspended; and (3) requiring the use of independent evaluators other than Wexford Health for performing discharge evaluations (Doc. 286). Defendants appealed.

On appeal, the Seventh Circuit noted, "by providing inadequate treatment, and, as a result, depriving detainees of a realistic possibility of release, Illinois has failed to uphold its end of the

balance." *Howe v. Hughes*, 74 F.4th 849, 859 (7th Cir. 2023).  Nevertheless, the Court concluded the injunction was overbroad and remanded "for the district court to craft a new injunction consistent with the PLRA and [its] opinion." *Id.*

On remand, the parties supplemented the record as directed by the Court (Docs. 334, 335, 336, 356).  After reviewing the supplemental documentation, the Court held an evidentiary hearing on August 25, 2025 to further clarify and develop the record (Doc. 364).

## FINDINGS OF FACT

### Parties

Plaintiffs Jacob Kallal and George Needs are civilly committed to the Big Muddy River Correctional Center Sexually Dangerous Persons Program (the "SDPP").  Plaintiff Needs was first committed in 1981 (Tr. Vol. I, pp. 46-47).  He has been housed at Big Muddy since 1995.  *Id*. Plaintiff Kallal was first committed in 2001 and has been housed at Big Muddy since his commitment (Tr. Vol. I, p. 86).[1]

Defendants are employees of the Illinois Department of Corrections ("IDOC").  Defendant Dr. Thomas Holt is the former Administrator of the SDPP and held the position from 2013 until June 2019 (Tr. Vol. II, p. 379; Doc. 283-3).  Dr. Holt created the SDPP (Tr. Vol. II, pp. 385-386). There was no Administrator for the SDPP between June 2019 and March 2021 (Doc. 283-2, ¶ 6). Heather Delashmutt nee Wright assumed the role from March 16, 2021 until March 2025 (Doc. 283-3; Doc. 364, p. 8).  Hunter Witcher assumed the role in June 2025.[2]  Defendant John Baldwin

---

[1] At the time of trial, James Howe and Timothy Charles were also named Plaintiffs.  Charles was released from the SDPP in October 2020.  Howe was released from the SDPP in September 2025.

[2] Hunter Witcher, as Holt's successor, is substituted as a party defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

was the Director of IDOC at the time of trial (Doc. 86)[3] and Defendant Daniel Sullivan was the

warden of Big Muddy (Tr. Vol. II, p. 314).[4]

## Civil Commitment

An estimated 5400 individuals are civilly committed under state and federal sex offender

programs across the country.[5]  Illinois has enacted two sexual commitment statutes – the Sexually

Dangerous Persons Act ("SDPA") and the Sexually Violent Persons Act ("SVPA"), 725 ILCS

207/1 *et seq.*  Individuals committed under the SVPA have been criminally convicted and complete

treatment at the Rushville Treatment & Detention Center, which is operated by the Illinois

Department of Human Services.  Those committed under the SDPA have not been convicted of a

sexual offense and are housed at Big Muddy under the operation of the Illinois Department of

Corrections.  *See* 725 ILCS 207/1 *et seq*.

Under the SDPA:

"When any person is charged with a criminal offense and it shall appear to the
[prosecutor] that such person is a sexually dangerous person, within the meaning
of this Act, then the [prosecutor] may file with the clerk of the court in the same
proceeding wherein such person stands charged with criminal offense, a petition in
writing setting forth facts tending to show that the person named is a sexually
dangerous person."

---

[3] The Court takes judicial notice that the current Director of IDOC is Latoya Hughes.  *See* https://www2.illinois.gov/idoc/aboutus/Pages/director.aspx.  Accordingly, Hughes is substituted for Baldwin as a party defendant pursuant to Rule 25(d).

[4] The Court takes judicial notice that the current warden of Big Muddy is Christel Crow.  *See* https://www2.illinois.gov/idoc/facilities/Pages/bigmuddyriver.aspx.  Accordingly, Crow is substituted for Sullivan as a party defendant pursuant to Rule 25(d).

[5] *See* Arielle W. Tolman, *Sex Offender Civil Commitment to Prison Post-Kingsley*, 113 Nw. U. L. Rev. 155 (2018) (noting that this statistic is likely an underestimate of the total population nationwide, as it only includes those people confined under "sexually violent predator programs," which generally target post-conviction sex offenders, thus excluding "sexually dangerous persons" programs that generally target pre-conviction sex offenders).

725 ILCS 205/3.01. A "sexually dangerous person" ("SDP") is defined as a person suffering from a mental disorder for at least one year, "coupled with criminal propensities to the commission of sex offenses, and who have demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children." 725 ILCS 205/1.01.

If a local state's attorney's office or the Illinois Attorney General's office files a petition to commit an individual to confinement as an SDP, the individual has a right to an attorney and a jury trial. 725 ILCS 205/5. If the individual is found beyond a reasonable doubt to be an SDP, they are placed in the custody of IDOC, and the Director of Corrections is required to provide "for care and treatment [of the committed individual] designed to effect recovery". 725 ILCS 205/3.01; 725 ILCS 205/8. The treatment provided must conform with the standards promulgated by the Sex Offender Management Board Act and be conducted by a treatment provider licensed under the Sex Offender Evaluation and Treatment Provider Act. *Id.*

An SDP may petition the committing court in writing to be released. 725 ILCS 205/9(a). Once an SDP petitions for release, he/she is evaluated by an evaluator licensed under the Illinois Sex Offender Evaluation and Treatment Provider Act ("recovery evaluation"). 725 ILCS 205/9(a). Those recovery evaluations are performed by employees of Wexford Health Sources, Inc. (Tr. Vol. II, p. 417).[6] To continue the commitment, the State must prove by clear and convincing evidence that the SDP remains a sexually dangerous person. 725 ILCS 205/9(b). "No additional application may be filed for two years after a finding that the person is still sexually dangerous or after the application is withdrawn" unless special circumstances are met. 725 ILCS 205/9(d).

The committing court is required to discharge the SDP if, after a hearing, he or she is found to be no longer dangerous. *Id.* If the court concludes the person appears no longer to be dangerous

---

[6] Wexford Health Sources Inc. is the contracted medical provider for IDOC (Tr. Vol. II, p. 375).

but that it is impossible to determine with certainty under conditions of institutional care that the person has fully recovered, it is to enter an order of conditional or supervised release. 725 ILCS 205/9(e).

### Big Muddy's Sexually Dangerous Persons Program (SDPP)

There are currently 126 SDPs housed at Big Muddy (Doc. 367, p. 48). Prior to adding three new therapists in 2025, staffing had fluctuated with an average of 2-3 therapists since trial in 2018 (Doc. 322, p. 2; Doc. 364, pp. 7-8). The SDPP is currently staffed with 7 therapists: Heather Young, Shannon Davis, Kaylee Gordon[7], Hunter Witcher, Richelle Konczak, Bridgette McClure, and Sayler Tasky (Doc. 367). Only six therapists carry a caseload as one therapist runs sex offender treatment for both SDPs and incarcerated individuals in the Volunteer Sex Offender Program ("VSOTP") (Doc. 367).

Individual therapy is not provided through the SDPP (Tr. Vol. I, at p. 148). The program utilizes cognitive behavioral therapy based on the risk needs responsivity model and the Illinois Sex Offender Management Board's guidelines and offers three categories of therapy: primary/core group therapy; offense specific group therapy; and didactic (psycho-educational) group therapy (Doc. 364, pp. 10). An SDP may be in a general group, one or more sex-offense specific groups, and one or more didactic groups (Tr. Vol. II, pp. 338-389).

Primary therapy groups are process-oriented groups focused on gaining insight into offense-related behaviors and dynamic risk factors. SDPs in primary therapy group present assignments including life history, case report, offense cycles, and release recovery plans. Primary therapy groups meet once or twice a week for 90 minutes per session. Four therapists run group

---

[7] Ms. Gordon was a correctional officer with IDOC from 2017 until 2025. She has been a Sex Offender Therapist I at Big Muddy since June 16, 2025 and, according to her resume, is not a licensed therapist. (Doc. 367, p. 20).

therapy, while the newest therapists are in orientation (Doc. 364, p. 11). These groups are led by the SDP's assigned therapist. Shannon Davis is the primary therapist for the plaintiffs.

The SDPP therapy schedule is prepared by the clinical staff and approved by the Administrator (Tr. Vol. II, pp. 397-398; Plf. Tr. Ex. 8). As recently as 2018, there were as many as eighteen SDPs in a single group therapy session (Tr. Vol. II, p. 255). Attendance for general group therapy has since been reduced to no more than 10 SDPs per group (Tr. Vol. II, p. 387; Doc. 364, p. 14).

The SDPP offers sexual offense specific groups designed to teach strategies specific to the individual's sexual offense (Tr. Vol. II, p. 388). Offense specific groups are both sex offender and sex offense specific. *Id.* The SDPP offers optional didactic groups on a rotating basis (Plf. Tr. Ex. 3). The didactic groups are structured, time-limited, clinical, closed therapy groups that teach specific topics and strategies related to the treatment process, while encouraging participating individuals to address and practice the behaviors in their other groups. *Id.*

At the time of trial, group therapy sessions were canceled at a rate as high as 38% (Tr. Vol. I, pp. 58, 149; Tr. Vol. II, pp. 294, 341; Plf. Tr. Ex. 55, p. 1). Cancelled groups were rarely rescheduled. The cancellation of group therapy sessions continued into 2025, with sessions frequently canceled due to low staff availability (Doc. 364, pp. 12-13).

At the time of trial, the SDPP was organized into four phases of indeterminate length (Tr. Vol. II, pp. 389-390). In 2020, the SDPP eliminated the phased treatment program. According to Sarah Brown-Foiles, IDOC Manager for Sex Offense Services, progression in the phased program was not clear to SDPs (Doc. 364, p. 15). The SDPP replaced the phased treatment program with the static stable risk assessment utilizing the Stable 2007 and Static-99R to conduct assessments. The Stable 2007 allows a treatment provider to identify dynamic risk factors that may change in

treatment.  These risk factors can then be targeted and used to determine treatment goals for the next six months per SDP.  *Id.*  The Static-99R allows a treatment provider to identify static (i.e., not changeable with treatment) risk factors.  *Id.*

Newly admitted SDPs undergo an assessment process to identify individual treatment targets and needs (Doc. 367, p. 51).  Upon completion of the assessment process, each SDP participates in an individualized treatment planning session in which the overall risk level and treatment goals are identified specific to treatment motivation, empirically based risk factors, and individual strengths.  *Id*.  Treatment plans and progress are reviewed every six months.  *Id*.

### Plaintiffs' Treatment

Between May 2024 and May 2025, Plaintiff Kallal was offered an average of 2.18 hours of primary group therapy per week, and Plaintiff Needs was offered an average of 1.95 hours of primary group therapy per week.  Brown-Foiles testified that in the last twelve months, one of the primary therapists was on maternity leave for three months and other therapists were not available to cover groups resulting in cancellations. (Doc. 364, pp. 12-13).  Brown-Foiles was unable to provide information regarding how many of the cancelled sessions were rescheduled (Doc. 367, p. 50).

In addition to primary group therapy, Plaintiffs also attend offense-specific and didactic groups.  These classes meet once per week for 60 minutes.  Plaintiff Kallal attended community re-entry, the anatomy of peace, strengths building, sexual deviancy, and a cycle group.  From May 2024 until the group was canceled in January 2025, Kallal's community re-entry group was offered 18 weeks and canceled 19 weeks.  Community re-entry was suspended in January 2025 due to low staffing levels. From June 2024 until January 2025, Kallal's anatomy of peace group was offered 14 weeks and canceled 16 weeks.  The group was also suspended in January 2025 due to low

staffing levels.  From June 2024 until it was suspended in January 2025, Kallal attended a strength building group.  That group was held 17 times and canceled 18 times.  From July 2024 until January 2025, Kallal was offered a cycle group which was offered 9 weeks and canceled 15 weeks. Kallal took and completed a sexual deviancy group that met for 60 minutes per week for 3 weeks in May 2024.

Plaintiff Needs attended an offense-specific group that addressed sexual deviancy.  The sexual deviancy group was offered 15 weeks and canceled 21 weeks before being suspended in January 2025 due to low staffing levels.

According to Brown-Foiles, as of October 2025, the offense-specific and didactic groups that were suspended in January 2025 due to low staffing numbers have been added back to the schedule (Doc. 367, p. 49).  Some of the reinstated groups include Rational Emotive Behavioral Therapy, Cycle group, Dynamic Risk Factor groups, Re-entry, and Houses of Healing.  *Id*.

### SDP Recovery/Release Evaluations

When an SDP petitions the committing court for a recovery evaluation, the evaluation is conducted by Wexford Health Sources, Inc. evaluators who are under contract with IDOC (at the time of trial, the evaluators were Dr. Melissa Weldon- Padera and Dr. Kristopher Clounch) (Tr. Vol. II, p. 376).  The purpose of the Wexford evaluation is to analyze the current and future risk the SDP poses and to ultimately make a recommendation for or against discharge or conditional release from the program.  (*Id*.; Doc. 124-1, p. 18; Plf. Tr. Ex. 14-16).  The Wexford evaluators base their evaluation and recommendation on the treatment file maintained by the SDPP, including the semi-annual assessments, treatment plans, and case notes created by the primary therapist, a brief consultation with the SDP's primary therapist and occasionally, an interview with the SDP (Tr. Vol. II, pp. 417-418; Plf. Ex. 15).

Between 2011 and 2018, 22 SDPs were released, discharged, or recommended for release or discharge by an evaluator (Tr. Vol. II, p. 395).  Since October 2018, 45 SDPs have been released, discharged, or recommended for release or discharge: 5 have been discharged; 31 have been released and remain in the community; 4 have been discharged but violated conditional release and returned to Big Muddy; and 5 have been recommended for release but remain at Big Muddy.

## Plaintiffs' Expert – Dr. Dean R. Cauley

Dr. Dean R. Cauley received a bachelor's degree in psychology from the University of Michigan, a master's degree in mental health counseling from Oakland University, a M.B.A. from Ludgert College of Business, and a Ph.D. in mental health counseling with a focus on criminal justice from Wayne State University (Doc. 124-1, pp. 26-27).  He has been in private practice since 2003 and has provided expert opinions and analysis in civil commitment cases in state and federal courts (Tr. Vol. I, pp. 175-176; *see also* Doc. 124-1, p. 25).  Prior to entering private practice, Dr. Cauley served in various roles at the Florida Civil Commitment Center for Sexually Violent Predators, including as clinical team leader and clinical therapist.  *Id*.  In the Florida program, he provided sex offender treatment in both group and individual sessions and supervised clinical team members.  *Id*.

Dr. Cauley offered the following opinions at trial: The SDPP falls far below the generally accepted standards in the field of civilly committed sex offender treatment with respect to the amount of therapy offered to SDPs and group sizes (Doc. 124-1, pp. 15-18, 20-22).  The inherent flaws in the SDPP result in treatment that is slow, repetitive, and not catered to the mission of treating the men and returning them to the community as quickly as possible.  *Id.*

In reaching his conclusions, Dr. Cauley relied on the generally accepted practices of inpatient sex offender treatment as determined through a network called the Sex Offender Civil

Commitment Program Network ("SOCCPN") (Tr. Vol.  I, pp. 177-186).  SOCCPN gathers information from sex offender civil commitment programs in 19 different states, including staff qualifications and ratios, phase descriptions, hours of treatment, etc., and determines generally accepted practices by calculating an acceptable range based on the information gathered.  (*Id*.; Doc. 261, p. 82).

Dr. Cauley compared the SDPP to SVP program at Rushville and opined that while Rushville consistently fell within the acceptable ranges of SOCCPN in the various aspects of its program, the SDPP was consistently far below the acceptable ranges.  *Id*.; Doc. 260, pp. 186-193.

The generally accepted duration for one session of group therapy is no less than 90 minutes (Tr. Vol. II, p. Doc. 261, p. 53).  The generally accepted number of hours for general group therapy is no less than 5 hours per week (Tr. Vol. I, p. 188).  Most programs meet two to three times a week for an average of two hours per session which promotes a continuum.  *Id*. at p. 250.  The national mean average for general group therapy in civil commitment programs is 7.5 hours per week.  *Id*. at p. 255.  Rushville is close to 5.  *Id*.

At the time of trial, Dr. Cauley opined: the number of treatment modalities that were on hold also placed the SDPP below generally accepted standards of treatment; certain treatment modalities like anger management and substance abuse tie into offense and re-offense at a basic, primary level and without addressing these precursors to a sexual crime, other work is not grounded (Doc. 124-1, p. 21); treatment modalities are "critical parts" of treatment and should be available to SDPs at all times, regardless of the SDP's level of recognition of their history or offenses (Doc. 260, p. 190); and it is atypical to place critical modalities on hold (Tr. Vol. II, p. 256).

The generally accepted maximum number of individuals in a therapy group is ten (Tr. Vol.

II, p. 249).  Groups exceeding ten individuals handicap the delivery and effectiveness of treatment by allowing offenders who would rather not participate to "hide out" in large groups. (Doc. 124-1, p. 17).  In large groups, "[c]ohesion, trust, and meaningful work are lost to simple issues of trying to simply organize and focus the group." *Id*.  Large groups have the inevitable effect of slowing progress, "as the group members have long periods of time between presentations, times of exploring their own issues and processing their own offense cycles." *Id*.

At the time of trial, the SDPP's staff to resident ratio was far below generally accepted practice standards.  The ratio of treatment providers to SDPs at Big Muddy was approximately 1 to 42.5 (Tr. Vol. II, p. 254) while the generally accepted ratio is one treatment provider for every ten patients (Tr. Vol. I, p. 192).  When the treatment provider to SDP ratio is substantially above the generally accepted ratio, "the quality and quantity of treatment – even under the very best circumstances with the very best intentions and in the best setting – is handicapped." (Doc. 124-1, p. 4).  As of November 2025, the ratio of treatment providers to SDPs at Big Muddy is approximately 1 to 21 – still below the generally accepted ration according to Dr. Cauley (Doc. 367, p. 48).

With respect to the Wexford recovery/release evaluations, Dr. Cauley offered the following opinions: "tests were presented as having 'considerable predictive validity' when they actually have very little. Indicators of risk were underscored as predicting future sexual violence when these items have shown minimal research outcomes as being predictive" (Doc. 124-1, p. 18). Important topics such as age or the passage of time were not given any attention in the evaluations. (*Id.*; Doc. 261, pp. 44-45).  The Wexford evaluations are based largely on past acts to assess the current condition of the SDP.  "Both sexual recidivism risk as well [as] antisocial traits decline beginning at age 40, and rapidly decline after age 60.  These reviews do not provide an accurate

conception of current or future risk (Doc. 124-1, p. 18).  The Wexford evaluations "do not adhere to generally accepted practice or evidence-based decision making." *Id*.

After reviewing supplemental documentation following trial, Dr. Cauley continued to have concerns about the Wexford evaluations (Docs. 336, 368).  Specifically, he was concerned that Wexford evaluators are not regularly conducting interviews as part of the evaluation process.  He opined that for the evaluation to comply with relevant generally accepted practices or with ethics related standards, an interview must be offered before an opinion is given. The individual may decline the interview, and the evaluator can still proceed, but the offer must be made. He further opined that the Wexford evaluations are weighted by offense history and not driven by treatment progress, insight, behavioral change, or by changes due to age.  As a result, past conduct drives up the appearance of current risk, which in turn indicates the SDP's condition has not changed due to treatment, the passage of time, or individual mitigating items.  Given that context, the SDPs cannot achieve release as the assessment will always show their risk as unchanged.  *Id.*

After reviewing supplemental documentation following trial, Dr. Cauley also opined that although treatment planning as written appeared adequate, the implementation of that plan for individuals was lacking. The SDPP continues to fall below the generally accepted standards with respect to the amount of therapy offered.  With respect to treatment planning, the implementation for individuals is lacking due to overall erratic scheduling of treatment modalities and low treatment hours.  Groups are started and then terminated or suspended, groups are too large, and groups are canceled frequently.  Dr. Cauley opined that SDPs lack clear guidelines for treatment completion or projected timeframes for progression.  *Id.*

## <u>LEGAL STANDARDS</u>

The Fourteenth Amendment prohibits the State from depriving any person of life, liberty, or property without due process of law. In the context of civil commitment, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed. *See Kansas v. Hendricks,* 521 U.S. 346, 356 (1997). "If the object or purpose of the [state] law [is] to provide treatment but the treatment provisions were adopted as a sham or mere pretext, there would [be] an indication of the forbidden purpose to punish…if civil confinement were to become a mechanism for retribution or general deterrence...[Supreme Court] precedents would not suffice to validate it." *Hendricks*, 521 U.S. at 371-73; *see also Bell v. Wolfish,* 441 U.S. 520, 535 (1979) (the purpose must not be punitive, as punishment is reserved for the criminal system). Thus, the Fourteenth Amendment mandates that civil detainees receive treatment for the disorders that led to their confinement and be released when they have improved enough no longer to be dangerous. *Hughes v. Dimas*, 837 F.3d 807, 808 (7th Cir. 2016).

Detention under the SDPP is a rehabilitative civil remedy – not punitive – and is to be employed for incapacitation and treatment. *See, e.g., Allison v. Snyder,* 332 F.3d 1076, 1079 (7th Cir. 2003); *see also Lane v. Williams*, 689 F.3d 879, 885 (7th Cir. 2012) (it is beyond dispute that the purpose of detention is not punitive – detainees' commitment is meant to be rehabilitative and aimed at the goal of their ultimate release). Due process requires state officials to provide civilly committed persons with access to mental health treatment that gives them a realistic opportunity to be cured or to improve the mental condition for which they were confined. *See Youngberg v. Romeo,* 457 U.S. 307, 319–22 (1982). The State "enjoy[s] wide latitude in developing treatment regimens [for sex offenders]," *Hendricks,* 521 U.S. at 368 n. 4, and "liability [on a claim of constitutional deprivation] may be imposed only when the decision by the professional is such a

substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg,* 457 U.S. at 323; *Allison*, 332 F.3d at 108.

In the past, the Seventh Circuit applied the same standard to substantive due process claims arising under the Fourteenth Amendment and deliberate indifference claims arising under the Eighth Amendment. *See Smith v. Dart*, 803 F.3d 304, 309-10 (7th Cir. 2015). And in analyzing the professional judgment standard, the court initially concluded that there is minimal difference in what the two standards require of state actors and that the standard is "at least as demanding" as the Eighth Amendment deliberate indifference standard. *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998).

The subjective element of the deliberate indifference standard was rejected by the Supreme Court in *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015) ("The question before us is whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officers' use of that force was *objectively* unreasonable. We conclude that the latter standard is the correct one."). And in *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018), the Seventh Circuit expanded *Kingsley's* logic to medical care claims brought by pretrial detainees under the Fourteenth Amendment so that a pretrial detainee need only establish that the defendant's conduct was objectively unreasonable – not that the defendant was subjectively aware that it was unreasonable. *Miranda*, 900 F.3d at 352-53. The rationale of *Kingsley* and *Miranda* extends to *Youngberg's* "substantial departure from accepted professional judgment" standard – an objective inquiry into prevailing medical standards and whether a reasonable professional, applying those standards, would have made the same decision considering the facts in a case.

## CONCLUSIONS OF LAW

### Counts I and II – Failure to Provide Adequate Treatment

Actual *treatment* of the civilly confined is what separates commitment from punishment and incarceration.[8]  Without adequate treatment designed to effectuate ultimate release, a civil commitment program is nothing more than a de facto prison disguised as a mental health facility. The Constitution clearly dictates that a civil detainee cannot simply be warehoused and put out of sight; they are not prisoners and must be afforded adequate treatment.  Specifically, they are entitled by law to "more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg,* 457 U.S. at 322; *see also Allen v. Illinois*, 478 U.S. 364, 370 (1986) ("In short, the State has disavowed any interest in punishment, provided for the treatment of those it commits, and established a system under which committed persons may be released after the briefest time in confinement.").  The Big Muddy SDPP operates contrary to these important principles.

Treatment must be more than mere window dressing to comply with the SDPA – it must enable a true path to release.  But the Big Muddy SDPP as constituted affords Plaintiffs no realistic opportunity to be cured or to improve their mental conditions.  Instead, it has transformed civil confinement into a punitive and potentially lifetime detention, which violates Plaintiffs' due process rights.

As Dr. Cauley explained, providing less than 5 hours of general therapy per week is a substantial departure from accepted professional standards and is objectively unreasonable as it fails to provide a meaningful opportunity for SDPs to meet any of the milestones necessary to

---

[8] Given this obvious distinction in purpose, the Court finds the fact that convicted SVPAs complete treatment at the Rushville Treatment & Detention Center while non-convicted SDPs are committed under the auspices of the Department of Corrections to be curious at best.

move to progress in the program at an acceptable speed.  The credible evidence (data collected from SOCCPN and review of the Rushville program) establishes that five hours per week is the minimum acceptable number of hours for group therapy.

For years, Plaintiffs have received far below the minimum acceptable number of hours of treatment per week as dictated by professional standards.  At the time of trial, Plaintiffs averaged just one hour of treatment per week.  This increased to 90 minutes per week in 2019.  Treatment ceased altogether in 2020, purportedly due to COVID-19 restrictions.  In 2022 and 2023, Plaintiffs averaged an hour or less of treatment per week.  In the last year, Plaintiffs have received on average between 1.8 and 2.4 hours of group therapy per week.  Therapy sessions were frequently cancelled and not rescheduled due to low staffing or other excuses.  Only since October 2025 does it appear that some SDPs have been offered up to five hours of sex offender treatment per week.

The SDPP's ratio of treatment providers to SDPs is also inadequate to meet meaningful treatment goals.  The ratio of therapists to SDPs has been as high as 1 to 42.5, which is a far departure from the generally accepted ratio of 1 to 10.  As of October 2025, the ratio has been reduced to 1 to 21 – still above the generally accepted ratio.

Dr. Cauley persuasively testified that the minimum hours of general group therapy offered per week coupled with the ratio of therapist to SDPs handicaps the delivery and effectiveness of treatment: "[c]ohesion, trust, and meaningful work are lost to simple issues of trying to simply organize and focus the group."  Large groups have the inevitable effect of slowing progress, "as the group members have long periods of time between presentations, times of exploring their own issues and processing their own offense cycles."  These inherent flaws result in treatment that is slow, repetitive, and not catered to the mission of treating the plaintiffs and returning them to the community as quickly as possible.

The offense specific and didactic group modalities fare no better. The most glaring problem was the number of these groups that have been on hold or cancelled due to low staffing. These treatment modalities are critical treatment components and should be available to SDPs at all times. As Dr. Cauley opined, these essential programs "tie into offense and re-offense at a basic, primary level. Without addressing these precursors to a sexual crime other work is not grounded." Again, only in the last several months has the SDPP begun offering offense-specific and didactic groups previously suspended due to low staffing. As the Seventh Circuit held, "the state may not continue to rely on cost and logistical difficulties to evade its constitutional obligations." *Howe*, 74 F.4th at 858-59.

Plaintiffs are evaluated twice a year by their primary therapists. These semi-annual evaluations are relied upon by the therapists in developing six-month treatment plans. Since July 2020, the evaluations have been conducted utilizing Stable 2007 and Static 99-R, which according to Defendants are meant "to better inform treatment plans and goals for SDPs moving forward." Defendants assert that SDPs are provided a one-on-one initial evaluation with their primary therapist from which a treatment plan is developed. The plan is utilized to help the SDP work toward their individual therapy goals. Evaluations are an integral part of an SDPs ability to move through the program.

Under the statute, an SDP may petition the committing court to be released. Once an SDP petitions for release, a Wexford employee evaluates the SDP under the Illinois Sex Offender Evaluation and Treatment Provider Act ("recovery evaluation"). 725 ILCS 205/9(a). The purpose of the Wexford evaluation is to analyze the ***current and future risk*** the SDP poses and to ultimately make a recommendation for or against discharge or conditional release from the program. In other

words, in determining whether the petition will be granted, the central question is whether the SDP has so changed that he is no longer likely to engage in predatory acts of sexual violence.

Significantly, Dr. Cauley opined that the facility and Wexford evaluators scored the Stable 2007 incorrectly. The Stable-2007 assessment places most weight on the last year, looking forward to what the individual most likely will be like in the coming year. However, Plaintiffs' scores were weighted by offense historical information more than treatment effects and scored contrary to clinical notes found in the files. The scores were also too high. Dr. Cauley opined that inaccurate scoring could impact recovery reports and any chances of Plaintiffs being released.

The Wexford reviews are the primary tool that courts use to evaluate whether a civilly committed person should be conditionally released. The deficiencies in the risk assessments have clearly transformed Plaintiffs' civil confinement into punitive, lifetime detentions in violation of the Due Process Clause. Plaintiff Needs has been civilly detained for over 45 years, while Plaintiff Kahal has been detained for 26 years. A civilly committed sex offender is entitled to "immediate release upon a showing that [he] is no longer dangerous or mentally impaired." *Kansas v. Hendricks*, 521 U.S. 346, 368–69 (1997). Without adequate risk assessments, Plaintiffs will continue to languish at Big Muddy without a reasonable hope of ever being released.

In sum, with respect to the claims asserted in Counts I and II, the Court concludes that Defendants continue to fail in their obligation to provide Plaintiffs with statutorily required rehabilitative treatment. Consequently, the SDPP, as currently structured and implemented, fails to meet generally acceptable professional standards and violates Plaintiffs' right to due process as guaranteed by the Fourteenth Amendment.

## DISPOSITION

The Due Process Clause of the United States Constitution requires that the nature and

duration of the confinement bear some reasonable relation to the confinement's non-punitive civil purpose. Thus, the State must ensure that it civilly confines individuals only so long as they are both mentally ill and dangerous to the public. Confinement beyond that point or confinement which imposes restrictions that are so excessive as to indicate the purpose is punitive rather than rehabilitative in nature is unconstitutional.

The evidence in this case establishes that the Sexually Dangerous Persons Program at Big Muddy River Correctional Center continues to suffer from systemic failures which has resulted in Plaintiffs being detained indefinitely with no real hope of being released. As such, this Court therefore finds that Defendants have deprived Plaintiffs due process in violation of the Fourteenth Amendment.

The Court further finds the Plaintiffs have established by a preponderance of the evidence that the issuance of a permanent injunction is warranted and necessary. The evidence establishes that there are systemic and gross deficiencies in the provision of therapy services, therapist to SDP staffing ratios, and recovery evaluation which place the Plaintiffs at a significant risk of harm. Therefore, the Court specifically concludes that Plaintiffs have suffered or will suffer irreparable injury if a permanent injunction is not issued given the significant deficiencies in the delivery of mental health services via the SDPP.

The Court further finds that there are no adequate remedies available at law to compensate Plaintiffs for their injuries. Plaintiffs are confined within the IDOC; Defendants are required to provide adequate mental care and treatment. Thus, the balance of hardships and public interest weigh heavily in Plaintiffs' favor.

For the foregoing reasons, Plaintiffs Jacob Kallal and George Needs' Request for a Permanent Injunction with respect to the claims asserted in Counts I and II (Doc. 10) is **GRANTED**.

The Court simply cannot allow Plaintiffs' constitutional rights to continue to be so blatantly disregarded and violated. While the Court recognizes that correcting systemic and structural deficiencies to comply with a court-imposed order to provide specific relief to the plaintiffs herein may pose a significant challenge to Defendants, the Constitution mandates that they meet the challenge and do so expeditiously.

Accordingly, the following permanent injunctive relief is **ORDERED**:[9]

1. Plaintiffs shall receive a minimum of 5 hours of group therapy per week;

2. Recovery/release evaluations shall analyze the current and future risk the SDP poses based on treatment effects rather than solely historical information.

Defendants are further **ORDERED** to file a status report **under seal** regarding their compliance with the instant Order **within 60 days** of its entry.

**IT IS SO ORDERED.**

**DATED:  March 30, 2026**

**STACI M. YANDLE**
**Chief United States District Judge**

---

[9] Absent class certification, the Court may not order injunctive relief for SDPs other than the plaintiffs herein. Obviously however, Defendants' task would be made easier by addressing and correcting the program deficiencies across the board rather than in a piecemeal fashion.